# EXHIBIT 8



    

2200 Sixth Avenue, Suite 425, Seattle, WA 98121 • 206.389.9321 • Toll Free: 855.329.0919    2208 North 30th Street, Suite 202, Tacoma, WA 98403 • 253.627.6401 • Toll Fee: 800.649.2034

# ONE-WEEK TRANSCRIPT TURNAROUND

Digital Transcripts • Internet Realtime • HD Legal Video • Picture-in-Picture Depositions
Remote Depositions • Designation Editing • Nationwide Scheduling • HD Videoconferencing

Thank you for choosing BA Litigation Services for your court reporting, legal video, and deposition technology needs. It is always our goal to provide you with exceptional service. If there is anything we can do to assist you, please don't hesitate to let us know.

*Sarah Fitzgibbon, CCR*
Vice President



The Premier Advantage™
PDF transcript bundle contains:

• Full-size and condensed transcripts
• Printable word index
• Hyperlinked selectable word index
• Embedded printable exhibit scans
• Hyperlinked selectable exhibit viewing
• Common file formats: txt, lef, mdb
  accessed via *paperclip* icon

STRATEGY  •  TECHNOLOGY  •  DESIGN  •  DEPOSITIONS

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON

 3            WESTERN DISTRICT OF WASHINGTON

 4                     AT SEATTLE

 5   ------------------------------)

 6   STATE OF WASHINGTON, et al.,  ) NO.2:25-cv-00244-LK

 7                    Plaintiffs, )

 8            v.                   )

 9   DONALD J. TRUMP, in his       )

10   official capacity as President )

11   of the United States, et al., )

12                    Defendants. )

13   ------------------------------)

14                        Washington, D.C.

15                        Thursday, April 3, 2025

16

17       Deposition of MICHELLE G. BULLS, a witness

18   herein, was called for examination by counsel for

19   Plaintiffs in the above-entitled matter, pursuant to

20   notice, the witness being first duly sworn by

21   BESS A. AVERY, a Notary Public in and for the

22   District of Columbia, taken at the offices of B&A

23   Litigation Services, 1029 Vermont Avenue, N.W.,

24   Washington, D.C., commencing at  9:06 a.m., when

25   were present on behalf of the respective parties:
```



```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF STATE OF WASHINGTON:

 3        WILLIAM MCGINTY, ESQ.

 4        LAURYN K. FRAAS, ESQ.

 5        Assistant Attorneys General

 6        Attorney General of Washington

 7        800 Fifth Avenue, Suite 2000

 8        Seattle, Washington  98104-3188

 9        (360) 709-6027

10        william.mcginty@atg.wa.gov

11        lauryn.fraas@atg.wa.gov

12   ON BEHALF OF THE DEFENDANTS:

13        VINITA B. ANDRAPALLIYAL, ESQ., SR. COUNSEL

14        CHRISTIAN S. DANIEL, ESQ., TRIAL ATTORNEY

15        ROBERT BOMBARD, ESQUIRE

16        UNITED STATES DEPARTMENT OF JUSTICE

17        Civil Division, Federal Programs Branch

18        1100 L Street, NW

19        Washington, DC  20530

20        (202) 305-0845

21        Vinita.B.Andrapalliyal@usdoj.gov

22        Christian.S.Daniels@usdoj.gov

23

24   ALSO PRESENT:  Miranda Berge, Esq. - HHS

25                  Anna Jacobs, Esq. - HHS
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
1                    I N D E X

2    Witness:                                    Page

3        MICHELLE G. BULLS

4            Examination by Mr. McGinty. . . . . . 6

5            Examination by Ms. Andrapalliyal. . . 184

6            Further Examination by Mr. McGinty. . 204

7

8

9

10                      - - -

11                 E X H I B I T S

12
```

```
13   Bulls Deposition Exhibits                    Page

14   Exhibit 1  Subpoena Duces Tecum  . . . . . . . . . 11

15   Exhibit 2  Resume of Michelle G. Bulls . . . . . . 33

16   Exhibit 3  Presidential Documents from the . . . . 49

17       Federal Register Vol. 90, 1/20/2025

18   Exhibit 4  Termination letter, dated 2/28/25 . . . 66

19   Exhibit 5  Exhibit 5, article from journal . . . . 77

20       Nature

21   Exhibit 6  NIH Grants Management Staff . . . . . . 91

22       Guidance - Award Assessments for

23       Alignment with Agency Priorities -

24       3/2025
```

```
25
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

1              E X H I B I T S   (Continued)

2

3   Exhibit 7  Memo from NIH to Institute and  . . . . 99

4         Centers Chief Grants Management

5         Officers, 2/13/2025

6   Exhibit 8  Memo from NIH to Institute and  . . . .104

7         Center Chief Grants Management Officers,

8         2/12/2025

9   Exhibit 9  Exhibit B - Notices of Awards . . . . .106

10  Exhibit 10 HSS Notices of Award  . . . . . . . . .112

11  Exhibit 11 NIH Office of Extramural Research . . .118

12         letter to Patrick Donnell, 3/12/2025

13  Exhibit 12 NIH Office of Extramural Research . . .122

14         letter to Julie C. Tang, 3/18/2025

15  Exhibit 13 NIH Office of Extramural Research . . .125

16         letter to  Garrett M. Steed, 3/21/2025

17  Exhibit 14 E-mail from Office of Sponsored . . . .126

18         Programs to Carol Rhodes

19  Exhibit 15 NIH letter to Carol Rhodes, . . . . . .129

20         3/18/2025

21  Exhibit 16 NIH letter to Lester Warnac . . . . . .132

22         Villaflor, 3/20/2025

23  Exhibit 17 NIH letter to Carole Rhodes,  . . . . .134

24         3/12/2025

25

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1              E X H I B I T S   (Continued)

 2

 3    Exhibit 18 E-mail from UW-AOR to Carol Rhodes, . .136

 4         3/21/25

 5    Exhibit 19 NIH letter to Carol Rhodes, . . . . .139

 6         3/20/2025

 7    Exhibit 20 NIH Grants Policy Statement . . . . .141

 8    Exhibit 21 Spreadsheet of terminations . . . . .180

 9    Exhibit 22 Revised version of Exhibit 21 . . . . .182

10

11
12(all exhibits retained)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              P R O C E E D I N G S

 2                  -   -   -   -   -

 3            (Bulls Deposition Exhibit 1 was

 4             premarked.)

 5   Thereupon,

 6                  MICHELLE G. BULLS,

 7   was called as a witness by counsel for Plaintiffs,

 8   and, having been duly sworn by the Notary Public,

 9   was examined and testified as follows:

10                     EXAMINATION

11   BY MR. McGINTY:

12       Q    Could you state your name and spell your

13   last name for the record, please.

14       A    Sure.  Michelle Bulls, B-U-L-L-S.

15       Q    Great.  And have you ever been deposed

16   before?

17       A    No.

18       Q    Okay.  So just in terms of ground rules,

19   we're here so that I can ask you some questions

20   about what you know about the case.  I'll ask you

21   questions and you'll answer them unless you're

22   instructed by counsel not to do so.

23            Is that fair?

24       A    That's fair.

25       Q    Okay.  It's important we make a clear
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1  record, so please wait for me to ask my question and

 2  I'll wait for you to answer.  Is that fair?

 3      **A    That's fair.**

 4      Q    If you don't understand a question, will

 5  you tell me?

 6      **A    Yes.**

 7      Q    Great.  And if you answer a question, I'm

 8  going to assume that you understood it.

 9          Is that fair?

10      **A    That is fair.**

11      Q    This isn't an endurance test.  If you need

12  to take a break for any reason, let me know.  I'll

13  try to accommodate you as soon as I can.  I just ask

14  that you answer any question that's pending before

15  we take a break.  Is that fair?

16      **A    That's fair.**

17      Q    Okay.  Now, do you understand that you are

18  testifying under oath today?

19      **A    Yes.**

20      Q    And what's your understanding of

21  testifying under oath?

22      **A    That I need to tell the truth.**

23      Q    Okay.  And why is it important that you

24  tell the truth when you're under oath?

25      **A    Because you need to understand the facts**

1    as I know them and they need to be true.

2        Q    Okay.  And you agree that you're going to

3    tell the truth today?

4        A    I do.

5        Q    Okay.  Is there any reason that you can't

6    answer my questions truthfully today?

7        A    No.

8        Q    Okay.  Has anyone told you not to tell the

9    truth at this deposition?

10       A    No.

11       Q    Okay.  Has anyone threatened you or told

12   you that bad things would happen if you told the

13   truth?

14       A    No.

15       Q    Has anyone told you that good things would

16   happen if you didn't tell the truth?

17       A    No.

18       Q    Okay.  How did you prepare for this

19   deposition?

20       A    I read through e-mails and just

21   familiarized myself and spoke with counsel.

22       Q    What e-mails did you read through?

23       A    E-mails that I received.

24       Q    Okay.  And who did you receive those

25   e-mails from?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1       **A       E-mails from my supervisor.**

2       Q    Okay.   Who is your supervisor?

3       **A       My supervisor was Liza Bundesen.**

4       Q    Bundesen?

5       **A       Mm-hmm.**

6       Q    Is that the only person who sent you

7  e-mails that you reviewed?

8       **A       Yes.**

9       Q    Okay.  Did you review any e-mails that

10  you've sent?

11      **A       Yes.**

12      Q    Okay.  What e-mails that you sent did you

13  review?

14      **A       I reviewed e-mails that I sent to Chief**

15  **Grants Management Officers.**

16      Q    Okay.  And, just, could you tell me what a

17  Chief Grants Management Officer is?

18      **A       It's an officer that is in the Funding**

19  **Institutes and Centers that is authorized to make**

20  **NIH awards on behalf of NIH and HHS.**

21      Q    Okay.  And when you sent those e-mails,

22  would they have been sent to all the Chief Grants

23  Management Officers or just to some of them?

24      **A       Some of the e-mails were sent to all of**

25  **them.**

1      Q      And some of them were sent to less than

2  all of them?

3      **A      Correct.**

4      Q      Okay.  And so for those that were sent to

5  less than all of them, who were those sent to?

6      **A      The -- I don't recall the institutes that**

7  **they were sent to, I apologize.**

8      Q      Do you recall the people?

9      **A      I recall one person.**

10      Q      Okay.  Who is that?

11      **A      Maggie Young.**

12      Q      Maggie Young?

13      **A      Mm-hmm.**

14      Q      And Maggie Young is the Chief Grants

15  Management Officer for?

16      **A      The Child Health Institute.**

17      Q      Okay.  Is that NICHD?

18      **A      Correct.**

19      Q      Okay.  So you reviewed e-mails from your

20  supervisor, Liza Bundesen.  You reviewed e-mails

21  that you sent to Chief Grants Management Officers.

22          Did you review any other documents?

23      **A      In e-mail form?  Yes, I did.**

24      Q      Okay.  What other -- so you reviewed other

25  documents in e-mail form?  Is that what you just

1    said?

2        A    Yes, I was trying to -- when you said,

3    "other documents," I was trying to understand what

4    you meant.

5        Q    Sure.  No, that's fair.

6             So what other documents in e-mail form did

7    you review?

8        A    I reviewed the -- I don't know what it's

9    called, where you -- where I'm supposed to come and

10   provide documentation, or provide documentation for

11   the -- this session.

12       Q    Sure.  No, that's fair.  Okay.

13       A    For this deposition.

14       Q    I'll go ahead and hand you what has been

15   marked Exhibit 1.

16            (Bulls Deposition Exhibit 1 was introduced

17             into the record.)

18            MR. McGINTY:  Give a copy to counsel.

19            (Document tendered to Ms. Andrapalliyal)

20   BY MR. McGINTY:

21       Q    Is this the document that you were just

22   referring to?

23       A    Yes.

24       Q    Okay.  And just for the record, this is

25   the Subpoena Duces Tecum that was served upon you

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    for today's testimony and a production of documents,

2    right?

**3          A    Correct.**

4          Q    Okay.

5               MS. ANDRAPALLIYAL:  I just want to, sorry,

6    state for the record we do have a standing objection

7    to the testimony here today.  This Subpoena Notice

8    and Deposition Notice were served in accordance with

9    expedited discovery that the Court ordered in

10   connection with its order denying the Court's motion

11   for -- or, the Plaintiff's Motion for Contempt.  And

12   that motion concerns a grant that NIH terminated.

13               That grant has been since reinstated, and

14   so it's our position that those discovery

15   requests -- and I say discovery in general -- has

16   been mooted.  That being said, we understood that

17   this deposition is moving forward today, but we just

18   wanted to make that objection for the record.

19               MR. McGINTY:  Okay.  I won't respond to

20   that right now, but if we need to follow up, we

21   will.

22   BY MR. McGINTY:

23          Q    Okay.  So you said that you reviewed other

24   documents in e-mail form.  And when you answered

25   that question as to what documents in e-mail form

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   you reviewed, I think you said this Subpoena that I
2   just put in front of you marked as Exhibit 1.
3           Is that right?
4       A    That's right.
5       Q    Okay.  I'm going to get to the Subpoena in
6   a little bit, but are there any other documents,
7   other than the ones you've talked about, e-mails
8   from your supervisor, e-mails that you sent, this
9   Subpoena document, any other documents that you
10  reviewed in preparation for today's deposition?
11      A    No other documents.
12      Q    Okay.  And did you talk to anybody in
13  preparation for today's deposition?
14      A    Yes.
15      Q    Okay.  Who did you talk to?
16      A    I spoke with the Office of General Counsel
17  and DOJ.
18      Q    Okay.  And did you talk to anybody else?
19      A    My husband.
20      Q    Okay.  What did you tell your husband?
21      A    I need you to take me.
22      Q    Okay.  Anything else?
23      A    No.
24      Q    Okay.  You didn't talk to anybody else
25  about today's deposition?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1       **A     The counsel.**

2       Q     Oh, yeah, yeah.  What I meant is, you

3  talked to DOJ, you talked to OGC, Office of General

4  Counsel?

5       **A     Yes.**

6       Q     And you talked to your husband?

7       **A     I talked to my husband.  And I alerted my**

8  **supervisor, my current supervisor, that I had to**

9  **come to the deposition.**

10      Q     Okay.  And who is that?

11      **A     Jon Lorsch.**

12      Q     Jon Lorsch?  Can you spell that for me.

13      **A     L-O-R-S-C-H.**

14      Q     Okay.  And did you talk substantively

15  about what your testimony might be today?

16      **A     No.**

17      Q     Okay.  Did he ask any questions?

18      **A     No.**

19      Q     Okay.  Let's turn to the Subpoena that's

20  been marked as Exhibit 1.  So you got a copy of

21  this?

22      **A     Yes.**

23      Q     Okay.  And when did you get a copy?

24      **A     I'm not sure.**

25      Q     All right.  If you could turn to page 5 of

1    Exhibit 1, there's a numbered list titled, "Requests

2    for Production."  Do you see that?

3         A    Yes.

4         Q    Did you review that before today?

5         A    Yes.

6         Q    Okay.  And what efforts did you make to

7    collect the documents that were asked for here?

8         A    I went through my e-mails and tried to

9    find anything that I could provide.

10        Q    Okay.  And did you find e-mails that would

11   match the descriptions in this list?

12             MS. ANDRAPALLIYAL:  Objection, calls for a

13   legal conclusion.

14   BY MR. McGINTY:

15        Q    You can answer.

16             (Witness reviews document)

17             THE WITNESS:  Yes.

18   BY MR. McGINTY:

19        Q    Okay.  What e-mails were those?

20        A    The e-mail that I sent to -- oh.  Well,

21   the e-mails that I received related to the

22   termination.

23        Q    Mm-hmm.

24        A    The e-mails that I sent to the Chief

25   Grants Management Officers related to the

1  **termination, the letter of termination, and a**

2  **response -- responses to requests for me to make the**

3  **termination.**

4      Q    Okay.  When you say, "the termination,"

5  you're talking about termination of a grant where

6  Dr. Kym Ahrens was the principal supervisor at

7  Seattle Children's Hospital.  Is that what you're

8  talking about?

9      **A    I'm talking about that includes, yes, the**

10  **grant.**

11      Q    Okay.  And anything else?

12      **A    I don't recall.**

13      Q    Okay.  Did you only look for e-mails, or

14  did you look for any other kinds of documents?

15      **A    E-mails.**

16      Q    Only e-mails?

17      **A    (Nodding head)**

18      Q    Okay.  Is that because no other documents

19  exist or because you didn't look?

20      **A    The e-mails had other documents attached.**

21      Q    Okay.  So let's just go through, I guess.

22  Let's start with Number 1.  This request calls for

23  all drafts in your possession, custody, or control

24  of the following documents included as an exhibit to

25  the declaration of Kym Ahrens and William McGinty.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1          Did you get copies of those documents so
 2   you could verify that you had -- to see if you had
 3   other copies of those versions of documents?
 4        A    No.
 5        Q    You didn't get copies of those?
 6        A    I don't recall.
 7        Q    Okay.  So Number 2 asks for all drafts in
 8   your possession, custody, or control of the document
 9   titled "Staff Guidance - Award Assessments for
10   Alignment with Agency Priorities - March 2025."
11          Do you know what document that's talking
12   about, Staff Guidance - Award Assessments for
13   Alignment with Agency Priorities?
14        A    Yes.
15        Q    Okay.  And do you have a copy of that?
16        A    Yes.
17        Q    Okay.  And did you give that to counsel?
18        A    Yes.
19        Q    Okay.  How many versions of that exist?
20        A    At the time I gave it to counsel or today?
21        Q    Today.
22        A    Probably two or three.
23        Q    Two or three versions of that exist?
24        A    Maybe -- yeah, I'll say three.
25        Q    Three?  Three that exist.
```

1          And how many versions existed when you

2    gave it to counsel?

3          MS. ANDRAPALLIYAL:  Objection.  That's

4    privileged information.

5          I'm going to instruct you not to answer.

6    BY MR. McGINTY:

7      Q    Okay.  When is the most recent version of

8    that document dated?

9          MS. ANDRAPALLIYAL:  Objection.  To the

10   extent it's calling for draft information,

11   privileged, I'm going to instruct you not to answer.

12         MR. McGINTY:  She just testified that

13   there's three versions of the document.  She

14   testified there's three versions of the document.

15   BY MR. McGINTY:

16     Q    Are any of those -- were any of those used

17   to implement NIH policy?

**18     A    They were used to provide guidance.  And**

**19   there's the one document, that was used to provide**

**20   guidance.  The rest of them have been draft versions**

**21   trying to update the guidance, so.**

22     Q    Okay.  Were they distributed to NIH staff?

23         MS. ANDRAPALLIYAL:  Objection.  To the

24   extent we're talking about drafts, I'm going to

25   instruct you not to answer on privileged grounds.

1          MR. McGINTY:  The question doesn't call

2    for the content of any document.  You substantiate

3    your objection on privilege?

4          MS. ANDRAPALLIYAL:  Well, the deliberative

5    process privilege doesn't just cover the contents of

6    the document, but it covers the communications that

7    go into the deliberative process.  And so timing and

8    who received what, that's part of the process that

9    should be protected.

10   BY MR. McGINTY:

11        Q    So it's your testimony today that only one

12   version of that document was ever used by NIH staff

13   for purposes of implementing NIH policy?

14        **A    I don't know if they used it.  It was**

15   **provided to them to provide guidance to them on how**

16   **to implement or assess their portfolios.  So --**

17        Q    Okay.

18        **A    -- I don't know.**

19        Q    It was given to them so that they could

20   assess their portfolios in conformance with the

21   guidance?

22        **A    Yes.**

23        Q    So it was used by them to assess their

24   portfolios.  Is that right?

25        **A    That is correct.**

