EXHIBIT 9

     

2200 Sixth Avenue, Suite 425, Seattle, WA 98121 • 206.389.9321 • Toll Free: 855.329.0919    2208 North 30th Street, Suite 202, Tacoma, WA  98403 • 253.627.6401 • Toll Fee: 800.649.2034

# ONE-WEEK TRANSCRIPT TURNAROUND

Digital Transcripts • Internet Realtime • HD Legal Video • Picture-in-Picture Depositions
Remote Depositions • Designation Editing • Nationwide Scheduling • HD Videoconferencing

Thank you for choosing BA Litigation Services for your court reporting, legal video, and deposition technology needs.  It is always our goal to provide you with exceptional service.  If there is anything we can do to assist you, please don't hesitate to let us know.

*Sarah Fitzgibbon, CCR*
Vice President



The Premier Advantage™
PDF transcript bundle contains:

• Full-size and condensed transcripts
• Printable word index
• Hyperlinked selectable word index
• Embedded printable exhibit scans
• Hyperlinked selectable exhibit viewing
• Common file formats: txt, lef, mdb
  accessed via *paperclip* icon

STRATEGY    •    TECHNOLOGY    •    DESIGN    •    DEPOSITIONS

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON

 3                      AT SEATTLE

 4   ------------------------------)

 5   STATE OF WASHINGTON, et al.,   ) NO.2:25-cv-00244-LK

 6                    Plaintiffs, )

 7            v.                    )

 8   DONALD J. TRUMP, in his        )

 9   official capacity as President )

10   of the United States, et al., )

11                    Defendants. )

12   ------------------------------)

13                      Washington, D.C.

14                      Friday, April 4, 2025

15

16        Deposition of LIZA Q. BUNDESEN, a witness

17   herein, was called for examination by counsel for

18   Plaintiffs in the above-entitled matter, pursuant to

19   notice, the witness being first duly sworn by

20   BESS A. AVERY, a Notary Public in and for the

21   District of Columbia, taken at the offices of B&A

22   Litigation Services, 1029 Vermont Avenue, N.W.,

23   Washington, D.C., commencing at 9:06 a.m., when were

24   present on behalf of the respective parties:

25
```



State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF STATE OF WASHINGTON:

 3        WILLIAM MCGINTY, ESQ.

 4        LAURYN K. FRAAS, ESQ.

 5        Assistant Attorneys General

 6        Attorney General of Washington

 7        800 Fifth Avenue, Suite 2000

 8        Seattle, Washington  98104-3188

 9        (360) 709-6027

10        william.mcginty@atg.wa.gov

11        lauryn.fraas@atg.wa.gov

12   ON BEHALF OF THE DEFENDANTS:

13        VINITA B. ANDRAPALLIYAL, ESQ., SR. COUNSEL

14        CHRISTIAN S. DANIEL, ESQ., TRIAL ATTORNEY

15        ROBERT C. BOMBARD, ESQ., TRIAL ATTORNEY

16        UNITED STATES DEPARTMENT OF JUSTICE

17        Civil Division, Federal Programs Branch

18        1100 L Street, NW

19        Washington, DC  20530

20        (202) 305-0845

21        Vinita.B.Andrapalliyal@usdoj.gov

22        Christian.S.Daniels@usdoj.gov

23        Robert.Bombard2@usdoj.gov

24   ALSO PRESENT:  Miranda Berge, Esq. - HHS

25                  Anna Jacobs, Esq. - HHS
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1                    I N D E X
 2  Witness:                                    Page
 3      LIZA Q. BUNDESEN
 4          Examination by Mr. McGinty. . . . . . .5
 5          Examination by Ms. Andrapalliyal. . .  104
 6          Further Examination by Mr. McGinty. . .110
 7
 8
 9
10                      - - -
11                  E X H I B I T S
12          (Exhibits attached to transcript)
13  Bundesen Deposition Exhibits                 Page
14  Exhibit 23  Subpoena Duces Tecum . . . . . . . . 12
15  Exhibit 24  Bundesen CV  . . . . . . . . . . . . 15
16  Exhibit 4   Termination letter, dated 2/28/25  . . 33
17  Exhibit 3   Presidential Documents from the  . . . 65
18          Federal Register Vol. 90, 1/20/2025,
19          Executive Order
20  Exhibit 5   Exhibit 5, article from journal  . . . 68
21          Nature
22  Exhibit 8   Memo from NIH to Institute and . . . . 77
23          Center Chief Grants Management Officers,
24          2/12/2025
25
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1              E X H I B I T S

2          (Exhibits attached to transcript)

3    Bundesen Deposition Exhibits                Page

4    Exhibit 7   Memo from NIH to Institute and . . . . 79

5         Centers Chief Grants Management

6         Officers, 2/13/2025

7    Exhibit 20  NIH Grants Policy Statement  . . . . . 81

8    Exhibit 25  Application for Federal Assistance . . 92

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2                  -  -  -  -  -
 3    Thereupon,
 4                 LIZA Q. BUNDESEN,
 5    was called as a witness by counsel for Plaintiffs,
 6    and, having been duly sworn by the Notary Public,
 7    was examined and testified as follows:
 8                    EXAMINATION
 9    BY MR. McGINTY:
10        Q    Could you please just state your name and
11    spell your last name for the record, please.
12        A    Liza Queyrel Bundesen.  And my last name
13    is spelled B-U-N-D-E-S-E-N.
14        Q    Great.  And we just met.  My name is
15    Will McGinty.  I represent Plaintiffs in this case.
16             Before we get too much further, are you
17    still employed by the federal government in any
18    capacity?
19        A    No.
20        Q    Okay.  When did you separate from
21    employment?
22        A    March 7, 2025.
23        Q    2025.  Are you represented by counsel in
24    this matter?
25        A    No.
```

1    Q    Okay.  Do you understand -- do you have a

2  general understanding of what this case is about?

3    **A    Generally, yeah.**

4    Q    Okay.  What's your understanding?

5    **A    That there is concern about the grant**

6  **terminations in light of some executive orders and**

7  **restraining orders.**

8    Q    Okay.  And we'll get into that a little

9  bit more in the future, but have you ever been

10  deposed before?

11    **A    No.**

12    Q    Okay.  So the purpose of this proceeding

13  is so that I can ask you questions and that you'll

14  answer my question, unless you're -- you're not

15  represented by counsel today, so normally if they

16  instruct you not to answer, counsel might raise a

17  privilege and ask you not to answer, and then what

18  we do with that is what you do with that.  Is that

19  fair?

20    **A    Yes.**

21    Q    Okay.  It's important we make a clear

22  record.  So please try to wait for me to answer a

23  question before you answer it, and I'll try to wait

24  for you to answer a question before I ask another

25  one.  Is that fair?

1    A    Yes.

2    Q    And this is hard.  I'm sure we're going to

3  talk over each over.  Let's try not to, to the

4  extent that we can.  Is that fair?

5    A    Yes.

6    Q    Okay.  If you don't understand a question,

7  will you ask me?

8    A    Yes.

9    Q    Great.  And if you answer a question, I'm

10  going to assume that you understood it.  Is that

11  fair?

12    A    Yeah.

13    Q    This isn't an endurance test.  We're not

14  here to see how long you can go answering my

15  questions.  If you ever need a break, just let me

16  know, and we'll accommodate you as soon as we

17  possibly can.  I just ask that you answer any

18  question currently pending before we go on break.

19  Is that fair?

20    A    Yes.

21    Q    And you understand that you're under oath

22  today?

23    A    Yes.

24    Q    What does that mean to you?

25    A    **It means that I must tell the truth under**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    **penalty of perjury.**

2        Q    Okay, great.

3            How did you prepare for this deposition?

4        **A    I met with colleagues from HHS, OGC, and**

5    **DOJ twice, and they just explained to me some of the**

6    **guardrails and what to expect, meaning that we would**

7    **be in a conference room, there would be a**

8    **stenographer, I would be under oath, and, you know,**

9    **some just very basic, basic instructions.**

10        Q    Okay.  Did they tell you anything else?

11            MS. ANDRAPALLIYAL:  Objection --

12            **THE WITNESS:  If you can clarify.**

13            MS. ANDRAPALLIYAL:  -- calls for

14    privileged attorney-client communication.  I'd ask

15    the witness not to answer.

16            MR. McGINTY:  Well, Counsel, she has said

17    that she terminated her employment on March 7th.  I

18    don't think there's an attorney-client relationship

19    there.

20            MS. ANDRAPALLIYAL:   There is a

21    relationship to the government information that's

22    being sought in this deposition today.

23            MR. McGINTY:  Do you have authority for

24    that?

25            MS. ANDRAPALLIYAL:  I'd be happy to

1    provide it to you later on today, but she's --

2    (inaudible.)

3            (Reporter asks for clarification)

4            MS. ANDRAPALLIYAL:  She's testifying as to

5    events that she became aware of in her official

6    capacity at NIH, and that information is still

7    government information.

8            MR. McGINTY:  I asked her what happened in

9    a meeting after March 7th when she terminated her

10   employment, so I don't see that there's any

11   relationship to either confidential government

12   information or an attorney-client privilege.

13           MS. ANDRAPALLIYAL:  I disagree.  I mean,

14   to the extent that she's being asked about, you

15   know, legal advice as to government information, the

16   Government does have an interest there.

17           The Government did not personally

18   represent Michelle Bulls either, but we're

19   protecting government information that she had in

20   her official capacity.  Similarly, we are doing the

21   same here today.

22           MR. McGINTY:  I disagree with your

23   understanding of privilege.

24   BY MR. McGINTY:

25       Q    I'm going to ask you again:  What did you

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

 1  discuss at that first meeting with DOJ and OGC?
 2          MS. ANDRAPALLIYAL:  Again, same objection.
 3  I ask the witness not to answer.
 4  BY MR. McGINTY:
 5      Q    And you decline to answer that question?
 6      A    (Nodding head)
 7      Q    Will you speak up, please.
 8      A    Yes.
 9      Q    Okay.  And what's the basis that you're
10  declining to answer that question?
11      A    Based on the request by DOJ colleagues.
12      Q    Okay.  So what were the dates that you met
13  with OGC and the DOJ?
14      A    Gosh, let's see.  Yesterday, and then --
15  so yesterday was Thursday -- and then Tuesday.
16      Q    Okay.  What time yesterday?
17      A    Yesterday at, I think, around 8:00 o'clock
18  at night.
19      Q    8:00 o'clock at night?
20      A    Yes.
21      Q    How long did that meeting last?
22      A    About 45 minutes.
23      Q    Okay.  And then you said the first one --
24  that was the second one.  The first one happened
25  when?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1     **A    I believe Tuesday.**

2     Q    Tuesday of this week?

3     **A    Yes.**

4     Q    So that would have been the first, if I'm

5     right?

6     **A    I don't have -- yeah.  I think it was**

7     **Tuesday because I was sick on Wednesday so, yeah.**

8     Q    Okay.  And how long did that meeting last?

9     **A    I think about an hour.**

10    Q    Okay.  Did they show you any documents?

11    **A    No.**

12    Q    And who was there?

13    **A    Let's see, Vinita, Rob, Miranda, and Anna.**

14    Q    Okay.  And you're pointing to the people

15    in the room?

16    **A    Yes.**

17    Q    Everyone but Christian?

18    **A    Yes.**

19    Q    Okay.  Did you give them any documents?

20    **A    No.**

21    Q    Okay.  And at the meeting last night, who

22    was that meeting with?

23    **A    The -- just to make sure, the same folks**

24    **that I just mentioned, so everyone but Christian.**

25    Q    Okay.  At that meeting did they show you

```
 1   any documents?

 2        A    No.

 3        Q    And at that meeting did you give them any

 4   documents?

 5        A    No.

 6        Q    Okay.  And you will decline to answer any

 7   questions about the substance of those

 8   conversations.  Is that right?

 9        A    Yes.

10        Q    On the basis of the attorney-client

11   privilege representation that counsel made a few

12   minutes ago?

13        A    Yes.  Based on my being a former federal

14   employee, yes.

15        Q    Okay.  But you are not represented by any

16   attorney in the room today?

17        A    No, I do not have personal representation

18   by an attorney.

19        Q    Okay.

20             (Bundesen Deposition Exhibit 23 was marked

21              for identification.)

22   BY MR. McGINTY:

23        Q    I hand you what's been marked Exhibit 23.

24        A    Okay.

25             MS. ANDRAPALLIYAL:  I would like to just
```

```
 1   make a standing objection on the record similar to

 2   the objection I made yesterday.  This deposition was

 3   noticed on the basis of the expedited discovery

 4   authorized in a discourse order denying Plaintiff's

 5   motion for contempt.  That motion was premised on a

 6   grant that NIH terminated, NIH has since reinstated

 7   that grant, so it's our position that the expedited

 8   discovery requests are now moot.  That being said,

 9   we understand the deposition may proceed.

10             MR. McGINTY:  I will respond to that on

11   the record today.

12             We've already had our 26(f).  We don't

13   need expedited discovery.  In addition, NIH has

14   terminated other grants to the Plaintiff states

15   utilizing the same form language in the

16   February 28th letter to Seattle Children's Hospital,

17   so I don't think information that we're seeking is

18   moot and I don't think there's a necessity for

19   expedited discovery.

20             In any event, I will note that Defendant's

21   counsel requested a conference on this very issue to

22   attempt to have the subpoenas and depositions

23   quashed and that request was denied by Judge King.

24             So with that I'll go ahead.

25   BY MR. McGINTY:
```

1      Q     Do you recognize what's been marked as

2   Exhibit 23?

3      **A     Yes.**

4      Q     And what is it?

5      **A     This is the Subpoena that I received.**

6      Q     Okay.  And this was served on you?

7      **A     Yes.**

8      Q     And did you read this Subpoena?

9      **A     Yes.**

10     Q     Did you go over it with anybody?

11     **A     No.**

12     Q     Did you take a look at the Requests for

13  Production that start on page 5?

14     **A     Yes.**

15     Q     And did you look for any documents that

16  would meet these descriptions?

