```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                          No. 1:25-cv-10787-WGY

 4

 5   AMERICAN PUBLIC HEALTH ASSOCIATION, et al,
              Plaintiffs
 6

 7   vs.

 8

 9   NATIONAL INSTITUTES OF HEALTH, et al,
              Defendants
10

11                        * * * * * * * *

12

13                      For Hearing Before:
                        Judge William G. Young
14

15            Status Conference/Motion to Dismiss

16

17                   United States District Court
                     District of Massachusetts (Boston.)
                     One Courthouse Way
18                   Boston, Massachusetts 02210
                     Thursday, May 22, 2025
19

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                   rhr3tubas@aol.com

25
```

1                  A P P E A R A N C E S

2


3    KENNETH PARRENO, ESQ.
     SHALINI GOEL AGARWAL, ESQ.
4        Protect Democracy Project
         15 Main Street, Suite 312
5        Watertown, MA 02472
         (202) 579-4582
6        E-mail: Kenneth.parreno@protectdemocracy.org
     and
7    LISA MANKOFSKY, ESQ.
         Center For Science In The Public Interest
8        1250 I Street, NW
         Suite 500
9        Washington, DC 20005-5979
         (202) 777-8381
10       E-mail: Lmankofsky@cspinet.org
     and
11   OLGA AKSELROD, ESQ.
     JESSIE J. ROSSMAN, ESQ.
12       American Civil Liberties Union Foundation
         125 Broad Street
13       New York, NY 10004
         (212) 549-2659
14       Email: Oakselrod@aclu.org
         For Plaintiffs

15


16    ANUJ K. KHETARPAL, ESQ.
         United States Attorney's Office
17       1 Courthouse Way, Suite 9200
         Boston, MA 02210
18       (617) 823-6325
         Email: Anuj.khetarpal@usdoj.gov
19       For Defendants


20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 11:00 a.m.)
 3          THE CLERK:  The Court will hear Civil Matter
 4     25-10787, American Public Health Association, et al vs.
 5     The National Institutes of Health, et al.
 6          THE COURT:  And we've -- well would counsel
 7     identify themselves, this is a related case.
 8          MR. PARRENO:  Good morning, your Honor, my name is
 9     Kenneth Parreno, I'm counsel for the plaintiffs, and I
10     will be arguing part of the hearing today, and with me
11     is one of my co-counsel, and including Ms. Mankofsky,
12     who will address subject matter jurisdiction, if that
13     arises in the matter.  I'll let them introduce
14     themselves.
15          MS. MANKOFSKY:  Good morning, your Honor, Lisa
16     Mankofsky from the Center for Science in the Public
17     Interest, co-counsel for the plaintiffs.
18          MS. AKSELROD:  Good morning, your Honor, Olga
19     Akselrod with the ACLU on behalf of the plaintiffs.
20          MS. ROSSMAN:  Good morning, your Honor, Jessie
21     Rossman for ACLU of Massachusetts on behalf of the
22     plaintiffs.
23          MS. AGARWAL:  Shalini Agarwal for Protect
24     Democracy on behalf of plaintiffs.
25          MR. KHETARPAL:  Good morning, your Honor, Anuj
```

1   Khetarpal for the United States.

2        THE COURT:  Good morning.

3        Well first I should say, because I've allowed

4   internet access to these proceedings, if you are

5   attending these proceedings via the internet, the rules

6   of court remain in full force and effect, that means you

7   must keep your microphone muted.  It also means that

8   there's no taping, streaming, rebroadcast, screen shots,

9   or other transcription of these proceedings.

10        With that said, come to the sidebar, and this need

11  not be on the record.

12        (Off the record sidebar.)

13        THE COURT:  All right.

14        It will come as no surprise to you that pursuant

15  to Federal Rule of Civil Procedure 65(a)(1), further

16  hearing on this motion for a preliminary injunction is

17  combined with trial on the merits.

18        In the related case I treated the opposition to

19  the motion for a preliminary injunction as a motion to

20  dismiss.  I'm prepared to do that today.  I'm prepared

21  to entertain that now.  While that's not necessary --

22  there are some differences here, I think both parties

23  understand them, but I would like to -- don't think I've

24  prejudged it, I haven't, and there are multiple parties

25  here, um, plaintiff parties, and their standing may be

1  different, though I've addressed the Tucker Act issue in

2  another case.  But reading the complaint here, I do want

3  to talk a bit about case management.

4       It looks to me like it would make sense, if

5  there's anything to try, to put this case on the same

6  track as the related case brought by the 16 states, and

7  I guess the place to start is with the plaintiffs in

8  this case.

9       Doesn't that make sense?

10      MR. PARRENO:  It does, your Honor.

11      THE COURT:  All right.

12      And how does the government -- what's the

13 government's position as to that?

14      MR. KHETARPAL:  Your Honor, the government does

15 not agree that it makes sense.  We think that -- in the

16 related case, your Honor, you asked the plaintiffs to

17 produce a list of terminated grants that they say are

18 subject to --

19      THE COURT:  I did.

20      MR. KHETARPAL:  And we now have a -- and, um, I've

21 spoken with our clients and I can tell you, your Honor,

22 that they have been working diligently, 7 days a week,

23 to try to gather an administrative record for those

24 grants that were identified in there.  There have been

25 some administrative hurdles created by the list that was

1    provided to them.