```
 1        Q    Okay.
 2             MR. McGINTY:  Do you maintain your
 3   privilege objection, Counsel?
 4             MS. ANDRAPALLIYAL:  I maintain the
 5   privilege objection as to drafts.  I don't maintain
 6   it as to the final version.
 7             MR. McGINTY:  Okay.
 8   BY MR. McGINTY:
 9        Q    How many versions of that document were
10   used to, for staff to assess their portfolios?
11        A    Can you repeat that question.
12        Q    Yeah.  I guess I'm trying to understand is
13   how many versions of that document were actually
14   used for the purposes of NIH doing its work,
15   including assessment of portfolios?  Was it all
16   three, was it only two, was it only one?
17        A    So they only received instructions to use
18   the first version.  The second and third versions
19   are versions that we worked on together as they had
20   questions and I answered them through the Staff
21   Guidance.
22        Q    Okay.  But did they use those versions to
23   assess their portfolios?
24        A    I don't know if they used those versions
25   to assess their portfolios.
```

1      Q    Okay.  Were they instructed to?

2      A    **They were instructed to -- they were**

3   **instructed to use the Staff Guidance to assist them**

4   **in addressing, because they had questions, to assist**

5   **them in addressing their questions and concerns.  So**

6   **if that is considered.**

7      Q    If that is considered?

8      A    **If that's considered giving, telling them,**

9   **or using it as Staff Guidance to assess their**

10  **portfolio, then yes.**

11     Q    Okay.  So, and how many -- so it sounds

12  like, if I'm understanding this right, and tell me

13  if I'm wrong, it sounds like there was a version of

14  the document that was sent out to staff, they were

15  instructed to use this to assess their portfolios,

16  if they had questions, the document changed in

17  response to their questions.  They continued to use

18  the updated version to assess their portfolios.

19          Am I right so far?

20     A    **They were uncomfortable with using all of**

21  **the new, you know, the additional pieces because we**

22  **were still awaiting additional guidance.  So they**

23  **had questions about the original, we addressed those**

24  **questions.  And staff were still a little hesitant**

25  **about using -- some staff were hesitant about using**

1    it, but they wanted to have it so that when they

2    were able to use it, they could.

3        Q    Okay.  So some staff were using it and

4    some staff didn't want to.  Am I understanding that

5    right?

6        A    Yes.

7        Q    Okay.  And right now we're talking about

8    the second version?

9        A    Yes.

10        Q    Okay.  And then there were continued

11    questions about this, and so you got more questions

12    about it, and a third version was created.  Is that

13    right?

14        A    Yes, yes.

15        Q    Okay.  And this third version, was that

16    used by staff to assess their portfolios?

17        A    I don't know.

18        Q    You don't know.  Okay.  Why not?

19        A    Because we were still -- they were still

20    waiting for me to issue the final guidance.

21        Q    And that has yet to be done?

22        A    And that has yet to be done.

23        Q    Okay.  So the first one has been used to

24    assess portfolios.  The second one was used by some

25    people to assess portfolios.  The third one you

1   don't know.  And there's a final that's forthcoming?

2        A    Yes.  It's been an evolving document.  And

3   so, like I said, some of them were -- some of the IC

4   staff were comfortable in using the document, some

5   of the staff were, decided that they were going to

6   stop and wait for the final document.  So it's been

7   a bit of back and forth.

8        Q    Okay.  And "IC," Institute/Centers?

9        A    Institutes and Centers.

10       Q    Thank you.

11       A    You're welcome.

12       Q    Let's see.  And then item Number 3 asks

13  for all communications made to or by you related to

14  documents identified in Requests for Production 1

15  and 2.

16            It sounds like there was lots of

17  communications to and by you about all of these

18  documents.  Is that right?

19       A    Yes.

20       Q    Okay.  And did you collect all of those

21  communications?

22       A    I believe I did.

23       Q    Okay.  And you gave them to counsel?

24       A    I believe I did.

25       Q    Okay.  Let's see.  And then all documents

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   in your possession, custody, or control, including

2   communications made to or by you, related to

3   termination of NIH Grant No. -- and then there's a

4   grant number there -- 5R21HD107311.  That's the

5   document we were just talking about with Kym Ahrens

6   as the principal investigator.  Is that right?

7        A    I do recognize the grant number, yes.

8        Q    Okay.  And it sounds like there's all

9   kinds of documents that would be responsive to that

10  one, too?

11       A    Correct.

12       Q    Okay.  And you gave those to counsel?

13       A    I --

14            MS. ANDRAPALLIYAL:  Objection.  Just a

15  standing objection here to the extent that we're

16  going through all these requests that are calling

17  for a legal conclusion where you're asking her

18  whether she has collected all of the documents

19  responsive to these requests.

20            MR. McGINTY:  Are you instructing the

21  witness not to answer?

22            MS. ANDRAPALLIYAL:  No.

23  BY MR. McGINTY:

24       Q    Could you repeat your last answer for me.

25       A    Can you repeat the question.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1       Q    Yes.  I think I just asked you if you gave

2    them to counsel.

3       **A    I believe so.**

4       Q    Okay.  So next one asks for all documents

5    in your possession, custody, or control related to

6    NIH's claims that research programs based on gender

7    identity are often unscientific, have little

8    identifiable return on investment, and do nothing to

9    enhance the health of many Americans.  Many such

10   studies ignore, rather than seriously examine,

11   biological realities.

12           Did you look for documents related to that

13   request?

14      **A    Yes.**

15      Q    Did you find any?

16      **A    It was in the termination letter.  That**

17   **was the language in the termination letter that was**

18   **provided to me.**

19      Q    Okay.  Anything else?

20      **A    No.**

21      Q    Okay.  Number 6 asks for all documents in

22   your possession, custody, or control related to

23   NIH's claim that it is the policy of NIH not to

24   prioritize these research programs.  Do you see

25   that?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **A    Yes.**

2    Q    And did you search for documents like

3    that?

4    **A    I provided the documents that likely had**

5    **this in it, but I was not searching for this**

6    **specific document, if that makes sense.**

7    Q    Okay.  You were looking for documents that

8    had that quoted language?

9    **A    Not the quoted language.  I looked for**

10    **documents that surrounded the termination, and if**

11    **the termination was based on this, it had that in**

12    **it.  I wasn't looking specifically for this, if that**

13    **makes sense.  I gave what I had and what I received,**

14    **and I -- that's what I gave.**

15    Q    Okay.  I guess my question is:

16    What this is asking for is documents

17    that's related to the claim that it is the policy of

18    NIH not to prioritize these research programs, so

19    did you look for any documents about NIH policy?

20    **A    No, I looked for documents related to the**

21    **termination.**

22    Q    Okay.  Did you look for any documents

23    related to the policy that animated the termination?

24    **A    No, I looked for the documents, the letter**

25    **that terminated the grant.**

1    Q    Okay.  Thank you.

2         So moving on to Number 7.  This one asks

3  for all documents in your possession, custody, or

4  control related to NIH's claims that this award

5  related to transgender issue no longer

6  effectuates agency priorities.

7         So did you look for any documents about

8  NIH priorities in response to this question?

9    **A    I looked for the termination documents**

10  **that may have included that language, but I did not**

11  **look for that language.**

12    Q    Okay.  You didn't look for any documents

13  about whether or not it is the policy, or, excuse

14  me, the priority of NIH to fund studies and research

15  related to transgender issues?

16    **A    No, I provided the documents that was**

17  **provided to me that may have included that.  I did**

18  **not search for that.**

19    Q    Okay.  The next one asks for all documents

20  in your possession, custody, or control that include

21  descriptions of policies, procedures, or guidance

22  regarding termination of NIH grants dated between

23  January 20, 2025 and March 6, 2025.  Do you see

24  that?

25    **A    Mm-hmm.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1     Q     Did you look for those kinds of documents?

2     **A     Yes, I provided all of the documents that,**

3     **regarding the termination.**

4     Q     Okay.  And would this have included the

5     document that we were just talking about a minute

6     ago, the Staff Guidance Award Assessments?  Would it

7     have included that one?

8     **A     Yes.**

9     Q     Okay.  Are there any other documents about

10    agency priorities or policies that are dated in that

11    range having to do with grant termination?

12    **A     No, not that I recall.**

13    Q     Okay.  The next one asks for all documents

14    in your possession, custody, or control including

15    communications, policy statements, or guidance

16    documents related to or referencing two Executive

17    Orders.  Do you see that there?

18    **A     Yes.**

19    Q     And did you search for those documents?

20    **A     I provided the documents that led up to**

21    **the termination.  That's all I provided.**

22    Q     Okay.  In response to this request

23    specifically?

24    **A     In response to the request for me to**

25    **provide all documentation that led up to, all the**

1    way through the termination.  That's what I

2    provided.

3         Q    Okay.  How about documents that relate to

4    or reference these two Executive Orders, did you

5    search for that?

6         A    If it was a part of the termination

7    package communication, I did provide it.  But I

8    don't know that I searched for the Executive -- like

9    I didn't provide the Executive Order, I don't

10   believe.

11        Q    Okay.  So you searched for documents that

12   would have related to the termination we've been

13   talking about, but not necessarily anything else?

14        A    Correct.

15        Q    Okay.  Did you search for any documents or

16   any communications between you and any person

17   affiliated with the Department of Government

18   Efficiency?

19        A    I provided all the e-mails, all of the

20   communications, and if that was a part of it, that

21   is part of that package.  I didn't look for any

22   communications with Department of Government

23   Efficiency.

24        Q    Okay.  Were there such communications?

25        A    There was no communication between, that I

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1  can, that I know of, directly between me and anyone

2  in the Department of Government Efficiency.  They

3  may have been copied on the e-mail, but not with me.

4      Q    Okay.  Sitting here today, can you

5  recollect any e-mails that they were copied on?

6      A    Yes, one.

7      Q    Okay.  Can you describe that e-mail for

8  me?

9      A    I believe that was the e-mail that

10 included a list of grants to be terminated.

11     Q    Okay.  So you got an e-mail.  Was it from

12 someone at the Department of Government Efficiency?

13     A    No.

14     Q    No.  They were copied on one.  Who was

15 sending that e-mail?

16     A    The e-mail that I received was from,

17 between me and my supervisor, and there was a string

18 below it.  So I wasn't directly on the e-mail with

19 that individual, it was forwarded to me with a list

20 of the terminations.

21     Q    I see.  And who was your supervisor at the

22 time?

23     A    Liza Bundesen.

24     Q    That was Liza Bundesen?

25     A    Yeah.

1    Q    And she was given a list of terminations?

2    **A    Correct.**

3    Q    And that list came from someone at the

4    Department of Government Efficiency?

5    **A    That list came from Rachel Riley.**

6    Q    Okay.

7    **A    And her address was from HHS Office of the**

8    **Secretary.**

9    Q    Thank you.  And the Department of

10   Government Efficiency was -- how were they involved

11   in that e-mail?

12   **A    Copied.**

13   Q    They were cc'd?

14   **A    I believe.**

15   Q    Okay.  So Rachel Riley at HHS sent it to

16   Liza Bundesen, who sent it to you.  Is that right?

17   **A    Yes.**

18   Q    Okay.  Can you remember anybody else who

19   was included on that e-mail?

20   **A    Not that particular e-mail.  Because one**

21   **of the e-mails came from Dr. Memoli, so those were**

22   **two separate strings, but both termination e-mails.**

23   Q    Oh, okay.  So there's another set of

24   terminations.  Am I understanding that right?

25   **A    It was the same -- yes, yes.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1      Q    Okay.  And that one came from Dr. Memoli?

 2      A    Yes.

 3      Q    But that was -- did it come from the same

 4   person at HHS?

 5      A    Yes, it came from the same person at HHS

 6   to Dr. Memoli that was forwarded to Liza.

 7      Q    I see.  And who is the person in the

 8   Department of Government Efficiency who was copied?

 9      A    I believe his name was Brad.

10      Q    Brad.  Don't remember the last name?

11      A    I don't.

12      Q    Okay, fine.  Okay.

13           So it sounds like there's at least two

14   e-mails that copied someone at the Department of

15   Government Efficiency.  One was forwarded to you by

16   Dr. Bundesen, one was forwarded to you by

17   Dr. Memoli.  Are there any others?

18      A    Dr. Memoli didn't forward the e-mail

19   directly to me.

20      Q    Oh.

21      A    He forwarded it to Liza Bundesen, who

22   forwarded it to me.

23      Q    I see.  Thank you for that clarification.

24      A    You are welcome.

25      Q    Are there any others?

1    A    No.

2    Q    Okay.  Just the two?

3    A    (Nodding head)

4    Q    Okay.

5    A    Yes.

6    Q    Thank you so much.  I did not ask you to

7    verbally answer the questions, and I should have

8    done so, so thank you so much for remembering to do

9    that.

10    A    You're welcome.

11    Q    We also asked for a copy of your CV and

12    your resume.  Did you give that to counsel?

13    A    Yes.

14          MR. McGINTY:  Counsel, do you have any of

15    those documents to provide today?

16          MS. ANDRAPALLIYAL:  Yes.  I believe we've

17    provided you a copy of Ms. Bulls' CV.

18          (Document tendered to Mr. McGinty)

19          MR. McGINTY:  Thank you.  Okay.  Let's go

20    ahead and mark this Exhibit 2.

21          (Bulls Deposition Exhibit 2 was marked for

22           identification.)

23          MR. McGINTY:  Counsel, would it be

24    possible to get a second copy of this?

25          MR. BOMBARD:  For the witness?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1              MR. McGINTY:  I was going to hand the
 2   witness the marked copy, and I would like to be able
 3   to follow along, if possible.
 4              MR. BOMBARD:  Oh.
 5              (Document tendered to Mr. McGinty)
 6              MR. McGINTY:  Thank you.
 7   BY MR. McGINTY:
 8        Q    Okay.  I just handed you what has been
 9   marked as Exhibit 2.  Do you recognize this
10   document?
11        A    Yes.
12        Q    And what is it?
13        A    My resume.
14        Q    Okay.  Feel free to reference this.  I'm
15   just going to ask you to go through your job
16   experience and education history since the time you
17   were 18, if that's possible.  And to the extent you
18   want to reference what's on the CV and point things
19   out to me, I'd appreciate it.
20        A    Starting forward or backward?
21        Q    Starting forward, please.  Let's start,
22   let's go chronological order from the time you were
23   18.
24        A    From the time I was 18, graduated, some
25   community college, cosmetology school, cosmetology
```

1    license.  Joined the government in a Pathways

2    Program.  Worked in the government from, I guess,

3    1989 -- I can't recall, but maybe, yeah -- 1989

4    through now.

5              I worked through Grants Management Clerk,

6    Grants Management Specialist, Grants Management,

7    Officer at NIH.  Went into Policy within the Office

8    of Policy for Extramural Research Administration as

9    an analyst.  Left NIH and went to the Indian Health

10   Service to head up their policy office.

11             Left the Indian Health Service to go to

12   HHS Office of Grants to head up the policy office

13   for HHS.  And came back to NIH as the Deputy

14   Director of the Office of Policy for Extramural

15   Research Administration, and then ultimately was

16   appointed as the Director.

17        Q    Okay.  So you started -- if I understand

18   you correctly, you started with the government

19   through a Pathways Program in 1989.  And then you

20   became a Grant Management Clerk in NIH; is that

21   right?

22        A    In the National Heart, Lung, and Blood

23   Institute.

24        Q    Okay.  And when was that?

25        A    I don't recall.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Okay.  Sometime early '90s?

2    **A    Yes, around -- well, I started as a Grants**

3    **Clerk --**

4    Q    Oh, I see.

5    **A    -- at '89.**

6    Q    So that would be the '89.  Okay.  And then

7    you became a Specialist?

8    **A    A Grants Management Specialist.**

9    Q    Grants Management Specialist.

10   Approximately when?

11   **A    Early '90s.**

12   Q    Early '90s.  And then Grants Management

13   Officer sometime --

14   **A    Mid '90s.**

15   Q    Mid '90s sometime?

16   **A    Late '90s, yes.**

17   Q    Okay.  And then you started as a Policy

18   Analyst in OPERA?

19   **A    Correct.**

20   Q    What were your job duties when you were

21   the Policy Analyst in OPERA?

22   **A    I worked in the Division of Grants Policy**

23   **representing NIH on federal-wide working groups for**

24   **Grants Administration.  I worked on the Grants**

25   **Policy Statement, the NIH Grants Policy Statement.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   Reviewed and analyzed policies and the regulations

2   and provided guidance to the Institutes and Centers.

3        Q    And approximately when was this that you

4   were an OPERA Policy Analyst?

5        A    2001 to, like, 2004 or '5.

6        Q    Okay.  And then approximately then you

7   moved to, you said, the Indian Health Service?

8        A    Correct.

9        Q    And you were -- you said you headed up

10  their Grants Office.  Did I understand that right?

11       A    Their grants policy functions.

12       Q    So what were you doing there?

13       A    Implementing, helping to identify policies

14  under HHS that directly conflicted with the

15  Indian -- I don't even know.  I'm -- Title 25 where,

16  you know, it was the Indian Determination,

17  Self-Determination Act identified how to implement

18  grant administration functions within the department

19  that would not disrupt the tribal programs, provided

20  technical assistance on how to maintain compliance

21  to the tribes with grant regulations and grant

22  policies.

23            Represented Indian Health Service through

24  the department on working with, you know, the Tribal

25  Affairs Office, just trying to make sure that we

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1   acknowledged the rights of the tribes and making

 2   certain that we provided clear and concise tribal

 3   consultation guidance and that kind of thing.

 4       Q    Okay.  And how long were you there?

 5       A    I was there for five years maybe?

 6       Q    Okay.  And then you moved to the HHS

 7   Office of Grants Policy.  Did I understand that

 8   right?

 9       A    Yes.  The HHS Office of Grants, and I was

10   in the -- I was the director for the Policy

11   Division.

12       Q    Okay.  And so if I'm tracking right, we're

13   off to the mid 2000s now?

14       A    I don't know where we are.

15            (Whereupon, laughter)

16   BY MR. McGINTY:

17       Q    Well, when did you move to the HHS Office

18   of Grants Policy from the Indian Health Service?

19       A    I moved there, I want to say, 2009.

20       Q    2009.  Okay.  And what were you doing when

21   you moved to the HHS Office of Grants Policy?

22       A    Providing grants administration guidance

23   for all of the departments under HHS.

24       Q    Okay.  That's a lot of departments.

25       A    Yes, Ops is, yeah, Operations Division.
```

1      Q    So what would that entail?

2      **A    Meeting with the operating divisions,**

3   **talking to them about, you know, they had questions**

4   **about various grants, HHS policy --**

5   **departmental-wide policies.  And I would answer the**

6   **questions, help them implement the policies, have**

7   **meetings to go over guidance.**

8      Q    Okay.  And you started there around 2009.

9   How long were you there?

10     **A    Probably about two and a half, almost**

11  **three years.**

12     Q    Two and a half years.  And then you became

13  the -- did I understand, from there you became the

14  Deputy Director of OPERA Grants Management.  Is that

15  right, or am I saying that wrong?

16     **A    OPERA.  No, just OPERA.**

17     Q    OPERA.  Just OPERA.  Okay.  Great.

18          So Deputy Director of OPERA around 2011?

19     **A    Yes.**

20     Q    Okay.  And when were you appointed the

21  Director?

22     **A    I believe it was 2012.**

23     Q    2012.  Okay.  So let's talk about your

24  role as the Director of OPERA.  What are your duties

25  in that role?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1          A      To provide -- so I have Compliance --
2    no -- oversee Compliance for NIH policies.  Oversee
3    the grants administration functions.  Provide
4    oversight to the Institutes and Centers on grants
5    administration.  Oversee the Federal Financial
6    Reporting Center where all of the financials are
7    submitted and analyzed.
8               And I oversee all of the closeout
9    functions for, administrative and financial, for
10   NIH.  Administrative compliance, foreign
11   interference, and research misconduct compliance and
12   that kind of thing.
13        Q      Okay.  When you say "oversee," what does
14   that mean?
15        A      Provide oversight, like, provide the
16   HHS-wide central level direction and then provide
17   that to the Institutes and Centers for them to
18   implement within their Institutes and Centers, and
19   provide them guidance as needed on implementation.
20   Help them with compliance functions when there's
21   noncompliance.
22               Work with them on different administrative
23   matters that come up either through the
24   administrative business effects of the grants when
25   recipients are noncompliant, or help them develop

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1  corrective action plans for recipients when they're

 2  not compliant.  And, also, oversee how they are

 3  implementing, "they" meaning the Institutions and

 4  Centers are implementing our guidance, going and

 5  looking at their compliance -- using a compliance

 6  model to test to see whether or not they're, you

 7  know, following the guidance that we provide, and

 8  when they don't, providing them with updates on how

 9  they need to manage.  Meeting with them on a

10  consistent basis twice a month to discuss policy and

11  compliance issues and to obtain guidance from them

12  on better ways that we can manage NIH grants.

13       Q    Okay.  So you meet with -- who do you meet

14  with twice a month?

15       A    I meet with the Institutes and Centers,

16  the -- so I service the Agency Chief Grants

17  Management Officer.  And then we have the Institutes

18  and Centers Chief Grants Management Officers that

19  actually issue the awards and oversee the fiscal

20  management of the awards.

21       Q    Okay.  And so it's the two times meeting

22  with the Chief Grant Management Officers.  Is that

23  right?

24       A    Twice, twice a month.

25       Q    Twice a month.  And you talk about,

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1  basically, all of the things that you just went

2  over?

3      A    Correct.

4      Q    Okay.  And in issuing the guidance that

5  you just talked about, when you issue that guidance,

6  is that different or the same as the Staff Guidance

7  that we were just talking about a minute ago on

8  Exhibit 1?

9      A    It's the same in that we communicate about

10  the guidance and they get to ask questions.  It's

11  different because typically we talk about things

12  that we all are working on, and in the grants

13  management arena, and not this kind of thing.  So,

14  yes, the guidance is provided, we talk about it, so

15  that's is the same.

16      Q    Okay.  And it's different insofar as --

17  how is it different?  I guess I didn't quite

18  understand.

19      A    It's different because we're typically

20  clear on what we are supposed to be doing with

21  grants administration.  And then this particular

22  situation we were just talking about, you know, how

23  do we manage, how do we identify categories and make

24  sure that we are very clear in providing that, those

25  next steps.  We want everyone to do things

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1   consistently.

 2          And sometimes with other guidance,

 3   institutes have different practices and procedures.

 4   So we give the guidance and allow them to go on and

 5   do what they do within their individual ICs as long

 6   as it matches their processes.  In this, it was a

 7   very intentional discussion of we all should do it

 8   the same way.

 9      Q    And when you say, "in this," you mean the

10   Staff Guidance --

11      A    The Staff Guidance, correct.

12      Q    -- that we were talking about on Exhibit

13   1?

14      A    Yes.

15      Q    Okay.  One of the divisions within OPERA

16   is the Division of Grants Policy.  Is that right?

17      A    Correct.

18      Q    What's that division, what does that do?

19      A    Implements the NIH Grants Policy

20   Statement, implements the Grants Administration

21   Manuals, answer policy questions, work with programs

22   to make sure that the program policies are enter --

23   that the Grants Administration regulations govern

24   the program policies.

25      Q    Okay.  And if I understood your previous

1   description, you were a policy analyst.  Were you in

2   the Division of Grants Policy?

3         A     I was.

4         Q     Okay.  And with your current role, what's

5   your role to that division?

6         A     I supervise the division Director.

7         Q     Okay.  What's your role with respect to

8   grant termination, just generally speaking?

9         A     I, generally speaking, with noncompliance

10  I work with the Institutes and Centers to help them

11  determine how to develop corrective actions and help

12  gain compliance with the recipient.  I -- and then

13  for other areas, I work with the institutes to

14  complete bilateral terminations, but I don't

15  terminate, typically.

16        Q     So you're saying there's two kinds of

17  terminations.  Generally speaking, there's a

18  noncompliance termination, there's a bilateral

19  termination?

20        A     Correct.

21        Q     Could you describe the difference between

22  those two?

23        A     Yes.  A bilateral termination is when we

24  work with the recipient and realize that it's in the

25  best interest for the project to be terminated

1  because we can't come -- can't identify a new

2  principal investigator or whatever the case may be.

3  That's just one example.

4           And noncompliance terminations, though

5  there have -- they are where the recipient is

6  unilateral, right, that we, NIH, cannot identify or

7  cannot come up with a corrective action plan to help

8  move the project along, and so the decision of the

9  agency would be to terminate.

10     Q    Are you generally involved in

11  noncompliance terminations?

12     A    I'm generally involved in noncompliance

13  discussions, yes.

14     Q    So if a noncompliance termination were to

15  happen, you would probably know about it?

16     A    Correct.

17     Q    Okay.  Prior to when President Trump was

18  inaugurated, in the time that you were Deputy

19  Director or Director at OPERA, how many noncompliant

20  terminations were there?

21     A    So deputy director, I don't recall.  As

22  the director, maybe one or two.  It doesn't happen

23  often.

24     Q    Okay.  And, help me.  I think you've been

25  director for quite a while.  I think you said since

1    2011.  Did I get that right?

2         A    2012.

3         Q    2012.  So since 2012, there's been one or

4    two noncompliance terminations until about

5    January 20th, 2025.  Is that right?

6         A    Yeah.  And it's probably more than one,

7    for sure, and less than a handful.  So I don't

8    recall, so I apologize, but I just know that that's

9    not what we normally do.  And, yes, the answer to

10   the question is whether -- actually --

11        Q    What were you going to say?

12        A    No, I need you to repeat the question

13   again, because I want to make sure I don't restate

14   it incorrectly.

15        Q    Sure.  No, that's fair, that's fair.

16             My question was just between when you were

17   appointed director in 2012 until January 20, 2025,

18   there's been, I think you clarified, more than one

19   but less than ten noncompliance terminations.  I

20   think that's what your testimony was.

21        A    My testimony was it doesn't happen often,

22   more than one and probably less than five.

23        Q    More than one, less than five.  Okay.

24             And since January 20, 2025, to the present

25   date, how many noncompliance terminations have there

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    been?

2       **A    Zero.**

3       Q    Oh, okay.  None at all.  Were they all the

4    bilateral terminations you were just talking about?

5       **A    We had some bilateral terminations between**

6    **January, yes.**

7       Q    Okay.

8       **A    And I don't recall the number, but not any**

9    **noncompliance.**

10      Q    So then the thread we were talking about

11   with Dr. Kym Ahrens, it's been reinstated now, but

12   when it was terminated, what kind of termination was

13   that?

14      **A    A termination that was provided to me, to**

15   **this -- yeah.**

16      Q    Okay.  It was neither noncompliant nor was

17   it bilateral?

18      **A    Correct.**

19      Q    Okay.  It was a different kind of

20   termination?

21      **A    Correct.**

22      Q    How many of that kind of termination was

23   there between when you were appointed director of

24   OPERA until January 20, 2025?

25      **A    Zero.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Zero.  That never happened before?

2    A    I'm sorry, let me restate.  There was one

3    termination that happened that way, but it was --

4    the grant was reinstated as well.  That, yes.

5    Q    Okay.  Which one was that?

6    A    That was one under the first Trump

7    Administration for the Eco Health Alliance.

8    Q    Okay.  Do you know why that one was

9    reinstated?

10   A    No.

11   Q    Okay.  Okay.  You just stated that this

12   particular kind of termination, like for a

13   Dr. Ahrens, was provided to you.  Who provided it?

14   A    Liza Bundesen, my supervisor.

15   Q    Okay.  And I think you said it was

16   provided by someone in HHS, I forget her name,

17   Rachel something?

18   A    Rachel Riley.

19   Q    Rachel Riley?

20   A    Correct.

21   Q    Okay.  And just to clarify, Rachel Riley

22   provided that list to Liza Bundesen, and that

23   included the termination to Dr. Ahrens?

24   A    Correct.

25   Q    Okay.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1              MR. McGINTY:  Mark this Exhibit 3, please.
 2              (Bulls Deposition Exhibit 3 was marked for
 3                identification.)
 4   BY MR. McGINTY:
 5        Q    I'm handing you what's been marked
 6   Exhibit 3.
 7              MR. McGINTY:  Counsel.
 8              (Document tendered to Ms. Andrapalliyal)
 9   BY MR. McGINTY:
10        Q    I'm sorry, just one more follow-up
11   question about the terminations that were provided
12   to you.
13              My understanding is there was an e-mail
14   from Rachel Riley and on which someone named Brad
15   from DOGE was copied on that e-mail, and that
16   applied to the termination for Dr. Ahrens, right?
17        A    I don't recall if that's the same e-mail.
18        Q    Okay.  So we'd have to take a look at that
19   e-mail to know?
20        A    Yes.
21        Q    Okay.  Do you recognize what I've just
22   handed you as Exhibit 3?
23        A    Yes.
24        Q    And what is this?
25        A    The Executive Order.
```

1      Q     Which one?

2      **A     14168, Defending Women from Gender**

3   **Ideology Extremism and Restoring Biological Truth to**

4   **the Federal Government.**

5      Q     Okay.  When did you first become aware of

6   this Executive Order?

7      **A     I believe the date that it came, that it**

8   **was issued.**

9      Q     Okay.  So on January 20th, 2025?

10     **A     Yes.**

11     Q     Okay.  Have you talked with anyone about

12  this document?

13     **A     Talked with the Department of Office of**

14  **Grants.**

15     Q     And what did you tell them?

16     **A     I didn't tell them anything.**

17     Q     Okay.  So you talked with the Department

18  of Office of Grants.  Is that a department within

19  NIH?

20     **A     No, HHS.**

21     Q     That's a department within HHS.  Okay.

22          And so, who at the Department of -- excuse

23  me.  You'll have to tell me that department name

24  again.

25     **A     Department of Grants.**

1    Q    Department of Grants.  Who at the

2  Department of Grants were you talking to about this

3  Executive Order?

4    **A    The leadership there.**

5    Q    And who is that?

6    **A    The Deputy Assistant Secretary for Grants**

7  **Dale Bell.**

8    Q    Did you say Dale Bell?

9    **A    Bell.**

10   Q    B-E-L-L?

11   **A    Yes.**

12   Q    And anyone else?

13   **A    And the various operating divisions that**

14  **were there to ask, you know, just to hear the**

15  **conversation to -- it was a meeting just to talk**

16  **about the fact that the Executive Orders had come**

17  **out and that they would provide guidance as they**

18  **could.**

19   Q    When was that meeting?

20   **A    I don't recall.**

21   Q    Was it in the week after the Executive

22  Order came out?

23   **A    It may have been -- I don't recall.  It**

24  **was definitely not long after it came out, so it**

25  **might have been a week or two.  I don't recall.  I**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    don't want to...

2         Q    Go ahead.

3         A    I don't want to make up a date.

4         Q    Sure, yes.  Late January, early February?

5         A    February, probably, late January or

6    February, probably.

7         Q    Okay.  And what was said at that meeting?

8         A    That they -- that there were Executive

9    Orders that had come out, recognizing that the

10   operating divisions wanted to obtain guidance and

11   that they would give us guidance as soon as they

12   could.  That was the first discussion.

13        Q    Okay.  And they didn't tell you to do

14   anything with respect to the Executive Order at that

15   time?

16        A    No.

17        Q    Who else was at that meeting?  You said

18   Dale Bell and all the operating divisions.  Who is

19   that?

20        A    The Agency Chief Grants Management

21   Officers.

22        Q    Is see.  From all of HHS?

23        A    From all of HHS.

24        Q    Okay.  And were there any subsequent

25   meetings?

1      A      Yes.

2      Q      Okay.  With -- we're talking about with

3    HHS and Dale Bell?

4      A      The same group.

5      Q      Okay.  And when was the next one?

6      A      Probably at two or -- two weeks after the

7    first one.

8      Q      So maybe mid February sometime?

9      A      Maybe.  Might -- maybe before.  I'm not

10   sure.  It was shortly after.

11     Q      Okay.  What happened at the second

12   meeting?

13     A      We were provided a document -- we asked

14   questions.  We asked for guidance on, like, a -- I

15   don't want to say it's frequently-asked questions,

16   but it was really to give us information on how we

17   should address the Executive Orders, because we

18   needed to know how, what we needed to do with them,

19   and so they provided guidance on that.

20     Q      And what was the guidance they provided?

21     A      We were asking whether or not -- because

22   by the time we met the second time, I think the TROs

23   had come out, and so they were going to tell us

24   whether, you know, what we needed to do with those.

25     Q      So was this a meeting about this Executive

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Order in particular that's been marked as Exhibit 3,

2    or was it all these Executive Orders?