17     **A     Yes.**

18     Q     And how did you look for those documents?

19     **A     Well, excuse me, let me clarify.**

20          **I reviewed all of the document requests,**

21  **and upon reviewing these requests, I knew that with**

22  **exception to my current CV, I did not have any of**

23  **these documents in my possession.**

24     Q     And why was that?

25     **A     Because I separated from federal service,**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    and all those documents would be on my work

2    computer, work servers, and I just don't have them

3    anymore.

4        Q    Okay.  Did you bring a copy of your CV

5    today?

6        A    I did not.  I e-mailed it to my HHS, OGC

7    colleagues.

8        Q    I see.  Okay.

9            MS. ANDRAPALLIYAL:  We do have a copy we

10   can provide you this morning.

11            THE WITNESS:  And it's very long.

12            (Document tendered to counsel)

13            MR. McGINTY:  I'll have you marked this.

14            MR. BOMBARD:  That might be double.  You

15   might want to check.  I thought I got four copies.

16            (Bundesen Deposition Exhibit 24 was marked

17             for identification.)

18   BY MR. McGINTY:

19       Q    I'm handing what's been marked Exhibit 24.

20   Do you recognize that document?

21       A    Exhibit 24?  Yes, this is my CV.

22       Q    And when was this last updated?

23       A    It was updated last night when I had to

24   change a date.

25       Q    So you updated it for this Subpoena?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1        A    Well, yes.  I updated it previously last

2    week.  And then when I went to send it to my

3    colleagues for the purpose of this deposition, I

4    realized that I had missed a date, that was just a

5    little copy of it.

6        Q    Okay.  So according to this, you have a

7    Ph.D. in Neuroscience from Georgetown University in

8    2003.  Is that right?

9        A    Yes.

10        Q    And this says, "with distinction."  What

11    does "with distinction" mean?

12        A    With honors.  No one ever really explained

13    it to me.  I was just told it was with distinction.

14        Q    Congratulations.

15        A    Thank you.

16        Q    And you got a B.S. in Molecular Biology

17    and a Minor in Psychology from Lehigh University in

18    1997?

19        A    Yes.

20        Q    And since you graduated with your Ph.D. in

21    2003, what has been your work experience?

22        A    So following my Ph.D. I did two policy

23    fellowships and then immediately went into

24    government service; so one fellowship at the

25    National Academies, another sponsored by the

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1   American Association for the Advancement of Science

2   that placed me at the National Institute of Mental

3   Health.

4        I was there as a fellow for two years, and

5   then I was fortunate enough to be hired as a federal

6   employee, and have been at NIH ever since.

7        Q    Got it.  And what have you been doing at

8   NIH since you were hired?

9        A    I started, as I mentioned, as a fellow,

10  policy fellow, and then transitioned to being a

11  policy analyst, and then chief of the Science Policy

12  and Evaluation Branch at the National Institute of

13  Mental Health.

14       Q    Okay.  And I'm going to stop you right

15  there.  Just go back and explain what those mean.

16  So policy fellow, policy analyst and, then, chief of

17  something.  I didn't catch it all.

18       Just explain what your duties were in

19  those roles?

20       A    Sure.  So as a policy fellow and a policy

21  analyst, the duties were very similar.  I would

22  largely translate complex scientific information for

23  consumption by the lay public and policy makers, so

24  I would explain the importance of NIH funded

25  research to the lay person.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1          So I would also write the congressional
2    justification.  So for that, it is, you know,
3    explaining the importance of science during the
4    appropriations process, so narratives about
5    initiatives, things like that.
6          I would write testimony for the NIMH
7    director when he was appearing in front of Congress.
8    I also did other functions like editing the
9    websites, you know, doing portfolio analyses,
10   crunching numbers, things like that.
11         And then you wanted me to explain the
12   other roles that I had?
13     Q    Yes, but before we do that, just a couple
14   of clarifying questions --
15     A    Sure.
16     Q    -- for the record.  NIMH is?
17     A    The National Institute of Mental Health.
18     Q    Great.
19     A    And that is one of the twenty-seven
20   Institutes and Centers that make up the National
21   Institutes of Health.
22     Q    Okay.  And you said you would do portfolio
23   analysis.  What is portfolio analysis?
24     A    So we would -- so NIH and the institutes
25   fund grants, and the grants could be on a wide range

1    of topics.  At the National Institute of Mental

2    Health we funded basic science, clinical trials,

3    intervention studies, things like that.

4            And so we would periodically look at the

5    entire universe of the grant portfolio and say,

6    okay, how much are we spending on genetics, how much

7    are we spending on, you know, services, things like

8    that.

9            And so we would just look at the

10   distribution in terms of funding number, location

11   of, you know, where the recipients existed, you

12   know, are we funding more on the West Coast, on the

13   East Coast, Middle America, things like that.  We

14   would look at alignment with our strategic plan.

15        Q    Got it.  I think I understand.  So it's a

16   way to balance the research project that you're

17   funding according to various NIH policies.  Am I

18   understanding that right?

19        A    So I would -- I think that was a piece of

20   data to go into something like -- into an assessment

21   of priorities, yeah, that is fair.

22        Q    Got it.  Okay.

23        A    Yeah.

24        Q    So you were doing the portfolio analysis

25   that would be used for that purpose?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    **A    Yes.**

2    Q    But you weren't doing that yourself at

3    that point?

4    **A    Doing what?**

5    Q    The rebalancing for the purposes of policy

6    --

7    **A    No, I was -- I was primarily just looking**

8    **at data and providing it to decision makers.**

9    Q    Okay.  Understood.  Okay.  And then, so

10   that was your role as a policy fellow and a policy

11   analyst.  Is that right?

12   **A    Yes.**

13   Q    And then the next thing you did was?

14   **A    I was the chief of the Science Policy and**

15   **Evaluation Branch.  I had previously been a fellow**

16   **and analyst within that branch, and so then I just**

17   **progressed and became a branch chief.  So that**

18   **branch -- so chief is, basically means the head of**

19   **the branch.  So that's -- yeah, that was my role.**

20   Q    So it's the same basic duties, but now you

21   were supervising people?

22   **A    Yes.**

23   Q    How many people were you supervising?

24   **A    Let's see.  I was supervising -- it varied**

25   **from year to year.  I think my last year I had about**

1    eight or nine FTEs, the government employees, and

2    then we would periodically host fellows, folks who

3    wanted to have a new experience from the intramural

4    programs and another part of the institutes.  So,

5    you know, at a peak I maybe had twelve people.

6         Q    So just clarifying, NIMH is part of the

7    extramural program?

8         A    NIMH is an institute within the National

9    Institutes of Health.  It has both an intramural and

10   extramural component, yeah.

11        Q    Got it.

12        A    Yes.

13        Q    And you were part of the extramural

14   program within NIMH?

15        A    So, yes, it's -- I'm trying to think how

16   to characterize this.

17             So it was non-intramural.  So typically

18   extramural staff are considered, have certain

19   duties, and then the policy and planning offices are

20   more considered HQ staff, so servicing the offices

21   and NIH director.

22             So we were not necessarily considered

23   extramural, but we were not intramural.

24        Q    Okay.  Fair enough.

25        A    It's confusing.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1      Q    Yeah, well, I was just trying to clarify.
2   So you said you would host intramural staff --
3      A    Oh, yeah.
4      Q    -- so I was just trying to understand how
5   you would host that.
6      A    Oh, yes.  It would be folks who were in
7   the lab in the intramural and they thought, I don't
8   know that I want to do lab work for the rest of my
9   life, let me see what else is out there.  And so we
10  would get them a new experience, get them to do some
11  policy work.
12     Q    Got it.  And after you were the chief of
13  that branch, what was the next stage in your career?
14     A    So then I left NIMH, The National
15  Institute of Mental Health, and moved to the Office
16  of NIH Director.  And within the Office of NIH
17  Director there are a number of suboffices.  So I
18  went to the Office of Extramural Research, and I was
19  a policy adviser there to the director of the Office
20  of Extramural Research.
21     Q    Okay.  What was your role there?
22     A    Every day was different.  So I would
23  prepare presentations for the director to give
24  inside and outside of NIH.  Again, I would work on
25  writing various documents, whether that's blogs

1    assisting with, you know, manuscripts.

2            I served very much a coordination role.

3    So we have -- had a large office, and so I would

4    make sure that people were aware of things that were

5    going on.  I chaired and co-chaired or facilitated

6    various committees.

7            I would take meeting minutes.  I would

8    make sure that if, as a result of the meeting, an

9    action item came out of that meeting, I would track

10   it and make sure that it was implemented.  So it was

11   really -- again, every day was very different so.

12       Q    And then what was the next in your career

13   after that?

14       A    Then I became the deputy director of

15   Office of Extramural Research.

16       Q    And what was your role in that respect?

17       A    So, let's see.  In collaboration with the

18   director of the Office of Extramural Research, we

19   managed the entire office, that consisted of about

20   300 federal employees, and also worked with about

21   300-plus contractors.

22            We managed the budget.  We provided -- so

23   the office provides a critical function in that it

24   serves as a resource for not only all 27 Institutes

25   and Centers at NIH, but then also the broader

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    biomedical research community.

2              So we provide basically the -- we oversaw

3    together the corporate framework for external

4    research, meaning infrastructure, IT infrastructure,

5    guidance, staff training, websites, policy

6    information.

7              And then I supervised directly several

8    divisions and offices within the office.  So I

9    oversaw several senior advisers as well as the Small

10   Business, Education, and Entrepreneurial Development

11   Office, Office of Laboratory Animal Welfare, NIH

12   Guide to Grants and Contracts which is where the

13   Notices of Funding Opportunities are published.

14             So it was really just overseeing the

15   day-to-day of the office, but then also directly

16   supervising certain components of it.

17        Q    Got it.  How about, do you have any role

18   with respect to scientific integrity?

19        A    Scientific integrity.  Can you please

20   define your interpretation of scientific integrity.

21        Q    Sure.  I'm just looking, I got this from

22   the website today.

23        A    Okay.

24        Q    It says:  The Office of Extramural

25   Research provides the corporate framework --

1       A     Yes.

2       Q     -- for NIH research administration --

3             MADAM COURT REPORTER:  Can you slow down,

4    please, when you read.

5             MR. McGINTY:  Of course, I'm sorry.

6             The Office of Extramural Research, OER,

7    provides the corporate framework for NIH research

8    administration ensuring scientific integrity.

9             **THE WITNESS:  Okay.  Thank you.  Yes,**

10   **absolutely.**

11            MS. ANDRAPALLIYAL:  Objection.  That calls

12   for speculation.

13            **THE WITNESS:  So the way that we define**

14   **scientific -- and I, forgive me, it's habit, I will**

15   **say "we," when talking about it.  I get chills.  As**

16   **we go along, I'll break that.**

17            **The way we define scientific integrity is,**

18   **broadly, there's something called "research**

19   **integrity" that has a very specific definition.  So**

20   **that's falsification, fabrication, plagiarism.**

21            **But then, more broadly, we think of**

22   **scientific integrity as ensuring that research is**

23   **conducted, you know, in a safe environment, so free**

24   **of harassment, discrimination, misconduct, things**

25   **like that.  So, yes, I was -- that is a mission of**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1   the office so, yes, I was involved in those

2   activities.

3   BY MR. McGINTY:

4       Q    How were you involved?

5       A    We would have biweekly integrity meetings

6   that involved folks across the office and we would

7   discuss specific cases that raised concerns at

8   institutions.  So if we became aware that there was

9   an allegation of harassment in the workplace of an

10  institution, we would discuss the circumstances

11  around that, or if there was concern about research

12  and conduct, you know, fabrication, falsification,

13  plagiarism, we would discuss that, and, you know,

14  the specifics about those situations and what

15  actions the NIH might take.

16      Q    Did you have any role in deciding if

17  something was kind of a breach of the scientific

18  integrity policy or not?

19      A    Can you please repeat the question.

20      Q    Yeah.  Did you have any role in deciding

21  whether or not a specific occurrence was a breach of

22  the scientific integrity policy or not?

23      A    Which scientific -- what scientific

24  integrity policy are you referring to?

25      Q    The scientific integrity policies that you

1    would discuss at these meetings that you're talking

2    about.

3        **A    So we discussed compliance with the Grant**

4    **Policy Statement that I see has been printed out,**

5    **and so we would discuss these cases as a team.  So I**

6    **was involved broadly along with my colleagues,**

7    **because these were very complex, and so we require**

8    **multiple perspectives in discussing.**

9        Q    When you were employed at NIH, did NIH

10   have its own scientific integrity policy?

11       **A    I do not remember.**

12       Q    Okay.  And so you were the deputy director

13   of the Office of Extramural Research.  I have that

14   right?

15       **A    Yes.**

16       Q    Did you ever become the acting director?

17       **A    Yes.**

18       Q    When did that happened?

19       **A    So I would serve as acting director on**

20   **occasions when the director was out of the office,**

21   **so if he was on vacation, on sick leave.  So this**

22   **happened periodically over the course of my time as**

23   **deputy director.  And then I became acting director**

24   **upon his retirement on February 14th.**

25       Q    And you were acting director until you

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1   left?

2        A    Yes.

3        Q    On March 7th?

4        A    Yes.

5        Q    And how were your roles as acting director

6   different from your role as deputy director?

7        A    I was responsible for overseeing the

8   entire office, not just a portion of it, so I went

9   from having about seven or eight direct reports to

10  having eighteen or so, and so was responsible for

11  the operations of the entire office.

12       Q    And why did you leave on March 7th?

13       A    I left because of a number of different

14  circumstances.

15       Q    Which were?

16       A    My workload and working conditions had

17  become untenable.

18       Q    Can you describe that?

19       A    Yes.  So the volume of work was

20  exceedingly high.  I was given directives to

21  implement with very short turnaround times, often

22  close of business or maybe within the next hour.

23            I was not offered the opportunity to

24  provide feedback or really ask for clarification.

25  And it was just extremely stressful, and I was

1    concerned that it was impacting my health.

2        Q    Any other reasons that you left?

3        A    Those were the main ones.

4        Q    Did anyone ask you to leave?

5        A    No.

6        Q    Did you have any substantive concerns with

7    the directives that you were asked to implement?