2         One being that a large chunk of those grants have

3    not in fact been terminated.  Others have been expired

4    on their own terms unrelated to any of the challenged

5    directives.  Others were --

6         THE COURT:  Remember, you're talking about another

7    case.

8         MR. KHETARPAL:  I understand, your Honor.

9         And so the reason I bring that up, your Honor, is

10   because there we have a list of grants that were -- that

11   were the subject of this administrative record, and even

12   with that, given those administrative hurdles that have

13   been created, NIH is going to have a difficult time

14   completing its administrative record by the June 2nd

15   date that this Court has set.  They will -- they're

16   working around the clock to do so, but they're currently

17   having -- it's been a challenge.

18        Here we do not have the grants yet identified, so

19   we don't know what grants --

20        THE COURT:  But --

21        MR. KHETARPAL:  And they would not be able to turn

22   to those until after the June 2nd date.  And that's why

23   I think being on the same timeline --

24        THE COURT:  I understand.  I understand.

25        Again, um, I hesitate to talk about another case

1    where I haven't got all counsel in that case, that

2    related case present, but, um, that case is going to

3    involve, in part at least, a challenge to the same

4    directives as this case.  So what you say makes a lot of

5    sense, and my response to it would be -- at least as to

6    the plaintiffs who have standing, because I'm not at all

7    clear they all do in this case, but as to the plaintiffs

8    who have standing, um, I expect to ask for a list of

9    grants that they think are covered here, um, that they

10   actually would have such impact as would give them

11   Article III standing.  I mean to ask for that.  But with

12   the respect to the challenged directives for which there

13   will also be an administrative record, I don't see why

14   we can't do at least that much, um, starting in June,

15   and then follow, if following is necessary, because

16   the -- in part it will depend upon how the Court rules

17   on the directives.

18        The government, um -- well I can see it both ways.

19   If the government loses on the directives, maybe that's

20   an entire loss for the government, but I'm not clear.

21   I'm talking about the states's case.  If the government

22   wins on the directives, perhaps they could lose on

23   certain grants.  Without knowing, I haven't reflected on

24   it, it would seem so here.

25        But if we put the specific grants they're

1    concerned with second, you'd be more comfortable?

2         MR. KHETARPAL:  Um, your Honor, preserving our

3    argument that those directives are not themselves final

4    agency actions, um, in terms of -- we are compiling what

5    we believe constitutes the administrative record for the

6    challenged directives in that related case, and we

7    agree, we believe that plaintiffs in this case have

8    challenged a subset, not every single one of those, but

9    a subset of those challenged directives.  So to the

10    extent that the directives in this case overlap with

11    those challenged directives, yes, I agree that we'd be

12    able to produce the administrative record with respect

13    to those directives to the plaintiffs in the same

14    timeframe.

15         THE COURT:  And the Secretaries and the official

16    defendants's rights are saved --

17         MR. KHETARPAL:  Thank you, your Honor.

18         THE COURT:  -- and no one is going to lose, either

19    side, rights by inadvertence.  And I thank you for that

20    response.

21         Well that's a helpful response.  What do you

22    think?  If we consolidated so much of it as went to the

23    directives and heard you on that, um, when the hearing

24    takes place, but, um -- I will see my way clearer, I

25    think as we go along, but gave them somewhat more as to

1    challenged grants.  Don't you agree, I would certainly

2    like a list of challenged grants here?

3        MR. PARRENO:  As an initial matter, your Honor, we

4    very much agree that proceeding on the same track, so

5    that there's a June 16th hearing, makes sense, um, and

6    we appreciate the Court's guidance and directive there.

7        As to the spreadsheet itself, the plaintiffs, the

8    private plaintiffs are diligently working to identify at

9    least that preliminary universe of grants similar to

10   what the Court directed the states.  We're prepared to

11   provide that by Tuesday, May 27th, to defendants, and we

12   can file that shortly thereafter with the Court, if the

13   Court, um, permits it.

14       The -- and if I may, your Honor, before addressing

15   the scheduling and the scope of the, um, June 16th

16   hearing and what would be covered there as well, and I

17   understand that I may well be fighting on a losing

18   ground here, but in channeling your directive to the

19   counsel in the other case to be "brave," "meticulous,"

20   and "thoughtful," I respectfully would request the

21   opportunity to seek preliminary relief on behalf of --

22       THE COURT:  Look, this is for me, um, I don't see

23   how I could be more transparent.  We're getting a great

24   deal of jurisprudence on preliminary injunctions, very

25   helpful throughout the nation.  This Court's practice,

um -- I follow this practice not to slow things down.

You want further proceedings.  Do you want to
start Tuesday?

MR. PARRENO:  No, your Honor, and we appreciate
the guidance.

THE COURT:  That's right, you don't want to start
Tuesday, because, um, I had thought -- and I could be
wrong, but this is not delay on the Court's part at all.