3        **A    All of the Executive Orders.**

4        Q    Okay.  Was this Executive Order marked as

5    Exhibit 3 specifically discussed?

6        **A    No.**

7        Q    Okay.  And so you said it was Dale Bell at

8    HHS, all the Operating Directors, Chief Grants

9    Management Officers.  Anybody else at that meeting?

10       **A    Yes, we had Office of General Counsel.**

11       Q    Okay.  Anyone from the Department of

12   Government Efficiency?

13       **A    Not that I know of.  I don't know.**

14       Q    How was the meeting held?

15       **A    Umm.**

16       Q    Was it on Zoom?

17       **A    Yes.**

18       Q    It was on Zoom?

19       **A    Teams, yes.**

20       Q    It was on Teams.  Do you know if there

21   were notes or a transcript made of the meeting?

22       **A    I don't know.**

23            MS. ANDRAPALLIYAL:  Objection.  You know,

24   OGC was present at this meeting so the contents of

25   this meeting are protected under the attorney-client

1  privilege, and so I'm going to instruct Ms. Bulls

2  not to answer.

3  BY MR. McGINTY:

4      Q    Did anyone ask for client advice at the

5  meeting, attorney-client advice?

6          MS. ANDRAPALLIYAL:  Objection, calls for a

7  legal conclusion.

8  BY MR. McGINTY:

9      Q    You can answer.

10     **A    Can you repeat the question.**

11     Q    Sure.  Did anyone ask for legal advice at

12 the meeting?

13     **A    Yes.**

14     Q    Okay.  Asking -- did you get any direction

15 from Dale Bell about how to implement an Executive

16 Order that did not constitute a request or the

17 provision of the request?

18         MS. ANDRAPALLIYAL:  Objection, calls for a

19 legal conclusion.

20 BY MR. McGINTY:

21     Q    You can answer.

22     **A    I don't know that I understand the**

23 **question.**

24     Q    Okay.  So you had two meetings with

25 Dale Bell.  At the second time you had the meeting,

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    the temporary restraining orders had come out, at

2    least as to some of the Executive Orders.

3             Do you know if at that time the temporary

4    restraining orders as to this particular Executive

5    Order had come out?

6    **A     I don't recall, because we didn't talk**

7    **about the details of all of the Executive Orders.**

8    **What we talked about was we were wanting to know if**

9    **we could fund grants.**

10   Q    I see.  What was the answer to that

11   question?

12            MS. ANDRAPALLIYAL:  Objection.  This

13   conversation was attorney-client privileged.  I'm

14   going to instruct Ms. Bulls not to answer.

15   BY MR. McGINTY:

16   Q    After the meeting, did you stop funding

17   grants?

18   **A     No.**

19   Q    Do you have any more meetings with

20   Dale Bell?

21   **A     Yes.**

22   Q    Okay.

23   **A     With the group, yes.**

24   Q    What was the next one?

25   **A     Probably at our chief GMO Council which is**

1    a, you know, a meeting that we always have where we

2    were just -- yeah.  That was the third meeting.

3        Q    Okay.  And was it about the same topic,

4    how to implement --

5        A    We did discuss this.

6        Q    Okay.

7        A    Not this exhibit, but the -- we discussed

8    the responses that we received for our questions --

9    from our questions during the previous meeting.

10       Q    Okay.  And your questions were:  Could you

11   fund grants?

12            MS. ANDRAPALLIYAL:  Objection.  Because

13   this is an attorney-client communication, it's

14   privileged.  I'm going to instruct Ms. Bulls not to

15   answer insofar as it was an attorney-client

16   conversation or communication.

17            MR. McGINTY:  If I understand the

18   objection correctly, you're only objecting insofar

19   as it was an attorney-client privileged

20   communication.

21            MS. ANDRAPALLIYAL:  Correct.

22            MR. McGINTY:  Do you want to have --

23            Can we go off the record for a second.

24                (Discussion off record)

25            (Recess taken - 10:07 to 10:20 a.m.)

1          (The record was read aloud as follows:

2          "QUESTION:  Did anyone ask for client

3          advice at the meeting, attorney-client

4          advice?

5          "MS. ANDRAPALLIYA:  Objection, calls for a

6          legal conclusion.

7          "QUESTION:  You can answer.

8          "THE WITNESS:  Can you repeat the

9          question.

10          "QUESTION:  Sure.  Did anyone ask for

11          legal advice at the meeting?

12          "THE WITNESS:  Yes.

13          "QUESTION:  Did you get any direction from

14          Dale Bell about how to implement the

15          Executive Order that did not constitute a

16          request or the provision of the request?"

17          MS. ANDRAPALLIYAL:  Thank you.

18          So I do want to maintain our objections on

19     attorney-client privilege here.

20          MR. McGINTY:  Okay.

21     BY MR. McGINTY:

22     Q    Before the break, we were talking about

23     these meetings with Dale Bell and I asked you if

24     there's any part of that meeting that you can

25     testify about, because counsel's objection and

1   instruction not to answer was an instruction not to

2   answer to the extent that attorney-client privileged

3   communications would have been implicated.  You've

4   now had an opportunity to talk to your lawyer about

5   that --

6          A    Correct.

7          Q    -- sorry, we spoke over each other.

8               Is that right?

9          A    Correct.

10         Q    Okay.  Is there any part of that meeting

11  that you can testify about today?

12              MS. ANDRAPALLIYAL:  Objection.  So

13  objection on the basis of attorney-client privilege,

14  but a separate objection on the basis of

15  deliberative process privilege to the extent that

16  there were deliberative communications at this

17  meeting.

18              **THE WITNESS:  Dale Bell coordinated the**

19  **meeting, but the meeting was specifically to obtain**

20  **legal guidance on what we could do as agencies under**

21  **the TROs.  So he actually coordinated the meeting,**

22  **but the meeting was definitely about obtaining legal**

23  **guidance.  That was the sole purpose of the meeting.**

24  BY MR. McGINTY:

25         Q    Okay.  We're talking about the second

1    meeting now?

2        A    We're talking about the second meeting,

3    yes.

4        Q    Okay.  Because at that time the TROs had

5    come out --

6        A    Right.

7        Q    -- as to some of the Executive Orders but

8    not necessarily all of them.  Is that right?

9        A    That's right.

10       Q    Okay.  Was there any other meetings

11   coordinated by Dale Bell?

12       A    The third meeting which he coordinates

13   often which as the Chief Grants Management Officer

14   counsel meeting.

15       Q    Okay.

16       A    Yeah.

17       Q    And what was that meeting about?

18       A    That meeting was about other, you know,

19   Grants Management matters.  Additional questions did

20   come up about we wanted additional information and

21   guidance from OGC.

22       Q    Okay.  Was any direction or instruction

23   from Dale given to you about this Exhibit 3?

24            MS. ANDRAPALLIYAL:  Objection to the

25   extent that it calls for the provision of

1   deliberative information that's protected on the

2   deliberative process privilege.

3   BY MR. McGINTY:

4       Q    Do you understand the objection?

5       **A    Yes.**

6       Q    Okay.  Is there anything you can tell me

7   about that meeting, about any instruction you were

8   given about Executive Order 14168, Exhibit 3?

9       **A    The meeting was not about this particular**

10  **Executive Order.  It was about all of the Executive**

11  **Orders and whether we could continue to, you know,**

12  **move forward with -- yeah, it wasn't about this.  It**

13  **was about all of them.**

14      Q    Okay.  My question was:  Were you given

15  any instruction about how to implement this

16  particular Executive Order?

17      **A    The answer is no.**

18      Q    Okay.  Were there any of these meetings

19  with Dale Bell where you were given specific

20  instruction about how to implement the Executive

21  Order marked as  Exhibit 3?

22          MS. ANDRAPALLIYAL:  Objection to the

23  extent that it calls for deliberative information to

24  be produced, especially about practices that haven't

25  been put into action yet.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1          **THE WITNESS:  There were discussions, but**

2    **no -- Dale did not provide final guidance.  It was**

3    **just us talking about additional questions that we**

4    **had with regard to the Executive Orders.  He did not**

5    **provide final guidance.**

6    BY MR. McGINTY:

7          Q    Okay.  How many of these meetings with

8    Dale Bell did you have about the Executive Orders,

9    about?

10         **A    Three.**

11         Q    Just three?

12         **A    And the -- meaning the last meeting**

13   **included the Executive Orders because the Chief**

14   **Grants Management Officer still had questions, but**

15   **the meeting was a broader meeting.  The second**

16   **meeting was a meeting that he actually coordinated**

17   **specifically.**

18         Q    I see.  It sounds like these meetings with

19   Dale Bell happened in a recurring way?

20         **A    Correct.  The meetings -- the Chief Grants**

21   **Management counsel meetings happened in a recurring**

22   **way, not meeting about Executive Orders.**

23         Q    Got it.  How often did the recurring

24   meetings happen?

25         **A    They should be happening once a month.**

1    Q    Do they happen once a month?

2    **A    We try to have them once a month.**

3    Q    Okay.  Sometimes they get canceled or

4    postponed?

5    **A    Correct.**

6    Q    Okay.  I believe the question that

7    prompted the question of these meetings was just who

8    have you communicated with about this document, and

9    specifically -- I guess I'll clarify that.

10        Who have you communicated with at NIH

11   about this document for the purposes of NIH policy

12   and procedure?

13   **A    I haven't communicated about this**

14   **document.  I've communicated about just overarching**

15   **funding and the Executive Orders.**

16   Q    Okay.  Including this document?

17   **A    Yes.**

18   Q    Okay.  And who have you communicated with

19   about that?

20   **A    The Chief Grants Management Officers.**

21   Q    Okay.  And what have you told them?

22        MS. ANDRAPALLIYAL:  Objection insofar as

23   it calls for privileged deliberative information

24   about action that hasn't been finalized yet.

25        **THE WITNESS:  We, as we talked earlier, we**

1   are -- I'm answering -- I'm trying to establish the

2   process by which they can continue.  So there's been

3   no final guidance.  We've been talking about the

4   Executive Orders.

5   BY MR. McGINTY:

6       Q    Okay.  Can you turn to page -- this is

7   from the Federal Register, so I guess it would be

8   page 8616, and look at Section 3(e).

9            Do you see that?

10      A    Yes.

11      Q    And it says, the last sentence of Section

12  3(e):

13           "Agencies shall take all necessary steps,

14            as permitted by law, to end the Federal

15            funding of gender ideology."

16           Do you see that?

17      A    Yes.

18      Q    Has NIH taken any action to implement that

19  sentence of Section 3(e)?

20           MS. ANDRAPALLIYAL:  Objection, calls for a

21  legal conclusion.

22  BY MR. McGINTY:

23      Q    You can answer.

24      A    Discussions are -- have been had, about

25  identifying agency priorities.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Okay.  What is the relationship between

2    agency priorities and that last sentence of Section

3    3(e)?

4          MS. ANDRAPALLIYAL:  Objection, calls for

5    speculation.

6    BY MR. McGINTY:

7    Q    You can answer.

8    A    **To be honest, I do feel like I'm now using**

9    **my own thoughts to tell you that, and I don't know**

10   **that that is the correct way to answer that**

11   **question.**

12   Q    Well, you told me that discussions had

13   been had about identifying agency priorities.  Was

14   that your testimony?

15   A    **That is my testimony.**

16   Q    Okay.  Where do those agency priorities

17   come from?

18   A    **The director of the agency.**

19   Q    Okay.  And what has the director of the

20   agency told you about those agency priorities?

21   A    **The director hasn't told me anything.  The**

22   **director is developing a memo to communicate agency**

23   **priorities, but there's nothing final, so we don't**

24   **have agency priorities final yet.**

25   Q    Well, grants have been terminated on the

```
 1   basis of agency priorities, haven't they?
 2        A    Yes.
 3        Q    But you don't have agency priorities that
 4   are final?
 5        A    I have letters that I've been asked to
 6   send.
 7        Q    Okay.
 8             MR. McGINTY:  Can I mark this as Exhibit
 9   4, please.
10             (Bulls Deposition Exhibit 4 was marked for
11              identification.)
12   BY MR. McGINTY:
13        Q    I'm passing to you what has been marked
14   Exhibit 4, and do you recognize this document?
15        A    Yes.
16        Q    And what is it?
17        A    A termination letter.
18        Q    This is one of those letters that you've
19   been asked to send that you were just talking about?
20        A    Yes.
21        Q    And you signed this letter, right?
22        A    Yes.
23        Q    Okay.  And why did you send this letter?
24        A    I was asked to send it.
25        Q    Who asked you to send it?
```

1    A    My supervisor.

2    Q    Okay.  And who is that?

3    A    At the time, Liza Bundesen.

4    Q    Okay.  How did she ask you to send it?

5    A    Via e-mail.

6    Q    Did she tell you why she was asking you to

7    send it?

8    A    Yes.

9    Q    Okay.  And what did she say?

10    A    That we were asked to terminate grants.

11    Q    Did she tell you why you were asked to

12    terminate grants?

13    A    She did not.

14    Q    Okay.

15    A    Can I correct the statement?

16         The e-mail that I received from

17    Liza Bundesen indicated that we needed to terminate

18    the grants, and the language in the letters were

19    provided so I didn't question, I just followed the

20    directive.

21    Q    Okay.

22    A    She didn't say:  Terminate the grant

23    because of.  She said:  The list below.  So I just

24    wanted to be clear about that.

25    Q    Okay.  And did you provide this e-mail to

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    counsel?

2         A    Yes.

3         Q    Okay.  And "the list is below," list of

4    what?

5         A    Awards to be terminated.

6         Q    Okay.  And is that the same list that you

7    were talking about earlier that came from

8    Rachel Riley?

9         A    That was on the same e-mail, yes.

10        Q    Okay.  And Brad may have been copied on

11   that e-mail?

12        A    I don't know if Brad was on that e-mail

13   string.

14        Q    Okay.

15        A    I can't recall.

16        Q    Brad was on one of the e-mail strings?

17        A    Correct.

18        Q    Do you remember if it was Brad Smith?

19        A    I know for sure Brad.

20        Q    Okay.  Definitely Brad.  It might have

21   been Brad Smith, it might have been Brad someone

22   else?

23        A    Yes.

24        Q    Okay.  And you said the language was

25   provided.  What do you mean by "the language was

```
 1   provided"?

 2        A    The letter.   There were template letters.

 3        Q    So the entirety of the letter language?

 4        A    Correct.

 5        Q    Okay.  So take a look at the first

 6   paragraph here:

 7             "Funding for Project Number," and then

 8              there's a number," is hereby terminated

 9              pursuant to the 2022 National Institutes

10              of Health Grants Policy Statement," and

11              C.F.R., a CFR section.  "This letter

12              constitutes a notice of termination."

13             You did not write that language?

14        A    No.

15        Q    You didn't write any word in this letter?

16        A    Just the signature.

17        Q    Okay.  You wrote your name?

18        A    Correct.  I mean, I -- yes, I wrote my

19   name and signed it.

20        Q    Okay.  And you don't know why this letter

21   was sent?

22        A    To terminate the grant.

23        Q    Okay.  But you don't know what agency

24   priorities are intended to be served by terminating

25   this grant?
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1      A    I didn't ask the question and I was not
 2  told, I sent the letter as it was.
 3      Q    Okay.  Did Rachel Riley provide the
 4  templates that you used?
 5      A    Yes.
 6      Q    So it says here -- actually, can you read
 7  the fourth paragraph, the one that starts with,
 8  "This award no longer effectuates."
 9      A    "This award no longer effectuates agency
10           priorities.  NIH is obligated to
11           carefully steward grant awards to ensure
12           taxpayer dollars are used in ways that
13           benefit the American people and improve
14           their quality of life.  Your project does
15           not satisfy these criteria.  Research
16           programs based on gender identity are
17           often unscientific, have little
18           identifiable return on investment, and do
19           nothing to enhance the health of many
20           Americans.  Many such studies ignore,
21           rather than seriously examine, biological
22           realities.  It is the policy of NIH not
23           to prioritize these research programs."
24      Q    Okay.  And this was part of the template
25  letter that Rachel Riley provided?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **A    Yes.**

2    Q    Are you aware of -- let me strike that.

3         Did NIH have any ability to alter this

4    language in any way?

5    **A    Did we have the ability?**

6         MS. ANDRAPALLIYAL:  Objection, assumes

7    facts not in evidence.

8    BY MR. McGINTY:

9    Q    Was this edited in any way from the

10   template letter that Rachel Riley provided?

11   **A    No.**

12   Q    Okay.  It says, "Your project does not

13   satisfy these criteria."  Do you see that there?

14   **A    Yeah.**

15   Q    Are you aware of any assessment of

16   Dr. Ahrens' grant in particular that was made to see

17   if her grant satisfied the criteria?

18   **A    No.**

19   Q    Would you have been aware of such

20   assessment if one had been made?

21   **A    I don't know.**

22   Q    Okay.  Would you have been aware of such

23   an assessment if one had been made by NIH?

24   **A    Yes.**

25   Q    And it says, "Research programs based on

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1   gender identity are often unscientific with little

 2   identifiable return on investment, and do nothing to

 3   enhance the health of many Americans."

 4          Did NIH do any assessment of this

 5   particular grant to see if it was unscientific?

 6   **A    I don't know.  The letter was provided and**

 7   **it was sent.  I don't know what happened before**

 8   **that.**

 9          Q    Well, did NIH do any assessment?

10   **A    I don't know.**

11          Q    You don't know if NIH did an assessment to

12   see if Dr. Ahrens' grant was scientific or not?

13   **A    Are you talking about -- I don't**

14   **understand your question, sorry.**

15          Q    Well, it says in this letter, and I

16   understand you didn't write it, but you signed it,

17   "Research programs based on gender identity are

18   often unscientific."  And that was the reason this

19   particular grant was terminated.

20          Is that right?

21   **A    That's what the letter says.**

22          Q    That's what the letter says.  So I'm

23   trying to figure out whether or not there was any

24   basis to think that Dr. Ahrens' grant was

25   unscientific.

1      **A     I don't know.**

2      Q     Okay.  And do you know if there was any

3    assessment to see if it had an identifiable return

4    on investment?

5      **A     No, I don't know.**

6      Q     Do you know if NIH did one?

7      **A     I don't know.**

8      Q     Okay.  Would you have been aware if NIH

9    did one?

10      **A     I'm not sure.**

11      Q     Okay.  And it also says, "and do nothing

12    to enhance the health of many Americans."

13          Do you know if NIH did any assessment to

14    see if Dr. Ahrens' grant would enhance the health of

15    many Americans?

16      **A     I don't know.**

17      Q     Okay.  Was this the only template language

18    that Rachel Riley provided?

19          MS. ANDRAPALLIYAL:  Objection.  To the

20    extent that you're calling for draft language that

21    wasn't finalized, that's privileged, and I instruct

22    the witness not to answer.

23    BY MR. McGINTY:

24      Q     I'll clarify.

25          Did Rachel Riley provide any other

1    template letters that were sent?

2    **A    Yes.**

3    Q    Okay.  What were those template letters

4    about?

5    **A    In that list, I don't recall.**

6    Q    How about any list for letters that had

7    been sent?

8    **A    DEI activities, this language.  I think**

9    **one on China.  I don't know.  That's it that I can**

10   **recall, and I'm sure I'm blanking right now.**

11   Q    So what you remember is the gender

12   identity language, the DEI language, and the China

13   language.

14        Was there language on vaccine hesitancy

15   that was used?

16   **A    In that batch, no.**

17   Q    Any batch that's been sent?

18   **A    Yes.**

19   Q    And that was provided by Rachel Riley,

20   too?

21   **A    Yes.  Well, actually, that was provided by**

22   **Dr. Memoli.  I don't know if Rachel Riley provided**

23   **that to him, I apologize.**

24   Q    Okay.  So Dr. Memoli wrote the one on --

25   or provided you with the one on vaccine hesitancy?

1      A    Provided my supervisor with the

2    instruction.

3      Q    And you don't know if that came from

4    Rachel Riley or not?

5      A    I don't.

6      Q    This letter that's been marked as

7    Exhibit 4 has similar language as the Executive

8    Order that's in Exhibit 3.  Do you agree with that?

9          MS. ANDRAPALLIYAL:  Objection, calls for

10   speculation.

11   BY MR. McGINTY:

12     Q    You can answer.

13     A    Are you asking me if I -- I haven't

14   compared.

15     Q    Okay.  Let's take a look at Executive

16   Order 14168.  Do you see in Section 2 where it says:

17          "These sexes are not changeable and are

18           grounded in fundamental and

19           uncontrovertible reality"?

20     A    Yes.

21     Q    And do you see in the letter of

22   February 28th where it says:

23          "Many such studies ignore rather than

24           seriously examine biological realities"?

25     A    Yes.

1      Q    That seems pretty similar, doesn't it?

2        MS. ANDRAPALLIYAL:  Objection, calls for

3  speculation, calls for a legal conclusion.

4  BY MR. McGINTY:

5      Q    You can answer.

6      **A    Looking at it today, it looks the same.**

7      Q    Going back to the language in the Order,

8  you write:  It's true -- or, rather, you write that

9  "Research programs based on gender identity" -- or

10  in this letter it says -- "are often unscientific,

11  have little identifiable return on investment, and

12  do nothing to enhance the health of many Americans."

13        Has NIH done any study whatsoever to see

14  if that's true?

15      **A    I don't know.**

16      Q    Would you know if they had done?

17      **A    I'm not sure.**

18      Q    Okay.  When did it become the policy of

19  NIH not to prioritize research programs based on

20  gender identity?

21      **A    I don't know.**

22      Q    So earlier I thought you testified that

23  one of your jobs at NIH was supervising the Division

24  of, I think you said, Grants Policy.  Is that

25  correct?

1        **A      Correct.**

2        Q      So would you know what the grant policies

3    are at NIH?

4        **A      I would.**

5        Q      And you don't know when it became the

6    policy of NIH to deprioritize the funding of

7    transgender issues?

8        **A      I do not.**

9        Q      Why not?

10               MS. ANDRAPALLIYAL:  Objection, calls for

11   speculation.

12               **THE WITNESS:  Final priorities have not**

13   **been provided.  I don't know.**

14               MR. McGINTY:  Okay.  Happy coincidence,

15   mark this as Exhibit 5, please.

16               (Bulls Deposition Exhibit 5 was marked for

17                identification.)

18   BY MR. McGINTY:

19        Q      I'm handing you what's been marked

20   Exhibit 5.  And I'll represent to you that this is

21   an article from the journal Nature that I've printed

22   out.  And I want to direct your attention to pages 4

23   and 5.

24               There are some cutouts here, or maybe

25   callout boxes, but seems to be a portion of the

```
 1   Staff Guidance - Award Assessments for Alignment

 2   with Agency Priorities.

 3             Do you see that?

 4        A    Yes.

 5        Q    Is this the document that we were talking

 6   about before when we were talking about Exhibit 1?

 7        A    Yes.

 8        Q    And you have -- this is a real document,

 9   it exists in NIH, right?

10        A    It's a real document.

11        Q    Okay.  And how have you used it?

12        A    To provide guidance to the ICs.

13        Q    Okay.  Where did it come from?

14        A    What do you --

15        Q    Who wrote it?

16        A    I wrote it, along with my deputy, yes.

17        Q    Okay.  You wrote this document?

18        A    Yes.

19        Q    Okay.

20        A    I developed it.

21        Q    Along with your deputy.  Who is that?

22        A    Kristen Ta.

23        Q    Can you spell that for me.

24        A    T-A.

25        Q    Great.  So this includes, on page 5, that
```

1    transgender issues language.  Do you see that?

2    **A    Yes.**

3    Q    Did you write this?

4    **A    Yes.**

5    Q    Okay.  I'm trying to understand, because

6    earlier on Exhibit 4 you said you didn't write any

7    word on that letter, and that included this

8    transgender issues language, didn't it?

9    **A    I didn't write any word on that letter.**

10    Q    Okay.  So where did this "transgender

11    issues" language come from?

12    **A    The categories from that letter.**

13    Q    I see.  I think I see.  Let me confirm.

14         You were given template letters, you cut

15    and past from those template letters into this Staff

16    Guidance document?

17    **A    Correct.**

18    Q    What's the purpose of this Staff Guidance?

19    **A    To help ICs to figure out how to fund or,**

20    **you know, yes, provide funds and how to protect the**

21    **categories.  If the DEI was the sole purpose, then,**

22    **you know, they don't make awards categories to us,**

23    **where we were trying to make sure that they worked**

24    **with the recipient to come to a mutual negotiation.**

25    Q    Okay.  So this --

1      **A      This is guidance.**

2      Q      Guidance to?

3      **A      The ICs.**

4      Q      To the ICs for the purposes of making

5      decisions about future awards?

6      **A      Making decisions on their portfolio,**

7      **including current awards, just their entire**

8      **portfolio.**

9      Q      Including current awards and future

10     awards?

11     **A      Correct.**

12     Q      Okay.  And so would this guidance instruct

13     ICs to terminate some awards?

14            MS. ANDRAPALLIYAL:  Objection, calls for a

15     legal conclusion and calls for speculation.

16     BY MR. McGINTY:

17     Q      You can answer.

18     **A      This is, again, draft guidance.  And the**

19     **guidance is to provide the ICs with an opportunity**

20     **to know the various categories and how to address**

21     **those.**

22     Q      Okay.  Let's go through those categories.

23     What is Category 1?

24     **A      Category 1 just requires for them to --**

25     **the sole purpose of the award is DEI, like we just**

1   were talking about.  The sole purpose of the award

2   is DEI, just a diversity supplement.

3        Q    Okay.  And, first of all, what does DEI

4   mean?

5        A    Diversity, equity, and inclusion.

6        Q    Okay.  Yeah, but what makes an award DEI

7   or not?

8        A    Oh.

9            MS. ANDRAPALLIYAL:  Objection, calls for

10  speculation.

11           THE WITNESS:  I don't have the

12  programmatic expertise to make that determination in

13  terms of the research and how it's reviewed.  This

14  is for ICs to use and make those determinations.

15  BY MR. McGINTY:

16       Q    Okay.  Is there any NIH policy for ICs to

17  make a determination as to whether an award is a DEI

18  award or not?

19       A    There are some awards that are

20  specifically, the sole purpose of the award is DEI.

21  So there has to be a programmatic rationale which is

22  outlined in either the Notice of Funding

23  Opportunity.

24       Q    And are those the only awards that would

25  fit into Category 1?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **A    DEI awards?**

2    Q    Well, I'm trying to figure out -- yeah,

3    yes.

4    **A    Yes, those would be the -- the award**

5    **cannot stand without -- the sole purpose of making**

6    **the award was to support DEI activities.**

7    Q    Okay.  And you're not sure whether or not

8    an award is DEI or not?

9    **A    The guidance is for them to take a look,**

10   **to use it to make determinations within their**

11   **portfolio as to whether or not it's a DEI award.**

12   Q    Okay.  So this talks about diversity

13   supplements or conference grants where the purpose

14   of the meeting is diversity.  That's what you are

15   talking about here?

16   **A    That's what I'm talking about.**

17   Q    And is that the only kind of award that

18   would fit into Category 1?

19        MS. ANDRAPALLIYAL:  Objection, calls for

20   speculation.

21        **THE WITNESS:  It's the example given.**

22   BY MR. McGINTY:

23   Q    Okay.  Are there other kinds of awards

24   that would fit into Category 1?

25        MS. ANDRAPALLIYAL:  Objection, calls

```
 1   speculation.
 2            THE WITNESS:  That's for the IC to
 3   determine.
 4   BY MR. McGINTY:
 5        Q    Okay.  How is the IC supposed to determine
 6   that?
 7        A    Looking at their portfolio and looking at
 8   why the grant was made.
 9        Q    Is there a definition of DEI anywhere?
10        A    I don't know.
11        Q    Would you know?
12        A    I would know.
13        Q    Okay.  Okay.  So in Category 1 they're
14   supposed to terminate the award, right --
15        A    Yes.
16        Q    -- and not fund it?
17        A    Category 1 is that they cannot fund the
18   award.
19        Q    Okay.  And then, so what's Category 2?
20        A    Where the DEI activity is ancillary to the
21   entire purpose of the award, so it just has pieces
22   that can be excised, but the award can still -- it's
23   still, you know, viable without the DEI activities.
24        Q    Okay.  And what are they supposed to do
25   with a Category 2?
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      A    The assessments that we talked about

2   earlier, take those and determine whether or not and

3   assess their portfolio to see how they can save the

4   award.