8            MS. ANDRAPALLIYAL:  Objection.  To the

9    extent that it's calling for deliberative

10   information, I ask the witness not to answer.

11           THE WITNESS:  Okay.  I will decline to

12   answer.

13   BY MR. McGINTY:

14       Q    Did you discuss with anyone at the federal

15   government for the purposes of deliberating about a

16   policy implementation your concerns?

17       A    I'm sorry, could you repeat that.

18       Q    Sure.  Did you discuss with anyone at the

19   federal government for the purposes of a policy

20   deliberation your concerns?

21       A    For purposes of a policy deliberation.

22           I'm sorry, what do you mean by "a policy

23   deliberation"?

24       Q    In order to decide what to do.

25       A    So when given certain directives to

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    implement -- so our office is largely responsible

2    for implementing policy and procedure.  And that's

3    never done in a vacuum.  It requires a lot of

4    collaboration across the office and across the

5    Institute and Centers.  So whenever we implement a

6    policy, we discuss with multiple people about the

7    approach.

8         Q    So speaking specifically about the policy

9    directives that you were instructed to implement on

10   short timelines that led to your departure from NIH,

11   did you discuss any concerns you had with anyone at

12   the federal government prior to the execution of

13   those directives?

14        A    Yes.

15        Q    You did.  Okay.  And who did you discuss

16   those with?

17        A    With Matt Memoli, the acting NIH director.

18        Q    Okay.  Anybody else?

19        A    With colleagues in the Office of

20   Extramural Research.  And I also sought input from

21   our Office of General Counsel on certain occasions.

22        Q    Okay.  And did you discuss your concerns

23   with anyone at HHS?

24        A    Yes.

25        Q    And who was that?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1       A      Who?

2       Q      Who was that?  Yeah.

3       A      Meaning with whom did I discuss the

4    concerns?

5       Q      Yeah.

6       A      Oh.  With Matt Memoli.

7       Q      Okay.  Anybody else?

8       A      And I don't remember exactly who -- I

9    think I discussed with colleagues in the Office of

10   Extramural Research, but I don't remember exactly

11   who.

12      Q      Okay.  Did you ever talk with

13   Rachel Riley?

14      A      Yes.

15      Q      About your concerns?

16      A      Yes.

17      Q      Okay.  Did you ever talk with Brad Smith?

18      A      No.

19      Q      Did you talk with anybody else?

20      A      About my concerns?

21      Q      Mm-hmm.

22      A      James McElroy.

23      Q      Who is James McElroy?

24      A      I believe his title is Deputy HHS Chief of

25   Staff, but I may -- I'm not entirely sure.

1    Q    And these were all conversations you had

2   prior to the decision to implement that we're

3   talking about?

4        **A    To implement what?**

5           MS. ANDRAPALLIYAL:  Objection, vague.

6           **THE WITNESS:  Yeah, I'm sorry.  Can you**

7   **please clarify.**

8   BY MR. McGINTY:

9    Q    Sure.  Speaking specifically about the

10  directives that you were instructed to implement on

11  short timelines, you said you had a day or an hour

12  to implement them.  Is that right?

13       **A    Yeah.**

14   Q    So speaking specifically about those, did

15  you discuss the concerns, if any, that you had about

16  them with Rachel Riley or Brad Smith or the

17  gentleman that you just named?

18          MS. ANDRAPALLIYAL:  Objection, compound.

19          **THE WITNESS:  I never met Brad Smith or**

20  **talked with him.  I talked with Rachel Riley one**

21  **time -- well, excuse me, let me clarify.  I talked**

22  **with Rachel Riley on February 28th and I expressed**

23  **some concerns with her, yes.**

24  BY MR. McGINTY:

25   Q    On February 28th?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

 1       **A      And with James McElroy.**

 2       Q      Okay.  Was that before or after the

 3   directive to implement was made?

 4       **A      Which directive are you referring to?**

 5       Q      The directive that led you to leave NIH.

 6              MS. ANDRAPALLIYAL:  Objection, misstates

 7   prior testimony.

 8              **THE WITNESS:  So as I mentioned earlier,**

 9   **there were multiple reasons I decided to submit my**

10   **resignation.**

11   BY MR. McGINTY:

12       Q      Okay.  Can you take a look at, I think

13   it's Exhibit 4 in front of you in this big stack.

14   It should be in order.

15       **A      Oh, this?**

16       Q      Yeah.

17       **A      Exhibit 4?**

18       Q      Yeah, it's confusing.  It's Exhibit 4, the

19   front page is Exhibit A.

20       **A      Okay.**

21              (Bulls Deposition Exhibit 4 was introduced

22               into the record.)

23   BY MR. McGINTY:

24       Q      Do you recognize this document?

25       **A      Let me just take a second.  As I**

1    mentioned, I have monovision contacts.

2              I have not seen this document before.

3        Q    Okay.  Go to the bottom.  You see you're

4    cc'd on this?

5        A    Mm-hmm, yes.

6        Q    You don't recognize having seen this

7    document before?

8        A    No, I've not seen this specific document

9    before.

10       Q    Have you seen letters that look like this?

11             MS. ANDRAPALLIYAL:  Objection, vague.

12             THE WITNESS:  I have seen a template

13   letter that looks like this.

14   BY MR. McGINTY:

15       Q    Okay.  And what was the template letter

16   that you saw?

17       A    So it resembled this document, but did not

18   have specific language; for example, you know,

19   addresses, salutations, grant numbers.  Yeah, so it

20   was missing specific information about the

21   individual grants.

22       Q    Looking at this letter, this Exhibit 4, do

23   you recognize what it is?

24       A    Yes, it is a termination letter.

25       Q    And the date is February 28th, 2025.  Is

1    that right?

2         **A    Yes.**

3         Q    That's the same day that you talked with

4    Rachel Riley?

5         **A    Yes.**

6         Q    Was this the only termination letter that

7    went out on February 28th?

8         **A    No.**

9         Q    How many termination letters went out on

10   February 28th?

11             MS. ANDRAPALLIYAL:  Objection, assumes

12   facts not in evidence.

13             **THE WITNESS:  I don't remember.**

14   BY MR. McGINTY:

15        Q    Do you know if it was more or less than

16   ten?

17        **A    I think it was more than ten, less than**

18   **30.**

19        Q    Okay.  And do you know how the decision to

20   make the grants that were terminated was made?

21        **A    I do not.**

22        Q    Okay.  Do you know who made the decision?

23        **A    I do not.**

24        Q    Do you recollect the circumstances that

25   led up to the termination of those grants on

1  February 28th?

2        A    Can you please clarify.

3        Q    How did you first learn that grants were

4  going to be terminated on February 28th?

5        A    I received a text message over Microsoft

6  Teams from James McElroy.  He said, Liza --

7  something to the effect of:  Liza, can you please

8  get in touch with Rachel Riley ASAP, she's been

9  trying to reach you.

10            I'm paraphrasing.

11            I said, James, I'm sorry, I do not know

12  who Rachel Riley is.  And then shortly thereafter,

13  James called me over a Microsoft Teams video call,

14  and so he was there and Rachel Riley was there.  She

15  introduced herself as being part of DOGE, who was

16  working with HHS.

17            And she informed me that a number of

18  grants will need to be terminated and that

19  Matt Memoli will be sending me an e-mail, a list of

20  grants in an e-mail shortly thereafter.

21        Q    Did she explain why the grants were being

22  terminated?

23        A    No.

24        Q    Did you ask?

25        A    She explained that -- excuse me, let me

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    clarify.

2              She said that the current administration's

3    OGC has a different opinion from the previous

4    administration's OGC on grant termination and,

5    therefore, we will need to terminate grants by the

6    end of the day.

7              I did not ask what, you know, what grants

8    because I just literally was a little bit confused

9    and caught off guard.  And so I waited to see what I

10   would receive by e-mail.

11       Q    And then what did you receive by e-mail?

12       A    I received an e-mail from Matt Memoli that

13   said something to the effect of:  Liza, the attached

14   list of grants need to be terminated by COB today.

15   And there was an Excel file attached to the e-mail.

16       Q    And did you look at the Excel file?

17       A    Yes.

18       Q    And can you describe it for me.

19       A    It was a list of grants -- well, you know,

20   I'm trying -- I don't exactly remember all of the

21   cells in the Excel file, but it was a list of

22   grants.  I can't remember if it had the grant

23   numbers, the titles, the institutions.  It had some

24   combination.

25       Q    Did it give any reason why the grants were

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    being terminated?

2        A    No.

3        Q    And what did you do next after you got

4    that memo from Matt Memoli?

5        A    And please allow me to clarify.

6            Also attached in the e-mail, I forgot to

7    mention, Matt said attached is an OGC-approved

8    termination letter, which was the template.  So then

9    after I received the e-mail, I took a look at the

10   list and then I called Ms. Michelle Bulls to talk

11   through next steps.

12       Q    And what did you say to Michelle?

13           MS. ANDRAPALLIYAL:  Objection, calls for

14   the provision of deliberative information.  I'd ask

15   the witness not to answer insofar that it would

16   divulge deliberative information.

17           THE WITNESS:  Also, in addition to talking

18   with Michelle, I also talked with, on the same phone

19   call, Teams call, with our Office of General

20   Counsel.

21           MR. McGINTY:  Okay.  So I'm just going to

22   say for the record that the deliberative process

23   exemption applies to communications made prior to a

24   decision that's made and only to the extent that

25   they are, in fact, deliberative communications.  So

1  here a decision had already been made, so I don't

2  think the deliberative process exemption applies.

3  If you make an offer of proof, want to put that on

4  the record.

5            MS. ANDRAPALLIYAL:  Again, the

6  deliberative process privilege routinely applies to

7  protect pre-decisional and deliberative

8  communications about a decision even if --

9  regardless of whether it has already been made, for

10 example, in employee cases where deliberative

11 process privilege is routinely invoked to protect

12 documents about decisions that have already come to

13 pass.  And the purpose of the privilege is to

14 protect agency deliberations decision making to

15 ensure that folks can frankly discuss their concerns

16 without being concerned about that information

17 making its way out of the government.

18            So I am happy to provide case law shortly.

19 If we could take a break, and if we could do that

20 now?

21 BY MR. McGINTY:

22    Q    Ms. Bundesen, when you got the e-mail from

23 Matt Memoli was it your understanding that the

24 decision to terminate the grants had already been

25 made?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

 1      **A      Yes.**

 2      Q      Okay.  So what did you discuss with

 3   Michelle Bulls?

 4      **A      I discussed how we would implement such --**

 5           MS. ANDRAPALLIYAL:  Objection.  To the

 6   extent this calls for deliberative information

 7   communication preceding a termination that are

 8   deliberative in nature, I object on that basis.  I

 9   object also on the basis of attorney-client

10   privilege.  As Ms. Bundesen stated, OGC was present.

11   And to the extent that any advice was sought or

12   received from OGC, I would ask the witness not to

13   answer on that basis as well.

14           MR. McGINTY:  For the record, she just

15   testified the decision to terminate the grants had

16   been made.  It's clearly not a pre-decisional

17   communication.

18   BY MR. McGINTY:

19      Q      But regardless, Ms. Bundesen, what actions

20   did you ask Michelle Bulls to take?

21      **A      So we spoke at a high level about how, how**

22   **we would terminate such awards on such a short**

23   **timeline.**

24      Q      Okay.  And what did you decide to do?

25      **A      So Ms. Bulls worked with the Chief Grants**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1  **Management Officers in the Institutes and Centers to**

2  **send out these termination letters and to restrict**

3  **funding in the HHS payment management system.**

4      Q    I want to direct your attention to

5  paragraph 4 of Exhibit 4, the paragraph that starts,

6  "This award no longer effectuates agency

7  priorities."

8      **A    Okay.**

9      Q    Would you read that paragraph for me.

10     **A    "This award no longer effectuates**

11          **agency priorities.  NIH is obligated to**

12          **carefully steward grant awards to ensure**

13          **taxpayer dollars are used in ways that**

14          **benefit the American people and improve**

15          **their quality of life.  Your project does**

16          **not satisfy these criteria.  Research**

17          **programs based on gender identity are**

18          **often unscientific, have little**

19          **identifiable return on investment, and do**

20          **nothing to enhance the health of many**

21          **Americans.  Many such studies ignore,**

22          **rather than seriously examine, biological**

23          **realities.  It is the policy of NIH not**

24          **to prioritize these research programs."**

25     Q    Do you know where that language came from?

1    **A    I do not.**

2    Q    Was it part of a template letter you got?

3    **A    I don't remember.**

4    Q    Do you know who wrote it?

5    **A    I don't.**

6    Q    Had you ever seen that language before

7    February 28th?

8    **A    I don't -- I'm sorry, I don't remember.**

9    Q    It says, "Research programs based on

10   gender identity are often unscientific."

11        Do you see that?

12   **A    Yes.**

13   Q    Is that true?

14        MS. ANDRAPALLIYAL:  Objection, calls for

15   speculation.

16        **THE WITNESS:  It's -- I don't know.  It's**

17   **a -- it's a vague phrase.**

18   BY MR. McGINTY:

19   Q    Okay.  Are there some research programs

20   based on gender identity that are scientific?

21        MS. ANDRAPALLIYAL:  Objection, calls for

22   speculation.

23        **THE WITNESS:  Are scientific.  I don't**

24   **know how to answer that.**

25   BY MR. McGINTY:

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    Okay.  So this references a project number

2    here, 5R21HD107311-02.  You don't recall that

3    project off the top of your head, do you?

4    A    No.

5    Q    Can you describe generally how a research

6    project is accepted for funding at NIH?

7    A    So grant applications are submitted by

8    institutions, so it could be an institute of higher

9    education, a small business.  So applications are

10   submitted.  They may be submitted in response to

11   different types of Notices of Funding Opportunities.

12        And then when NIH receives the application

13   and processes it, they go to -- the applications go

14   through a two-tier, peer-review process.  So the

15   applications are reviewed by peer-review panels.

16   These are convened experts in specific scientific

17   areas, these are folks outside of NIH, they're

18   separate committees.