You know I have moved as promptly as I know how, um,
once this case was reassigned to this session.  And I
intend to move as promptly as the parties competently
can move, because you have claimed irreparable injury.

Now technically I don't have to determine that if
I can determine the merits, but I'm not the least -- by
saying it's "collapsed with trial on the merits," the
request for preliminary relief does not disappear.
Rather I'm a great believer in evidence.  I want to see
the challenged grants.  In another case, he finds fault
with them and the like, which may well be his right.  It
is his right in the other case.  We'll see what they
have to say.  So we need to sort this out.  I'm prepared
to sort it out.  I'm not going anywhere.  And, um, I
just took a plea in a case that was going to start on
June 2nd.  If you want to start, we'll start.  "No."  I
mean I don't hear you say you do, so call my bluff and

1    say you do, and we'll see.

2          So, um, I really have thought this through.  But I

3    want to assure you that the emergency, the exigency of

4    any case in which preliminary relief is sought and

5    supported in -- with very significant pleadings, is not

6    lost on the Court, it's not to dodge it and put it in

7    some sequence, it's practically to engage with actual

8    evidence.

9          So, um, I used my chance to speak.  I don't mean

10   to speak over you, but I've decided that.

11         MR. PARRENO:  Thank you, your Honor.

12         THE COURT:  All right.

13         Now when do you want to argue the motion, what's

14   now become a motion to dismiss?  I'm prepared today if

15   you wish.

16         MR. PARRENO:  Your Honor, we're prepared to argue

17   the jurisdictional point today and also prepared to be

18   heard and understood on the moving forward on the

19   merits, and prepared to also think through the

20   scheduling, the administrative record, all of that to

21   move forward so we can expeditiously and efficiently,

22   especially given the urgency of the matter, um, proceed

23   to be prepared for trial.

24         THE COURT:  Thank you.  So since you're prepared

25   to argue, I want to hear the argument.

1          Again, since in a related case I have satisfied

2     myself as to Tucker Act, I think, um, I don't need oral

3     argument, but the defendants, the official defendants,

4     do not waive that at all.  But without argument, I will

5     deny it on the basis of my written order in the related

6     case.  Now that's not your only argument.  So focusing

7     on other arguments, I will hear you.  I would think

8     about 15 minutes a side is sufficient, though that's not

9     an invitation to take 15 minutes.  So I'll hear the

10    government.  I'll hear the -- I never know what to call

11    them, but I'll hear the official defendants.

12          MR. KHETARPAL:  Thank you, your Honor.

13          And, um, I understand and hear the Court does not

14    wish to have oral argument concerning subject matter

15    jurisdiction, we -- and I will not engage in that,

16    however I just urge the Court to take a look at the

17    footnotes that have been provided in our opposition

18    concerning the binding nature of the First Circuit's

19    precedent, which we believe is not binding on this

20    Court, and I know the Court relied upon that in its --

21          THE COURT:  I did rely on it and, um, I think

22    there's much to say.  I think you're probably right in

23    your -- in your footnote.  But that being said, then

24    it's up to me to decide these things and I've decided

25    them.  So I, um, must stand on -- I'm prepared to stand

```
1    on the written order that I've made, and the official
2    defendants's rights are in every respect saved.
3           Now as to the other grounds, I am very interested
4    to hear you.
5           MR. KHETARPAL:  Understood, your Honor, and thank
6    you for acknowledging the preservation of our rights.
7           Your Honor, with respect to, um, issues that were
8    not at issue in the other case, in the related case, um,
9    we, um, as we brought up, we believe that at least some
10   of the plaintiffs here do not have Article III standing.
11   We note that the, um, organizational plaintiffs, both
12   APHA and the United Auto Workers, rely on associational
13   standing, um, and we understand that the Supreme Court
14   has said that there is such a theory, and preserving our
15   objection and argument with respect to that, however,
16   um, as a general matter with associational standing.
17   However in this case specifically we do not believe that
18   APHA, the United Auto Workers, have shown that they have
19   associational standing.
20          In order to have associational standing, they must
21   show that the interests they seek to protect are germane
22   to the organization's purpose.  We do not believe
23   they've met that requirement, specifically, that, um,
24   they -- the folks in the United Auto Workers, for a
25   moment, this is a labor union that is, by their own
```

1    constitution, is set up to, um, challenge and to

2    negotiate with management of the employees.  We now

3    believe that issues concerning grant terminations by NIH

4    are germane to that purpose here.  And similarly, we

5    don't believe APHA has shown that they have -- that the

6    issues here are germane to their purpose either.  We

7    believe that under Article III they have not shown

8    injury and redressability on their own and again have

9    not met the associational standing guideline or, um,

10   factors.

11        We -- on the merits, your Honor, we believe that

12   the plaintiffs are unlikely to succeed on the merits

13   because --

14        THE COURT:  Well unlikely to succeed is not the

15   standard now, the standard is -- so long as they've pled

16   it adequately, I have to give all intendments in their

17   favor, don't I, at least, and then take evidence and

18   decide that?