5      Q    Okay.  And, again, there's no definition

6   of DEI that you're aware of that they would use to

7   do that?

8      A    I'm sure there's a definition of DEI

9   within the various, what do you call it,

10  activities -- no, grant activities.  I don't know if

11  there's a DEI standard definition across the -- a

12  policy definition, but definitely a programmatic

13  definition.

14     Q    What's the difference between those two

15  things?

16     A    Well, a policy definition would be from

17  the central and, you know, it would be more

18  administrative, so I don't have administrative DEI.

19  But for the purposes of the research, there might be

20  programs where there is either, you know, statutory

21  language that defines DEI or that the program

22  defines it, DEI, which is more on the scientific,

23  programmatic side.

24     Q    Okay.  So if I'm understanding you

25  correctly, there might be a definition within each

1  one of the ICs that defines DEI?

2      A    It might be a scientific definition that

3  is used by all ICs.

4      Q    And you wouldn't be aware of it?

5      A    Not in the sense of issuing the Staff

6  Guidance.  In other words, I needed them to take

7  that -- the guidance is for them to use and to make

8  those assessments, not for me to tell them.

9      Q    Did anyone tell you to write this

10  guidance?

11      A    Yes.

12      Q    Who told you to write the guidance?

13      A    The guidance was -- well, nobody told me

14  to write it.  The guidance was requested.

15      Q    Okay.  By whom?

16      A    By the Grants Management officials and --

17  yeah, by the Grants Management officials.

18      Q    Grants Management, are these the same as

19  the --

20      A    The Chief Grants Management Officers

21  within the funding, IC.

22      Q    Okay.  And why did they ask for the

23  guidance?

24      A    So they could begin making, you know,

25  begin looking at how they can issue awards.

```
 1        Q     Did something happen to make them think
 2    that they needed guidance?
 3        A     I think people were --
 4              MS. ANDRAPALLIYAL:  Objection, calls for
 5    speculation.
 6              THE WITNESS:  Yeah, I'm thinking, you
 7    know.  I don't -- yeah, that's really an assumption.
 8    BY MR. McGINTY:
 9        Q     Well, I'm just trying to figure this out,
10    right, because people don't ask for guidance for no
11    reason.
12              Did anyone tell you why they wanted the
13    guidance?
14        A     Yes, so that they could know, to make sure
15    that they were able to know what awards to fund and
16    how to make determinations on how funding would be
17    made under the DEI activities.
18        Q     Was there any communication prior to this
19    guidance indicating that DEI activities would not be
20    funded?
21        A     There was a funding pause that was placed
22    on the agency, so they wanted to understand what
23    could be funded.
24        Q     So this is in response to the funding
25    pause?
```

1    **A    Yes.**

2    Q    Did you talk with any of your supervisors

3    about this guidance?

4    **A    Yes.**

5    Q    And who did you talk to?

6    **A    Liza Bundesen.**

7    Q    Did you talk with Dr. Memoli?

8    **A    No.**

9    Q    Okay.  All right.  How about any future

10   version of this guidance?

11   **A    Liza briefed Dr. Memoli.**

12   Q    Okay.  And how many conversations have you

13   had with Dr. Bundesen about it?

14   **A    I don't recall how many.  It was frequent.**

15   Q    Okay.  And what did you talk about?

16        MS. ANDRAPALLIYAL:  Objection.  To the

17   extent that the question is calling for the

18   provision of deliberative information, I would

19   instruct the witness not to answer.

20   BY MR. McGINTY:

21   Q    Did Dr. Bundesen draft any part of this?

22   **A    No.**

23   Q    Did she review a draft?

24   **A    Yes.**

25   Q    And did she approve it?

1      A    It wasn't final, it was still ongoing, so

2   the portions that she reviewed, she -- we just

3   discussed.

4      Q    Okay.  How did you go about writing this

5   guidance?

6           MS. ANDRAPALLIYAL:  Objection.  To the

7   extent the question is calling for deliberative

8   information, I instruct the witness not to answer.

9   BY MR. McGINTY:

10     Q    Did you examine any existing NIH policies?

11     A    I'm sure I did.  I'm sure I looked at the

12  policy statement and -- the Grants Policy Statement,

13  just to see if there was anything in there that we

14  could use.

15     Q    And there's no citation to the Grants

16  Policy Statement in here, is there?

17     A    No.

18     Q    Okay.  Did you look at anything else?

19          MS. ANDRAPALLIYAL:  Objection.  To the

20  extent the question is calling for specific and

21  deliberative information, I instruct the witness not

22  to answer.

23  BY MR. McGINTY:

24     Q    Did you examine any Executive Orders prior

25  to writing this guidance?

1      **A      Of course I read the Executive Orders.**

2      Q      And you said, "of course."  Why did you

3      say of course?

4      **A      Because I needed to be aware.**

5      Q      Why did you need to be aware?

6      **A      Because that's information that I needed**

7      **to know, or at least review, as the discussions were**

8      **taking place.**

9      Q      Because it's obvious, isn't it, that the

10     Executive Orders are causing this to happen?

11            MS. ANDRAPALLIYAL:  Objection, legal

12     conclusion, calls for facts not in evidence, calls

13     for speculation.

14     BY MR. McGINTY:

15     Q      You can answer.

16     **A      I don't know that it's obvious, but I**

17     **definitely read the Order, all of the Orders.**

18     Q      So going back to page 5 of this Nature

19     article and the guidance that you wrote, looking at

20     Appendix 3, and it says:

21            "Language provided to NIH by HHS providing

22             examples for research activities that NIH

23             no longer supports."

24            Do you see that?

25     **A      Yes.**

```
 1        Q    And it says:

 2             "China:  Bolstering Chinese universities

 3              does not enhance the American people's

 4              quality of life or improve America's

 5              position in the world.  On the contrary,

 6              funding research in China contravenes

 7              American national security interests  and

 8              hinders America's foreign-policy

 9              objectives."

10             Do you see that?

11        A    Yes.

12        Q    This language was provided by

13   Rachel Riley?

14        A    Yes.

15        Q    And then it says:

16             "DEI:  Research programs based primarily

17              on artificial and non-scientific

18              categories, including amorphous equity

19              objectives, are antithetical to

20              scientific inquiry, do nothing to expand

21              our knowledge of living systems, provide

22              low returns on investment, and ultimately

23              do not enhance health, lengthen life, or

24              reduce illness.  Worse, so called

25              diversity, equity, and inclusion (DEI)
```

1              studies are often used to support

2              unlawful discrimination on the basis of

3              race and other protected characteristics,

4              which harms the health of Americans.

5              Therefore, it is the policy of NIH not to

6              prioritize such research programs."

7         That language also was provided by

8    Rachel Riley?

9         A    Yes.

10        Q    And, finally, the transgender language

11   that we looked at before which was also provided by

12   Rachel Riley?

13        A    Yes.

14        Q    And it was provided by her in the form of

15   template letters to terminate grants?

16        A    Yes.

17             MR. McGINTY:  Mark this as Exhibit 6,

18   please.

19             (Bulls Deposition Exhibit 6 was marked for

20             identification.)

21   BY MR. McGINTY:

22        Q    I'm handing you what's been marked

23   Exhibit 6, and I'll represent to you that this was

24   also published in the Nature journal, and I've

25   printed it off of their website.

1           Do you recognize this document?

2      A    Yes.

3      Q    And what is it?

4      A    The draft Staff Guidance.

5      Q    And this is a little bit later than the

6   Exhibit 5 we were just looking at, right?

7      A    Correct.

8      Q    This one is dated March 25, 2025.  Is that

9   right?

10     A    Yes, yes.

11     Q    Did you write this one, too?

12     A    Yes.

13     Q    And when did you write this one?

14          MS. ANDRAPALLIYAL:  Can we go off the

15   record, please.

16               (Discussion off record)

17          (Recess taken - 11:06 to 11:31 a.m.)

18   BY MR. McGINTY:

19     Q    You understand you're still under oath?

20     A    Yes.

21     Q    Okay.  So continuing to look at what we

22   marked as Exhibit 6, I think earlier you testified

23   that you wrote this document.

24     A    Yes.

25     Q    And why did you write this document?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      **A      To help the Institutes and Centers with**
2   **trying to figure out how to make awards, give them**
3   **guidance.**
4      Q     Okay.  Give them guidance on making awards
5   and also terminating awards, right?
6      **A      Making awards and making assessments on**
7   **which categories they need to use to make those**
8   **assessments.**
9      Q     Okay.  So this says, under Category 1,
10  "Add the action to the master spreadsheet"?
11     **A     Yes.**
12     Q     What's the master spreadsheet?
13          MS. ANDRAPALLIYAL:  Objection.  To the
14  extent the question calls for information that's
15  deliberative, I'm instructing the witness not to
16  answer.
17  BY MR. McGINTY:
18     Q     How does NIH keep track of the grants it
19  has terminated?
20     **A     We do track it in a spreadsheet.**
21     Q     Okay.  And what's on that spreadsheet?
22          MS. ANDRAPALLIYAL:  Objection.  To the
23  extent that the question is calling for information
24  that's deliberative and not final, I'm instructing
25  the witness not to answer.

```
 1   BY MR. McGINTY:

 2        Q     Okay.  Does the spreadsheet contain

 3   information about grants that have been terminated?

 4        A     Yes.

 5        Q     Okay.  And do you use a spreadsheet to

 6   keep track of that?

 7        A     Yes.

 8        Q     Okay.  Does the spreadsheet indicate the

 9   reason that the grants were terminated?

10        A     Based on the categories, yes.

11        Q     Okay.  And that's the Category 1, 2, 3,

12   4 you have here?

13        A     No.  The categories that were provided in

14   the termination letters.

15        Q     Okay.  And which categories are those?

16        A     The categories of the DEI --

17        Q     Okay.  So going --

18        A     -- China.

19        Q     -- back to --

20        A     Yeah.

21        Q     -- what I think had been marked Exhibit 5,

22   page 5 of Exhibit 5?

23        A     Yes.

24        Q     So you're looking at China, DEI, and

25   transgender issues?
```

1    **A    Yes.**

2    Q    Are there any other categories that

3    designate the reason that a grant was terminated?

4    **A    Vaccine hesitancy is the one additional**

5    **one.**

6    Q    Any others?

7    **A    No.**

8    Q    Okay.  And how do you know which of those

9    categories to terminate a grant under?

10   **A    Based on the letters that are provided**

11   **to -- you know, the list.  We receive a list.**

12   Q    That's the list you get from Rachel Riley?

13   **A    That's the list that I get from my**

14   **supervisor or, yeah, it's forwarded.**

15   Q    Okay.  And does that list show which

16   category reason to terminate the grant for?

17   **A    Yes.**

18   Q    Okay.  How does it do that?

19   **A    It has a category section.**

20   Q    What's the form of this list?

21   **A    It's a spreadsheet.**

22   Q    It's a spreadsheet.  Okay.

23   **A    So our spreadsheet matches that**

24   **spreadsheet.**

25   Q    Did you, like, copy and paste into it?

1            MS. ANDRAPALLIYAL:  Objection.  To the

2    extent the information sought is deliberative and

3    not final in nature, I'm instructing the witness not

4    to answer.

5    BY MR. McGINTY:

6       Q    Okay.  So you get a spreadsheet that tells

7    you which grants to terminate and the reasons why?

8       A    Yes.

9       Q    And what are those reasons?

10      A    Based on the categories.

11      Q    Is it verbatim what I'm seeing her, China,

12    DEI --

13           MS. ANDRAPALLIYAL:  Objection.  To the

14    extent that this is calling for deliberative

15    information that has not been finalized, I'm

16    instructing the witness not to answer.

17    BY MR. McGINTY:

18      Q    Speaking only about grants that have

19    actually been terminated, the spreadsheet that you

20    get, what does it say for the reason that the grants

21    have been terminated?

22      A    The categories, you know, DEI,

23    transgender, you know.

24      Q    Is that verbatim?

25      A    I don't -- I can't tell you verbatim, but

1    it doesn't include all of this detail that was

2    provided in the termination letter.  It just gives

3    the title, the category.

4        Q    So it says China, DEI, or transgender?

5        A    Yes, and vaccine --

6        Q    And vaccine?

7        A    -- hesitancy.

8        Q    Okay.  When you get that list and you get

9    the template letters, do you get a letter for each

10   grant that you're going to terminate, or do you have

11   to do some kind of, like, word merge?

12             MS. ANDRAPALLIYAL:  Objection.  The

13   question is calling for provision of deliberative

14   information which is privileged.  I'm instructing

15   the witness not to answer.

16   BY MR. McGINTY:

17       Q    Okay.  But it's your testimony that the

18   reason that the grant is going to be terminated is

19   provided to you.  Is that right?

20       A    That's right.

21       Q    And you don't have any input into that?

22       A    I don't.

23       Q    Okay.  And you're testifying that the

24   template letter for each reason is provided to you.

25   Is that right?

1    **A    Yes.**

2    Q    And you don't have any input into that

3    either?

4    **A    I don't.**

5    Q    Okay.  And how many of these lists have

6    you gotten to terminate grants?

7         MS. ANDRAPALLIYAL:  Objection.  To the

8    extent this information is deliberative and

9    nonfinal, I'm instructing the witness not to answer.

10   BY MR. McGINTY:

11   Q    How many lists have you gotten for grants

12   that have been terminated?

13   **A    More than five.**

14   Q    And how many grants have you terminated on

15   the basis of these lists?

16   **A    Lots of grants.  I don't know the number.**

17   Q    More than a hundred?

18   **A    More than a hundred.**

19   Q    More than a thousand?

20   **A    No.**

21   Q    Somewhere between a hundred and a

22   thousand?

23   **A    Somewhere between five hundred and a**

24   **thousand.**

25   Q    Somewhere between five hundred and a

```
 1   thousand.
 2       A     Mm-hmm.
 3             MR. McGINTY:  This is Exhibit 7, I think
 4   we are on.
 5             (Bulls Deposition Exhibit 7 was marked for
 6              identification.)
 7   BY MR. McGINTY:
 8       Q     Do you recognize this document?
 9       A     Yes.
10       Q     And you wrote this document, right?
11       A     I wrote it with Dr. Lauer, yes.
12       Q     Okay.  And what is it?
13       A     It's the supplemental -- it's the
14   beginning of the guidance providing agency -- I mean
15   ICs with guidance on how to unpause funding.
16       Q     And it does say that there is a
17   restriction.  What's the restriction that it gives
18   guidance about?
19       A     On spending funding related to DEI
20   activities on grants.
21       Q     Was there a definition of DEI activities
22   provided with this memo?
23             MS. ANDRAPALLIYAL:  Objection.  To the
24   extent the information sought is deliberative and
25   not final, I'm instructing the witness not to
```

1    answer.

2    BY MR. McGINTY:

3         Q    How are ICs supposed to determine if

4    something fell within DEI activities?

5         **A    They have scientific, the scientific**

6    **background and they know their programs, so the**

7    **Grants Management officials work with the program**

8    **officials to identify DEI activities where it's not**

9    **clear in the statute.**

10        Q    Are you aware of any statute that talks

11   about that?

12             MS. ANDRAPALLIYAL:  Objection, calls for a

13   legal conclusion and assumes facts not in evidence.

14   BY MR. McGINTY:

15        Q    You can answer.

16        **A    The Minority Health Disparity Institute**

17   **does have language about minority health and that**

18   **kind of thing.  So I don't know if it's -- I don't**

19   **think it ties directly, but I think that is being**

20   **used.  And that's an assumption, that's not facts.**

21        Q    Okay.  You said the Minority Health and

22   Research Institute?  Did I get that right?

23        **A    Minority Health Disparity.**

24        Q    Minority Health Disparity Institute.

25             What's the purpose of the Minority Health

1    Disparity Institute?

2        A    I don't know.

3        Q    Okay.  So this March 25 Guidance says it

4    is rescinding the March 13 Guidance.  Is that right?

5        A    Yes.

6        Q    So the March 25 Guidance kind of takes the

7    place of this March 13?

8            MS. ANDRAPALLIYAL:  Objection.  This is a

9    draft so I'm instructing the witness not to answer

10   as to deliberative information that has not been

11   finalized.

12   BY MR. McGINTY:

13       Q    The March 25 Guidance has an issue date of

14   March 25, right?

15       A    It does say that, but it is not final.

16       Q    Has this been given to ICs?

17       A    It was shared for feedback.

18       Q    Oh, with whom?

19       A    The ICs.

20       Q    Okay.

21       A    Yeah.

22       Q    And the ICs have not implemented it yet?

23       A    I cannot say that they have implemented

24   the guidance.  What they've been told is that we

25   cannot give them final guidance until we receive the

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **final details from the director.**

2        Q    So earlier you talked about, I think,

3    three versions of this document.  This March 25 one,

4    which version is this?

5        **A    The latest.**

6        Q    This is the latest?

7        **A    Mm-hmm, yes.**

8        Q    And the one that's in the Nature article,

9    which one is that?

10       **A    It looks like it might be --**

11            MS. ANDRAPALLIYAL:  Objection.  To the

12   extent that the question is seeking deliberative

13   information that has not been finalized yet, I'm

14   instructing the witness not to answer.

15   BY MR. McGINTY:

16       Q    You said the first one was used by ICs to

17   implement policy, right?

18       **A    To implement guidance on how to unpause**

19   **funding.**

20       Q    Was the one in the Nature article used by

21   ICs to implement guidance on how to unpause funding?

22       **A    The -- it expanded on the original**

23   **guidance as we received the draft memo on the**

24   **priorities.  We wanted to make sure that when the --**

25   **as the memo came out, that they had an understanding**

1    of the next steps in the guidance.  So the guidance

2    just expanded based on the anticipation of receiving

3    the memo.

4         Q    Okay.  So this February 13th one is the

5    first.  Is that right?

6         A    Yes.

7         Q    And then the one in the Nature article is

8    the second.  Is that right?

9         A    Yes.

10        Q    Okay.  And the March 25 one is the last

11   one?

12        A    I believe so, yes.

13        Q    Okay.

14             MS. ANDRAPALLIYAL:  Objection to the

15   draft.  So I object to the extent that the

16   information sought is seeking final information that

17   has not been finalized yet.

18             MR. McGINTY:  I think privilege has been

19   waived, Counsel.

20             MS. ANDRAPALLIYAL:  The deliberative

21   process privilege does not have a subject matter

22   waiver component to it.

23             (Reporter requests clarification)

24             MS. ANDRAPALLIYAL:  The deliberative

25   process privilege does not have a subject matter

```
 1   waiver component to it.
 2            MR. McGINTY:  Would you mark this.  I
 3   think we're on 8.
 4            (Bulls Deposition Exhibit 8 was marked for
 5              identification.)
 6   BY MR. McGINTY:
 7        Q    I'm handing you what's been marked
 8   Exhibit 8.  Do you recognize this document?
 9        A    Yes.
10        Q    And what is this?
11        A    A memo that Dr. Lauer and I sent asking,
12   alerting folks that we were evaluating our agency
13   priorities for the new administration.
14        Q    And this one says, "We recognize that NIH
15   programs fall under recently issued temporary
16   restraining orders," and there's a list of some
17   cases, right?
18        A    Mm-hmm.
19        Q    Why was that included in here?
20            MS. ANDRAPALLIYAL:  Objection.  The
21   question calls for attorney-client communications,
22   it's privileged.  I'd instruct the witness not to
23   answer.
24   BY MR. McGINTY:
25        Q    By issuing this guidance you were alerting
```

1    the programs that there were temporary restraining

2    rules that apply, right?

3        **A    Yes.**

4        Q    Okay.  In any of the subsequent guidance

5    did you alert the programs that there were temporary

6    restraining orders that applied?

7             MS. ANDRAPALLIYAL:  Objection.  The

8    question seeks deliberative information.  I instruct

9    the witness not to answer.

10   BY MR. McGINTY:

11       Q    Let's see.  Going back to what I think is

12   Exhibit 6, March 25 Guidance, were ICs given any

13   guidance to avoid the termination of grants to

14   institutions providing gender affirming care in

15   plaintiff states in this case?

16            MS. ANDRAPALLIYAL:  Objection,

17   information seeks -- the question seeks information

18   that's deliberative, not final, and potentially

19   attorney-client privileged, so I'm instructing the

20   witness not to answer.

21   BY MR. McGINTY:

22       Q    Has NIH terminated grants to institutions

23   that provide gender affirming care in the plaintiff

24   states in this case?

25            MS. ANDRAPALLIYAL:  Objection, calls for a

```
 1   legal conclusion.

 2   BY MR. McGINTY:

 3        Q    You can answer.

 4        A    I don't -- I don't know of an institute or

 5   center that has terminated a grant based on this

 6   information in this guidance.

 7        Q    Okay.  That's because you get the lists of

 8   grants to terminate from outside of NIH, right?

 9        A    Yes, it -- yes, the list comes from

10   outside of NIH.

11        Q    So what has this guidance been used to do,

12   if anything?

13        A    To anticipate the memo of the priorities.

14   ICs have not been instructed to terminate grants.

15        Q    So grant terminations are coming

16   exclusively from outside of NIH?

17        A    Yes.

18        Q    Okay.  Let's see.

19             (Bulls Deposition Exhibit 9 was marked for

20              identification.)

21   BY MR. McGINTY:

22        Q    Exhibit 9, do you recognize this document?

23        A    Yes.

24        Q    And just for the record, we're on

25   Exhibit 9.  And what is it?
```

1       **A       It's a Notice of Award.**

2       Q       And who is it a Notice of Award to?

3       **A       Seattle Children's Hospital.**

4       Q       And this is the same grant that we were

5       talking about, I think, on Exhibit 2, maybe

6       Exhibit 3?

7       **A       Yes.**

8       Q       Now, could you just run through the table

9       that appears on page 1 of this exhibit.

10      **A       The table?**

11      Q       Yeah, there's some numbers there.  I'm not

12      entirely sure how to follow it.

13              What does this table indicator mean?

14              MS. ANDRAPALLIYAL:  Objection, assumes

15      facts not in evidence.

16      BY MR. McGINTY:

17      Q       Do you know how to interpret this table?

18      **A       What?  There -- it looks like tables.  Are**

19      **you talking about this table?**

20      Q       Sorry.  I mean the table entitled,

21      "Summary Federal Award Financial Information."

22      **A       Okay.**

23      Q       Sorry.  Sorry for my confusion.

24      **A       Okay.  Yes, I can tell you that the --**

25      **it's the budget start date -- you know, the budget**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   period start date from when the grant started and

2   the end date for when the grant ended.  Then, you

3   know, it has the obligation of funds and it's the

4   deobligation.

5        Q    And what is that, deobligation?

6        A    Removing funding, the existing funding,

7   from the grant.

8        Q    Okay.

9        A    And then the total amount that's obligated

10  is the amount that was left on the award, it looks

11  like.  So it looks like they didn't deobligate the

12  entire.  There was money left for the recipient.

13  And the project period end date which is, at the

14  time, the entire life cycle of the grant project.

15       Q    And so how much was deobligated?

16       A    I -- I can only assume the amounts here.

17  I didn't deobligate it, but I'm looking at the

18  table.

19       Q    According to this table, how much was

20  deobligated?

21       A    Yeah, well my math is bad so.

22            It's the 200 -- 200,453, 162,636, and the

23  37,000 it looks like it was -- those all have minus

24  signs, so that tells me that they deobligated that

25  amount, and the remaining left is the 40,000.

```
 1              (Reporter requests clarification)

 2              THE WITNESS:  40,091.

 3   BY MR. McGINTY:

 4        Q    Okay.  Thank you.

 5              So who issued this letter?

 6        A    Margaret Young.  It's not a letter.  It's

 7   a Notice of Award.

 8        Q    Okay.

 9        A    Yeah.  I just wanted to make that

10   distinction.

11        Q    No, I appreciate it.

12              So Margaret Young issued this Notice of

13   Award?

14        A    Yes.

15        Q    Who is Margaret Young?

16        A    She is the Chief Grants Management Officer

17   of Child Development, NICHD.

18        Q    Okay.  If you would turn to page 5.

19        A    Yes.

20        Q    There's some language here under

21   "Termination" and "Transgender Issues."

22              Could you read the language under

23   Termination?

24        A    "This award related to Transgender

25              Issues no longer effectuates agency
```

1          priorities.  It is the policy of NIH not

2          to further prioritize these research

3          programs.  Therefore, the award is

4          terminated."