19        So they go through an initial peer review

20   based on the criteria that are described in the

21   Funding Opportunity.  And they receive a score, a

22   written summary.  And then, based on the scores and

23   the summaries, those are ranked in some type of

24   order.  It would be a percentile order because NIH

25   receives a lot of applications, far more meritorious

1    applications that can be funded.  And then they go

2    to the institute or center, National Advisory

3    Council.

4              And these are panels of outside experts

5    who then provide advice to the institute director

6    about the merits of the different projects.  And

7    then ultimately, if peer review members, peer review

8    panels, and councils recommend the project for

9    funding, then they will be considered by the

10   institute director, and the institute director makes

11   the final funding decision.

12        Q    So this project would have gone through

13   that whole process?

14        A    Yes.

15        Q    And it would have been funded?

16        A    Yes.

17        Q    After having been looked at, it sounds

18   like two different panels of peer review?

19        A    Yes.

20        Q    And those peer review panels consist of

21   scientific experts?

22        A    Yes.

23        Q    Who would have evaluated the scientific

24   merit of the research project?

25        A    Yes.

1    Q    And they would have decided that it has

2    merit?

3    **A    Yes.**

4    Q    More merit than other projects that were

5    also meritorious that couldn't be funded?

6         MS. ANDRAPALLIYAL:  Objection, calls for

7    speculation, assumes facts not in evidence.

8         **THE WITNESS:  So could you say that one**

9    **more time.**

10   BY MR. McGINTY:

11   Q    Of course.

12   **A    The last part.**

13   Q    Yeah, absolutely.

14        You said that NIH receives far more

15   applications, far more meritorious applications than

16   it can fund.

17   **A    Mm-hmm.**

18   Q    And this project was funded, right?

19   **A    Mm-hmm -- yes.**

20   Q    Everyone forgets.

21        So my question was:  This project would

22   have been decided that it had scientific merit, and,

23   in fact, more merit than other meritorious projects

24   that could not be funded?

25        MS. ANDRAPALLIYAL:  Objection, calls for

```
 1   speculation, assumes facts not in evidence.
 2           THE WITNESS:  So institutes will make
 3   decisions based on merit, certainly, but also
 4   availability of funding and portfolio balance.  So
 5   multiple factors go into the decision to fund an
 6   award.
 7   BY MR. McGINTY:
 8       Q    Okay.  So, in your opinion, are research
 9   programs based on gender identity often
10   unscientific?
11           MS. ANDRAPALLIYAL:  Objection, calls for
12   speculation.
13           THE WITNESS:  I think that this is a very
14   vague statement.
15   BY MR. McGINTY:
16       Q    In your opinion are research programs
17   based on gender identity a bad return on investment?
18           MS. ANDRAPALLIYAL:  Objection, calls for
19   speculation.
20           THE WITNESS:  Could we take a quick break,
21   a bathroom break.
22   BY MR. McGINTY:
23       Q    If you could answer that question, please.
24       A    Oh, sure, I'm sorry.  Can you say it again
25   one more time.
```

1          Q      Sure.   In your opinion are research

2    programs based on gender identity, do they have

3    little return on investment?

4               MS. ANDRAPALLIYAL:   Same objection, calls

5    for speculation.

6               **THE WITNESS:  Yeah, I'm not sure how to**

7    **answer that question.   Can you say it one more time.**

8    BY MR. McGINTY:

9          Q      Sure.   I'm asking your opinion on the

10   truth or falsehood of the statement.

11         **A      Okay.**

12         Q      And the statement is:   Research programs

13   based on gender identity have little identifiable

14   return on investment.

15              MS. ANDRAPALLIYAL:   Objection,

16   speculation.

17              **THE WITNESS:  So my personal opinion is,**

18   **is that's not correct.**

19   BY MR. McGINTY:

20         Q      Okay.   Thank you.

21              MR. McGINTY:   Yeah.

22              **THE WITNESS:  Just really quickly.**

23              MR. McGINTY:   We can go off the record.

24              (Recess taken - 9:49 to 9:57 a.m.)

25   BY MR. McGINTY:

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    Now, before the break we were talking

2  about Exhibit 4.  Do you still have that in front

3  you?

4        **A    Yes.**

5    Q    That's the letter to Dr. Tham.  And I was

6  asking about this language that appears in paragraph

7  4 of the letter.

8        **A    Yeah.**

9    Q    And so in your opinion as a scientist, is

10 this true, "Research programs based on gender

11 identity do nothing to enhance the health of many

12 Americans"?

13        MS. ANDRAPALLIYAL:  Objection, calls for

14 speculation.

15        **THE WITNESS:  In my opinion, that's a very**

16 **vague statement, and I personally don't agree with**

17 **it.**

18 BY MR. McGINTY:

19    Q    It goes on to say, "Many such studies

20 ignore, rather than seriously examine, biological

21 realities."

22        What's your opinion as a scientist about

23 that statement?

24        MS. ANDRAPALLIYAL:  Objection, calls for

25 speculation.  The witness is here to testify in her

1   official capacity as former acting director and

2   standing director of OPERA.

3               **THE WITNESS:  OER.**

4               MS. ANDRAPALLIYAL:  OER?

5               **THE WITNESS:  Mm-hmm.**

6               MR. McGINTY:  Counsel, objection to form,

7   not appropriate.

8               **THE WITNESS:  I'm sorry, I didn't**

9   **understand.**

10              MR. McGINTY:  We're having a lawyer fight.

11              **THE WITNESS:  Oh, okay.**

12              MR. McGINTY:  It's okay.  It doesn't

13  matter for you.

14              (Whereupon, laughter)

15  BY MR. McGINTY:

16      Q    The question for you is:  In your opinion

17  as a scientist, many such studies ignore, rather

18  than seriously examine, biological realities, is

19  that true?

20              MS. ANDRAPALLIYAL:  Objection, form, and

21  calls for speculation.

22              **THE WITNESS:  So my personal opinion, I**

23  **don't understand the basis of the sentence.  It's**

24  **unclear to me.**

25  BY MR. McGINTY:

1      Q    What's unclear about it?

2      **A    There are no citations, it is a**

3   **generalization.**

4      Q    Is the idea that some people are

5   transgender contrary to biological reality in your

6   opinion as a scientist?

7           MS. ANDRAPALLIYAL:   Objection, calls for

8   speculation.

9           **THE WITNESS:   Can you say it one more**

10  **time, please.**

11  BY MR. McGINTY:

12     Q    Sure.

13     **A    Thank you.**

14     Q    Is the idea that someone, that some people

15  are transgender or gender diverse contrary to

16  biological reality in your opinion as a scientist?

17     **A    I don't have an opinion on that statement.**

18     Q    The last sentence of this paragraph is,

19  "It is the policy of NIH not to prioritize these

20  research programs."

21          Do you understand what that means?

22     **A    Just on face value, what that sentence**

23  **says.**

24     Q    What's your understanding of that

25  sentence?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    **A    That this letter says -- sorry.  Where is**

2    **the exact -- I'm sorry, could you refer me to the**

3    **paragraph.**

4    Q    Of course.  It is the last sentence in the

5    fourth paragraph of this letter on what is page 2 of

6    Exhibit 4.

7    **A    I see.  "It is the policy of NIH not to**

8    **prioritize..."**

9    **I do not know the origin of that sentence**

10   **so I can't really comment on it.**

11   Q    From reading the letter, what would be

12   your understanding of that sentence?

13   **A    That this letter is asserting that there**

14   **is an NIH policy not to prioritize these research**

15   **programs.**

16   Q    And what research programs are those?

17   **A    I don't know because it's vague.**

18   Q    Could it be research programs based on

19   gender identity?

20   MS. ANDRAPALLIYAL:  Objection, calls for

21   speculation.

22   **THE WITNESS:  I don't know.**

23   BY MR. McGINTY:

24   Q    Could you read that paragraph for me

25   again, just silently to yourself.

1        A    Oh, silently.  Okay.

2             (Witness reviews document)

3    BY MR. McGINTY:

4        Q    Does that clarify what research programs

5    are being talked about in that last sentence?

6        A    **Based on this paragraph, it says research**

7    **programs based on gender identity.**

8        Q    And those are the research programs that,

9    according to this letter, it is the policy of NIH

10   not to prioritize?

11       A    **That's what it would seem based on this**

12   **paragraph.**

13       Q    In your capacity as acting director of OER

14   as of February 28th, 2025, were you aware of any

15   such policy?

16       A    **I was aware of high level discussions**

17   **about possibly creating such a policy.**

18       Q    Had that policy been created at the time

19   that this letter was sent out?

20       A    **I do not remember.  I remember**

21   **deliberations about it, discussions about it, but I**

22   **do not remember seeing a final policy.**

23       Q    What was the reason that that policy was

24   being enacted?

25       A    **I -- I do not know.  I know that -- let me**

1  clarify that Dr. Memoli had discussed NIH priorities

2  moving forward, but I don't know anything beyond

3  that.

4      Q    Did he tell you anything about NIH

5  priorities moving forward?

6           MS. ANDRAPALLIYAL:  Objection.  To the

7  extent that this question is calling for the

8  pre-decisional deliberative information, I ask the

9  witness not to provide that information.

10          THE WITNESS:  Yeah, we had high level

11  discussions that did also include our Office of

12  General Counsel colleagues.  So, again, it was -- it

13  was high level.  I don't really recall too much

14  because --

15  BY MR. McGINTY:

16      Q    Okay.

17      A    -- it was a little while ago at this

18  point.

19      Q    Okay.  Well, what's the date today?

20      A    I don't know.

21      Q    Is it April 4th, 2025?

22      A    I don't know.

23      Q    Okay.

24      A    I don't have my Fitbit on.

25      Q    Sure.  Well, can you refer back to

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Exhibit 24.

2         **A      Yeah, that's my CV.**

3         Q      That's your CV.  I mean 23.

4         **A      Oh.  The Subpoena.**

5         Q      Yeah.  What's the date that it asks you to

6    testify today?

7         **A      April 4th.**

8         Q      Okay.  Is it April 4th today?

9         **A      Yes.**

10        Q      Okay.  And when did these discussions

11   happen that you're referring to?

12        **A      They would have been probably the end**

13   **of -- well, end of February, beginning of March, so**

14   **roughly the three weeks during which I was acting**

15   **OER Director, but I don't know the exact dates.**

16        Q      It was after January 20th, 2025?

17        **A      Yes.**

18        Q      Were they caused by the incoming

19   administration?

20             MS. ANDRAPALLIYAL:  Objection, calls for

21   speculation.

22             **THE WITNESS:  I don't know.**

23   BY MR. McGINTY:

24        Q      You said that this grant that got

25   terminated on February 28, 2025, was in a list of

1  other grants to be terminated on that day.  Is that

2  right?

3      **A    I do not recognize this specific number**

4  **and I don't remember the list of -- the numbers and**

5  **the titles of the list.  All I can say is that I was**

6  **given a list, but I don't know which specific ones,**

7  **awards, were on there.**

8      Q    Okay.  While you were acting director of

9  OER how many such lists did you get?

10      **A    I believe two.  Two, I think, roughly**

11  **around that.  I think one on the 28th and one**

12  **subsequently.  I think the week after, but my memory**

13  **is fuzzy.**

14      Q    Was the second one on March 7th?

15      **A    March 7th, we did not receive a list.**

16      Q    Would it have been March 6th, then?

17      **A    I don't remember.**

18      Q    Don't remember?

19      **A    No.**

20      Q    But there were two lists?

21      **A    No, I'm -- my memory is unclear, so I'm**

22  **speculating.  I'm sorry.  I don't -- I'm not a**

23  **hundred percent clear on that.**

24      Q    In your time at NIH, have you ever

25  received a list of grants to terminate in that same

1    fashion before?

2        A    No.

3        Q    In your time at NIH how many grants were

4    you aware of that had been terminated prior to

5    January 20th, 2025?

6        A    I don't know the number.

7        Q    Was it more or less than ten?

8        A    I don't -- I don't know.

9        Q    Okay.  What would be the process to

10   terminate a grant prior to January 20, 2025?

11       A    So let me just set the background that I'm

12   not an expert in grant termination, that whenever a

13   grant is suspended or terminated, it's considered on

14   a case-by-case basis and involves discussions with

15   multiple people such as Ms. Bulls and colleagues in

16   OER, OPERA, the institutional officials.  So

17   typically -- I mean, there is no typical situation.

18            But as I see that you've printed out the

19   Grants Policy Statement, there is a section in the

20   Grants Policy Statement, 8.5, I believe, that

21   describes the circumstances under which grants are

22   terminated or suspended.  Typically, grants are

23   suspended in order to allow the recipients to come

24   back into compliance with any applicable laws and

25   regulations to address any concerns that NIH may

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1   have about the specific situation.

2        Q    And this letter addresses that on the

3   fifth paragraph, right?

4        A    Oh.

5             (Witness reviews document)

6             THE WITNESS:  So the paragraph --

7   BY MR. McGINTY:

8        Q    Beginning, "Although."

9        A    "Although..."  Right.

10       Q    Is that unusual for a termination to

11  declare that no corrective action is possible?

12            MS. ANDRAPALLIYAL:  Objection, calls for

13  speculation.

14            THE WITNESS:  I do not know because I've

15  never been directly involved in sending termination

16  letters, so I can't speak as an expert on this.

17  BY MR. McGINTY:

18       Q    Okay.  Are you aware of any grant

19  termination from your period at NIH prior to

20  January 20th, 2025, where no corrective action was

21  allowed?

22       A    I don't -- I don't remember, no, sorry.

23       Q    How familiar are you with the Grant Policy

24  Statement?

25       A    I'm -- I'm familiar that it is the terms

1    and condition of NIH awards, that it is over 400

2    pages long, and I'm more familiar with some sections

3    than others.  Typically when we have a question, we

4    just, you know, we will search for the relevant

5    section.

6        Q    Was part of your duties as deputy and

7    acting director to interpret and apply the Grants

8    Policy Statement?

9        A    To interpret and apply.  Can you clarify

10   that question.  To interpret and apply.

11           Yeah, as part of the duties of the Office

12   of Extramural Research, the Grants Policy Statement

13   it says the term and condition of all awards, so it

14   is our responsibility to be -- to ensure that

15   recipients comply with the Grants Policy Statement.