19        MR. KHETARPAL:  Well, your Honor, this was drafted

20   as an opposition to a preliminary injunction, but I

21   understand --

22        THE COURT:  I don't fault you.

23        MR. KHETARPAL:  Sure.

24        THE COURT:  But now it's a motion to dismiss.

25   We'll get to evidence just as rapidly as I can.  Believe

1   me.

2        MR. KHETARPAL:  Well, your Honor, the -- on that

3   motion to dismiss, your Honor has the attachments to

4   their, um, to their complaint and to their --

5        THE COURT:  I do.

6        MR. KHETARPAL:  -- motion, and we think that the

7   -- on the face of those, they have failed to state a

8   claim for which relief can be granted.

9        THE COURT:  That's the language I understand.

10       MR. KHETARPAL:  First, with respect to at least

11  one of the challenged directives here, on its face, that

12  they've attached, I believe it is Exhibit 12, um,

13  Exhibit 13, Exhibit 14, very explicitly state that it

14  has rescinded that directive, therefore that directive

15  is no longer in existence, the directive is moot.  So at

16  least with respect to that, on its face there's no --

17  there's no relief that this Court can grant the

18  plaintiffs here.

19       THE COURT:  Because there's no case or

20  controversy.

21       MR. KHETARPAL:  Because there's no case or

22  controversy, that's correct, your Honor.

23       Similarly there are two other of the challenged

24  directives here which very expressly, on their face, say

25  that NIH is not to terminate grants or to violate any

1    temporary restraining orders that have been issued.  I

2    understand that plaintiffs, in their reply brief, had

3    echoed what was stated in the Court's jurisdictional,

4    um, opinion in the related case, saying while these are

5    a barrage of directives that were all issued at the same

6    time, your Honor, these are one- or two-page e-mails,

7    all attached here, that plaintiffs had in their

8    possession, and they very clearly state exactly what I

9    just stated, that they require NIH not to terminate

10   grants, so therefore they cannot have caused any injury,

11   as plaintiffs have alleged.  So similarly with respect

12   to those directives, there is no relief that this Court

13   can grant them with respect to the --

14       THE COURT:  Is that because some other court has

15   restrained action?

16       MR. KHETARPAL:  It was -- there were other courts

17   earlier on that had said that NIH cannot terminate

18   grants pursuant to an executive order.  These

19   directives, as can be seen on the face of them, said,

20   "Okay, you cannot terminate grants pursuant to an

21   executive order or the Office of Management and Budget

22   Guidance."  The Court then subsequently said that that

23   does not preclude the agencies from terminating grants

24   on their own account for their own reasons that are not

25   specifically related to doing so on the basis of an

1     executive order.

2          Again that's the -- the two directives there, that

3     have been pointed out in my brief, all they say are you

4     cannot terminate grants pursuant to this executive order

5     or Office of Management and Budget directive.  So on

6     their face, your Honor, there's nothing that the Court

7     can --

8          THE COURT:  Again, I don't know what grants we're

9     talking about here --

10         MR. KHETARPAL:  Neither do I, your Honor.

11         THE COURT:  -- and it would be very helpful if I

12    did.  But you're not representing to me that the

13    universe of grants has not changed once these current

14    officials in the National Institutes of Health have

15    assumed their position, you're not saying that to me?

16         MR. KHETARPAL:  No, these are just relating to the

17    specific directives that they are challenging that are

18    at issue.

19         THE COURT:  All right.

20         MR. KHETARPAL:  So with respect to the grants

21    themselves, your Honor, the termination of those grants,

22    we agree that -- this is -- the terminations have

23    complied with the terms of the agreements of the grants

24    themselves, and the regulations that are built into the

25    grants -- the grants, and which incorporate the grant

1    policy statement.

2         The NIH grant policy statement very explicitly

3    states that it adopts and effectuates its program

4    goal -- the contract terms say that the defendants may

5    terminate grants "if the award no longer effectuates the

6    program goals or agency priorities," and it very

7    explicitly cites --

8         THE COURT:  And if I understand it correctly, um,

9    to the extent there's any reason given at all, the

10   reason given is, "Well it no longer reflects the

11   agency's priorities," isn't that so?

12        MR. KHETARPAL:  Well we believe that there are

13   further reasons provided than them and I understand --

14        THE COURT:  And provided?

15        MR. KHETARPAL:  I believe that they -- the

16   government believes they were provided, your Honor.

17        THE COURT:  And what were they?

18        MR. KHETARPAL:  And dependent on the nature of the

19   grant.  And that just shows that these were -- there was

20   more reason behind it than just the blanket grant

21   terminations, there were -- there were different

22   categories of grants that, um, the plaintiffs have

23   pointed out, including those that they said constituted

24   DEI grants and gender --

25        THE COURT:  You introduced that.  What does that

1    mean?  And I say this with respect.  What does "DEI

2    grant," what does that mean?