5     Q    Who wrote that language?

6     A    That language was taken from the

7  termination letter that I sent on the 28th.  The

8  termination letter went out, had that language, and

9  then I instructed her to issue the Notice of Award

10 using the same language.

11    Q    Okay.  Why did you instruct her to do

12 that?

13    A    That's the process for terminating awards,

14 is issuing the letter and then the institute will --

15 well, this process is the issuing of the termination

16 letter, but the award is the official document.

17    Q    So why did you instruct Margaret Young to

18 take the language from the termination letter?

19    A    Because we were asked to terminate the

20 awards, of the award, other awards.

21    Q    Could you have used different language?

22         MS. ANDRAPALLIYAL:  Objection.  To the

23 extent the question is calling for the provision of

24 deliberative information that wasn't actually

25 finalized into this letter, I'm instructing the

1   witness not to answer.

2   BY MR. McGINTY:

3       Q    Did anyone tell you to use this language

4   exactly?

5       **A    I consulted with OGC.**

6       Q    Office of General Counsel?

7       **A    Correct.**

8       Q    And under "Transgender Issues," this

9   language is also identical to the language from the

10  termination letter?

11      **A    Yes.**

12      Q    And did anyone tell you to use this

13  language exactly?

14      **A    No.  The language matched the language in**

15  **the letter, so I just followed the guidance from the**

16  **letter and advised that the award matched the**

17  **letter.**

18      Q    It's kind of --

19      **A    I didn't have any other language to give.**

20      Q    It's kind of a funny typo under

21  "Termination."  "Transgender issues" is capitalized

22  on the "T."  Do you know why that is?  Under

23  "Termination," sorry.

24      **A    Oh.**

25           (Witness reviews document)

1        **THE WITNESS:  No, I don't know.**

2   BY MR. McGINTY:

3        Q    Could it have been copied and pasted from

4   something?

5             MS. ANDRAPALLIYAL:  Objection, calls for

6   speculation.

7        **THE WITNESS:  I don't know.**

8   BY MR. McGINTY:

9        Q    Is it standard practice to capitalize the

10  "T" on these Notice Awards?

11            MS. ANDRAPALLIYAL:  Objection, calls for

12  speculation.

13       **THE WITNESS:  The "T"?**

14  BY MR. McGINTY:

15       Q    On "Transgender issues."

16       **A    I've not issued an award for a letter that**

17  **-- before.**

18       Q    Have you told anyone to capitalize that

19  "T"?

20       **A    The language was taken from the letter.**

21            (Bulls Deposition Exhibit 10 was marked

22             for identification.)

23  BY MR. McGINTY:

24       Q    I'm handing you what's been marked

25  Exhibit 10.  Do you recognize this document?

1        **A      A Notice of Award.**

2        Q      And it's the same grant as we were talking

3    about in Exhibit 9, isn't it?

4        **A      Yes.**

5        Q      And taking a look at that, "Summary

6    Federal Award Financial Information," could you tell

7    me what that summary means?

8        **A      It looks like the deobligations were**

9    **reversed.**

10       Q      Do you know why the deobligations were

11   reversed?

12              MS. ANDRAPALLIYAL:  Objection, asks for

13   speculation.

14              MR. McGINTY:  I asked if she knew.

15              **THE WITNESS:  If I knew why?**

16   BY MR. McGINTY:

17       Q      Why the deobligations were reversed.

18       **A      To reinstate the grant.**

19       Q      Do you know why this grant was reinstated?

20       **A      No, but I was asked to reinstate the**

21   **grant.**

22       Q      Who asked you to reinstate it?

23       **A      I want to say my supervisor.  This is the**

24   **acting supervisor.**

25       Q      And who is that?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      **A      Dr. Lorsch.**

2      Q      Dr. Lorsch?

3      **A      Yeah.**

4      Q      Do you know when that happened?

5      **A      Probably around the same day or the day**

6    **before of the issue date of the letter.**

7      Q      And this grant was originally terminated

8    in response to one of those lists you got, right?

9      **A      Yes.**

10     Q      Has any other grant been reinstated since

11   you got a Notice to Terminate on one of those lists?

12     **A      Yes.**

13     Q      Which ones are those?

14     **A      I think it's a COVID grant, the COVID OT**

15   **of the transaction.**

16     Q      COVID OT.  Do you know what grantee?

17     **A      I don't know.**

18     Q      Go to page 5 in Exhibit 10.

19            MS. ANDRAPALLIYAL:  Can we go off the

20   record, please.

21                  (Discussion off record)

22            MR. McGINTY:  Back on the record.

23   BY MR. McGINTY:

24     Q      So we're on page 5, and it says:

25            "Revised Award:  This grant has been

1          restored and the termination clause

2          rescinded effective immediately.  This

3          grant will continue under the original no

4          cost extension."

5       What does that mean?

6     **A    It means that the grant was restored, you**

7  **know, and that the termination was rescinded, and**

8  **when the grant was terminated, it was in a no cost**

9  **extension.  And we were just saying that we wanted**

10 **the recipient to know that they can continue in**

11 **their extension.**

12    Q    Okay.  It does say:

13          "The previous terms and conditions of

14           award remain in effect as stated below."

15       What does that mean?

16          MS. ANDRAPALLIYAL:  Objection, assumes

17  facts not in evidence.

18  BY MR. McGINTY:

19    Q    You can answer.

20    **A    I don't know what that means.  It just --**

21  **I don't know.**

22    Q    Okay.  Because it says "Termination," and

23  it has the same language related to transgender

24  issues.  It says:

25          "Transgender issues:  Research programs

1          based on gender identity are often..."

2          (Reporter requests Mr. McGinty to read

3           slower)

4          MR. McGINTY:  Sorry, of course.

5     BY MR. McGINTY:

6          Q    It has the same language from the letter

7     we were talking about earlier.

8          A    Yes.

9          Q    Do you know why that language is still

10    there?

11         A    I don't.

12         Q    Is this grant subject to being defunded

13    again because of what it researches?

14         MS. ANDRAPALLIYAL:  Objection, calls for

15    speculation.

16         THE WITNESS:  No.

17    BY MR. McGINTY:

18         Q    It's not?

19         A    Not that I am -- not that I would say, no.

20         Q    Is it part of your duties as the Director

21    of OPERA to interpret Notice of Awards like this?

22         A    Yes.

23         Q    So how would you interpret this Notice of

24    Award when it says, "The previous terms and

25    conditions will remain in effect as state below,"

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1  and it still has the "Termination" and "Transgender

2  issues" language?

3      **A    I would interpret it that someone didn't**

4  **delete the language, because when we typically**

5  **revise awards, the previous terms and conditions**

6  **still apply.  So I believe that it was in error.**

7      Q    And going back to page 1, was that also

8  issued by Margaret Young?

9      **A    Yes.**

10     Q    Did you ask Margaret Young to issue this

11 NOA?

12     **A    The recension of the termination, yes.**

13     Q    And did you give her any particular

14 instructions with respect to the "Termination" and

15 "Transgender issues" language?

16     **A    I told her to revise the award and restore**

17 **the grant and sent her the language to restore the**

18 **grant.**

19     Q    And that's the language -- which language

20 is that?

21     **A    "This grant has been restored and the**

22        **termination clause rescinded effective**

23        **immediately.  The grant will continue**

24        **under the original no cost extension."**

25     Q    Did you get that language from anywhere?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1        A      No.

2        Q      You wrote that?

3        A      I wrote it.

4              MR. McGINTY:  We can go off the record.

5        (Luncheon recess taken -- 12:03 to 1:08 p.m.)

6              MR. McGINTY:  Back on the record.  Go

7    ahead and mark this, please.

8              (Bulls Deposition Exhibit 11 was marked

9               for identification.)

10   BY MR. McGINTY:

11       Q      I'm handing you what's been marked

12   Exhibit 11.  Do you recognize this document?

13       A      Yes.

14       Q      And what is it?

15       A      A termination letter.

16       Q      And this is another one that you wrote,

17   right?

18       A      This is another one that I issued that was

19   written.

20       Q      I'll clarify.  You signed this, right?

21       A      Correct.

22       Q      Okay.  And you signed this on behalf of

23   Margaret Young?

24       A      Yes.

25       Q      And that's the same Margaret Young that we

1  were talking about earlier, the Chief Grants

2  Management Officer at NICHD?

3      **A    Yes.**

4      Q    Why did you issue this on behalf of

5  Margaret Young?

6      **A    I believe at that time because the letters**

7  **were coming out quickly that I just issued them on**

8  **behalf of the IC Chief GMO, and then they would**

9  **handle the Notice of Reward.**

10     Q    Did you talk to Margaret Young, before you

11 issued it, about issuing this letter?

12     **A    No.**

13     Q    Is this another one of the letters that

14 you got in a list?

15     **A    Yes.**

16     Q    And that list was sent to you by your

17 supervisor?

18     **A    Yes.**

19     Q    Who at the time was?

20     **A    March 12th?  I can't recall.**

21     Q    Okay.  And do you recall whether or not

22 Rachel Riley was cc'd on the e-mail you got that

23 terminated this grant as well?

24     **A    I don't recall --**

25     Q    Okay.

1      **A      -- Rachel being on there.**

2      Q      You'd have to look at the e-mail to know?

3      **A      Yes.**

4      Q      And you did get this in an e-mail from

5      your supervisor?

6      **A      An e-mail from my supervisor, a forwarded,**

7      **probably.**

8      Q      A forwarded e-mail from your supervisor

9      that had the spreadsheet that you were talking about

10     earlier?

11     **A      All of them have spreadsheets.**

12     Q      And that spreadsheet has the list of

13     grants to terminate?

14     **A      Yes.  And a point of clarification, if I**

15     **may?**

16              MS. ANDRAPALLIYAL:  Sure.

17              **THE WITNESS:  Because the process was just**

18     **continuing to be a lot, we actually -- I did say to**

19     **the -- I asked the Chief Grants Management Officers**

20     **if they were okay with me just issuing the letter**

21     **and them issuing the Notice of Awards.  And they did**

22     **say that they were okay with that.  And I do have**

23     **some of that in writing.**

24     BY MR. McGINTY:

25     Q      Great.  Thank you for that clarification.

1      **A      Yeah.**

2      Q      By way of further clarification, did you

3   have any input in saying whether or not this

4   particular grant was going to be terminated?

5      **A      No.**

6      Q      And did you have any input in the language

7   on this letter?

8      **A      No.**

9      Q      To your knowledge, did anyone at NIH have

10  input?

11          MS. ANDRAPALLIYAL:  Objection.  It calls

12  for the provision of deliberative information.  I'm

13  instructing the witness not to answer.

14          MR. McGINTY:  Counsel, deliberative

15  process exemption only applies where an action has

16  not been taken.  I'm talking about terminating a

17  grant.

18          MS. ANDRAPALLIYAL:  No, that's not true.

19  The deliberative process privilege applies to

20  pre-decisional communications that precede a final

21  action, so it does apply to actions that have

22  already been taken.

23  BY MR. McGINTY:

24      Q      Is there anything other than this letter

25  that explains why the grant was being terminated?

1      **A      The spreadsheet.**

2      Q      The spreadsheet explains why?

3      **A      It doesn't explain, it just lists the**

4      **category.**

5      Q      Okay.  Is there anything other than this

6      letter and the spreadsheet?

7      **A      An e-mail.**

8      Q      An e-mail?

9      **A      Yes.**

10     Q      An e-mail you got from your supervisor?

11     **A      Yes.**

12     Q      Anything other than this letter, that

13     spreadsheet, and the e-mail?

14     **A      No.**

15     Q      Okay.  Were either the spreadsheet or the

16     e-mail shared with the grant recipient?

17     **A      No, not that I'm aware of.**

18            MR. McGINTY:  Mark this, please.

19            (Bulls Deposition Exhibit 12 was marked

20             for identification.)

21     BY MR. McGINTY:

22     Q      I'm handing you what's been marked

23     Exhibit 12.  And do you recognize this document?

24     **A      Yes.**

25     Q      And what is it?

1      **A      Termination letter.**

2      Q      And this is another termination letter

3   that you signed?

4      **A      Yes.**

5      Q      And this one is to the Regents of the

6   University of California, San Francisco.  And it's

7   Project No. 1R01 AI186641-01 --

8             (Reporter requests clarification)

9             MR. McGINTY:  I'm sorry.  1R01 AI186641-0.

10  BY MR. McGINTY:

11     Q      Is that correct?

12     **A      Dash 01.**

13     Q      And is this another one of the

14  terminations that you got in a list?

15     **A      Yes.**

16     Q      From your supervisor?

17     **A      Yes.**

18     Q      And this letter is dated March 18?

19     **A      Yes.**

20     Q      And who was your supervisor at that time?

21     **A      I believe it was Jon Lorsch at that time,**

22  **for sure.**

23     Q      Jon Lorsch?

24     **A      Dr. Lorsch.**

25     Q      Dr. Lorsch?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      **A      Yeah.**

2      Q      And, to your knowledge, did anyone at NIH

3   have any input in whether or not this grant was

4   going to be terminated?

5      **A      I don't know.**

6      Q      Would you know?

7      **A      I don't know.**

8            MS. ANDRAPALLIYAL:  Objection, calls for

9   speculation.

10   BY MR. McGINTY:

11      Q      You can answer.

12      **A      I wouldn't know.**

13      Q      And is there anything, other than this

14   letter, that explains why this grant was terminated?

15      **A      The spreadsheet, the e-mail.**

16      Q      Anything else?

17      **A      No.**

18      Q      Okay.  Did you ever talk to Dr. Lorsch

19   about this termination?

20            MS. ANDRAPALLIYAL:  Go ahead.

21            **THE WITNESS:  No.**

22   BY MR. McGINTY:

23      Q      Did he tell you why this grant was being

24   terminated?

25            MS. ANDRAPALLIYAL:  Objection.  Because

1  the question is seeking deliberative information, I

2  instruct the witness not to answer.

3  BY MR. McGINTY:

4      Q    Let's go back very quickly to Exhibit 11.

5  I just want to make sure that the grant project

6  number is on the record.

7           Could you read that for me.

8      A    **Can I read -- I'm sorry?**

9      Q    The project number that was being

10  terminated.

11     A    **Oh.  5 U01 HD108779-04.**

12     Q    Great.  And to whom -- what was the

13  institution this was issued to?

14     A    **Regents of the University of Minnesota.**

15     Q    Thank you.

16          MR. McGINTY:  Mark that one, please.

17          (Bulls Deposition Exhibit 13 was marked

18           for identification.)

19  BY MR. McGINTY:

20     Q    I hand you what's been marked Exhibit 13.

21  Do you recognize this document?

22     A    **Yes.**

23     Q    And what is it?

24     A    **A termination letter.**

25     Q    Okay.  And this one is a grant to the

1    Regents of the University of Colorado.  Is that

2    right?

3         **A    That is correct.**

4         Q    And could you read the project number for

5    me, please.

6         **A    Sure.  1R21 HD115838-01.**

7         Q    And this is another one that was provided

8    to you in a list from your supervisor?

9         **A    Yes.**

10        Q    And the only thing to explain why that

11   grant was terminated is this letter, the spreadsheet

12   that was attached to that e-mail, and the e-mail

13   itself?

14        **A    The e-mail itself doesn't explain it, it**

15   **just asks me to terminate it.  The spreadsheet**

16   **attached gives the category and the grant number.**

17        Q    Okay.  And, to your knowledge, NIH didn't

18   do any assessment of this particular grant before it

19   was terminated?

20        **A    I don't know.**

21             MR. McGINTY:  Mark that, please.

22             (Bulls Deposition Exhibit 14 was marked

23              for identification.)

24   BY MR. McGINTY:

25        Q    I hand you what's been marked Exhibit 14.

1    Now, starting about halfway down the page, this

2    appears to be an e-mail from you.  Is that right?

3        **A    Yes.**

4        Q    And what is this e-mail from you?

5        **A    A termination letter.**

6        Q    And did you start sending these in the

7    form of an e-mail at some point?

8        **A    Yes.**

9        Q    When was that?

10       **A    Likely around the same date of this**

11   **letter.**

12       Q    Which is March 21, 2025?

13       **A    Yeah, around that time.**

14       Q    And why did you do that?

15       **A    To be efficient.**

16       Q    Why did you need to be efficient?

17       **A    The letters were -- the spreadsheet had**

18   **many terminations on the list, so I did it to be**

19   **efficient.**

20       Q    It was easier to send it in e-mail form

21   because there were so many to do?

22       **A    Yeah.**

23       Q    And who is the institution that this grant

24   was issued to?

25       **A    University of Washington.**

1      Q    And what's the project number?

2      A    5R01MD017573-03.

3      Q    Okay.  And this one, I think you alluded

4   to it already, but this one is also on the basis of

5   the spreadsheet that you got?

6      A    Yes.

7      Q    And who sent you that spreadsheet?

8      A    Probably it was forwarded to me by my

9   supervisor.

10     Q    Forwarded from whom?

11     A    From Dr. Memoli.

12     Q    Dr. Memoli?

13     A    Yeah, at this point.  That's correct.

14     Q    And do you know if it was forwarded to

15  Dr. Memoli from anybody?

16          MS. ANDRAPALLIYAL:  Objection, calls for

17  speculation, calls for a provision of deliberative

18  information.

19  BY MR. McGINTY:

20     Q    You can answer.

21          MS. ANDRAPALLIYAL:  Objection.  To the

22  extent that it calls for the provision of

23  deliberative information, I would instruct the

24  witness not to answer.

25          MR. McGINTY:  Can you explain the

1    privilege attaching to an e-mail that the person

2    forwarded an e-mail.

3            MS. ANDRAPALLIYAL:  To the extent that the

4    answer is -- that the answer would provide

5    information that is deliberative, I would instruct

6    the witness not to answer.

7    BY MR. McGINTY:

8        Q    Did any of the to or from or cc fields on

9    that e-mail, or on the e-mails that were attached to

10   it, contain back-and-forth deliberative discussions?

11       **A    Not that I'm aware of.**

12       Q    Okay.  Do you recall if the e-mail that

13   Dr. Memoli -- was forwarded from Dr. Memoli, was

14   forwarded from anybody else?

15       **A    I don't recall.**

16       Q    Okay.  The only way to know that would be

17   from the e-mail?

18       **A    Yes.**

19       Q    Okay.

20           MR. McGINTY:  Mark that.

21           (Bulls Deposition Exhibit 15 was marked

22            for identification.)

23   BY MR. McGINTY:

24       Q    I pass you what has been marked

25   Exhibit 15.  Do you recognize this document?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    A    Yes.

2    Q    What is it?

3    A    **It is a termination letter.**

4    Q    And this is two-sided.  I'm sorry, I

5  printed this double sided.

6    A    **That's okay.**

7    Q    And that's your signature at the end,

8  right?

9    A    **Yes.**

10    Q    Okay.  And this is another one of the

11  terminations on the basis -- that was sent to you on

12  a spreadsheet?

13    A    **Yes.**

14    Q    And what's the institution that received

15  this grant?

16    A    **University of Washington.**

17    Q    And what's the project number?

18    A    **1F31 AI181431-01A1.**

19    Q    Okay.  And the only thing that would

20  explain why this grant was terminated is this letter

21  and the spreadsheet?

22    A    **Yes.**

23        MS. ANDRAPALLIYAL:  Sorry.  Objection,

24  assumes facts not in evidence.

25  BY MR. McGINTY:

1       Q    What are the documents that would explain
2   why this grant was terminated?
3       **A    The letter, the e-mail that was forwarded**
4   **with the spreadsheet.**
5       Q    And that spreadsheet was forwarded to you
6   from your supervisor?
7       **A    Yes.**
8       Q    And who is your supervisor at the time?
9       **A    I believe it was Dr. Lorsch.  There was a**
10  **transition period so.**
11      Q    So either Dr. Lorsch or?
12      **A    Dr. Bundesen.**
13      Q    Okay.  Either Dr. Lorsch or Dr. Bundesen.
14           And would Rachel Riley have been on any of
15  the to or from fields of that e-mail?
16      **A    Not at that time, not during this time**
17  **period.**
18      Q    Anyone else from HHS?
19      **A    No.**
20      Q    So did -- so that stopped at some point?
21      **A    Yes.  I didn't see the to, where it**
22  **originated.  It was just coming from Dr. Memoli to**
23  **either Liza or Dr. Lorsch.**
24      Q    And when did you stop being able to see
25  where it originated?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1       A    I don't even recall because I stopped

2   looking down on the e-mails at that point.  It

3   was -- yeah.

4       Q    Before or after March 10?

5       A    Probably after.

6       Q    Sometime after March 10?

7       A    Yes.

8            (Bulls Deposition Exhibit 16 was marked

9             for identification.)

10  BY MR. McGINTY:

11      Q    I'm showing you what's been marked

12  Exhibit 16.  Do you recognize this?

13      A    Yes.

14      Q    And what is it?

15      A    A termination letter.

16      Q    And this is another one that you signed?

17      A    Yes.

18      Q    And who is the recipient of this grant?

19      A    University of Washington.

20      Q    And what's that project number?

21      A    5R01LM013301-05.

22      Q    And this is another one that came to you

23  in the form of a spreadsheet listing the grants to

24  terminate?

25      A    Yes.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      Q      And that was sent to you by your

2    supervisor?

3      **A      Yes.**

4      Q      Which was who at this point?

5      **A      Dr. Lorsch.**

6      Q      That was Dr. Lorsch.

7             And you wouldn't have known who sent

8    Dr. Lorsch this spreadsheet?

9      **A      Typically, like I said, I started seeing**

10   **just the e-mail forwarded from -- sent to Dr. Lorsch**

11   **from Dr. Memoli.**

12     Q      Got it.

13     **A      Yeah.**

14     Q      So Dr. Memoli sent it to Dr. Lorsch.  Is

15   that right?

16     **A      That is correct.**

17     Q      Okay.  And do you know who sent it to

18   Dr. Memoli?

19     **A      No.**

20     Q      Okay.  Because that information was cut

21   off of the e-mail?

22     **A      I don't know if it was cut off, it just**

23   **wasn't there.**

24     Q      It wasn't on the e-mail?

25     **A      No, it wasn't on the e-mail.**

1     Q     Okay.

2           (Bulls Deposition Exhibit 17 was marked

3            for identification.)

4   BY MR. McGINTY:

5     Q     I'm handing what's been marked Exhibit 17.

6   Do you recognize this?

7     A     Yes.

8     Q     And what is this?

9     A     A termination letter.

10    Q     And who is the institution it was issued

11  to?

12    A     University of Washington.

13    Q     And what's the project number?

14    A     1G13LM014426-01.

15    Q     And this is another one that you got in a

16  spreadsheet?

17    A     Yes.

18    Q     And it was sent to you by your supervisor?

19    A     Yes.

20    Q     And do you know who sent the spreadsheet

21  to your supervisor?

22    A     During this period it was from Dr. Memoli

23  to -- I -- this is the foggy period, sorry.

24    Q     Okay.  You're not sure who your supervisor

25  was?

1    A    I'm sure who my supervisor was.  I'm just

2  not sure of the period when it was, the different

3  time frames.

4    Q    That's fine.  It was either Bundesen or

5  Lorsch?

6    A    Right.

7    Q    And do you know who sent it to Dr. Memoli?

8    A    I don't recall during this time.  Yeah,

9  I'm not sure if it was just forwarded from

10  Dr. Memoli to Liza or Jon to me.  Because, remember,

11  during a period of time, it was on the from with --

12  how do I say?  The person that it was sent from at

13  the department was on there, and at a point that

14  stopped.

15    Q    But when it was from someone from the

16  department, that was Rachel Riley?

17    A    The two times, yes.

18    Q    Okay.  Was there anyone else from HHS it

19  was sent from?

20    A    Not that I'm aware of.

21    Q    Okay.  So either it was Rachel Riley or

22  you didn't have the information?

23    A    Correct.

24    Q    Okay.  And this letter and the other

25  letters we've been looking at, this is still the

1    same template letter that was provided to you?

2        A    Yes.

3        Q    You didn't write one word in this letter?

4        A    No, just signed it.

5        Q    Okay.  And the only thing that would

6    explain why this grant was terminated is this letter

7    and the spreadsheet and the e-mail?

8        A    Yeah, the spreadsheet that was attached to

9    the e-mail.

10            (Bulls Deposition Exhibit 18 was marked

11             for identification.)

12   BY MR. McGINTY:

13       Q    I'm handing you what's been marked

14   Exhibit 18.  Do you recognize this?

15       A    Yes.

16       Q    And what is it?

17       A    A termination letter.

18       Q    And this is another one that looks like it

19   was in e-mail form.  Is that right?

20       A    Yes, that's correct.

21       Q    And who is the institution it was issued

22   to?

23       A    University of Washington.

24       Q    And what's the project number?

25       A    1R21AI183907-01A1.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1              (Reporter requests clarification)
 2         THE WITNESS:  "A" as in apple.
 3   BY MR. McGINTY:
 4         Q    And this is another termination that you
 5   issued on the basis of a spreadsheet that was sent
 6   to you?
 7         A    Yes.
 8         Q    And that was sent to you -- who sent you
 9   that spreadsheet?
10         A    Dr. Lorsch.
11         Q    Dr. Lorsch sent it to you.  And Dr. Memoli
12   sent it to Dr. Lorsch?
13         A    Correct.
14         Q    And the only thing that would explain why
15   this grant was terminated is this letter and the
16   e-mail and the spreadsheet?
17              MS. ANDRAPALLIYAL:  Objection, assumes
18   facts not in evidence.
19   BY MR. McGINTY:
20         Q    What are the documents that would explain
21   why this grant was terminated?
22         A    The letter, the forwarded spreadsheet that
23   had the categories in there.
24         Q    Okay.  Anything else?
25         A    No.
```

```
 1              MS. ANDRAPALLIYAL:  Can we go off the
 2    record for a minute.
 3              MR. McGINTY:  Why?
 4              MS. ANDRAPALLIYAL:  I would like to confer
 5    with my co-counsel.
 6              MR. McGINTY:  About what?
 7              MS. ANDRAPALLIYAL:  I don't think I'm
 8    obligated to tell you that.
 9              MR. McGINTY:  We just had a break.  I
10    think we're going to keep going.
11              MS. ANDRAPALLIYAL:  I'd like to stop, and
12    I don't think that's -- I don't -- yeah, I'd like to
13    stop, please.
14              MR. McGINTY:  Okay.  Off the record.
15              (Recess taken - 1:31 to 1:46 p.m.)
16              MR. McGINTY:  We can go back on the
17    record.
18              All right.  I just want to note for the
19    record that we took about a 15-minute break just
20    now.
21    BY MR. McGINTY:
22         Q    Ms. Bulls, did you confer with counsel at
23    the break?
24         A    I asked a question.
25         Q    Did you talk to your lawyers?
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      A     Yes.