16   So, yes, we review, and we need to be informed about

17   it.

18       Q    We can get into this a little later, but

19   are you aware of any section in the NIH Grants

20   Policy Statement that would say it's not the policy

21   of NIH to fund studies related to transgender

22   people?

23       A    I don't know.  I've not seen that before

24   in the Grants Policy Statement.  But, again, I would

25   have to review it, search it.

1    Q    Would you have expected to be aware of a
2  section like that if it existed?
3    **A    Yes, yes, I would expect to be aware.**
4    Q    Okay.  And you previously testify that
5  you're not usually involved in grant terminations,
6  right?
7    **A    Correct.**
8    Q    Was it strange, then, that you were sent a
9  list of grants to terminate?
10   **A    I'd never -- as mentioned before, I'd**
11 **never received a list of grants to terminate before.**
12   Q    Did you have concerns with that procedure?
13   **A    Yes, I thought it was unusual.**
14   Q    What were your concerns?
15        MS. ANDRAPALLIYAL:  Objection.  To the
16 extent this is calling for pre-decisional,
17 deliberative information, I'd ask the witness not to
18 answer.  But you can answer on other --
19        I'd also -- well, I amend my statement to
20 say I also assert attorney-client privilege to the
21 extent that those concerns implicate discussions
22 with the Office of General Counsel.
23        **THE WITNESS:  That's true.**
24        **Can you please restate.**
25 BY MR. McGINTY:

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    Yeah.  I just asked if you had concerns
2  with that procedure.
3    **A    As I mentioned, it was -- I never received**
4  **a list of grants before to terminate, so it was new**
5  **to me.**
6    Q    Okay.  And was that your only concern?
7         MS. ANDRAPALLIYAL:  Objection.  To the
8  extent the answer would implicate deliberative
9  process or attorney-client privilege, I'd ask the
10 witness not to answer.
11        **THE WITNESS:  Okay.**
12 BY MR. McGINTY:
13   Q    Did you discuss your concerns with the
14 Office of General Counsel?
15   **A    I think that's -- isn't that privileged**
16 **information?  Or...**
17   Q    After receiving a list of grants to
18 terminate, did you talk with the Office of General
19 Counsel?
20   **A    I did.**
21   Q    Without asking about any of your
22 communications with your attorneys, what were your
23 concerns?
24   **A    I did not have any background information**
25 **about the decision and did not have -- just did not**

1    understand.

2        Q    So you didn't know why it was made?

3        A    Correct.

4        Q    And you weren't told?

5        A    Correct.  Correct.

6        Q    Are you aware of anyone at NIH who had

7    input into the decision about which grants to

8    terminate?

9        A    I do not.

10       Q    And you don't know how the decision to

11   terminate the grants was made?

12       A    I do not.

13       Q    And you don't know what the language in

14   this letter means?

15            MS. ANDRAPALLIYAL:  Objection, vague.

16            THE WITNESS:  That, yeah.  Do you have --

17   specifically about the letter, yeah.

18   BY MR. McGINTY:

19       Q    Sure.  Let's talk about paragraph 4.

20       A    Okay.

21       Q    Earlier I was asking you if you had

22   opinions about the language in paragraph 4 which

23   explains why this grant is being terminated.  Is

24   that a fair characterization of the paragraph?

25       A    Yes.

1      Q    And your testimony was many of the

2   statements in this paragraph are vague and you don't

3   know what they mean.  Is that right?

4      **A    That's right.**

5      Q    So you don't know why this grant was

6   terminated and you were never told, and the letter

7   that explains it, doesn't explain it.  Is that

8   right?

9           MS. ANDRAPALLIYAL:  Objection, compound.

10          **THE WITNESS:  I was never told, that's**

11   **correct.  And as I mentioned before, I thought the**

12   **language is vague.**

13   BY MR. McGINTY:

14      Q    Okay.  Did you receive more than one form

15   letter?

16      **A    I don't -- I don't think so.  I don't**

17   **fully remember, but I think it was just the one**

18   **template letter attached to the e-mail that had the**

19   **Excel file with the grants.**

20      Q    Were there grants that had to do with

21   things other than gender identity that were

22   terminated?

23      **A    Yes.**

24      Q    So, for example, DEI?

25      **A    Yes.**

1      Q    And vaccine hesitancy?

2      **A    I do not recall anything about vaccine**

3   **hesitancy being on that list.**

4      Q    How about grants that would benefit

5   institutions in China?

6      **A    Yes.**

7      Q    So do you know if the language in

8   paragraph 4 which is about gender identity would be

9   in all of those form letters?

10     **A    No.  I recall that the template form**

11  **letter had boilerplate language that could then be**

12  **modified for the different circumstances, the**

13  **different buckets of grants that were to be**

14  **terminated.**

15          **And my recollection, again, a little hazy,**

16  **was that the categories were DEI, research in China,**

17  **and transgender or gender ideology.  So that's what**

18  **I remember.**

19     Q    Do you know who drafted those form

20  letters?

21     **A    I do not.**

22     Q    Were you ever told?

23     **A    No.**

24     Q    Did you ever ask?

25     **A    I do not think so, no.**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    Is it consistent with the way that NIH had

2    operated up until January 20th, 2025, for grants to

3    be terminated for reasons that NIH had no input in?

4            MS. ANDRAPALLIYAL:  Objection, calls for

5    speculation.

6            **THE WITNESS:  So I do not know who had**

7    **input into the terminations.  So your latter part of**

8    **the question saying that NIH had no input in, I**

9    **don't -- I know that I didn't have input, but I do**

10   **not know if anyone else at NIH had input.**

11   BY MR. McGINTY:

12   Q    Would it be consistent with the way that

13   NIH operated, to your understanding, prior to

14   January 20, 2025, for a policy to be enacted not to

15   prioritize certain research programs without you

16   providing input?

17   **A    No.**

18   Q    And why is that?

19   **A    Well, let me clarify.  We -- so without me**

20   **providing insight.**

21   **         Administrations implement new priorities,**

22   **you know, every administration.  But the input**

23   **perhaps that I might provide would be discussions**

24   **and discussions about implementation of those**

25   **priorities.  So it would not be the decision making**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1   about the priorities, but more about the mechanics

2   of the implementation.

3          Q    But you didn't provide that kind of input

4   into this termination on Exhibit 4 either?

5          A    No.

6          Q    And that's unusual, right?

7          A    Yes.

8          Q    In fact, it never happened before, to your

9   understanding?

10         A    That's my --

11              MS. ANDRAPALLIYAL:  Objection, calls for

12  speculation.

13              THE WITNESS:  Yeah, I don't -- I don't

14  know, at least not involving me.

15  BY MR. McGINTY:

16         Q    Would you take a look at Exhibit 3,

17  please.

18              (Bulls Deposition Exhibit 3 was introduced

19               into the record.)

20              THE WITNESS:  The Executive Order, yeah.

21  Okay.

22  BY MR. McGINTY:

23         Q    It sounds like you recognize this.

24         A    I see -- I'm reading the title.  I

25  recognize the title, yes.

1    Q    Have you seen this before today?

2    A    I have seen -- I've seen it.  I have not

3    read it.

4    Q    You haven't read this before today?

5    A    No.

6    Q    Okay.  Did you talk with anyone at NIH

7    about implementing this Executive Order that's in

8    Exhibit 3?

9    A    At a high level, yes.

10   Q    Who did you talk to?

11   A    So Dr. Tara Schwetz, who was the director

12   of the Division of Program Coordination and

13   Strategic Initiatives at NIH.

14   Q    And what implementation decisions were

15   made with respect to this Executive Order?

16        MS. ANDRAPALLIYAL:  Objection.  To the

17   extent the answer calls for the provision of

18   pre-decisional deliberative information, I request

19   the witness not to answer.

20        THE WITNESS:  And I don't know.

21   BY MR. McGINTY:

22   Q    Okay.  Okay.  I just want to ask you to

23   compare some language.