3            MR. KHETARPAL:  Your Honor --

4            THE COURT:  Look, I -- I wrestle with this.  Is it

5    the -- I know what those words separately mean, they

6    mean, um, "Diversity," "Equity," "Inclusion."  I have

7    not taken those words as, um, pejorative in my judicial

8    practice and indeed in my lifetime.  I understand -- and

9    the Supreme Court has wrestled with this concept of

10   affirmative action, and that I do understand, and I've

11   had cases dealing with that, but that has always, um --

12   whatever problems there may be with affirmative action,

13   the courts -- all the courts, the ones to which I am

14   responsible, have uniformly, um, been very careful to

15   avoid discrimination.

16           And just as a thought, a thought exercise.  If

17   putting these three words together, D-E-I, somehow is

18   offensive or no longer the policy of the United States

19   of America, I mean does that mean our policy is

20   "Homogeneity, Inequity, and Exclusion"?  I mean are you

21   going to stand there and tell me that now is the policy

22   of the National Institutes of Health?

23           MR. KHETARPAL:  Your Honor, I am not making that

24   assertion.  The assertion I am making is --

25           THE COURT:  It would be a breathtaking assertion

1    if you did.

2        MR. KHETARPAL:  I understand that and I respect

3    that, your Honor.

4        The assertion I am making is that for each

5    individual grant -- and I use "DEI" as one of the

6    examples of these 5 or 6 categories --

7        THE COURT:  You'll understand that I don't

8    understand -- and I'm sincere, because if it were

9    defined back in the day -- I see now on the website

10   there are efforts now further to define it, and the one

11   thing that appears to be clutched onto is the Supreme

12   Court's decision in **Students for Fair Admissions**.  Well

13   I understand that decision.  At the trial level, that

14   was tried in the next courtroom here.  I've read the

15   District Court decision.  I've read the Supreme Court

16   decision.  I know what those decisions say.  And those

17   decisions will be fully, um, capaciously enforced here

18   and honored.  I work for the Supreme Court.

19       I don't -- and I'm saying it honestly.  When you

20   say to me "DEI," as though that's bad, I don't

21   understand what that means.  Someone's got to help me on

22   that.  I'm not making a policy statement, I'm making a,

23   um -- I'm asking for, um, a definition of a policy that

24   squares with what I had always understood were the, um,

25   defining elements of the American experience.  Lawful.

1          And go ahead, what other grounds were advanced?

2          MR. KHETARPAL:  Excuse me, your Honor?

3          THE COURT:  What other grounds were advanced?  You

4     say there are specific grounds that were advanced.

5          MR. KHETARPAL:  Your Honor, each of the -- each of

6     the notices of termination laid out the specific

7     reasons.

8          THE COURT:  Like what?  Give me an example.

9          MR. KHETARPAL:  They had found that, well, with

10    respect to those that your Honor has -- that we've just

11    been discussing with DEI, they discuss grants that make

12    racial classifications that they believe NIH has

13    determined do not advance scientific research.

14         THE COURT:  "Racial classifications that do not

15    advance scientific research."

16         MR. KHETARPAL:  And, your Honor, I need to pull

17    out the exact claim language.  I apologize.

18         THE COURT:  No, no, I understand what you said.

19         MR. KHETARPAL:  And similarly for the other -- for

20    those others, um, there were grants related to the covid

21    pandemic that were terminated because, as NIH

22    determined, that the covid pandemic is no longer present

23    in the United States.  And the point being, your Honor,

24    is that the grant termination letters laid out its

25    reasoning for terminating those grants, finding that

1    these grants no longer effectuate agency priorities.

2        THE COURT:  And so treating it as a motion to

3    dismiss, giving all intendments the plaintiff's way, um,

4    there is a rational basis explained here, which of

5    course is in the hands of the public officials, not in

6    this Court's hands, and I'm very sensitive to that.

7        All right, I think I understand the argument.

8    That's 15 minutes.

9        I'll hear you.

10       MR. PARRENO:  Thank you, your Honor.  And just

11   sort of say "sign-posting" to the Court, I will be

12   handling any discussion on the merits.  My colleague,

13   Ms. Mankofsky, will be handling anything on the

14   jurisdiction.  And I'll hand it over to her now.

15       THE COURT:  You can split it up as you wish.

16       MR. PARRENO:  Thank you, your Honor.

17       MS. MANKOFSKY:  Thank you, your Honor.

18       I believe that the jurisdictional issues I need to

19   respond to, um, based on, um, counsel for DOJ's

20   argument, is standing of the associational plaintiff,

21   UAW --

22       THE COURT:  Well that's a concern of the Court for

23   anyone, um -- yes, go ahead.

24       MS. MANKOFSKY:  And also, I think, whether or not

25   this is moot.  But if there are any other jurisdictional

1    issues, please let me know.

2          Shall I start with the UAW --

3          THE COURT:  That's always a good rhetorical

4    beginning, as though it were on me to spot the issues.

5    It's not.  It's on you.  But you've spotted those two,

6    so go ahead.