2      Q     Okay.

3            MR. McGINTY:  Can I ask the court reporter

4   how much time we've been on the record.

5            (Whereupon, the reporter discloses time

6             spent on the record)

7            MR. McGINTY:  A little less than four

8   hours?

9            MADAM COURT REPORTER:  Yes.

10            MR. McGINTY:  I'll also note for the

11   record that we've been on the record for a little

12   less than four hours.

13            (Bulls Deposition Exhibit 19 was marked

14             for identification.)

15   BY MR. McGINTY:

16      Q    I'm handing you what's been marked

17   Exhibit 19.

18            MR. McGINTY:  Counsel.

19            (Document tendered to Ms. Andrapalliyal)

20   BY MR. McGINTY:

21      Q    Do you recognize this document?

22      A    Yes.

23      Q    And what is it?

24      A    A termination letter.

25      Q    Okay.  And this is another one that you

1  signed, right?

2      A    Yes.

3      Q    Okay.  And who is the issuing

4  institution -- or the institution that received the

5  termination letter?

6      A    University of Washington.

7      Q    And what's that project number?

8      A    1R01 TW012904-01.

9      Q    And this is another one that you got in a

10  spreadsheet from your supervisor?

11      A    Yes.

12      Q    Okay.  And where are the documents that

13  explain why the grant was terminated?

14      A    The spreadsheet and the request for me to

15  terminate.  And this letter right here, sorry.

16      Q    No, that's fine, that's fine.

17          And, again, this was language -- the

18  language in this letter was provided to you?

19      A    Yes.

20      Q    And you didn't write one word in this

21  letter?

22      A    (Nodding head)

23      Q    Sorry, I didn't hear your answer.

24      A    No.  Sorry, no.

25          (Bulls Deposition Exhibit 20 was marked

```
 1              for identification.)

 2   BY MR. McGINTY:

 3      Q    I'm handing you Exhibit 20.  And I'll note

 4   that it is big and unwieldy and the pages are not

 5   bound.  So I'll ask you to be careful with your

 6   handling it.

 7           But do you recognize this document?

 8      A    Yes.  Yes, I do.

 9      Q    And what is it?

10      A    NIH Grants Policy Statement.

11      Q    And how are you familiar with it?

12      A    I'm familiar with it because I placed

13   information in it, I use it to advise recipients, I

14   use it to assess compliance, I read it.

15      Q    Assess compliance with what?

16      A    With the policies that are in the policy

17   statement to determine whether or not the recipients

18   are complying with the terms and conditions of the

19   award.

20      Q    Okay.  What's the purpose of the document?

21      A    To provide, lay out the grant policy

22   requirements of -- that serve as the terms and

23   conditions of all NIH award administrative

24   requirements.

25      Q    Turn to page Romanette ii.  So this
```

```
 1   says -- see where it says:

 2              "Is intended to make available to NIH

 3               recipients, in a single document, the

 4               policy requirements that serve as the

 5               terms and condition of NIH grant awards"?

 6       A    Yes.

 7       Q    And is that a true description of what

 8   this document is for?

 9       A    It is.

10       Q    Is this the most recent version of this

11   document?

12       A    It is.

13       Q    Okay.  Are there any operative amendments

14   to it?

15       A    Can you explain your question.

16       Q    Sure.  Has any document been issued that

17   changes the terms of this document?

18       A    The -- there have been Guide Notices that

19   have been issued that we provide to, yes, to the

20   public.

21       Q    To the public?

22       A    Yeah.

23       Q    How many of those have been issued?

24       A    I don't recall.

25       Q    Do you know if it changed the terms?
```

1       A       They do -- they add to the terms at times.

2       Q       Okay.  Let's see, could you turn to page

3    I-53.

4               Do you see here where it says:

5               "The more significant of the public policy

6                requirements for the purpose of peer

7                review are those concerning research

8                involving human subjects; inclusion of

9                genders, members of minority groups, and

10               individuals across the lifespan in

11               clinical research; and research involving

12               live vertebrate animals"?

13      A       No.  Where are you reading from?

14              Oh, I see it.

15      Q       Okay.  You found it?

16      A       Yes, I see it.

17      Q       What does that mean?

18              MS. ANDRAPALLIYAL:  Objection, assumes

19    facts not in evidence, calls for a legal conclusion.

20    BY MR. McGINTY:

21      Q       You can answer.

22      A       The public policy requirement is -- this

23    is about making sure that the peer review of the

24    research for humans and an -- human subject,

25    inclusion of gender, members of minority groups.

1          It basically outlines the public policy

2     requirements that we should point to and consider

3     when we are making awards.

4          Q    What does "inclusion of genders" mean?

5               MS. ANDRAPALLIYAL:  Objection, calls for

6     speculation, assumes facts not in evidence.

7     BY MR. McGINTY:

8          Q    You can answer.

9          A    "Inclusion of genders" is inclusion of

10    gender, all genders.

11         Q    Okay.  All right.  What do you mean by

12    "all genders"?

13         A    It means whatever the gender -- whatever

14    is identified as the gender.

15         Q    What does "members of minority groups"

16    mean as used in that section?

17              MS. ANDRAPALLIYAL:  Objection, assumes

18    facts not in evidence, calls for speculation.

19    BY MR. McGINTY:

20         Q    Well, Ms. Bulls, you helped draft this

21    document, right?

22         A    (Nodding head)

23         Q    Could you answer.

24         A    Yes.

25         Q    And part of your role is to help the ICs

1   understand what this document means, right?

2       **A    That is correct.**

3       Q    Is part of your role to help the public

4   understand what this document means?

5       **A    That is correct.**

6       Q    And so it's part of your regularly

7   occurring duties to interpret this document, isn't

8   it?

9       **A    It is.**

10      Q    Okay.  So what does "members of minority

11  groups" mean here?

12          MS. ANDRAPALLIYAL:  Objection, asked and

13  answered, and the document speaks for itself.

14  BY MR. McGINTY:

15      Q    You can answer.

16      **A    "Members of minority groups" is identified**

17  **in the Notices of Funding Opportunities.  The**

18  **details of those are typically laid out in the**

19  **eligibility criteria or the eligibility areas of the**

20  **Notices of Funding Opportunities.  So it would tie**

21  **back to whatever the program issued in that NOFO**

22  **and identified in the NOFO.**

23      Q    So what's the public policy requirement

24  that they're talking about when they say, "The more

25  significant of the public policy requirements for

1    the purpose of peer review are those concerning

2    research involving human subjects; members of

3    minority groups"?

4           Does that refer to the NOFO?

5       **A    Yes, because the viewers look at the NOFO,**

6    **and they review based on the information that's in**

7    **the Notices of Funding Opportunities.  They have**

8    **their criteria.**

9       Q    I see.  And the NOFO will have the

10   criteria.  How does that relate to the members of

11   minority groups?  I guess I'm just not following

12   your answer.

13      **A    So if it's a Notice of Funding Opportunity**

14   **that is specific to a minority health or minority**

15   **HBCU, the research is linked to that, they will lay**

16   **out in the NOFO who is eligible to receive the**

17   **funding and lay out the criteria that they will use**

18   **for the recipient, or applicant at that time, to**

19   **be -- to apply for the funding, they lay out that**

20   **criteria.**

21           **And they have to be responsive.  And then**

22   **it goes to peer review for them to review all of how**

23   **the applicant responded to the Notice of Funding**

24   **Opportunities.  So that's how we look at that from**

25   **the peer review standpoint.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Got it.  So this is explaining why you do

2   NOFOs and the way you do it?

3    **A    This is explaining the public policy**

4   **requirements that apply to those NOFOs, and the**

5   **guidance by which reviewers are looking at as the**

6   **scientists or the program officials write the NOFOs.**

7         **So it's kind of all baked into the Notice**

8   **of the Funding Opportunity, the purpose of the grant**

9   **itself.  And then we, because before it is an**

10  **application, once it's an award, then they are bound**

11  **by the requirements here to follow that.**

12   Q    Does anything in this language that we

13  were just talking about suggest that research into

14  transgender or gender diverse health issues would

15  not be a priority for NIH?

16        MS. ANDRAPALLIYAL:  Objection, calls for

17  speculation.

18  BY MR. McGINTY:

19   Q    You can answer.

20   **A    Can you repeat the question.**

21   Q    Does anything about the language we've

22  been talking about imply that it's a priority of NIH

23  not to fund research into transgender issues?

24   **A    Not at the time that this was issued.**

25   Q    Nothing in this language said that?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **A    Nothing.**

2    Q    How about health disparities across racial

3    groups?

4        MS. ANDRAPALLIYAL:  Same objection, calls

5    for speculation.

6    BY MR. McGINTY:

7    Q    You can answer.

8    **A    Yes, same response.  The language does not**

9    **say anything about that in this -- at this time, in**

10   **the April 2024.**

11   Q    Have any of the amendments you just talked

12   about to these policies and procedures changed the

13   NIH priorities for funding of transgender issues?

14       MS. ANDRAPALLIYAL:  Objection to the

15   extent that your question is calling for the

16   provision of deliberative information that hasn't

17   finalized yet.

18   **THE WITNESS:  The --**

19       MS. ANDRAPALLIYAL:  And instruct the

20   witness not to answer to the extent that the

21   question is asking for that information.

22   BY MR. McGINTY:

23   Q    I'm asking only about effective policy.

24   I'm asking only about policies that are effective

25   right now, today, that are final.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1          My question is:  Have there been any

2     amendments to this policy statement that would make

3     it so NIH does not have a priority of funding

4     transgender issues?

5          MS. ANDRAPALLIYAL:  Objection, assumes

6     facts not in evidence.

7          **THE WITNESS:  No.**

8     BY MR. McGINTY:

9          Q    How about research for racial disparities?

10         **A    No.**

11         Q    How about research regarding vaccine

12    hesitancy?

13         MS. ANDRAPALLIYAL:  Objection, calls for

14    speculation.

15         **THE WITNESS:  Your question is still the**

16    **same?**

17    BY MR. McGINTY:

18         Q    Yeah.  The question is:  Are there any

19    effective policies for NIH right now, today, that

20    are final that say that NIH deprioritizes funding

21    for vaccine hesitancy?

22         **A    No.**

23         Q    Okay.  How about research that might

24    benefit institutions in China?

25         MS. ANDRAPALLIYAL:  Same objection, calls

1    for speculation.

2          **THE WITNESS:  Not where there's not a, a**

3    **foreign interference or nondisclosure requirement**

4    **or -- but at this time China is on the list of**

5    **countries of concern.**

6    BY MR. McGINTY:

7          Q    Would you turn to I-73, please.  Now what

8    I want to ask you about is this list of, I think

9    it's five things that appears in the top third of

10   the page.  It's under a section that's starts on

11   I-72, so if you need to familiarize yourself with

12   any portion, go right ahead.

13         But my question is, there's these five

14   sections here, could you just read those into the

15   record and tell me what they mean.

16         MS. ANDRAPALLIYAL:  Objections, calls for

17   speculation.

18         **THE WITNESS:  So I'm going to read it, but**

19   **then I also want to respond if that's okay.**

20   BY MR. McGINTY:

21         Q    Sure.

22         **A    "Significance, Investigators, Innovation,**

23   **Approach, Environment."  This section was written**

24   **by, by the experts in the peer review area.**

25         Q    Okay.  So do you have an understanding of

1   what this means and how it's used in the grant

2   application and review process?

3        **A    I have an overarching understanding of**

4   **what that means.**

5        Q    Okay.  I'm just going to be asking for

6   your understanding.

7        **A    Yeah.**

8        Q    For your understanding, what does

9   "Investigators" mean?

10        MS. ANDRAPALLIYAL:  Objection, calls for

11   speculation.

12        **THE WITNESS:  Investigators that are**

13   **participating on the award that are leading the**

14   **scientific direction.**

15   BY MR. McGINTY:

16        Q    And it has to do with how qualified the

17   investigators are, right?

18        **A    Yes.**

19        MS. ANDRAPALLIYAL:  Objection, misstates

20   the -- yeah, misstates the testimony.

21   BY MR. McGINTY:

22        Q    Does it have to do with how qualified the

23   investigators are who are applying?

24        **A    It has to do with their qualifications and**

25   **their capacity.**

1        Q    What makes an investigator qualified?

2             MS. ANDRAPALLIYAL:  Objection, calls for

3    speculation.

4             **THE WITNESS:  I don't feel comfortable**

5    **answering that because I don't review grants.**

6    BY MR. McGINTY:

7        Q    So you don't know what makes an

8    investigator qualified?

9        **A    I know what I would think an investigator**

10   **is qualified and how they are qualified.  But I'm**

11   **not a scientist, so I wouldn't -- you know, what I**

12   **might see and someone else might see is two**

13   **different things.  And so I don't want to -- I'm not**

14   **comfortable with answering that question.**

15       Q    Okay.  So in your opinion what makes an

16   investigator qualified?

17            MS. ANDRAPALLIYAL:  Objection, calls for

18   speculation, and the witness is not here to testify

19   in her personal capacity.

20            **THE WITNESS:  Yeah, I'm not an expert in**

21   **that.**

22   BY MR. McGINTY:

23       Q    You can answer.

24       **A    Yeah, I'm not an expert in --**

25       Q    So you don't have an opinion?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1        **A    I have an opinion.  I'm not comfortable**
2     **with giving my opinion outside of my official**
3     **capacity.**
4        Q    With all due respect, Ms. Bulls, you are
5     here today to testify, and you've not been
6     instructed not to answer.  I'm asking for your
7     opinion.
8        **A    It has to be -- I would assume -- so in my**
9     **opinion, it would be the principal investigator is**
10    **the person that has the expertise in the scientific**
11    **area by which they were applying for the grant.**
12       Q    And what would give them expertise?
13          MS. ANDRAPALLIYAL:  Objection, calls for
14    speculation.
15          MR. McGINTY:  I'm asking her to explain
16    her opinion.
17          **THE WITNESS:  Their background, their**
18    **qualifications, their experience, publications.**
19    BY MR. McGINTY:
20       Q    If they had background and qualifications
21    and publications in the area that they're applying
22    for a grant for, that would make them more qualified
23    for that grant?
24          MS. ANDRAPALLIYAL:  Objection, calls for
25    speculation, calls for testimony in the witness's

1    personal capacity which she is not here to do.

2    BY MR. McGINTY:

3        Q    Is that right?

4        **A    Is what right?  I'm sorry.**

5            MR. McGINTY:  Could you read back the

6    question, please.

7            (The record was read aloud as follows:

8            "QUESTION:  If they had a background and

9             qualifications and publications in the

10            area that they're applying for a grant

11            for, that would make them more qualified

12            for that grant?")

13        **THE WITNESS:  I don't know that it would**

14    **make them more qualified, because they're -- the**

15    **grant is -- there's a competition across the board,**

16    **so they would be in the running to receive a grant.**

17    BY MR. McGINTY:

18        Q    Understood.  Thank you.

19            What does "Environment" mean?

20            MS. ANDRAPALLIYAL:  Objection, calls for

21    speculation.

22        **THE WITNESS:  The environment is the --**

23    **where the project is going to be taking place, place**

24    **of performance.**

25    BY MR. McGINTY:

1    Q    And how is that evaluated in the grant

2    application and review process?

3            MS. ANDRAPALLIYAL:  Objection, calls for

4    speculation.

5            **THE WITNESS:  I don't know -- so they look**

6    **at the grant application and they assess whether or**

7    **not the place of performance is an acceptable place**

8    **to conduct the research.**

9    BY MR. McGINTY:

10    Q    What would make it acceptable?

11            MS. ANDRAPALLIYAL:  Objection, calls for

12    speculation.

13            **THE WITNESS:  Yeah, I can't answer that.**

14    BY MR. McGINTY:

15    Q    Do you have an opinion on what would make

16    it acceptable?

17            MS. ANDRAPALLIYAL:  Objection.  The

18    witness is not here to testify in her personal

19    capacity, offer her personal opinions.

20            **THE WITNESS:  No, I don't have an opinion.**

21    BY MR. McGINTY:

22    Q    Would you turn to IIA-3.

23    **A    IIA-3, you say?**

24    Q    No.  IIA --

25    **A    Oh, 3.**

```
 1        Q    -- 3.
 2        A    Got you.
 3        Q    Could you read the second paragraph that
 4   appears on IIA-3.
 5        A    "As noted in this section, some
 6             requirements may necessitate the
 7             submission of a separate document (e.g,
 8             human subjects assurance, certification
 9             of IRB approval, institutional exemption,
10             civil rights assurance --"
11        Q    I'm going to interrupt you.  I meant the
12   second paragraph at the top of the page.
13        A    Oh, I'm sorry.
14        Q    No, you're fine.
15        A    "This chapter addresses the public
16             Policy requirements, objectives, and other
17             appropriation mandates applicable to NIH
18             awards.  The term 'public policy'
19             indicates that the requirement is based
20             on social, economic, or other objectives
21             or considerations that may be attached to
22             the expenditure of Federal funds by the
23             recipients, subrecipients, and
24             contractors, in general, or may relate to
25             the expenditure of Federal funds for
```

1              research or other specified activities."

2       Q     So if there were a social, economic, or

3  other objective of distributing NIH funds, I would

4  expect to find it in this Part 4 of this document,

5  right?

6              MS. ANDRAPALLIYAL:  Objection, calls for

7  speculation.

8              **THE WITNESS:  Yes.**

9  BY MR. McGINTY:

10      Q     Can you turn to IIA-14.  Would you read

11 that paragraph under 4.1.2, Civil Rights

12 Protections, please.

13      **A     The entire paragraph?**

14      Q     Yes, please.

15      **A     I'm going to have to take some water.**

16      Q     Please do.

17      **A     "Recipients are required to administer**

18              **NIH-funded projects in compliance with**

19              **the federal civil rights laws that**

20              **prohibit discrimination on the basis of**

21              **race, color, national origin, disability,**

22              **age, and sex, which includes**

23              **discrimination on the basis of gender**

24              **identity, sexual orientation, and**

25              **pregnancy, and comply with the applicable**

1              **conscience protections."**

2        Q    That's the end.

3        **A    Oh.  I thought you said -- I meant the**

4    **whole, I'm sorry, the whole section.**

5        Q    Oh, no, I just meant that first paragraph

6    under that section.  I apologize.

7        **A    That's okay.**

8        Q    So recipients for NIH funding, they're

9    prohibited from discriminating on the basis of sex,

10   right?

11       **A    That's correct.**

12       Q    And prohibited from discriminating against

13   transgender people also?

14            MS. ANDRAPALLIYAL:  Objection, calls for a

15   legal conclusion, calls for speculation.

16            **THE WITNESS:  That is correct.**

17   BY MR. McGINTY:

18       Q    And they are forbidden from discriminating

19   against gender diverse people, too?

20            MS. ANDRAPALLIYAL:  Objection, calls for a

21   legal conclusion, calls for speculation, and assumes

22   facts not in evidence.

23            **THE WITNESS:  I would think so.**

24   BY MR. McGINTY:

25       Q    Does this section that we were just

1  looking at right here, does this imply that NIH has

2  any policy for not funding research into transgender

3  issues?

4          MS. ANDRAPALLIYAL:  Objection, calls for

5  speculation.

6          **THE WITNESS:  Not at the time this was**

7  **issued.**

8  BY MR. McGINTY:

9      Q    So this language doesn't have any

10 implication that NIH does not fund transgender

11 related research?

12         MS. ANDRAPALLIYAL:  Objection, calls for

13 speculation.

14         **THE WITNESS:  Not before this.  Not before**

15 **this was issued.**

16 BY MR. McGINTY:

17     Q    Okay.  And is there any effective

18 operative amendment to this NIH Policy Manual that

19 would change that so that NIH does have a policy of

20 defunding transgender issues?

21     **A    Not at this time.  In draft form, but not**

22 **at this time publicly.**

23     Q    Okay.  So there's drafts that are being

24 generated that will change that?

25         MS. ANDRAPALLIYAL:  Objection.  To the

1   extent that the question is calling for the

2   privileged and deliberative information that has not

3   been finalized, the witness is instructed not to

4   answer.

5   BY MR. McGINTY:

6       Q    So right now, today, there is no published

7   NIH policy that says NIH does not fund transgender

8   related issues?

9       **A    No.**

10      Q    And if I understood your testimony

11  correctly, the only written policy that exists is

12  the form letters that you got in connection with

13  those spreadsheets terminating grants?

14          MS. ANDRAPALLIYAL:  Objection, misstates

15  prior testimony.

16          **THE WITNESS:  The letters are not**

17  **considered policy.**

18  BY MR. McGINTY:

19      Q    The letters aren't policy?

20      **A    No, they're not considered policy.**

21      Q    So there's no policy that NIH has to

22  defund or to not fund transgender related research?

23          MS. ANDRAPALLIYAL:  Objection, calls for

24  speculation, assumes facts not in evidence.

25          **THE WITNESS:  The question you asked**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    **before was whether it was published, anything today,**

2    **and publicly available.  No.**

3    BY MR. McGINTY:

4        Q    Is there a policy that NIH implements but

5    is not published that defunds transgender related

6    research?

7        **A    Not at this time.**

8        Q    So there's no policy that NIH implements

9    that defunds transgender related research?

10       **A    Not at this time.**

11       Q    When you say, "this time," what do you

12   mean?

13       **A    I'm saying that earlier I spoke to you**

14   **about the priorities memo.  Once that memo is**

15   **finalized, that will be made publicly available, but**

16   **it's still in draft form, we're still going through**

17   **a process.**

18       Q    Okay.  And is that memo implemented in any

19   way?

20           MS. ANDRAPALLIYAL:  Objection, calls for a

21   legal conclusion, calls for speculation.

22           **THE WITNESS:  No, nothing final is**

23   **implemented related to the memo.**

24   BY MR. McGINTY:

25       Q    Okay.

1    **A    The draft memo.**

2    Q    So right now, today, NIH does not have a

3    policy of defunding or not funding transgender

4    related research?

5         MS. ANDRAPALLIYAL:  Objection, calls for

6    speculation.

7         **THE WITNESS:  That is correct.**

8    BY MR. McGINTY:

9    Q    Okay.  Now, following this, there's some

10   significant policies having to do with stem cell

11   research and fetal human cells.  Is that correct?

12   **A    Yes.**

13        MS. ANDRAPALLIYAL:  I'm sorry, what page

14   are we on?

15        MR. McGINTY:  Just the following pages,

16   IA-15, IA-16 [sic].

17        MS. ANDRAPALLIYAL:  IIA-15?

18        MR. McGINTY:  Yes, sorry.

19   BY MR. McGINTY:

20   Q    Are these policies the kind of things --

21   are these the kind of social, economic, and other

22   policy goals that this Section 4 is about?

23        MS. ANDRAPALLIYAL:  Objection, calls for

24   speculation.

25        **THE WITNESS:  Can you repeat.  I'm sorry,**

1    I was just --

2    BY MR. McGINTY:

3        Q    Sure.  Let me find it.  Okay.  When we get

4    to IIA-28 --

5        A    Okay.

6        Q    -- and IIA-29, there's policies about

7    human stem cell research and human fetal tissue

8    research?

9        A    Yes.

10       Q    And earlier in this section we talked

11   about the overriding umbrella section it had, which

12   was, its purpose with to set out the social,

13   economic, and public policy issues surrounding NIH

14   funding.  Is that right?

15       A    That is right.

16       Q    Okay.  So I'm just asking if these sorts

17   of sections, 4.1.13 and 4.1.14, are examples of

18   those kinds of social, economic, and public policy

19   implications of NIH funding.

20           MS. ANDRAPALLIYAL:  Objection, calls for

21   speculation.

22           THE WITNESS:  I interpret them to be, yes.

23   BY MR. McGINTY:

24       Q    Okay.  And this references on IIA-28

25   Executive Order 13505, doesn't it?

1      **A      Yes.**

2      Q      So when the NIH policies are informed by

3   an Executive Order, it's referenced somewhere,

4   right?

5              MS. ANDRAPALLIYAL:  Objection, calls for

6   speculation.

7              **THE WITNESS:  Yes.**

8   BY MR. McGINTY:

9      Q      Okay.

10     **A      Where there is -- correction, where there**

11  **is an Executive Order, yes.**

12     Q      Let's see.  I'm looking for 4.1.15.  Here

13  we go, "Human Subjects Protections."

14             Can you summarize this section for me.

15  What are the human subjects protections that NIH

16  implements in this policy manual?

17     **A      Making certain that there are assurances**

18  **and protocols in place to provide protections to**

19  **participants.**

20     Q      And it also requires that human trials

21  include all kinds of people, right?

22     **A      I just said, yes.**

23     Q      And why is that important?

24             MS. ANDRAPALLIYAL:  Objection, calls for

25  speculation.

```
 1            THE WITNESS:  It's important to the
 2   outcomes of science.
 3   BY MR. McGINTY:
 4       Q    And that includes clinically important sex
 5   gender differences, doesn't it?
 6            MS. ANDRAPALLIYAL:  Objection, calls for
 7   speculation.
 8            THE WITNESS:  I don't see it as just one
 9   thing.  It includes all participants.
10   BY MR. McGINTY:
11       Q    Which includes sex and gender differences,
12   right?
13            MS. ANDRAPALLIYAL:  Objection, calls for
14   speculation.
15            THE WITNESS:  It does.  I would interpret
16   it to include that.
17   BY MR. McGINTY:
18       Q    Okay.  So is there anything here in this
19   4.1.15 Section that indicates it is not the policy
20   of NIH to defund or to not fund transgender related
21   research?
22            MS. ANDRAPALLIYAL:  Objection, calls for
23   speculation.
24            THE WITNESS:  No.
25   BY MR. McGINTY:
```

 1     Q    Okay.  And, in fact, it's actually the

 2   opposite, isn't it?  This policy actually says that

 3   transgender related research is important?