24        Do you see at Section 2 where it says:

25        "It is the policy of the United States to

```
 1                 recognize two sexes, male and female.
 2                 These sexes are not changeable and are
 3                 grounded in fundamental and
 4                 incontrovertible reality."
 5           Do you see that?
 6      A    Yep.
 7      Q    Is that similar to the language that we
 8  see in paragraph 4 of Exhibit 4 that we were talking
 9  about earlier?
10           MS. ANDRAPALLIYAL:  Objection, calls for
11  speculation.
12           THE WITNESS:  I mean, I don't think the
13  language is the same.  Can you clarify.
14  BY MR. McGINTY:
15      Q    Sure.  It says, for example:
16                 "Many such studies ignore, rather
17                  seriously undermine, biological
18                  realities."
19           See that in Exhibit 4?
20      A    Is it -- I'm sorry, where is it?
21           MR. BOMBARD:  Is that Exhibit 3 or 4?
22           MR. McGINTY:  I was just referencing
23  Exhibit 4.
24           THE WITNESS:  Oh, Exhibit 4.  I was
25  looking at 3.
```

```
 1   BY MR. McGINTY:

 2        Q    Oh, yes.

 3             "Many such studies ignore, rather than

 4   seriously examine, biological realities," in

 5   paragraph 4 of Exhibit 4.  And I ask you to compare

 6   that language to Section 2 in Exhibit 3.

 7             MS. ANDRAPALLIYAL:  And same objection,

 8   calls for speculation.

 9             THE WITNESS:  I don't really understand

10   the question.  If you are asking do I think they

11   align?

12   BY MR. McGINTY:

13        Q    Do they align?

14        A    I don't really -- yeah, I don't know.

15        Q    Okay.  Would you turn to Exhibit 5.

16        A    Okay.

17             (Bulls Deposition Exhibit 5 was introduced

18              into the record.)

19   BY MR. McGINTY:

20        Q    I'll represent to you this is an article

21   from the journal Nature.  Please take a look at the

22   pages 4 and 5.

23        A    Mm-hmm.

24        Q    And I understand this might be difficult

25   for you to see.
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1       **A      I may have to switch to my glasses, yeah.**

2       Q      But let me know.

3       **A      Okay.**

4       Q      There's some callout boxes there that

5    purports to be a document called, "Staff Guidance -

6    Award Assessments for Alignment with Agency

7    Priorities."

8              Do you see that?

9       **A      Mm-hmm.**

10      Q      Do you recognize the document that's in

11   these callout boxes?

12      **A      Yes.**

13      Q      And what is it?

14      **A      My recollection is that it was Staff**

15   **Guidance issued to the Chief Grants Management**

16   **Officers on the different categories of grants that**

17   **would need to be -- well, now I don't fully**

18   **remember.  I remember it being Staff Guidance about**

19   **how to handle grants that fell into these different**

20   **categories.**

21      Q      And to your knowledge was this Guidance

22   ever implemented?

23      **A      I do not know.**

24      Q      Did you have any role in drafting this

25   document?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1      **A      I did not.**

2      Q      Who drafted it?

3      **A      I do not know.**

4      Q      Under what circumstances have you seen

5      this before?

6      **A      It was forwarded to me by a colleague**

7      **after it had been distributed to the Chief Grants**

8      **Management Officers.**

9      Q      Would it be -- who forwarded it to you?

10     **A      A co-chair.  My co-chair of the committee**

11     **that we ran for communicating with the Extramural**

12     **staff in the Institutes and Centers.  Everything was**

13     **happening very quickly, and sometimes people did not**

14     **make it on cc lines, and so we would try to keep**

15     **each other in the loop as much as possible, so she**

16     **wanted to make sure I'd seen it.**

17     Q      Would it be unusual for this to be

18     forwarded to the Chief Grant Management Officers

19     without you seeing it first?

20            MS. ANDRAPALLIYAL:  Objection, calls for

21     speculation.

22            **THE WITNESS:  Not necessarily.**

23     BY MR. McGINTY:

24     Q      What's your understanding of the four

25     categories?

1    A    I can't -- I'm sorry.  I can't see them in

2  this tiny print.

3         All right.  I need a second to get my

4  glasses.

5    Q    Okay.

6    A    I'm sorry.

7         MR. McGINTY:  Okay.  Off the record,

8  please.

9              (Discussion off record)

10         (Recess taken - 10:24 to 10:28 a.m.)

11         MR. McGINTY:  Back on the record.

12  BY MR. McGINTY:

13    Q    All right.  We just took a short break for

14  you to put on your glasses so you can read this

15  document.  Are you able to make out the words?

16    A    Yes.

17    Q    I understand it may not be comfortable.  I

18  don't think it's comfortable for me either.

19         I think the question on the table was:

20  What's your understanding of the four categories?

21    A    My understanding is that these are

22  specifically related to DEI activities.  And the

23  categories demonstrate different scenarios under

24  which a grant -- different types of guidance

25  depending on the level of DEI-related activities in

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    an application award.

2          Q    And what happens to Category 1?

3          A    "The sole purpose of the project

4               is DEI related, for example, diversity

5               supplements of conference grants where

6               the purpose of a meeting is diversity,

7               and/or the application was received in

8               response to a NOFO that was unpublished

9               as outlined above."

10              And the guidance or action is that:

11              "ICs must not issue the award."

12         Q    While you were deputy director or acting

13   director of OER, were any NOFOs unpublished?

14         A    While I was deputy director or acting

15   director of OER, yes.

16         Q    Okay.  What does that mean for a NOFO to

17   be unpublished?

18         A    The NOFO was essentially taken off of the

19   website, taken out of the NIH Guide to Grants and

20   Contracts.

21         Q    And were any NOFOs unpublished as outlined

22   above, as that's meant in this Staff Guidance?

23         A    As outlined above.

24              (Witness reviews document)

25              THE WITNESS:  I'm sorry, what -- you mean,

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    is there something in the first two paragraphs that

2    you're referring to?

3    BY MR. McGINTY:

4        Q    What the Guidance seems to say.

5             (Witness reads sotto voce)

6             (Reporter requests clarification)

7             THE WITNESS:  I'm sorry, I'm sorry.

8             Is it disruptive for me to read it?  Okay.

9    So I'm reading the Guidance:

10                "This staff guidance rescinds the guidance

11                 provided in the February 13th, 2025, memo

12                 to IC Chief Grants Management Officers

13                 entitled Supplemental Guidance..."

14             I'm sorry, I'm not seeing -- it could be

15    that I'm just missing it.  I'm not seeing reference

16    to funding opportunities in these first paragraphs.

17             (Witness further reviews document)

18             THE WITNESS:  I don't see anything related

19    to funding opportunities in the introductory

20    background paragraph.

21    BY MR. McGINTY:

22        Q    From January 20, 2025, to when you

23    separated from NIH, were any NOFOs taken down, to

24    your knowledge, because of DEI-related concerns?

25        A    Yes.

1      Q      Okay.  How many?

2      A      I don't remember the exact number.  Less

3   than a hundred, I think, when I was there.

4      Q      And those would all fall into the Category

5   1 in this guidance here?

6             MS. ANDRAPALLIYAL:  Objection, calls for

7   speculation.

8             THE WITNESS:  No.

9   BY MR. McGINTY:

10     Q      Why not?

11     A      Category 1 says the sole purpose of the

12  project is DEI related.  So funding opportunities

13  come in different flavors.  They may have a single

14  purpose, they may be focused on DEI, or a funding

15  opportunity may have a component of it that focuses

16  on DEI.

17     Q      So some of them would be Category 1 and

18  some of them would be Category 2.  Or some of them

19  would just fall outside of this policy entirely?

20     A      So this is guidance, not policy.  And

21  these -- this guidance refers to awards and not

22  funding opportunities.  So there's just a

23  distinction.

24             Could you rephrase your question, please.

25     Q      Sure.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    A    Or restate it.

2    Q    Yeah.  I can clarify it.

3         My question is:  Category 1 says:  The

4    action is ICs must not fund the award.  And Category

5    1 includes instances where the application was

6    received in response to a NOFO that was unpublished

7    --

8    A    Oh, I see.

9    Q    -- as outlined above.

10        And I asked you when the NOFOs are

11   unpublished as outlined above, you read the first

12   two paragraphs.

13   A    I see.  Got it.

14   Q    And I agree with you, I don't see anything

15   about NOFOs being unpublished there.  So my question

16   is, you know, were there NOFOs that were unpublished

17   because of DEI concerns between January 20th, 2025

18   and March 7th when you were separated?

19   A    Yes.

20   Q    Okay.  And those would fall under Category

21   1, right?

22   A    Yes.

23   Q    Okay.  Would you take a look at page 5,

24   please.  Let me know if you need time.  I understand

25   this is hard.

1    **A     Okay.  What am I looking for?**

2    Q     I direct your attention to Appendix 3.

3    **A     Okay.**

4    Q     And just review that silently to yourself

5    for a bit.

6          (Witness reviews document)

7          **THE WITNESS:  Okay.**

8    BY MR. McGINTY:

9    Q     Is this the language that came attached to

10   that form letter that you received?

11   **A     I don't -- I don't remember.**

12   Q     Would you compare the transgender issues

13   language to that paragraph 4 on Exhibit 4 for me.

14         (Witness reviews documents)

15         **THE WITNESS:  It appears to be the same.**

16   BY MR. McGINTY:

17   Q     It's identical, right?

18   **A     I think -- I mean, yeah, I think so.**

19   Q     Does that fresh your recollection as to

20   whether these Appendix 3 categories or block quotes

21   were given to you with those form letters?

22   **A     Unfortunately, it doesn't.  I could**

23   **speculate, but I don't -- I don't remember.**

24   Q     You'd have to look at the e-mail to know?

25   **A     Yeah, I would need -- I would need to**

1   look -- I -- I need to look at the e-mail and the

2   form letter to -- I just don't remember.  As I

3   mentioned before, there was boilerplate language

4   that I recall being associated with the form letter,

5   but I just don't remember exactly what it said.

6        Q    Were you instructed to use that

7   boilerplate language exactly in the termination

8   letter?

9        A    I don't recall receiving specific

10  instructions.  I believe the letter may have said

11  something like, use this language.  But I don't -- I

12  didn't receive a directive from anybody.

13       Q    When you say, "the letter may have said,"

14  do you mean a cover letter to the form letter, or do

15  you mean the form letter itself?

16       A    I think the form letter itself, but,

17  again, I'm sorry, I don't remember.

18       Q    Okay.  Again, you would need to take a

19  look at the documents to know?

20       A    Yes, I just don't remember.

21       Q    Okay.  Would you take a look at Exhibit 8,

22  please.

23            (Bulls Deposition Exhibit 8 was introduced

24             into the record.)

25            THE WITNESS:  This is terrible.  Okay.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1   BY MR. McGINTY:

 2        Q     And this is -- do you recognize this

 3   document?

 4        A     Hang on.  Let me just read it real

 5   quickly.

 6              (Witness reviews document)

 7              THE WITNESS:  Yes.

 8   BY MR. McGINTY:

 9        Q     Okay.  And what is it?

10        A     This was a memo signed by then OER

11   Director Mike Lauer and Michelle Bulls that was sent

12   to the IC Chief GMOs instructing them to -- you

13   know, informing them about the temporary restraining

14   order and that, in light of that, the institutes are

15   authorized to proceed with issuing awards.

16        Q     Did you have a role in drafting this memo?

17        A     No.

18        Q     Okay.  Did Mike Lauer talk to you about

19   it?

20        A     Yes.

21        Q     And what was the purpose of those

22   communications?

23              MS. ANDRAPALLIYAL:  Objection.  To the

24   extent the information sought is pre-decisional and

25   deliberative, I'd ask the witness not to answer.
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1              THE WITNESS:  Just very high level, that

2    this would be sent out, yeah.

3    BY MR. McGINTY:

4        Q    Do you know why this was sent out?

5        A    To communicate with the Institutes and

6    Centers that they could continue issuing awards in

7    light of the restraining order.

8        Q    Would you take a look at Exhibit 7,

9    please.

10            (Bulls Deposition Exhibit 7 was introduced

11             into the record.)

12            (Witness reviews document)

13   BY MR. McGINTY:

14       Q    Do you recognize this document?

15       A    I'm trying to jog my memory.  Just give me

16   a second.

17            It looks familiar, but I don't -- I don't

18   remember the circumstances surrounding it.

19       Q    It's another memo issued by Michael S.

20   Lauer, isn't it?

21       A    Yes.

22       Q    And it was issued the day after Exhibit 8?

23       A    Yes.

24       Q    It was issued on February 13, 2025, right?

25       A    Yes.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1        Q    And it's a modification of the memo that
 2   was issued the previous day, isn't it?
 3        A    It appears to be, yes.
 4        Q    Is that usual?
 5             MS. ANDRAPALLIYAL:  Objection, calls for
 6   speculation.
 7             THE WITNESS:  May I ask you, is it usual
 8   in what way?
 9   BY MR. McGINTY:
10        Q    Is it common for OER to issue a guidance
11   letter that's modified the very next day?
12        A    I can't -- I mean, that would be a general
13   statement.  We, you know, we make course corrections
14   routinely.  "We," at NIH.  So I can't -- I can't
15   really speak to that.
16        Q    It Michael Lauer still with NIH?
17        A    No.
18        Q    Do you know when he separated?
19        A    On February 14th, 2025.
20        Q    Did that have anything to do with either
21   of these memos in Exhibit 8 or Exhibit 7?
22             MS. ANDRAPALLIYAL:  Objection, assumes
23   facts not in evidence and calls for speculation.
24             THE WITNESS:  I do not know.
25   BY MR. McGINTY:
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1      Q    Did Michael Lauer talk with you about why
2   he was separating?
3      **A    Yes.**
4      Q    What did he say?
5      **A    Health concerns.**
6      Q    I think I'm going to ask you about the NIH
7   Policy Statement now --
8      **A    Okay.**
9      Q    -- which is, for the record, I believe,
10  Exhibit 20.  So we've already talked a little bit
11  about this document.
12            (Bulls Deposition Exhibit 20 was
13             introduced into the record.)
14  BY MR. McGINTY:
15     Q    Do you know what it is generally?
16     **A    Yes.**
17     Q    And what is it, generally speaking?
18     **A    It is a compilation of relevant laws,**
19  **regulations, policies, definitions, you know,**
20  **descriptions.  As I mentioned, it's the term and**
21  **condition of every NIH grant award.**
22     Q    And what's its general purpose?
23     **A    NIH expects that all recipients of NIH**
24  **funding comply with everything in this document.**
25     Q    Turn to page romanette ii.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1     **A     Okay.**

2     Q     So it's intended to make available to NIH

3     recipients in a single document the policy

4     requirements that serve as the term and conditions

5     of NIH grant awards, right?

6     **A     Yes.**

7     Q     And it's also designed to be useful to

8     those interested in NIH grants by providing

9     information about NIH, its organization, staff, and

10    its grant process, right?

11    **A     Yes.**

12    Q     So this is intended for the public, people

13    who are interested in getting grants and people who

14    have grants that they understand what they are

15    supposed to do, right?

16    **A     Yes.**

17    Q     Okay.  Would you take a look at page I-53,

18    please.

19    **A     Okay.  2.3.6, is that the page?**

20    Q     2.3.6.  That's exactly right.

21    **A     Okay.**

22    Q     I want to ask you about language that

23    appears about three-quarters of the way down the

24    page in the middle of the third paragraph after

25    2.3.6.  It starts, "The more significant of the

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1    public policy requirements."
 2        A    Okay.
 3        Q    Do you see that?
 4        A    Yes.
 5        Q    And it says:
 6             "The more significant of the public policy
 7              requirements for the purpose of peer
 8              review are those concerning research
 9              involving human subjects; inclusion of
10              genders, members of minority groups, and
11              individuals across the lifespan in
12              clinical research, and research involving
13              live vertebrate animals."
14             What does that mean?
15             MS. ANDRAPALLIYAL:  Objection, calls for
16    legal conclusion, calls for speculation.
17             THE WITNESS:  I think I would have to read
18    the entire section to have a better understanding of
19    these few sentences.  In isolation, I'm not exactly
20    sure what this -- these last two sentences mean.  I
21    mean, it's pertaining to human subjects research and
22    research involving animals.
23             Do you have another either clarification,
24    or do you want me to read the entire section?
25    BY MR. McGINTY:
```

1    Q    What would you need to read to understand
2  the entirety of 2.3.6?
3    A    I'm not sure, so.
4    Q    Okay.  Without reading the entirety of
5  Part 2 --
6    A    Mm-hmm.
7    Q    -- are you able to say what that means?
8    A    The entirety of -- without reading the
9  entirety of it?
10    Q    Right.
11    A    No.  I mean, it just indicates that
12  there's a policy requirement for peer review
13  pertaining to human subjects and animal research.
14  So that's all I'm gleaning from those sentences.
15    Q    What does "inclusion of genders" mean?
16         MS. ANDRAPALLIYAL:  Objection, calls for
17  speculation.
18         THE WITNESS:  So I think I would have to
19  see how -- if gender is defined somewhere in this
20  document.  I'm not -- given this context, I don't
21  exactly know.
22  BY MR. McGINTY:
23    Q    Okay.  Please turn to page I-62.
24    A    Okay.  Okay.
25    Q    There's a policy about human fetal tissue

1    here, right?

2        **A    Yes.**

3        Q    And why is that policy here?

4            MS. ANDRAPALLIYAL:  Objection, calls for

5    speculation, assumes facts not in evidence.

6            (Witness reviews document)

7            **THE WITNESS:  Because this is an NIH**

8    **policy.**

9    BY MR. McGINTY:

10       Q    So policies like this that would constrain

11   or require grantees to do research in a particular

12   way, you would expect to find them in this document,

13   right?

14       **A    Most of them.  So the NIH Grants Policy**

15   **Statement is typically updated once a year because,**

16   **as you can see, it's a large document.  But over the**

17   **course of the year, if policy changes are made or**

18   **implemented, then NIH issues -- will issue a notice,**

19   **an NIH Guide to Grants and Contracts.**

20           **And then, at the end of the year, when it**

21   **comes time to update the Grants Policy Statement,**

22   **those notices are then rolled into the update of**

23   **Grants Policy Statement.**

24       Q    And if I wanted to find those notices,

25   where would I look?

1      **A      The NIH Guide to Grants and Contracts.**

2      Q      Is that on the website?

3      **A      Yes.**

4      Q      Take a look at I-73, please.  What I want

5      to ask you about is the five bulleted points right

6      above 2.4.1.4.

7      **A      Okay.**

8      Q      It's in a policy that starts on, or a

9      section that starts on I-72 called Scored Review

10     Criteria.

11     **A      Okay.**

12     Q      So if you'll look to the previous page, go

13     right ahead.

14     **A      Mm-hmm.**

15            (Witness reviews document)

16            **THE WITNESS:  Okay.**

17     BY MR. MCGINTY:

18     Q      But my question first is just, it says

19     that "Reviewers will consider each of the five

20     criteria below."  And one of those is

21     Investigator(s).

22     **A      Mm-hmm.**

23     Q      Can you just tell me what that means?

24            MS. ANDRAPALLIYAL:  Objection, calls for

25     speculation, assumes facts not in evidence.

1        **THE WITNESS:  Generally it means, you**

2   **know, are the investigators positioned to carry out**

3   **the research proposed, and it means do they have a**

4   **track record of productivity, do they have subject**

5   **matter expertise, et cetera.**

6   BY MR. McGINTY:

7        Q    What would give an investigator subject

8   matter expertise?

9             MS. ANDRAPALLIYAL:  Objection, calls for

10  speculation.

11        **THE WITNESS:  Yeah, I think that depends**

12  **on the field, the project, the funding opportunity.**

13  **Typically, I would imagine, and I'm speculating, it**

14  **would be training, previous research experiences,**

15  **things like that.**

16  BY MR. McGINTY:

17        Q    In your role as deputy director and acting

18  director, did you have any role in implementing or

19  supervising that peer review process we talked about

20  earlier?

21        **A    So I supervised the NIH peer review policy**

22  **officer, and she participated in deliberations**

23  **related to peer review policy in conjunction with**

24  **colleagues at Institutes and Centers.**

25        Q    Okay.  So you'd be able to speak generally

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    as to the policy for how that peer review was

2    conducted?