7          MS. MANKOFSKY:  Yes, thank you very much.  And,

8    um, I'm prepared to discuss all the jurisdictional

9    issues, but we find --

10          THE COURT:  Well, um, get discussing.

11          MS. MANKOFSKY:  -- we find your May 12th order,

12    which addressed so many of the same jurisdictional

13    issues to be controlling here, but I'd be pleased to

14    raise the other ones, if you'd like.  But just to get to

15    the point about the associational --

16          THE COURT:  That's the reason for putting 15

17    minutes on it.

18          MS. MANKOFSKY:  Yes.

19          THE COURT:  It's a delightful forcing mechanism.

20    And I try to be helpful.

21          Look, some things are different in this case.  I

22    spotted the UAW, I thought to myself, "What's the UAW

23    doing here?"  So to the extent that's helpful.

24          When he says -- a lot of these things are moot,

25    they just don't -- the challenge misses the mark.  Well

1    I made notes of that.  Now if that's helpful, go ahead.

2         MS. MANKOFSKY:  Okay, thank you, your Honor.

3         So on the, um, second prong of the requirements

4    for associational standing, whether or not the

5    association that is a plaintiff, um, the interests

6    sought to be protected in the case, are they germane to

7    the organization's purpose?  Um, opposing counsel didn't

8    mention APHA, but just to make the record clear, their

9    mission is to "Bold public health capacity and promote

10   effective policy and practice."  We think it's very

11   clear that the challenge to the directive and to the

12   termination that resulted in these hundreds of

13   terminations, um, clearly show that the mission of the

14   APHA is germane, um, the billions of dollars of research

15   thrown out in the stream, um, it certainly hinders

16   APHA's stated mission.

17        Turning to the UAW, um, the, um -- they represent

18   75,000 workers who depend on funding from grants for

19   their jobs, their salary, benefits, research costs,

20   training, mentoring opportunities, and so UAW is seeking

21   to protect the employment and training opportunities for

22   its members and --

23        THE COURT:  You know I'm going to have to look at

24   the higher court cases, but it strikes me, um -- my

25   colleague, Judge O'Toole here, early on in this space of

1    cases that has arisen from the advent of the new

2    administration, Judge O'Toole dismissed one such case

3    brought by unions against -- and I think it was the DOGE

4    termination e-mails, on the ground that the unions did

5    not have standing.  Now that's something I'm going to

6    have to look into, and that case at most will be

7    persuasive, but the fact it comes from one of my

8    colleagues does give me pause, Ms. Mankofsky.

9        Are you familiar with the case?

10       MS. MANKOFSKY:  I'm afraid not, from your

11   description, but we would be pleased to, um --

12       THE COURT:  Well I'm not deciding from the bench,

13   so, um -- I'm telling you I'm concerned about the

14   union -- and the argument was the same.  If I -- if I

15   understood Judge O'Toole's case, these people were

16   federal workers who were being fired and they were

17   represented by the union.

18       Now I recognize Judge Alsup, there's issues there,

19   um, that arrived at a different conclusion.  But I will

20   tell you, it gives me pause.

21       All right.

22       MS. MANKOFSKY:  We'd be pleased to provide a

23   further supplemental written submission on those cases?

24       THE COURT:  I am open to -- I'm doing a lot of

25   reading, I'm open to further briefing, and I will take

1    this under advisement.

2         MS. MANKOFSKY:  We would appreciate that.

3         I can bring up a few cases to your attention now,

4    if that's helpful.

5         THE COURT:  Well what do you say to -- I'm sure

6    you can brief them, and we'll be looking them up too.

7         But what do you say to his answer -- what is --

8    I'm characterizing it, he did it much better, but he's

9    saying "What is this all about?  We're not -- the

10   directives are either moot or not being effectuated, at

11   least most of them."  Shouldn't I just knock them all

12   out?  The whole idea of the Rules of Civil Procedure is

13   to get to the essence of the controversy.

14        What directive is most -- or directives are most

15   concerning to you?

16        MS. MANKOFSKY:  Your Honor, I -- I, um, would draw

17   your attention first to your very comprehensive and

18   well-reasoned May 12th order where at I believe Page 25,

19   you found that the moot defense that the government

20   raised in the related case would not prevent, um, the

21   case from going forward and from having the June 16th

22   hearing.  And we have defined "directive," we in fact

23   just ordered a new directive, and I would suggest to

24   your Honor that through the prehearing briefing and

25   through the June 16th trial hearing/trial that you have

1    in mind, um, where we can, um, take evidence, that would

2    be the best place to, um, resolve the issue of what

3    directives ought to be the scope of any relief that's

4    given.  But I can also direct your attention to, in our

5    reply, where we have brought to the Court's attention,

6    there are applications that are -- that have been put on

7    hold and it's not moot, things are still being done --

8          THE COURT:  Well that's conclusory.  I'll take it

9    under advisement.  So let me go to your colleague here,

10   though I pressed him on it, and though I'm -- well let

11   me ask you.

12         I'm not taking a position on this.  But what do

13   you understand "DEI" means in this context?  Or they're

14   hostile to the -- the words put together as, um, when

15   someone in this administration says "DEI," there's

16   apparently something wrong with that.  As neutrally as

17   you can, what does that mean?