 4     **A    That is what the policy says at this time,**

 5   **yes.**

 6     Q    And "at this time," you mean today?

 7     **A    Yes.**

 8     Q    So is there anything in this policy

 9   anywhere that says that NIH does not fund

10   transgender related research?

11          MS. ANDRAPALLIYAL:  Objection, assumes

12   facts not in evidence.

13          **THE WITNESS:  No.**

14   BY MR. McGINTY:

15     Q    And is there anything in any of the

16   effective amendments to this policy that says NIH

17   does not fund or defund transgender related

18   research?

19     **A    Publicly, no.**

20     Q    Publicly, no?

21     **A    No.**

22     Q    But NIH is terminating grants on the basis

23   that they fund transgender related research, isn't

24   it?

25          MS. ANDRAPALLIYAL:  Objection, calls for

 1   speculation.

 2           **THE WITNESS:  Termination letters**

 3   **terminate the grant.**

 4   BY MR. McGINTY:

 5       Q    On the basis that they are studying

 6   transgender related issues?

 7       **A    And others.  And other issues that are --**

 8   **yeah.**

 9       Q    Are those other issues anywhere in this

10   policy manual?

11       **A    No.**

12       Q    Are those other issues anywhere in the

13   effective amendments to this policy memo?

14       **A    No.**

15       Q    Are you familiar with the 2022 version of

16   this policy memo?

17       **A    Yes.**

18       Q    Given your job title, it might be an funny

19   question.

20           Is there anything in that 2022 version

21   that says that NIH has a policy of not funding or

22   defunding transgender related research?

23       **A    No.**

24       Q    In fact, in that 2022 version, it's also

25   the opposite, the policy is actually to fund that

1    research, isn't it?

2          MS. ANDRAPALLIYAL:  Objection, calls for

3    speculation.

4          **THE WITNESS:  It doesn't exclude.**

5    BY MR. McGINTY:

6       Q    Doesn't exclude, but research on

7    sex gender minorities is important under that 2022

8    Version 2, right?

9          MS. ANDRAPALLIYAL:  Objection, calls for

10   speculation.

11         **THE WITNESS:  In the Institutes and**

12   **Centers where those priorities are, they are able to**

13   **fund and have been able to fund their research.**

14   BY MR. McGINTY:

15      Q    Have you ever been told not to talk about

16   either of the Executive Orders in your

17   communications about terminating grants?

18         MS. ANDRAPALLIYAL:  Objection.  To the

19   extent that -- to the extent the question is seeking

20   attorney-client and deliberative information, I'm

21   instructing the witness not to answer.

22   BY MR. McGINTY:

23      Q    Can you answer that question?

24         MS. ANDRAPALLIYAL:  Again, to the extent

25   the question is seeking deliberative or

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   attorney-client information, I instruct the witness
2   not to answer.
3   BY MR. McGINTY:
4       Q    Without divulging any deliberative or
5   attorney-client privileged information, have you
6   ever been told not to talk about the Executive
7   Orders in your communications about grant
8   termination?
9       **A    That would divulge discussions with the**
10  **Office of General Counsel.  And seeking clarity from**
11  **the funding -- you know, just in seeking clarity**
12  **between the priorities, we need to know if the**
13  **priorities, you know, the memo, so.**
14      Q    The memo that you are currently drafting?
15      **A    The memo that the agency head is drafting.**
16      Q    Outside of communications about drafting
17  that memo, has anyone told you not to talk about the
18  EOs when you talk to, for example, the Chief Grants
19  Management Officers?
20      **A    No.**
21           MS. ANDRAPALLIYAL:  Objection.  The
22  question calls for provision of deliberative,
23  attorney-client information, so to the extent that
24  that information is implicated, I would instruct the
25  witness not to answer.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1          **THE WITNESS:  During the meetings about**
2    **staff guidance, no, nobody has told me not to talk**
3    **about that, but I just don't because it's -- yeah,**
4    **nobody said not to, though.**
5    BY MR. McGINTY:
6          Q     Have you ever told the Chief Grants
7    Management Officers not to refer to the Executive
8    Orders when they discuss grant terminations with
9    investigators?
10         **A     No.**
11         MS. ANDRAPALLIYAL:  Objection --
12         **THE WITNESS:  No.  Sorry.**
13         MS. ANDRAPALLIYAL:  Objection to the
14   extent that --  objection.  The question is seeking
15   deliberative information so I'd instruct the witness
16   not to answer.
17         MR. McGINTY:  Can you explain your
18   objection to me.
19         MS. ANDRAPALLIYAL:  You're seeking
20   deliberative information that employees are using to
21   make a final policy decision, and so for that reason
22   it's deliberative communications protected by the
23   Daubert process privilege.
24         MR. McGINTY:  I'm seeking a communication
25   that instructs agency behavior, not the information

1  of the policy.

2          MS. ANDRAPALLIYAL:  I'm not sure I

3  understand the difference.

4          MR. McGINTY:  The difference is one is

5  deliberative and one isn't.

6          MS. ANDRAPALLIYAL:  But any communications

7  that are pre-decisional that go towards that final

8  decision are arguably --

9          MR. McGINTY:  And I'm asking about the

10  final decision not to talk about the EOs.

11          MS. ANDRAPALLIYAL:  Can you repeat the

12  question, please.

13          MR. McGINTY:  Sure.

14  BY MR. McGINTY:

15      Q    Have you ever told any Grants Management

16  Officers not to talk about the EOs when they discuss

17  grant terminations --

18          MS. ANDRAPALLIYAL:  Objection, vague.

19  BY MR. McGINTY:

20      Q    -- with the public.

21          There's no objection on the table.  You

22  can answer.

23      A    No.

24      Q    Okay.

25      A    The question is -- I would like to correct

1   that.

2         The question has been are we terminating

3   on the basis of the EOs.  And the answer is we are

4   looking at the priorities, the agency priorities,

5   and that's what the letter has stated.  So that,

6   that's what I'm pointing them back to, the letter

7   and the priorities, not the EOs.

8         If they asked.  If that was a question

9   during a meeting.  And the answer was the

10  termination is based on the agency's new priorities

11  as outlined in the termination letters.  That's all

12  I provided.

13      Q    The agency priorities are not published in

14  the Grants Management, the Grants Policy Statement,

15  or any amendments to it?

16      A    Correct.

17      Q    The Agency's priorities, as far as you're

18  aware, only exist in form letters that you were

19  given by Rachel Riley?

20         MS. ANDRAPALLIYAL:  Objection, asked and

21  answered.

22         THE WITNESS:  By my supervisor, yes.

23  BY MR. McGINTY:

24      Q    Okay.  And there's no other place where

25  these agency priorities are published or made

1    available?

2              MS. ANDRAPALLIYAL:  Objection, asked and

3    answered.

4              **THE WITNESS:  No.**

5              MR. McGINTY:  Okay.  I think we're about

6    to move into a new area.  It might be time to take a

7    quick five or ten-minute break.  Can we go off the

8    record.

9              (Recess taken - 2:29 to 2:50 p.m.)

10             MR. McGINTY:  We can go back on the

11   record.

12   BY MR. McGINTY:

13       Q    Now, I know you have a big stack of

14   exhibits right in front of you.  And I'm going to

15   ask you to find Exhibit 3 which is the February 28th

16   letter to Dr. Tham.

17       **A    Exhibit 3, you said?**

18       Q    Oh, did I get the number wrong?

19             No, not that one.  Maybe it's 4.

20       **A    Okay.**

21       Q    Yeah, 4.  Sorry.

22       **A    Yeah.**

23       Q    Okay.  So about a little more than halfway

24   down the page it says here in this letter:

25             "It is the policy of NIH not to prioritize

```
 1              these research programs."
 2          Do you see that?
 3      A    Yes.
 4      Q    Okay.  And "these research programs,"
 5  meaning research programs based on gender identity,
 6  right?
 7      A    Yes.
 8      Q    Now, I just asked you to go through a lot
 9  of NIH policies, and your testimony was there is no
10  written final policy of NIH not to prioritize
11  research programs based on gender identity.
12          That was your testimony, right?
13      A    Yes.
14      Q    So when this letter says it is the policy
15  of NIH not to prioritize these research programs,
16  that's not referring to any written policy, is it?
17          MS. ANDRAPALLIYAL:  Objection, assumes
18  facts not in evidence.
19          THE WITNESS:  I don't know what it was
20  intended to mean because I didn't write it.
21  BY MR. McGINTY:
22      Q    There is no effective and final NIH policy
23  that you are aware of not to prioritize research
24  programs based on gender identity.  Is that right?
25      A    That I know of, no.
```

1       Q    And in your role as Director of OPERA,

2   would you expect to know about such a policy?

3            (Reporter requests clarification)

4            MR. McGINTY:  Director of OPERA.

5            MS. ANDRAPALLIYAL:  Objection, calls for

6   speculation.

7            **THE WITNESS:  I don't -- not necessarily.**

8   BY MR. McGINTY:

9       Q    In your role as Director of OPERA, what

10  kind of policies do you oversee?

11      **A    Grants administration policies and**

12  **grants -- internal policies for our grants managers,**

13  **which are called the NIH Grants Administration**

14  **Manuals, which is an internal document that supports**

15  **the external document which is the NIH Grants Policy**

16  **Statement.**

17      Q    So those are all policies that apply to

18  NIH as a whole?

19      **A    Yes.**

20      Q    So the policies that you might not be

21  aware of would be policies that would apply to one

22  IC, for example?

23           MS. ANDRAPALLIYAL:  Objection, calls for

24  speculation.

25           **THE WITNESS:  I don't know.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1   BY MR. McGINTY:

2       Q    Do you know of policies within the ICs

3   that you do not oversee?

4       **A    I don't know.**

5       Q    Okay.  And just to be clear, there is no

6   NIH policy not to prioritize research programs based

7   on gender identity that you are aware of?

8       **A    That -- that is clear.  No, not that I am**

9   **aware of.**

10      Q    Okay.

11      **A    Can I ask a point of clarification?**

12      Q    Please.

13      **A    You are saying NIH policies, and I don't**

14  **see priorities as something that I would oversee.**

15      Q    Sure.

16      **A    You know?**

17      Q    I understand.  I guess my question comes

18  from the part of the sentence where it says, "It is

19  the policy of NIH not to prioritize these research

20  programs."  So that's why I'm asking you about the

21  policies of NIH.

22      **A    Okay.**

23      Q    And you're not aware of any policy of NIH

24  not to prioritize those research programs?

25      **A    No, I don't have any (indiscernible).**

```
 1            (Reporter requests clarification)
 2            THE WITNESS:  I don't have any insight on
 3       it.
 4  BY MR. McGINTY:
 5       Q    Okay.  So now let's go back to Exhibit 3.
 6       A    I don't know if I'll be able to find it
 7       now.
 8            (Witness reviews documents)
 9            THE WITNESS:  I just saw it.  Where did it
10       go?  It's running from me.  Maybe I'll look closer.
11       I have to re-order.
12            (Witness reviews documents)
13  BY MR. McGINTY:
14       Q    I understand the papers get shuffled.
15            Okay.  And we are looking at page 8616 on
16  Exhibit 3, and looking at Section 3(e).  The last
17  sentence there, it says:
18            "Agencies shall take all necessary steps,
19             as permitted by law, to end the Federal
20             funding of gender ideology."
21            Do you see that?
22       A    Yes.
23       Q    Has NIH, to your knowledge, terminated any
24  grants implementing that sentence?
25            MS. ANDRAPALLIYAL:  Objection, calls for a
```

1    legal conclusion, calls for speculation.

2         **THE WITNESS:  We terminated it based on**

3    **the language in the letter.**

4    BY MR. McGINTY:

5         Q    Is it your testimony that the language in

6    the letter had no connection to the sentence that I

7    just read?

8         MS. ANDRAPALLIYAL:  Objection, calls for

9    speculation, calls for a legal conclusion, assumes

10   facts not in evidence.

11        **THE WITNESS:  I don't know what the**

12   **intention was for the two.  I don't know.**

13   BY MR. McGINTY:

14        Q    The language in the letter was given to

15   you.  Is that right?

16   **A    Yes.**

17        Q    And you don't know why it was written.  Is

18   that right?

19   **A    I don't know.**

20        Q    Okay.  Let's go to Section 3(g) of this

21   same Executive Order.

22   **A    Okay.**

23        Q    It says:

24             "Federal funds shall not be used to

25              promote gender ideology.  Each agency

1          shall assess grant conditions and grantee

2          preferences to ensure grants funds do not

3          promote gender ideology."

4      See that?

5  **A    Yes.**

6      Q    To your knowledge, has NIH terminated any

7  grants in implementing this section of this

8  Executive Order?

9          MS. ANDRAPALLIYAL:  Objection, calls for a

10 legal conclusion, calls for speculation.

11 **     THE WITNESS:  To my knowledge, the letter**

12 **terminates the grant and the language is in the**

13 **termination letter.**

14 BY MR. McGINTY:

15     Q    Okay.  And the reason that the grants were

16 terminated, if I understand your prior testimony

17 correctly, is stated in the letter and it's stated

18 in the spreadsheet that states which grants you are

19 going to terminate.  Is that right?

20 **    A    Yeah, the spreadsheet, remember, I was**

21 **telling you, it has the categories, like, Y, you**

22 **know, D, I, that kind of thing.**

23     Q    Okay.  Are you familiar with the START

24 platform?

25 **    A    No.**

1      Q    Okay.  That's not an internal NIH platform

2    for administrative information chain?

3           MS. ANDRAPALLIYAL:  Objection, calls

4    for -- assumes facts not in evidence.

5           **THE WITNESS:  What would it be -- I don't**

6    **under -- is it a part of something I would use for**

7    **work?  I mean --**

8    BY MR. McGINTY:

9      Q    That's my understanding from just

10   googling.  I searched START NIH, and that appears to

11   be an internal database.  I'm just asking if you are

12   familiar with it?

13     **A    I don't know about it, no.**

14     Q    Okay.

15     **A    I'm trying -- you have me think -- like,**

16   **NIH like START.**

17     Q    S-T-A-R-T.

18     **A    Oh, okay.  No.**

19           (Bulls Deposition Exhibit 21 was marked

20            for identification.)

21   BY MR. McGINTY:

22     Q    I'm handing you what's been marked

23   Exhibit 21.  Do you know what that is?

24     **A    Oh, gosh.**

25           MS. ANDRAPALLIYAL:  Can I have a copy.

```
 1                (Document tendered to Ms. Andrapalliyal)

 2              THE WITNESS:  It's a spreadsheet of all

 3    the termin -- it looks like terminations.  That's

 4    what this says up here, but I'm not familiar with

 5    this document.

 6    BY MR. McGINTY:

 7         Q    You haven't seen this before?

 8         A    Is this the spreadsheet?  A spreadsheet

 9    that -- we have a master spreadsheet that kind of, I

10    think, has all of the terminations in it.  But

11    that's not this -- I don't know if that is this.

12         Q    You don't know by looking at it?

13              MS. ANDRAPALLIYAL:  Objection, asked and

14    answered.

15              THE WITNESS:  The spreadsheet that I have

16    doesn't look like this.

17    BY MR. McGINTY:

18         Q    What does it look like?

19         A    It has all the information in it, like the

20    grant number, the title, you know, that kind of

21    stuff.  I don't know that it has, like -- it has the

22    administering IC.

23              What does this have?  I thought that said

24    program official.  It has -- it has a lot of this in

25    it.  It does.
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1        Q    Okay.  Could you go over to "Termination

 2   Reason," that column.  See the first four rows it

 3   says, "gender ideology (EA14168)"?  Do you see that?

 4        A    This is small.

 5        Q    I have a modified version with some

 6   columns taken out, it's a bit bigger.  Would you

 7   like to see that?

 8        A    Yes, please.  Sorry.

 9             (Bulls Deposition Exhibit 22 was marked

10              for identification.)

11   BY MR. McGINTY:

12        Q    I'm handing you what's been marked

13   Exhibit 22.

14        A    Yes.

15        Q    And I will represent to you that this is a

16   version of Exhibit 21, and I've taken some columns

17   out so that the information on it is more legible.

18        A    Thank you.

19        Q    But if you ever need to refer back to

20   Exhibit 21 for any reason, let me know.  I don't

21   mean to take information away from you, I just want

22   you to be able to see it.

23        A    Exactly.

24        Q    Okay.  So the question I just had was, for

25   now, this first four rows, you see where it says
```

1    "Termination Reason"?

2        A    Yes.

3        Q    And it says "gender ideology," and then in

4    parenthesis, 14168?

5        A    Yes.

6        Q    Is that the same thing that appears on

7    your internal spreadsheet that you didn't know

8    about?

9        A    Not that I know about.

10       Q    Okay.

11       A    But I will say that there are different

12   spreadsheets that are being maintained, so I

13   don't -- I don't know about all of them.  I just

14   know about mine.

15       Q    How do you know there are different

16   spreadsheets that are being maintained?

17       A    Well, because we are actually working

18   with, to give data to HHS.  Then we provide data to

19   maintain ourselves so we know when the grant was

20   terminated.  And HHS wants to be able to put that

21   information, publicize that information.

22           So some of this information is made

23   available, like, with the columns, the categories

24   that I was telling you about.  So I see the

25   categories which is what determination reason looks

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    like, but I don't know that I've seen this in my

2    spreadsheet.

3         Q    When you say "this," what do you mean?

4         A    This gender -- so gender ideology, yes.

5    But the EA14168, I don't recall seeing that.

6         Q    You didn't see that.  Okay.

7              MR. McGINTY:  Okay.  I think we're done.

8              MADAME COURT REPORTER:  May I just ask:

9    would you like to order a copy?

10             MS. ANDRAPALLIYAL:  I would, but we would

11   also like to redirect.

12             MADAME COURT REPORTER:  Oh, sorry.

13             MS. ANDRAPALLIYAL:  But maybe we could --

14   could we take a break before we do that.  Maybe

15   reconvene at 3:30.

16             (Recess taken - 3:05 to 3:38 p.m.)

17             MS. ANDRAPALLIYAL:  Okay.  We're back on

18   the record.