3         A    At a very high level.

4         Q    Okay.  So maybe not on the level of --

5    well, tell me what "high level" means.

6         A    Well, meaning, so I'm the kind of person

7    that knows a small amount about a large volume of

8    things.  So just understanding composition of peer

9    review panels, you know, the general process,

10   scoring, the different staff who are involved in the

11   process, you know, how many peer reviewers are

12   involved every year, things like that.

13        Q    Okay.  Got it.

14             How about Environment in this list, on a

15   high level, a level that you're comfortable speaking

16   to --

17        A    Yeah, right.

18        Q    -- what does that mean?

19        A    It's my understanding that it is, is the

20   environment conducive to the conduct of the

21   research, so are there sufficient resources, does

22   the institution have a track record of productivity,

23   just things like that.  So is the environment

24   conducive to allowing the research to be successful.

25        Q    Can you speak to what kind of environment

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

 1   would be successful in a clinical trial?

 2          MS. ANDRAPALLIYAL:  Objection, calls for

 3   speculation.

 4          **THE WITNESS:  I'm not a clinical trial**

 5   **expert, I'm a basic scientist, so I don't feel**

 6   **comfortable answering that.**

 7   BY MR. McGINTY:

 8      Q    Okay.  Are you aware of the kinds of

 9   grants that generally get funded or the kinds of

10   environments that generally get funded for clinical

11   trials?

12          MS. ANDRAPALLIYAL:  Objection, vague.

13          **THE WITNESS:  No, I don't know if there**

14   **are shared characteristics of these types of**

15   **institutions.  I imagine they would be affiliated**

16   **with hospitals or institutions of higher education.**

17   BY MR. McGINTY:

18      Q    Why do you make that assumption?

19      **A    Because I would imagine -- well, I'm not**

20   **sure -- that trial lists are usually medical**

21   **doctors.  So I would assume, again, I'm making**

22   **assumptions here, that there would be some kind of**

23   **hospital affiliation.**

24      Q    Okay.  Turn to IIA-3, please.

25      **A    I'm sorry, one more time?  IIA-3?**

```
 1        Q    IIA-3.
 2        A    Public Policy Requirements?
 3        Q    Yeah.  I'm talking about -- I don't know
 4   if it's chapter or part or --
 5        A    Okay.
 6        Q    What's the correct terminology?
 7        A    Part.
 8        Q    Part?
 9        A    Well, I don't know.  Well, I don't know,
10   actually.  Never mind.
11        Q    All right.  We'll use "Part 4" just for
12   our purposes today.
13        A    Okay.
14        Q    So in this Part 4, what's the general
15   purpose of Part 4?
16        A    Well, I mean the title is, "Public Policy
17   Requirements Objectives and Other Appropriation
18   Mandates."  So let's see.  So it appears, based on
19   this, my cursory review right now, that it
20   enumerates different policy requirements and
21   mandates.
22        Q    And that's particularly to public policy,
23   right?
24        A    It says public policy.
25        Q    And there's a definition of public policy
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

 1  here?

 2      A    Okay.

 3      Q    And it means -- well, I'll just indicate

 4  that about the middle of the second paragraph here

 5  and it says:

 6            "The term 'public policy' indicates that

 7             the requirement is based on social,

 8             economic, or other objectives or

 9             considerations that may be attached to

10             the expenditure of Federal funds by

11             recipients, subrecipients, and

12             contractors, in general, or may relate to

13             the expenditure of Federal funds for

14             research or other specified activities."

15      A    Okay.

16      Q    So this Part 4, and then as amended by the

17  notices that you were talking about earlier, would

18  be the public policy requirements for NIH

19  recipients, right?

20            MS. ANDRAPALLIYAL:  Objection, calls for

21  speculation.

22            THE WITNESS:  I'm not -- I'm not entirely

23  sure.  It would appear so, but again, I'm not an

24  expert in some of this content, much of this

25  content, so.  But it would appear so.

```
1    BY MR. McGINTY:
2        Q    In your role as deputy director and acting
3    director, were you involved in interpreting and
4    applying this Part 4?
5        A    As I mentioned earlier, generally, yes, I
6    would be involved along with Ms. Michelle Bulls and
7    her colleagues in interpreting and applying the
8    Grants Policy Statement along with, you know,
9    Institutes that are colleagues as well.
10       Q    Okay.  Are you aware of anything in this
11   Part 4 that says it's the policy of NIH not to fund
12   or to defund research on transgender related issues?
13       A    I am not aware.
14       Q    If such a policy existed in here, would
15   you expect to be aware of it?
16       A    Yes.
17       Q    Okay.
18            MR. McGINTY:  Mark this, please.
19            (Bundesen Deposition Exhibit 25 was marked
20             for identification.)
21            (Document tendered to counsel)
22            MS. ANDRAPALLIYAL:  Thank you.
23   BY MR. McGINTY:
24       Q    I'm handing you what's been marked as
25   Exhibit 25.
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    **A    Okay.**

2        Q    And I don't expect you to recognize that

3    document.  I will represent to you that it is the

4    application for NIH Funding for the grant that was

5    terminated in Exhibit 4.

6            Does that make sense to you?

7    **A    Yes.**

8        Q    I'll have some specific questions about

9    the content of that application.

10           Are you familiar generally with NIH grant

11   applications?

12   **A    Yes.**

13       Q    And what's the source of your familiarity?

14   **A    Having been at NIH for 21 years and I've**

15   **seen many grant applications during that time frame.**

16       Q    And, I'm sorry, I'm just checking my notes

17   to see if there are particular pages I need to ask

18   you about.

19           Okay.  Could you please turn to page 24,

20   please.  If you could just read silently to yourself

21   that paragraph that's numbered C1, and you don't

22   need to read the references below it, just the

23   paragraph.

24           (Witness reviews document)

25   **THE WITNESS:  Okay.**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    BY MR. McGINTY:

2        Q    So this would form part of the basis upon

3    which the investigator was evaluated for the

4    purposes of that peer review, right?

5        **A    That's my understanding, yes.**

6        Q    Okay.  And from your experience working at

7    NIH, do you have a sense as to whether a statement

8    like that would contribute to a higher score or a

9    lower score?

10       **A    So, because I'm not -- I've never worked**

11   **in transgender research, I can't comment on that.**

12   **I'm not an expert in the field, so I don't know if**

13   **this description would contribute to a higher or**

14   **lower score.**

15       Q    Okay.  Take a look at page 33.

16       **A    Okay.**

17       Q    There's another personal statement there.

18   Without reading it, are you able to say whether or

19   not this personal statement would have formed part

20   of the evaluation for the investigator part of the

21   evaluation?

22           MS. ANDRAPALLIYAL:  Objection, calls for

23   speculation.

24           **THE WITNESS:  I don't know, because this**

25   **person is not the principal investigator, it seems,**

1  but maybe key personnel.  So I actually don't know

2  if this would go into the investigator portion of

3  the review.

4  BY MR. McGINTY:

5      Q    Do you know what portion of the review it

6  would go into?

7      A    I'm not sure, sorry.

8      Q    Would it go into some portion of the

9  review?

10         MS. ANDRAPALLIYAL:  Objection, calls for

11  speculation.

12         THE WITNESS:  I don't know, sorry.

13  BY MR. McGINTY:

14      Q    Okay.  What information would you need to

15  have in order to know?

16      A    I would need to consult with my former

17  direct report, who is the peer review policy

18  officer.  Yeah, I -- I -- I don't -- I'm not

19  thinking of a document that I would reference that

20  would help me to know.  Yeah, I don't, I'm sorry.

21      Q    Okay.  Who is the peer review policy

22  officer?

23      A    Dr. Stephanie Constance.

24      Q    And do you know if Dr. Constance is still

25  the peer review policy officer?

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    A    She's still at NIH, yes.

2    Q    Okay.

3         MR. McGINTY:  We can take a quick break,

4    15 minutes.  Off the record.

5         (Recess taken - 11:05 to 11:22 a.m.)

6    BY MR. McGINTY:

7    Q    Just a few more questions.  I'll remind

8    you that you're still under oath.  Do you understand

9    that?

10   A    Yes.

11   Q    Great.  So I think you said you got one,

12   maybe two, lists of grants to terminate.  Is that

13   right?

14   A    Yes.

15   Q    At that time was there any method that you

16   were using to track the grants that were terminated

17   with those lists that you got?

18   A    Not -- no.

19   Q    Okay.  Are you aware of any tracking

20   method that was put in place after that?

21   A    No.

22   Q    Okay.  Do you know what the START program

23   is?

24   A    I'm generally aware of it, yes.

25   Q    What is it?

1    **A    So it is, I believe, a tool that is used**

2    **by the Division of Program Coordination and**

3    **Strategic Initiatives to, I think, track data calls**

4    **to the Institutes and Centers.  I've never logged on**

5    **to it, I've never used it, but I just know it's some**

6    **type of tracking tool, I believe.**

7         Q    I see.  So what kind of data calls does it

8    track, do you know?

9    **A    I don't know exactly.  I believe it is**

10    **data calls that are distributed through the Planning**

11    **and Evaluation Officers Community at the Institute**

12    **and Centers.  But that's -- that's all I know.**

13         Q    Okay.  Do you know how long information

14    about those data calls is kept in the platform?

15    **A    I don't know.**

16         Q    Okay.

17              MR. McGINTY:  And I'll just advise Counsel

18    now that I anticipate we'll be asking for

19    information related to any of those data calls for

20    any of those terminated grants.  I just want to

21    alert you to, whatever information you have, to

22    preserve that information.

23    BY MR. McGINTY:

24         Q    And you said it was utilized by a

25    particular division.  Would you say the name of the

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    division again.

2        A    The Division of Program Coordination and

3    Strategic Initiatives.

4        Q    What is that division?

5        A    That is a division, a large division

6    within the office of NIH Director.  It's composed of

7    a number of smaller divisions and offices.  Their

8    role is to coordinate across NIH strategic

9    initiatives crosscutting science, things like that.

10       Q    Okay.  What's a strategic initiative?

11       A    Oh, I -- I mean, I don't know how they

12   define it.  I would imagine it would have to do with

13   a research initiative, but I don't know.

14       Q    Okay.  And when you said "data call," what

15   is that?

16       A    So "data call" is a term that is used very

17   broadly at NIH.  It might be, like, for annual

18   reports.  NIH has to coordinate lots of different

19   reports, and one data call might be please tell us

20   how many types of collaborative activities you

21   engaged with other HHS agencies in the past year,

22   something like that.  So it can be any flavor of

23   just requests for information across the different

24   Institutes and Centers.

25       Q    Who is generally responsible for doing

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    those data pulls from the data systems that NIH has?

2        A    The data pulls.  Do you mean, I'm sorry,

3    can you clarify.

4        Q    I'm sorry.  I'll use a different word.

5    I'll use your word, "data call."

6            Who is responsible for actually doing

7    those data calls?

8        A    It depends on the contents.  So typically

9    the request may be distributed by the -- and I'll

10   use the nickname, DPCPSI, so division of, you know.

11   Within DPCPSI is the Office of Evaluation and

12   Reporting.

13           And so they may issue the requests, an

14   e-mail that they send out to the Institutes and

15   Centers for any number of things, contributions to

16   reports, maybe, you know, information about a

17   portfolio.

18           And then that goes to the Institute

19   Planning and Evaluation Officers.  Usually there's

20   one or two representatives from each Institute and

21   Center, and those folks typically reside in the

22   Institute and Center Policy offices.  Sometimes

23   their Policy and Evaluation might be in the title.

24   Sometimes it might be Policy and Communications.

25   They all organize themselves a bit differently.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    I see.  Okay.  So are you aware of any

2  data calls that were made about any of the

3  terminated grants that appeared on those lists that

4  you got?

5    **A    No, I'm not aware.**

6    Q    Okay.  Would that have been a way to

7  identify which grants should go on that list?

8         MS. ANDRAPALLIYAL:  Objection, calls for

9  speculation.

10        **THE WITNESS:  I don't -- I don't know.**

11 BY MR. McGINTY:

12   Q    Okay.

13   **A    Yeah.**

14   Q    But the START platform is a way to track

15 those data calls?

16   **A    That's my understanding, yeah, I believe**

17 **that's...**

18   Q    Do you know how they are tracked in the

19 START platform?

20   **A    I don't.**

21   Q    Okay.  Do you know if they're labeled in

22 any particular way?

23   **A    I don't.**

24   Q    Okay.  Now, earlier you testified to your

25 role in terminating grants.  Is that right?

1    **A     That I typically am not involved in the**
2    **termination of grants.**
3        Q    Do you recall any instance in which you
4    were instructed to terminate a grant prior to
5    January 20th, 2025?
6    **A     No.**
7        Q    Okay.  And do you recall any instance in
8    which someone from outside of NIH gave NIH an
9    instruction to terminate the grant prior to
10   January 20, 2025?
11           MS. ANDRAPALLIYAL:  Objection, calls for
12   speculation.
13           **THE WITNESS:  I'm not aware.**
14   BY MR. McGINTY:
15       Q    Can't recall any instance of that as you
16   sit here today?
17   **A     I am aware that when an institution is**
18   **suspended or debarred from receiving federal funding**
19   **then that would be an instance where grants would be**
20   **terminated.  I'm trying to recall if -- I'm sorry.**
21   **I'm thinking about the debarments of Eco Health**
22   **Alliance.  And I'm trying to remember if we were**
23   **instructed by HHS to terminate those grants because**
24   **of the debarment, and I'm not remembering the -- I**
25   **can't remember exactly.**

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1            But that would be a circumstance where if
2    an extension and debarment official said because
3    this institution is debarred from receiving federal
4    funding then they can no longer receive federal
5    funding.  But I'm not -- I don't recall exactly.
6        Q    Got it.  You don't have any specific
7    recollection.  Maybe Eco Health Alliance?
8        A    Yes.
9        Q    Do you know what was the outcome of the
10   Eco Health Alliance debarment?
11       A    They were -- the institution was debarred.
12   I don't remember for how many years.
13       Q    Why are institutions generally debarred?
14       A    For failing to comply with laws and
15   regulations.
16       Q    And do you know if any of the grants that
17   were terminated with the February 28th letters --
18   excuse me -- with the February 28th letters or the
19   subsequent list you got, were any of those
20   institutions debarred?
21       A    Not to my knowledge.
22       Q    Okay.  Do you know what the SEAR acronym
23   means?  S-E-A-R.
24       A    No.  I may have at one point but now I
25   don't remember.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    Q    So going back do Exhibit 4 which is the

2    termination letter.