18         MR. PARRENO:  You're saying exactly the problem

19   here, your Honor, which is one of the central points in

20   our pleadings, that there is no working definition here

21   for "DEI," for "gender identify," for "covid-related,"

22   for all these terms and bases upon which the defendants

23   are terminating -- have terminated and are likely going

24   to continue to terminate additional grants.  That itself

25   is arbitrary and capricious and in violation of

1    statutory and regulatory requirements.

2         We've seen how this has played out so far, and on

3    a motion to dismiss we take as true the allegations in

4    the complaint, how the only information that has been

5    provided about these definitions, about what is

6    encompassed in any sort of these -- any of these

7    research topics --

8         THE COURT:  Well you see -- wait a minute.  Wait a

9    minute.  You see I honestly don't understand what's the

10   problem with DEI?  It's a policy question.  Well I think

11   it's a policy question.  I do understand at least the

12   debate about gender identity.  I understand what

13   policies might, um, be on one side of that issue or

14   another.  I don't purport to understand the science of

15   Covid 19, but I understand mercifully that we have -- we

16   seem to be beyond the height of that pandemic and now,

17   um, one hopes we're preparing for the next.

18        So, you know, I don't frame a question to tease

19   anyone, I always try to be transparent.  I'm not the

20   policymaker here and, um, that's not going to happen.

21   The jurisprudence on arbitrary and capricious is well-

22   known and fairly well-known to this Court.  DEI -- well

23   I'm just repeating myself.

24        Go ahead.

25        MR. PARRENO:  Of course, your Honor, and that was

1    the agency's burden.  It's the agency's burden, or

2    defendants's burden to show what the definition was at

3    the time the decisions were made.

4        THE COURT:  Agreed.

5        MR. PARRENO:  First off, in the allegations of the

6    complaint, we have alleged that there was no such

7    definition.  That alone needs to be taken as true at

8    this juncture for the purpose of deciding this 12(b)(6)

9    portion.  But we also believe, as alleged, that there

10   will be no such contemporaneous definition.

11       Your Honor highlighted that there may be some

12   attempts now on websites, post hoc, as your Honor is

13   well aware, that's not what is central to an agency's

14   decision of whether something is arbitrary or

15   capricious.

16       THE COURT:  Let me engage with you on this.  I can

17   conceive that it is both within the authority of this

18   Court and it may become required in this litigation, um,

19   to find that the termination of one or more grants, the

20   issuance of one or more directives, if they're final

21   agency action, are arbitrary and capricious, and then

22   vacate that.  I've done that.  I've refused to do that.

23   I understand that jurisprudence.

24       You're talking about what may happen in the

25   future.  I guess that's one of the reasons I want the

1    list of grants where people, you say your colleagues,

2    the United Auto Workers actual -- the people they

3    represent, are or will be out of a job because funding

4    has been cut off in an arbitrary and capricious fashion.

5    I understand that.  And though he raises issues of

6    redressability, at least I can conceptualize how that

7    might be redressed.

8         You're not arguing that I'm going to put limits on

9    the discretion of policymakers going forward, are you?

10        MR. PARRENO:  Your Honor, to the extent that the

11   agency action has violated congressional and regulatory

12   mandates requiring research into health disparities,

13   addressing health equity and health disparity, which we

14   highlight in both our complaint and in our briefing, and

15   to the extent that they're violating regulatory

16   requirements.

17        THE COURT:  And I found some, or what at first

18   glance looks like Congress has spelled out, "We expect

19   research into this and that."  And that's probably

20   stronger than the Congressional mandate candidly because

21   Congress, the problem with litigation -- not litigation,

22   legislation -- legislation is incredibly difficult

23   because, as Yogi Berra said better than I can call to

24   mind, "It's difficult to predict the future."  No one

25   could have predicted an administration acting in this

1   fashion.

2        So I'm left to look at what prior Congresses have,

3   um, mandated.  And I agree with you, if Congress has

4   required it, using the usual test, plain and ordinary

5   meaning, um, but it's not for me to decide.

6        But you're not suggesting that I do?

7        MR. PARRENO:  I am arguing or our position is that

8   they have violated those mandates.  And in addition --

9        THE COURT:  And I could explain the mandate, in no

10  uncertain terms, so we know what it is going forward.

11       MR. PARRENO:  Based on the plain language of the

12  legislation which --

13       THE COURT:  Because that's what courts do.

14       MR. PARRENO:  Yes, its plain and ordinary meaning,

15  yes, sir, your Honor.

16       And I will also say that, in addition to the

17  discretion that agencies have here, I mean there is a --

18  one of the cabins on the arbitrary and capricious

19  standard here is providing a reasoned decision here.

20       The other thing that I haven't fully addressed yet

21  and I'd like to raise now is the lack of any

22  individualized attention to any of the directives, and

23  my colleague, counsel for defendants, may have been

24  saying that there is this reasoning, there is individual

25  reasoning.