19                       EXAMINATION

20   BY MS. ANDRAPALLIYAL:

21        Q    Good afternoon, Ms. Bulls.

22        A    Good afternoon.

23        Q    So I'll be asking you just a few questions

24   here today.  And let me know if anything is unclear

25   or when you have any questions.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1          So I'll just start with the Subpoena that
 2   was issued that we talked about in Exhibit 1.  Do
 3   you have the handy?
 4        A    Yes.
 5        Q    Okay.  And will you turn to page 5 of that
 6   document.  And you see the second half of that page
 7   number, "Requests for Production"?
 8        A    Yes.
 9        Q    Okay.  Did you discuss these Requests for
10   Production with counsel?
11        A    No.
12        Q    Okay.  Did you receive -- were you told by
13   counsel to collect documents in preparation for
14   these discovery requests?
15        A    Yes.
16        Q    Okay.  Is it possible that counsel is
17   collecting documents in other ways apart from asking
18   you to collect documents?
19          MR. McGINTY:  Objection, calls for
20   speculation.
21          THE WITNESS:  It is possible.
22   BY MS. ANDRAPALLIYAL:
23        Q    Okay.  Are you aware of whether counsel is
24   collecting documents in other ways?
25        A    I don't know.
```

1    Q    Okay.  I'll turn to -- and I'm sorry, I
2  don't have the exhibit number handy, but the one,
3  DEI Staff Guidance.
4              MR. McGINTY:  Which one?
5              MS. ANDRAPALLIYAL:  The third one.
6              (Reporter requests clarification)
7              MS. ANDRAPALLIYAL:  DEI Staff Guidance.
8              MR. McGINTY:  The one dated March 25?
9              MS. ANDRAPALLIYAL:  No, I guess, the first
10  one, please.
11              MR. McGINTY:  The first one, so the one
12  dated February 12th.
13              MS. ANDRAPALLIYAL:  Okay, yes.
14              MR. McGINTY:  So that would be Exhibit 8.
15              MS. ANDRAPALLIYAL:  Exhibit 8, okay.
16  BY MS. ANDRAPALLIYAL:
17    Q    Do you have Exhibit 8 handy, Ms. Bulls?
18    A    Yes.
19    Q    You have it?
20    A    Yes.
21    Q    Okay, great.
22              Now, what, in your understanding, was the
23  basis for issuing this; in other words, what
24  policies were the basis for issuing this Staff
25  Guidance, to your knowledge?

1      A      There wasn't a policy that was issued.  It

2    was the temporary restraining orders that were

3    issued that caused us to develop this guidance.

4    There was a funding pause.

5      Q      Mm-hmm.

6      A      And the funding pause was in place, and we

7    were trying to figure out, you know, just make sure

8    that folks understood that the -- given, you know,

9    the recent court -- it says, "...given the recent

10   court orders, this cannot be a factor in IC funding

11   decisions at this time."

12          So we're trying to talk about the fact

13   that leadership is going to be looking over agency

14   priorities.

15     Q      Okay.  Okay.

16          MS. ANDRAPALLIYAL:  Okay.  And then can we

17   go to -- and what was the second version, which

18   exhibit was that?

19          MR. McGINTY:  The one dated February 13th.

20          MS. FRAAS:  7, I believe.

21          MR. McGINTY:  Yeah, the one dated after

22   the one that said follow court order, it says don't

23   follow court orders.  And that's February 13 and

24   that's Exhibit 7.

25   BY MS. ANDRAPALLIYAL:

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Do you have that one handy?

**2    A    Yes, I do.**

3    Q    Okay.  And, to your knowledge, what

4   were -- what, if any, policies or priorities were

5   the basis for this guidance?

**6    A    There were no policies.  There were no**

**7   priorities for the guidance.**

8    Q    Okay.  When you say there were no

9   priorities, do you mean there were no final

10  priorities, or something else?

**11    A    Final priorities.  I issued this based on**

**12  the Secretarial directive related to DEI funding.**

13    Q    Okay.

**14    A    That was just to say that, that the**

**15  Secretary had issued a memo, or a Secretarial**

**16  directive.**

17    Q    Okay.

**18    A    So it wasn't agency priorities, but it was**

**19  a Secretarial directive.**

20    Q    Okay.  So it was a Secretarial directive.

21  So when you say -- when you contrast with an agency

22  priority, what do you mean by that?

**23    A    It means, for me, that there was a**

**24  directive coming from HHS Office of the Secretary**

**25  that was issued to the NIH and the other operatives.**

1      Q    So by "agency," do you mean NIH?  Are you
2  contrasting NIH with HHS when you are distinguishing
3  between --
4      **A    Yeah, I am.**
5      Q    -- Secretarial directive and agency
6  priorities directive?
7      **A    Yeah.**
8      Q    Okay.  Well, let me switch gears a little
9  bit.
10          If we can go to Exhibit -- go to Exhibit 4
11  which, I believe, is the December 28th termination.
12  Give me one second.
13          So looking at that document, but also
14  looking at the several other exhibits that we've
15  discussed earlier in this deposition regarding other
16  grant terminations, is it correct to say that your
17  prior testimony identified three documents that, in
18  your view, explained the terminations?  And by those
19  three documents, I mean an e-mail you received,
20  spreadsheets you received, and a template letter.
21      **A    Yes.**
22      Q    Is that correct?
23      **A    That is correct.**
24      Q    Okay.  Do you know if there are other
25  documents out that NIH has produced that would

1  explain these terminations but that you did not

2  receive?

3      **A      I do not know.**

4      Q      Okay.  Is it possible?

5      **A      It is possible.**

6      Q      Now, can you remind us of your title

7  again.

8      **A      The Director of the Office of Policy for**

9  **Extramural Research Administration.**

10      Q      And what's the title of the person you

11  report to?

12      **A      The Deputy Director for Extramural**

13  **Research.**

14      Q      And who does that person report to?

15      **A      The Principal Deputy of Extramural**

16  **Research.**

17          (Reporter requests clarification)

18          **THE WITNESS:  Extramural.**

19          **And, I believe, the person I reported to,**

20  **the Principal Director and Director, so.**

21  BY MS. ANDRAPALLIYAL:

22      Q      And the Principal Deputy is one title, and

23  then above that is the Director.  Is that correct?

24      **A      That's correct.**

25      Q      Okay.  And who does the Director report

1    to?

2        **A      Secretary.**

3        Q      Secretary of HHS?

4        **A      HHS.**

5        Q      Okay.  Now, are you involved in the

6    discussion of what should be agency priorities in

7    funding research?

8        **A      No.**

9        Q      No?  Okay.  Who would be involved in those

10   discussions?

11       **A      It would be the Deputy Director for**

12   **Extramural Research, the Principal Deputy, and the**

13   **Director of the Agency along with all of the**

14   **Institute and Centers Directors.**

15       Q      Okay.  And who actually sets agency

16   priorities for funding, for funding research?

17       **A      The Director along with the IC Directors.**

18       Q      Okay.  Now, are you aware of whether the

19   Acting Director has issued funding priorities?

20       **A      I'm not aware.**

21       Q      Are you aware of draft priorities?

22       **A      I am aware of draft priorities.**

23       Q      Of draft priorities that are currently

24   being developed?

25       **A      I'm aware -- I saw a draft document, but I**

1    don't know if it's still under development.  I'm

2    not -- I don't have any insight.  I just know that I

3    saw a draft document, definitely, yes.

4         Q    Do you know if any draft priorities have

5    been finalized?

6         A    I don't know.

7         Q    Is it possible that they have and you

8    don't know?

9         A    It is possible.

10        Q    Turning back to Exhibit 4, I know I'm

11   jumping around a little bit, I do apologize.

12            But turning back to Exhibit 4 to the grant

13   termination letter, at one point counsel for

14   Plaintiff asked you to compare the language in that

15   letter to the language in Exhibit 3, which is the

16   Executive Order 14168.  Is that correct?

17        A    Yes.

18        Q    Okay.  And specifically, I believe, asked

19   you to compare the language in that letter to

20   Section 2 of the Executive Order.  Is that correct?

21        A    Yes.

22        Q    Okay.  Section 2 on page 1, at the bottom

23   of page 1.

24        A    Mm-hmm, yes.

25        Q    Okay.  Now, do you have any basis, any

1  official basis, to know whether the language in that

2  termination letter was included because of the

3  Executive Order?

4      **A    No.**

5      Q    Do you have any reason to believe or --

6  you said at one point that the language looked

7  similar.

8          What was the basis for that, for that

9  statement?

10     **A    Just me looking at it today, yeah.**

11     Q    Okay.  Did anybody tell you that the

12  letter was based on the Executive Order?

13     **A    No.**

14     Q    Do you have reason to believe that it was,

15  that the letter was based on the Executive Order?

16     **A    I don't know.**

17     Q    Okay.  The letter in Exhibit 4 says that,

18  that this award no longer effectuates agency

19  priorities.  Is that correct?

20     **A    Yes.**

21     Q    Okay.  And do you have reason to believe

22  that those agency priorities are based on Executive

23  Order 14168?

24     **A    Can you restate.**

25     Q    Sure.  Do you have reason to believe, in

1  your official capacity, that the language in the

2  letter saying that this award no longer effectuates

3  the agency priorities was based on Executive Order

4  14168?

5      A    No.

6      Q    Okay.  Let me switch gears again and let

7  me go back to that third version of the Staff

8  Guidance in the record, the March 25th document.

9           Do you have that handy?

10     A    Exhibit?

11          MR. McGINTY:  For the record, I believe

12  this is Exhibit 6.

13  BY MS. ANDRAPALLIYAL:

14     Q    Exhibit 6.

15     A    Okay.

16     Q    Okay.  Thank you.

17          Now, Ms. Bulls, is that a final document

18  that you have there as Exhibit 6?

19     A    No, it's not intended to be final.

20     Q    Okay.  Is there a watermark on that

21  document?

22     A    Yes.

23     Q    What does the watermark say?

24     A    "Confidential."

25     Q    Is there a header on that document?

1    A    Yes.

2    Q    What does the header say?

3    A    "Internal:  Not for Distribution Outside

4    of the Government."

5    Q    Do you know why that watermark and that

6    header was included on this document?

7    A    Yes.

8    Q    Why?

9    A    Because people were sending the document

10   out to places where it's being posted publicly.

11   Q    And why is it a problem that this document

12   was being posted publicly?

13   A    Because, one, it was a draft document,

14   and, two, it was an internal document, Guidance for

15   Staff, and ...

16   Q    So when you say it was a draft document,

17   was it -- was it subject to change?

18   A    Yes.

19   Q    When you sent it out, what was the purpose

20   of sending this kind of document out?

21   A    I sent it out and asked for folks to --

22   because they had a lot of questions, and so I asked

23   them to take a look at the document to see if the

24   updated version of the document answered their

25   questions.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      Q    And what are the problems that arise if a

2    draft document is posted publicly?

3      **A    People have information that is not final,**

4    **it's internal, and it's still going through vetting**

5    **processes.  So it gives the pre-- what do you -- I**

6    **mean it's like pre-information that's not available,**

7    **not even final, within the agency.**

8      Q    And is it possible that there are

9    inaccuracies in a draft document like that when it

10   hasn't been finalized?

11     **A    Yes, because it still has to go through**

12   **approval within the management and leadership levels**

13   **and be approved, or at least reviewed by OGC.**

14     Q    And is it possible that that kind of

15   document would be materially changed before it's

16   finalized?

17           MR. McGINTY:  Objection, leading.

18           **THE WITNESS:  The document has changed**

19   **over time, and it's very different than where it**

20   **started.  And, yeah, it's not the same document.**

21   BY MS. ANDRAPALLIYAL:

22     Q    So it has changed -- sorry.

23           Are you saying that it has changed over

24   time?

25     **A    Yes.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    Okay.  And could it change further over

2    time?

3    **A    It will.**

4    Q    Okay.

5         MS. ANDRAPALLIYAL:  I'm going to jump

6    around again, and we might need an exhibit number

7    again here.  The reinstatement document?

8         Do you have that exhibit number, Counsel?

9         MR. McGINTY:  I believe that's Exhibit 10.

10   BY MS. ANDRAPALLIYAL:

11   Q    Do you have that handy, Ms. Bulls?

12   **A    I'm getting at it.  We were doing fine**

13   **before the grants policy.**

14        (Whereupon, laughter)

15   BY MS. ANDRAPALLIYAL:

16   Q    Okay.  Do you have a copy of that now,

17   Ms. Bulls?

18   **A    Yes, I do.**

19   Q    Okay, great.  Could you turn to page 5 of

20   that document, please.

21        (Reporter requests clarification)

22        MS. ANDRAPALLIYAL:  Yes, page 5 of this

23   reinstatement document.

24   BY MS. ANDRAPALLIYAL:

25   Q    Okay.  And could you remind us which part

1  of Section IV has the language that you drafted?

2      A    This:

3           "Revised Award:  This grant has been

4            restored and the termination clause

5            rescinded effective immediately.  The

6            grant will continue under the original no

7            cost extension."

8      Q    Okay.  Now, below that there is -- sorry,

9  at the very end of that page there's a statement

10 that says:

11          "The previous terms and conditions of

12           award remain in effect."

13          Do you see that language down at the

14 bottom?

15     A    Yes.

16     Q    Now, is it part of your job

17 responsibilities to interpret these kinds of Revised

18 Notices of Award?

19     A    I never see them.

20     Q    You never see them?  Okay.

21     A    No.

22     Q    Who is in charge of administering them?

23     A    The Institute and Centers, so the Chief

24 Grants Management Officer is responsible for making

25 sure that the terms are correct.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1       Q     Okay.  So in your duties do you typically
2    come across these Revised Notices of Award?
3       **A     No.**
4       Q     No?  Okay.
5             Do you have reason to believe that the
6    language beginning on page, at the bottom of page 5
7    in some way invalidates the reinstatement of the
8    grant?
9             MR. McGINTY:  Objection, leading, lack of
10   foundation.
11   BY MS. ANDRAPALLIYAL:
12      Q     What does this Notice of Award do?  What
13   does this document do?
14            MR. McGINTY:  Objection, lack of
15   foundation.
16   BY MS. ANDRAPALLIYAL:
17      Q     Do you know what this document does?
18      **A     The document communicates the terms and**
19   **conditions to the recipient.**
20      Q     Okay.  A Notice of Award, what is a Notice
21   of Award?
22      **A     It's a funding instrument.**
23      Q     Okay.  And so, do you understand what
24   this, what this Notice of Award is doing?
25      **A     Yes.**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      Q    What is it doing?

2      A    It is giving funding information from the

3   Institute and Center to the recipient.

4      Q    Okay.

5      A    And are you talking about this particular

6   award, or all?  Just --

7      Q    I'm talking about this particular award.

8      A    This particular award is communicating

9   that the grant has been restored and that the

10  termination clause is rescinded.

11     Q    Okay.

12     A    This is the first part.  Because there's a

13  second part, too, so.  That's the only one I know

14  about.

15     Q    Okay.  And by "second part," what do you

16  mean by second part?

17     A    So when Institutions and Centers issue

18  awards, they issue the original award and then they

19  issue revisions on top of that.

20     Q    Okay.

21     A    So the top revision was the latest

22  revision as of the issue date of 3/27.

23     Q    Okay.  And so when you drafted this

24  language regarding the revised award, what was the

25  intent of that language?

1      **A      To restore the grant and to rescind the**
2   **termination.**
3      Q    Okay.  And did you mean to conditionally
4   restore the grant?
5      **A    No.**
6      Q    Okay.  Did this language intend to subject
7   the reinstatement to, to the language that follows
8   regarding, yeah, the start at the top of page 6?
9      **A    No, my language was to restore the grant,**
10  **which is what I sent to the Chief GMO.**
11     Q    Okay.
12     **A    The other language looks like it was**
13  **adding money back to the grant, which I had -- that**
14  **was just an action from the Chief GMO to restore**
15  **funding back to the grant.**
16     Q    I see.  You're talking about the second
17  revised --
18     **A    -- revision, yes.**
19          (Simultaneous speaking)
20  BY MS. ANDRAPALLIYAL:
21     Q    -- statement.  I see.
22     **A    Yeah, which was separate from the first**
23  **one.**
24     Q    I see, okay.  And then can we move to the
25  manual, that big stack at the bottom.  So can we

1   just go to the introduction on page ii.

2        **A    Yes.**

3        Q    What is your understanding of the point of

4   this, of this manual?  What is the purpose for this

5   manual?

6        **A    It's to provide NIH recipients with the**

7   **policy requirements and lay out the standard terms**

8   **and conditions of the award.**

9        Q    So when you say that it's meant for NIH

10  recipients, does that mean it's for people who have

11  already received, or institutions that have already

12  received NIH grant funding?

13       **A    Yes.**

14       Q    Okay.  How often is this manual updated,

15  in your experience?

16       **A    It's typically updated annually.**

17       Q    Annually?

18       **A    Yes.**

19       Q    Okay.  And so when was this document most

20  recently updated?

21       **A    It was updated April 2024.  Well, that's**

22  **the publication date.**

23       Q    And, in your experience, has NIH issued

24  new funding priorities or policies outside of this

25  policy statement or initially without modifying this

1    policy statement?

2         A    Yeah, funding priorities are typically

3    outside of it.  And they're housed on the websites

4    of the Institutes and Centers.

5         Q    Okay.

6         A    We usually just issue a Guide Notice to

7    talk about, you know, what the public policies are,

8    legislative mandates, but we don't get into the

9    funding, aside from the CRs.  We have to issue a CR

10   Notice.

11        Q    Okay.  And what are Guide Notices?  You

12   used that term earlier.

13        A    Yeah, Guide Notices communicate NIH

14   policies in the interim, between the time that the

15   policy statement is updated, because policies change

16   before the policy statement is revised.  So we use

17   that as an instrument to communicate the policies,

18   policy changes, that might impact the end grants

19   policy statement.

20        Q    Do you know if there are new Guide Notices

21   being developed at this time based on any new agency

22   priorities for policies?

23        A    I don't know.

24        Q    Okay.  Ms. Bulls, I'm done with my

25   questions.  Thank you so much for your time.

1      **A      Thank you.**

2             MR. McGINTY:  I will have some follow-ups.

3    Take a five-minute break?

4             (Recess taken - 4:08 to 4:16 p.m.)

5             MR. McGINTY:  Let's go back on the record.

6                      FURTHER EXAMINATION

7    BY MR. McGINTY:

8        Q    Thank you, Ms. Bulls, for hanging in

9    there.  I think we're almost done.

10      **A      Okay.**

11       Q    You were asked about Exhibit 1, the

12   Subpoena Duces Tecum that was sent to you.

13      **A      Yes.**

14       Q    Do you recall just now you were asked

15   about that?

16      **A      Yes.**

17       Q    And you were asked if counsel directed you

18   to gather those documents.  Is that right?

19             MS. ANDRAPALLIYAL:  Objection, misstates

20   prior testimony.

21             MR. McGINTY:  Would you read that back.

22             (The record was read aloud as follows:

23             "QUESTION:  And you were asked if counsel

24              directed you to gather those documents.

25              Is that right?")

```
 1              MR. McGINTY:  If you go back up to the
 2    redirect, and I believe the question was about
 3    counsel's representation to Ms. Bulls about
 4    Exhibit 1.
 5              (The record was read aloud as follows:
 6              "QUESTION:  So I'll be asking you just a
 7               few questions here today.  And let me
 8               know if anything is unclear or when you
 9               have any questions.
10              "So I'll just start with the Subpoena that
11               was issued that we talked about in
12               Exhibit 1.  Do you have that handy?
13              "ANSWER:  Yes.
14              "QUESTION:  Okay.  And will you turn to
15               page 5 of that document.  And you see the
16               second half of that page is numbered
17               'Requests for Production'?
18              "ANSWER:  Yes.
19              "QUESTION:  Okay.  Did you discuss these
20               Requests for Production with counsel?
21              "ANSWER:  No.
22              "QUESTION:  Okay.  Did you receive -- were
23               you told by counsel to collect documents
24               in preparation for these discovery
25               requests?
```

```
 1              "ANSWER:  Yes.

 2              "QUESTION:  Okay.  Is it possible that

 3               counsel is collecting documents in other

 4               ways apart from asking you to collect

 5               documents? "

 6              MADAM COURT REPORTER:  Is that what you

 7               wanted?

 8              MR. McGINTY:  Yes, thank you.

 9   BY MR. McGINTY:

10       Q    So you were asked if counsel instructed

11   you to collect documents in response to those

12   requests, right?

13       A    Yes.

14       Q    And you did collect those documents,

15   right?

16       A    Yes.

17       Q    And other than your CV, are you aware of

18   any of those documents having been provided to

19   Plaintiff's counsel today?

20       A    I don't know.

21       Q    And you've been here all day.  Did you see

22   counsel give those documents to us?

23       A    No.

24       Q    Let's see.  When you were asked about

25   Exhibit 8, which is the February 12th Staff
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1  Guidance -- if you could pull that up, that would be

2  great.

3          Now, this was from Dr. Lauer and from you.

4  Is that right?

5      A    That is correct.

6      Q    And Dr. Lauer resigned the next day,

7  right?

8      A    I don't remember.

9      Q    You don't remember.  Did Dr. Lauer resign?

10     A    Yes, he did.  He retired.

11     Q    Do you know if it had any connection with

12  this Exhibit 8?

13     A    I'm sorry?

14     Q    Do you know if his retirement had any

15  connection with this Exhibit 8?

16     A    No.

17     Q    Okay.  When you were asked about

18  Exhibit 7, if I remember correctly, you said that

19  Exhibit 7 was in response to a Secretarial

20  directive.  Did I understand that right?

21     A    Yes.

22     Q    Was that Secretarial directive written

23  down?

24     A    Yeah, it's in the document from the

25  department.  It was attached.

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1        Q    I see.  It is this February 10th document
 2   here?
 3        A    Yes.
 4        Q    Okay.  And that had to do with DEI
 5   funding?
 6        A    Yes.
 7        Q    Is it common for those kinds of directives
 8   to come from HSS?
 9             MS. ANDRAPALLIYAL:  Objection, calls for
10   speculation.
11             THE WITNESS:  I don't know.
12   BY MR. McGINTY:
13        Q    Okay.  I'm going to ask a bit, a few more
14   questions about Exhibit 4, the February 28th letter.
15             And you were asked if you knew whether or
16   not there were other documents other than the
17   e-mail, the spreadsheet, and the template letter
18   that explained terminations like what we see on this
19   Exhibit 4.
20             Do you remember that?
21        A    Yes, I do.
22        Q    And, as I recall your testimony, you said
23   you didn't know if there were other documents that
24   might exist.
25        A    I don't know if there are other documents.
```

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    Q    If you wanted to find that out, who would

2  you ask?

3         MS. ANDRAPALLIYAL:  Objection, calls for

4  speculation.

5         **THE WITNESS:  If I wanted to find out who**

6  **would I ask?  My supervisor.**

7  BY MR. McGINTY:

8    Q    Okay.  Who, right now, is who?

9    A    **Jon Lorsch.**

10   Q    Jon Lorsch.

11   A    **But at the time I think it was**

12  **Liza Bundesen.**

13   Q    Liza Bundesen might know?

14   A    **I don't know.**

15   Q    Can you think of anybody else who might

16  know whether or not other documents exist?

17        MS. ANDRAPALLIYAL:  Objection, calls for

18  speculation.

19        **THE WITNESS:  No, I don't know.  I don't.**

20  BY MR. McGINTY:

21   Q    How about Rachel Riley?

22   A    **I don't know.**

23   Q    Okay.  Just confirming your testimony, you

24  got this template language word for word, right?

25   A    **Yes.**

1     Q     You didn't write one word in this?

2     A     No.

3     Q     And there's several letters like this.  I

4  think you testified somewhere over five hundred and

5  less than a thousand for grants that you terminated

6  with those kind of template letters.  Is that right?

7     A     Yes.

8     Q     Is that common?

9          MS. ANDRAPALLIYAL:  Objection, calls for

10  speculation.

11          THE WITNESS:  Is -- is what common?

12  BY MR. McGINTY:

13     Q     Have you ever, before January 20th, 2025,

14  put your name on a letter like this without having

15  written a single word of it?

16          MS. ANDRAPALLIYAL:  Objection, beyond the

17  scope of redirect.

18  BY MR. McGINTY:

19     Q     You can answer.

20     A     No.

21     Q     And it's your testimony that you don't

22  know why any of this language was included, right?

23          MS. ANDRAPALLIYAL:  Objection, misstates

24  prior testimony.

25  BY MR. McGINTY:

1    Q    Do you know why any of this language is
2    included?
3    **A    No.**
4    Q    Before January 20th, 2025, did you put
5    your name on a letter when you didn't know why any
6    of the words were included in it?
7            MS. ANDRAPALLIYAL:  Objection,
8    argumentative.
9            **THE WITNESS:  Not that I can recall.**
10   BY MR. McGINTY:
11   Q    Is that something you might remember?
12   **A    I don't know.**
13   Q    You were asked if you were regularly
14   involved in discussions of what agency priorities
15   should be, and I think you said:  Deputy Director,
16   Principal Director, the Director of the agency, and
17   the Institute Directors.  Is that right?
18   **A    Yes.**
19   Q    Okay.  And can you name those people for
20   me?
21   **A    The acting leader -- or, well, from when**
22   **these letters were written?  Is that what you mean?**
23   **Yes.**
24   Q    I mean everybody from the first letter,
25   which I understood is February 28, 2025, to the

1  most recent, which I think is March 27th.

2          Who are all the people in that time frame

3  who would be involved in discussions about what

4  agency priorities should be?

5      A    I don't know.  I don't know -- I know who

6  the people -- I know the people that were in the

7  positions, but I don't know if they were discussing

8  agency priorities.  Because we were talking about

9  funding priorities, that's what I was saying to

10  counsel.

11      Q    Oh, okay.  In funding priorities, then.

12      A    Funding priorities.

13      Q    Then funding priorities, then.

14      A    During the time that this letter was

15  issued, it would have been Liza, maybe, and

16  Dr. Memoli.  I don't know of anyone else except for

17  the IC directors that probably were --

18      Q    Okay.  And how many IC directors are

19  there?

20      A    There are, I want to say, 20 -- well,

21  there's 27 different Institute and Centers, but

22  there's 24 ICs that administer funds.  So I'm going

23  to just talk about the 24 that I know.  And I'm not

24  sure the CSR has an IC director.  Yeah, so, yes, 24.

25      Q    Okay.  If I am understanding you

 1  correctly, the people who might be involved in those

 2  discussions of what agency funding priorities should

 3  be would be Liza Bundesen, Dr. Memoli, and then the

 4  24 IC directors?

 5          MS. ANDRAPALLIYAL:  Objection, calls for

 6  speculation.

 7          MR. McGINTY:  Following up on the question

 8  you asked.

 9          **THE WITNESS:  I'm sorry?**

10  BY MR. McGINTY:

11      Q    I'm following up on a question that

12  counsel asked.

13      **A    Oh, okay.**

14      Q    She asked you who are the people who would

15  be involved in agency priorities for funding, and

16  you said Deputy Director, the Principal Director,

17  the Director of the agency, and Institute Directors.

18  I'm just making sure I have a full list of who that

19  is.

20      **A    So you want the names of the individuals**

21  **or -- I don't understand the question.**

22      Q    If I get the names of the individuals that

23  would be great.

24      **A    The names -- I don't know the names of all**

25  **of them, so it's just Liza and Matt.  Matt from this**

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1    letter.

2              (Reporter requests clarification)

3              THE WITNESS:  Matt, M-a-t-t, Matthew

4    Memoli.

5    BY MR. McGINTY:

6         Q    Plus the 24 IC directors?

7         A    Yes.

8         Q    And I think you said the acting director

9    generally does funding priorities.

10              Are funding priorities generally written

11    down somewhere?

12         A    They're on the -- it's not the acting

13    director, it's the Institute and Centers.  And their

14    funding priorities and funding strategies are out on

15    their individual websites.

16         Q    Are you generally familiar with those?

17         A    No.  I'm familiar with just the

18    overarching strategy, which is to push, because they

19    have different strategies, you send the recipients

20    back to the various Institute and Centers to look at

21    those.

22         Q    Okay.  And in this instance with respect

23    to this February 28th letter we're looking at and

24    the other termination letters that reference the

25    policy of NIH not to prioritize certain research

1   programs, that didn't come from the Institute and

2   Centers, did it?

3       **A    I don't know.  I don't know.**

4       Q    Were they -- is any language like this on

5   any of the Institute and Centers websites?

6       **A    Not that I know of.**

7       Q    And earlier it was your testimony that

8   this was sent to -- or sent from someone at HHS.  So

9   Rachel Riley?

10      **A    This particular language and e-mail, yes.**

11      Q    The language that we're looking at in

12  Exhibit 4?

13      **A    Yes.**

14      Q    Do you have any reason to believe that the

15  Institute and Centers sent that language up to HHS

16  and it was distributed back down?

17      **A    I don't know.**

18      Q    How many Institutes and Centers have

19  grants that were terminated with these kinds of form

20  letters?

21      **A    Many, if not --**

22      Q    All of them?

23      **A    -- most.**

24      Q    Sorry, I spoke over you.  Can you say that

25  again?

1       **A      Many, if -- yeah, many.**

2       Q      Is it all of them?

3       **A      By now it might be.  I don't know.  I -- I**

4    **honestly just don't know.  But I believe that all of**

5    **them have been impacted at this point.**

6       Q      So it stands to reason that this is not a

7    funding priority that's coming from the individual

8    Institutes and Centers, doesn't it?

9           MS. ANDRAPALLIYAL:  Objection, calls for

10   speculation.

11          **THE WITNESS:  I don't know.**

12   BY MR. McGINTY:

13      Q      You were also asked if you have any

14   official basis to know whether the language in these

15   template letters relates in any way to the Executive

16   Orders.  Do you recall that testimony?

17      **A      Yes.**

18      Q      And you testified you don't have any

19   reason to believe that or to know that on your

20   official basis?

21      **A      That is correct.**

22      Q      If you wanted to figure that out, who

23   would you ask?

24          MS. ANDRAPALLIYAL:  Objection, calls for

25   speculation.

1           **THE WITNESS:  I would ask my supervisor.**

2    BY MR. McGINTY:

3        Q    Which in February 28 was Liza Bundesen?

4        **A    Correct.**

5        Q    Can you think of anybody else who might

6    know?

7           MS. ANDRAPALLIYAL:  Objection, calls for

8    speculation.

9           **THE WITNESS:  I can't.**

10   BY MR. McGINTY:

11       Q    Is it possible that Rachel Riley knows?

12          MS. ANDRAPALLIYAL:  Objection, calls for

13   speculation.

14          **THE WITNESS:  I don't know.  It's**

15   **possible.  I don't know.**

16   BY MR. McGINTY:

17       Q    You were asked about this March 25th

18   Guidance, Exhibit 6.

19          And your testimony was it's still subject

20   to change, right?

21       **A    Yes.**

22       Q    Has this Guidance been relied on by any

23   Institute or Center to take any action?

24       **A    I don't know.**

25       Q    If you wanted to know that, who would you

1    ask?

2        **A    The Institute and Center.**

3        Q    You have to ask each Institute and Center

4    directly?

5        **A    I would.**

6        Q    And you testified about Exhibit 10 which

7    was the March 27th Notice of Award.

8        **A    Yes.**

9        Q    And I think your testimony here was that

10   it's not within your usual job duties to interpret

11   these kinds of Notices of Award.  Is that right?

12       **A    Yes.  No, I don't usually interpret these**

13   **Notices of Awards.  I don't -- my testimony, what I**

14   **recall is that I said I don't normally see them so I**

15   **wouldn't interpret them.**

16       Q    You don't normally see them, let alone

17   interpret them?

18       **A    Right.**

19       Q    Fair enough.  Earlier when you were

20   looking at page 5 and page 6, your testimony was it

21   looked to you, maybe on the basis of just a lay

22   person's understanding, that this language under

23   termination and transgender issues may have been

24   included by mistake.

25            Do you recall that testimony?

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

1      **A      I do recall that testimony, yeah.**

2      Q      If I wanted to get to the bottom of that,

3      who would I need to ask?

4      **A      You would need to ask the Institute or**

5      **Center, so Maggie.  Margaret Young.**

6      Q      Margaret or Maggie Young?

7      **A      Yes.**

8      Q      How is Maggie spelled?

9      **A      M-A-G-G-I-E.**

10     Q      Great.  Do you know if NIH has ever made a

11     promise not to terminate this grant in the future?

12             MS. ANDRAPALLIYAL:  Objection, calls for

13     speculation.

14             **THE WITNESS:  No, I don't know that.**

15             MR. McGINTY:  Okay.  Nothing further.

16             MS. ANDRAPALLIYAL:  We're good.  Thank

17     you.

18             MR. McGINTY:  Oh, yeah.  We do need the

19     rough transcript, I'll put that on the record.

20             MADAM COURT REPORTER:  And you're ordering

21     the original --

22             MR. McGINTY:  We're ordering the original

23     and we'll probably expedite it.

24             MADAM COURT REPORTER:  Okay.

25             And may I ask, are you ordering a copy,

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

 1   and when do you need it?  Do you need a rough draft,

 2   too?

 3           MS. ANDRAPALLIYAL:  Yes, please.  Yeah,

 4   and on the same time frame, I guess, for both.

 5           (Whereupon, at 4:38 p.m. the deposition of

 6   MICHELLE G. BULLS was concluded.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

1              ACKNOWLEDGMENT OF DEPONENT

2          I, MICHELLE G. BULLS, do hereby

3     acknowledge that I have read and examined the

4     foregoing testimony, and the same is a true, correct

5     and complete transcription of the testimony given by

6     me and any corrections appear on the attached Errata

7     sheet signed by me.

8

9

10    _____          _____

11          (DATE)                          (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2               I, Bess A. Avery, Registered Merit
 3   Reporter, the officer before whom the foregoing
 4   deposition was taken, do hereby certify that the
 5   foregoing transcript is a true and correct record of
 6   the testimony given; that said testimony was taken
 7   by me stenographically and thereafter reduced to
 8   typewriting under my supervision; and that I am
 9   neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12               IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 7th day of
14   April 2025.
15
16   My commission expires:
17   November 14, 2028
18
19   _____
20   /s/BESS A. AVERY
21   NOTARY PUBLIC IN AND FOR THE
22   DISTRICT OF COLUMBIA
23
24
25
```





State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle - April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025

State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025



State of WA, et al. vs Trump, et al.
Bulls, Michelle -  April 03, 2025