3        **A    Okay.**

4    Q    As you sit here today, do you believe that

5    this termination letter was sent because of the

6    gender ideology order that's in Exhibit 3?

7            MS. ANDRAPALLIYAL:   Objection, calls for

8    speculation, calls for a legal conclusion.

9            **THE WITNESS:   I'm not -- I'm not certain.**

10   BY MR. McGINTY:

11   Q    Okay.

12       **A    Yeah.**

13   Q    So just restating, in your opinion as the

14   former acting director of OER, do you have any

15   belief as to whether or not this letter was sent

16   because of the gender ideology order?

17           MS. ANDRAPALLIYAL:   Objection, call for a

18   legal conclusion.

19           **THE WITNESS:   As I mentioned before, I was**

20   **not given any background as to why these grants were**

21   **being terminated, so I can't -- I don't know if it's**

22   **related to this direct order or not.**

23   BY MR. McGINTY:

24   Q    Are you aware of any currently effective

25   NIH policy that would support the termination of

1    this particular research project?

2    **A    I'm not aware.**

3    Q    Okay.

4         MR. McGINTY:  No further questions at this

5    time.

6         MS. ANDRAPALLIYAL:  So I'd like to

7    redirect and ask some questions, but perhaps we can

8    go off the record to discuss.

9              (Discussion off record)

10    (Recess taken - 11:34 a.m. to 12:05 p.m.)

11                   EXAMINATION

12   BY MS. ANDRAPALLIYAL:

13    Q    Good morning, Ms. Bundesen.  I'm Vinita

14   Andrapalliyal.  I'm just going to ask you a few

15   questions here today.

16         My first question is about NIH funding

17   decisions.  You testified earlier that multiple

18   factors go into the decision of whether to fund a

19   particular research project.  Is that correct?

20    **A    Yes.**

21    Q    Okay.  Can you give some examples of

22   factors that would go into that decision?

23    **A    So peer review scores would be one.  Also,**

24   **portfolio balance, meaning so at the National**

25   **Institute of Mental Health where I previously worked**

1    there were different programmatic divisions.  Some

2    focused on basic science, some focused on treatments

3    and interventions, others on services.

4             And in order to ensure an appropriate

5    balance across the portfolio, an institute may say

6    we have a lot of research in basic neuroscience,

7    let's, instead of funding more of that, let's fund

8    some more schizophrenia research.  So that would be

9    another, another option -- or not option, but

10   reason.  And, of course, availability of funding.

11        Q    Are policy priorities ever considered in

12   making those funding decisions in your experience

13   over time?

14        A    So in my experience not policy per say,

15   it's more programmatic.

16        Q    Programmatic.

17        A    Yes, scientific priorities.

18        Q    Scientific priorities.

19        A    Strategic plans.

20        Q    Okay.

21        A    So NIH funds investigator-initiated

22   research, but then also may target certain types of

23   research, like we would like to see more

24   schizophrenia research.

25        Q    So, for example, like stem cell research,

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1 would you say the decision of whether to fund stem

2 cell research would be considered -- is that a

3 programmatic priority or a policy priority in your

4 view?

5      **A    That would be a programmatic priority,**

6 **however, any research that is funded needs to be in**

7 **compliance with law, regulation, and policy.**

8      Q    Okay.  Okay, thank you.  I'll move on to

9 another topic.

10     **A    Okay.**

11     Q    We discussed Exhibit 20, the Grants Policy

12 Statement.  Is it your understanding that the Grants

13 Policy Statement is the sole repository of policies,

14 priorities, guidance, and other directives regarding

15 NIH grants?

16     **A    I would say it's the primary repository.**

17 **As I mentioned earlier, NIH will periodically issue**

18 **guide notices or policy notices across the course of**

19 **the year.  And that's considered like an addendum, I**

20 **would say, to the Grant Policy Statement.**

21          **And then at the end of the year or when it**

22 **comes time to revise and update the Grants Policy**

23 **Statement, then the substance of the notices are**

24 **then rolled into the Grants Policy Statement update.**

25     Q    And is there a difference between a policy

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    notice and guide notice, or can there be a

2    distinction?

3         A    No, a guide notice is -- so in the Guide

4    to Grants and Contracts there are different types of

5    publications.  One would be Notices of Funding

6    Opportunities, but then also another type of

7    publication would be a Guide Notice and then there

8    are different subcategories of Guide Notices.

9              So it could be a Notice of Information,

10   we're having this interesting conference that you

11   may want to go to, or a policy notice or some other

12   kind of notice.

13        Q    Okay.  In your experience have you seen

14   other sorts of, I guess, priorities notices or other

15   sorts of documents memorializing funding priorities

16   that perhaps precede or are separate from guide

17   notices or statements in the Grants Policy

18   Statement?

19        A    Will you say it one more time.

20        Q    Sure, yeah.

21        A    Thank you.

22        Q    In your experience have you seen

23   priorities notices or other notices that sort of

24   precede these guide notices that you're talking

25   about, and also precede, you know, inclusion in the

1    Grants Policy Statement?

2            MR. McGINTY:  Object to the form.

3            **THE WITNESS:  I'm sorry?**

4            MR. McGINTY:  I objected to the form of

5    the question.

6            **THE WITNESS:  Oh, oh.**

7            **I'm not exactly sure I'm following.  There**

8    **are strategic plans that may be issued by Institutes**

9    **and Centers that are not in the Guide to Grants and**

10   **Contracts.  I don't know if that's what you --**

11   BY MS. ANDRAPALLIYAL:

12       Q    I was just wondering if you were aware if

13   there were other types of documents that might

14   contain things like funding priorities, apart from

15   these categories that we have identified already.

16       **A    Yes.  Those would be Institute and Center**

17   **Strategic Plan and then also -- and those are**

18   **categorized on the NIH report website, the**

19   **repository of all those.  The Institutes and Centers**

20   **will also publish -- I guess, post -- certain**

21   **priorities outside of strategic plans on their**

22   **websites, maybe a divisional priority.**

23           **And then in the guide -- so those are**

24   **separate from the guide.  In the Guide to Grants and**

25   **Contracts there may be what are called Notices of**

1    **Special Interest.  Excuse me.  They're not funding**

2    **opportunities per se, but they say, hey, these are**

3    **some topics and priorities for our institute, or**

4    **multiple institutes, that we think are interesting.**

5    **Please reference these when you apply to a Notice of**

6    **Funding Opportunity over here.**

7        Q    Okay.

8        **A    So...**

9        Q    Thank you.  And you testified that you

10   were involved in high level discussions with

11   Dr. Memoli regarding agency funding priorities

12   during your time as acting director.  Is that

13   correct?

14       **A    Yes.**

15       Q    Okay.  And do you know whether those

16   priorities have been finalized?

17       **A    I do not know if they have been finalized.**

18       Q    Is it possible that they were finalized

19   while you were there and you don't remember?

20       **A    It's possible.**

21       Q    Okay.  Okay.

22           MS. ANDRAPALLIYAL:  Thank you very much

23   for your time.  I have no further questions.

24           **THE WITNESS:  Okay.**

25           MR. McGINTY:  Go off the record.

```
 1                    (Discussion off record)

 2            (Recess taken - 12:14 to 12:36 p.m.)

 3                    FURTHER EXAMINATION

 4    BY MR. McGINTY:

 5        Q    Thank you, Ms. Bundesen.  I just have a

 6    few more questions.  I really thank you for your

 7    time today.

 8            So you were asked about documents that

 9    would inform NIH funding decisions.  Do you remember

10    that?

11        A    Documents?  No, I don't remember.

12        Q    You were asked about NIH funding

13    decisions, and you gave an example of factors.  You

14    gave peer review scores --

15        A    Oh, yes.

16        Q    -- and portfolio balance and availability

17    of funding.  Remember that?

18        A    Yes.

19        Q    So those are all factors that would govern

20    whether or not to issue a grant in the first

21    instance, right?

22        A    Yes.

23        Q    Okay.  Would those factors generally be

24    used to terminate grants?

25        A    So I would refer back to Section -- gosh,
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    now I forget -- 8.5.2 of the Grants Policy Statement

2    that would describe the circumstances under which

3    grants could be suspended if terminated.  So with

4    those factors, you're asking would peer review

5    scores, priorities, and availability of funding,

6    would those factors go into terminating grants?  Was

7    that your question?

8        Q    Right.

9        A    No, not specifically, no.

10       Q    You also testified about high level

11   discussions you had with Dr. Memoli.

12            Remember that?

13       A    Yes.

14       Q    When did those discussions start?

15       A    I don't remember.  They would have been,

16   let's see, I became acting officially the Monday

17   after February 14th, to the 17th, yeah, the 17th, so

18   likely sometime that week or the week after.  But I

19   don't remember the exact time.

20       Q    Okay.  And how often would you have those

21   discussions?

22       A    Not terribly often.  He had articulated at

23   one point the desire to create, you know, documents

24   memorializing NIH priorities.  So we discussed that

25   on a few occasions, but not many times.

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1     Q    Okay.  When you say a few occasions?

2     A    Um, let's see.  Probably, maybe less than

3  five times, so probably like one or two times, I

4  think, in person or virtual, and then I recall some

5  high level discussions over e-mails and some draft

6  language.

7     Q    Okay.  So you exchanged e-mails, there was

8  some draft language?

9     A    Yeah.

10     Q    You had in-person meetings or Zoom

11  meetings.  Were there any other communications you

12  had about these high level discussions?

13     A    No.

14     Q    Okay.  And who else was involved in these

15  high level discussions?

16     A    Let's see.  Office of General Counsel

17  and -- I'm trying to remember.  I'm sorry, I

18  can't -- I can't recall with fidelity.  I could make

19  a guess, but I'm really not sure.

20     Q    Okay.  You'd need to take a look at that

21  e-mail to know?

22     A    Well, yes.  And I suppose e-mails and

23  maybe Outlook meeting invitations.  I just don't --

24  I don't recall exactly.

25     Q    Okay.  So that's e-mails, the Outlook

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1  meeting invitations.  Are there any other documents

2  that would refresh your recollection about who was

3  involved in those meetings?

4       A    No.

5       Q    Okay.  And, let's see, I think you

6  already -- you said that you had some meetings with

7  Dr. Memoli as to high level discussions.  I'm not

8  sure you said there was anyone else in the meeting

9  that you had as opposed to the e-mails that you were

10 exchanging?

11      A    So that's where I'm not sure.  I had very

12 limited.  In my time at NIH while I was acting

13 director, I only met with Dr. Memoli a handful of

14 times, so it wouldn't -- it would not have been

15 often.

16           So maybe once or twice, but I don't -- I

17 know one meeting our Office of General Counsel was

18 present and possibly some other staff, but I'm

19 not -- I'm not entirely sure.  I could make a guess

20 but I'm not entirely sure.

21      Q    Okay.  And why aren't you sure?

22      A    Because just the sheer volume of work that

23 I was managing at the time, long hours, you know,

24 often getting, I estimate, sometimes hundreds of

25 e-mails, you know, a day.  It was just the volume.

1          There was a lot going on.  And so with

2     that level of stress with the volume of work,

3     sometimes my memory goes a little bit.

4          Q    Okay.  Understood.  And just for the

5     record, who is Dr. Memoli?

6          A    Dr. Matthew Memoli was the acting NIH

7     Director when I was still at NIH.

8          Q    And what's your understanding of the

9     acting NIH director's duties?

10              MS. ANDRAPALLIYAL:  Objection, calls for

11     speculation.

12              THE WITNESS:  To oversee the organization.

13              MR. McGINTY:  Okay.  No further questions.

14              (Whereupon, signature having not been

15     waived, the deposition of LIZA Q. BUNDESEN was

16     concluded at 12:42 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2            I, LIZA Q. BUNDESEN, do hereby acknowledge

 3     that I have read and examined the foregoing

 4     testimony, and the same is a true, correct and

 5     complete transcription of the testimony given by me

 6     and any corrections appear on the attached Errata

 7     sheet signed by me.

 8

 9

10     _____    _____

11           (DATE)                          (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Bess A. Avery, Registered Merit

3    Reporter, the officer before whom the foregoing

4    deposition was taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the testimony given; that said testimony was taken

7    by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 14th day of

14   April 2025.

15

16   My commission expires:

17   November 14, 2028

18

19   _____

20   BESS A. AVERY

21   NOTARY PUBLIC IN AND FOR THE

22   DISTRICT OF COLUMBIA

23

24

25

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
 1              E R R A T A   S H E E T

 2    IN RE:  STATE OF WASHINGTON, et al. V. DONALD J.

 3    TRUMP, et al.

 4    RETURN BY: _____

 5    PAGE      LINE            CORRECTION AND REASON

 6    _____     _____    _____

 7    _____     _____    _____

 8    _____     _____    _____

 9    _____     _____    _____

10    _____     _____    _____

11    _____     _____    _____

12    _____     _____    _____

13    _____     _____    _____

14    _____     _____    _____

15    _____     _____    _____

16    _____     _____    _____

17    _____     _____    _____

18    _____     _____    _____

19    _____     _____    _____

20    _____     _____    _____

21    _____     _____    _____

22    _____     _____    _____

23    _____     _____    _____

24    _____    _____

25       (DATE)              (SIGNATURE)
```

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

```
1         E R R A T A   S H E E T   C O N T I N U E D

2    IN RE:  STATE OF WASHINGTON, et al. V. DONALD J.

3    TRUMP, et al.

4    RETURN BY: _____

5    PAGE      LINE            CORRECTION AND REASON

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____  _____

25      (DATE)                  (SIGNATURE)
```



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025

State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025

State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025

State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza - April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025



State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025

State of WA, et al. vs Trump, et al.
Bundesen, Liza -  April 04, 2025