1      THE COURT:  I think you said "any individualized

2  attention to any of these 'directives,'" but I think you

3  meant "grant."

4      MR. PARRENO:  Yes, your Honor, my apologies, any

5  individualized attention to the grant.  And to the --

6  and any reasoning to the statements, um, underlying

7  these boilerplate sort of statements in the directives

8  themselves that we found in the termination letters, all

9  of that is something that comes out at trial.  What we

10  have alleged is a lack of any individualized reasoning,

11  that these are in fact boilerplate statements that have

12  no factual basis that are contrary to the mountain of

13  scientific knowledge that is present, and that alone

14  gets us past this juncture.  And importantly is, um, is

15  a mode by which agencies must be, um, cabined in their

16  discretion as well.

17      THE COURT:  All right.  I'll take the motion to

18  dismiss under advisement.

19      Now let's see where we stand.

20      My instinct is that, um, I should consolidate the

21  attack on the directives with the case brought by the

22  states.  I don't expect this, but I don't happen to have

23  in the courtroom any of the counsel for the states.  Do

24  we?  All right.  We're talking about another case.  So

25  I'm not entering any consolidation order until I have a

1    status conference and invite you all in and consolidate.

2         At the same time, I think the public officials's

3    concern about responding to specific grants -- and I can

4    see the need both to respond and to focus on the

5    discrete responses, one, that must await the provision

6    in this case of a comparable spreadsheet as I have in

7    the other case.

8         And then the, um, the officials will have day-for-

9    day the same time between the order I entered orally in

10   the other case and June 2nd to produce the

11   administrative record on those grants.  That will have

12   the inevitable effect that addressing specific grants

13   will follow the, um, hearing, trial of the 16 states.

14        I think that is the just way to proceed.  I'll

15   briefly hear the parties before I recess.

16        MR. PARRENO:  Your Honor, if I may?  I apologize,

17   but if I may ask a question to clarify the scope of the

18   June 16th hearing, just to make sure there's clear

19   communication on our side about what will be addressed?

20        THE COURT:  Sure.

21        MR. PARRENO:  Is it that that hearing will address

22   strictly the APA claims against the directives or does

23   your Honor -- am I misunderstanding what your Honor has

24   said?

25        THE COURT:  I think that's right.  I, um, think I

1    need a status conference to -- with all the parties

2    present, to be sure we're on the same wavelength, all of

3    us, as to consolidation.  Once I'm clear on that, um,

4    because I expect there are communications -- the

5    government counsel referred to them in the other case

6    and I -- I honor it, I defer to the efforts of the NIH

7    to produce records and the like, or produce a record, so

8    we need a status conference to do that.  I'll schedule

9    it.

10          MR. PARRENO:  Okay.

11          THE COURT:  But you see how I plan to, um, run

12   these cases on parallel tracks with the, um, grant-

13   specific consideration, should I get there, trailing the

14   16 states, um, hearing in the case.

15          You understand?

16          MR. PARRENO:  Yes.  Thank you, your Honor.

17          THE COURT:  And the government, questions?  That

18   was a good question.  We'll schedule a status conference

19   and have everyone in here.

20          You understand -- it presumes that someone is left

21   standing here after the motion to dismiss is determined,

22   um, we ought not make that determination.  But I have a

23   duty to manage the cases and I'm doing the best I can.

24          MR. KHETARPAL:  And I understand.  I remember from

25   the last hearing in the other case, your Honor, that we

1    were all starting to figure out how to wrap our arms

2    around this and we continue to do that.

3         But your question that I have, and I do not know

4    whether the status conference will be prior to the June

5    2nd date or not, but, um, as of this point, is your

6    Honor asking the government to produce the

7    administrative record, with respect the directives

8    themselves, to plaintiffs in this case by that same day?

9         THE COURT:  That's a very good question.  The

10   answer is "yes."  As to the directives.

11        MR. KHETARPAL:  Okay, as to the directives only.

12   Thank you.

13        THE COURT:  All right.

14        Really, let me just say, personally, but

15   professionally, I do welcome you all and I look forward

16   to working with you.  You're using the right language,

17   "wrap our arms around the case and get to the merits in

18   a fashion that, um, justly can address these important

19   issues."  And I'm very grateful for your professional

20   performance here.

21        All right, we'll take it under advisement -- what

22   I'm treating as a motion to dismiss under advisement.

23   The Clerk will, in a timely fashion, schedule a status

24   conference that will seek to coordinate both cases.

25        We'll recess.

1          THE CLERK:  All rise.

2          (Ends, 12:00 p.m.)

3

4                C E R T I F I C A T E

5

6          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

7     hereby certify that the forgoing transcript of the

8     record is a true and accurate transcription of my

9     stenographic notes, before Judge William G. Young, on

10    Thursday, May 22, 2025, to the best of my skill and

11    ability.

12

13

14

15
      /s/ Richard H. Romanow 05-30-25
16    _____
      RICHARD H. ROMANOW  Date
17

18

19

20

21

22

23

24

25