UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;         )
INTERNATIONAL UNION, UNITED       )
AUTOMOBILE, AEROSPACE, AND        )
AGRICULTURAL IMPLEMENT            )
WORKERS (UAW); BRITTANY CHARLTON; )
KATIE EDWARDS; PETER LURIE; and   )
NICOLE MAPHIS,                    )
                                 )
                Plaintiffs,       )    CIVIL ACTION NO.
        v.                        )    25-10787-WGY
                                 )
NATIONAL INSTITUTES OF HEALTH;    )
JAY BHATTACHARYA, in his official )
capacity as Director of the       )
National Institutes of Health;    )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F. )
KENNEDY, JR., in his official     )
capacity as Secretary of the      )
United States Department of Health )
and Human Services,               )
                                 )
                Defendants.       )
_____ )
```

YOUNG, D.J.                                    May 30, 2025

**MEMORANDUM AND ORDER**

This civil action brought by the American Public Health

Association ("APHA"), IBIS Reproductive Health ("Ibis"), the

International Union, United Automobile, Aerospace, and

Agricultural Implement Workers ("UAW"), Dr. Brittany Charlton,

Dr. Katie Edwards, Dr. Peter Lurie, and Dr. Nicole Maphis

(collectively, "the Plaintiffs") seeks declaratory and injunctive relief against the National Institutes of Health, Director Jay Bhattacharya in his official capacity, and Secretary Robert F. Kennedy, Jr. in his official capacity (collectively, "the Public Officials").  It is one of many lawsuits across the nation that allege that the current Administration's policies have been implemented in an unlawful manner, in violation of the Administrative Procedure Act and the Constitution, by agencies of the Executive Branch.

The Plaintiffs filed a motion for a preliminary injunction, and, consistent with its usual practice, this Court promptly scheduled a hearing and collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  The Court construed the parties' submissions on that motion for preliminary injunction as a motion to dismiss, ECF No. 66, which, for the reasons stated below, is ALLOWED in part as to Counts IV, VI, and VII which are dismissed without prejudice, and DENIED in part as to the remaining Counts.

## I.   INTRODUCTION

### A.   Procedural History

The Plaintiffs filed suit against the Public Officials on April 2, 2025.  See Compl., ECF No. 1.   On April 25, 2025, the Plaintiffs filed a Motion for Preliminary Injunction, which has been fully briefed.  Pls.' Mot. Prelim. Inj., ("Pls.' Mot."),

ECF No. 37; Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 41; Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 66; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 71; Suppl. Br. Standing Pl. UAW, ECF No. 79.[1]

On May 1, 2025 this action was randomly reassigned to this session of the Court. Elec. Notice Reassignment, ECF No. 52. This Court promptly scheduled a hearing on the preliminary injunction motion for May 22, 2025. Elec. Clerk's Notes, ECF No. 77. The motion for preliminary injunction was collapsed into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the opposition to the motion was construed as a motion to dismiss, and the Plaintiffs' reply was construed as an opposition. Id. The parties accepted the Court's invitation to hear the motion at that time, the Court heard argument on the motion to dismiss, and it took the matter under advisement. Id.

**B.    Facts Alleged**

The Court takes the following facts almost verbatim from the Complaint, and accepts them as true for purposes of the motion to dismiss. Quotation marks are omitted for readability.

---

[1] The Court also received submissions from amici. See ECF Nos. 76 and 81. The Court is grateful for these helpful submissions.

The Court presumes familiarity with the history of the National Institutes of Health ("NIH"), the types of grants it awards, and the grant process, skipping to the salient allegations. Compl. ¶¶ 26-80.

### 1. Executive Orders 14151, 14168, and 14173

Beginning on January 20, 2025, President Trump issued a series of executive orders ("EOs"). Compl. ¶ 80. In the first EO mentioned in the Complaint, Executive Order No. 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," the President declared that the prior administration "forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military." See Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("EO 14151"). EO 14151 instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Id. ¶ 81 (citing EO 14151). Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law, all 'equity-related' grants or contracts" within 60 days. Id.

On January 21, 2025, President Trump issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." See Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("EO 14173"). Similar to EO 14151, to address the purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," the order requires the Director of the OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Compl. ¶ 82.

With respect to gender, on January 20, 2025, the President also issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." Id. ¶ 83

[5]

(quoting Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO 14168")).

### 2. OMB Issues Guidance Based Upon the Executive Orders

On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum directing all federal agencies -- including the NIH -- to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and all other relevant agency activities that may be implicated by [the Eos, supra], including, but not limited to, financial assistance for DEI, woke gender ideology, and the green new deal." Id. ¶ 84

### 3. The NIH Implements the Executive Orders and OMB Guidance

On February 12, 2025, the NIH issued a memorandum stating that it "is in the process of reevaluating the agency's priorities based on the goals of the new administration." Id. ¶ 87. That memorandum states that the "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in [Institutions and Centers' ("ICs")] funding decisions at this time." Id. The memorandum also indicates that "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo." Id.

On February 13, 2025, NIH issued another memorandum to IC
chief grant management officers ("February 13 Memo"), that
announced "hard funding restrictions" on "awards where the
program promotes or takes part in diversity, equity, and
includsion [sic] ('DEI') initiatives" with those restrictions
applying "to new and continuation awards made on or after
February 14, 2025." Id. ¶88. The memorandum also states that,
"[i]f the sole purpose of the grant, cooperative agreement,
other transaction award (including modifications), or supplement
supports DEI activities, then the award must be fully
restricted. The restrictions will remain in place until the
agency conducts an internal review for payment integrity." Id.

On February 28, 2025, the NIH issued staff "guidance"
("February 28 Guidance") that rescinded the February 13
memorandum, but expanded on its core anti-DEI messaging,
stating: "NIH will no longer prioritize research and research
training programs that focus on Diversity, Equity and Inclusion
(DEI) . . . . Prior to issuing all awards (competing and non-
competing) or approving requests for carryover, ICs must review
the specific aims[,] assess whether the proposed project
contains any DEI research activities or DEI language that give
the perception that NIH funds can be used to support these
activities." Id. ¶ 92. The memorandum also instructs officials
to "completely excise all DEI activities[.]" Id.

The February 28 Guidance identifies four categories of awards and mandates actions for each category deemed "DEI related":

- "Category 1" - the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a [Notice of Funding Opportunities] that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" - the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work.to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project."

- "Category 3" - the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism-this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" - the project does "not support any DEI activities." ICs "may proceed with issuing the award."

- Category 5 projects are those awarded "to [e]ntities in certain foreign countries." According to that part of the document, "Additional guidance on awards to foreign

entities is forthcoming.  At this time, ICs should hold all awards to entities located" in certain countries, including South Africa.

Id. ¶ 97.

On March 25, 2025, the NIH issued further guidance ("the March 25 Guidance").  Id. ¶ 96.  The March 25 Guidance also identifies a list of forbidden topics for NIH grants and prescribes language to be included in termination letters, identifying "China," "DEI," and "Transgender issues," "Vaccine Hesitancy" and "COVID-related" research.  Id. ¶¶ 98-99.  Like the February 25 Guidance, the March 25 Guidance directs NIH officials to revise Notices of Award that are terminated pursuant to the Directives, and instructs them to include the following (or substantially similar) language in those revisions: "It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim].  Therefore, this project is terminated."  Id. ¶ 100.

The March 25 Guidance also features an FAQ section that includes, among other instructions:

> When ICs issue revised [Notices of Award ("NOAs")][ to terminate awards, do they have to use the exact language provided by HHS in the termination term? Yes, ICs must use the exact language provided in Appendix 3, with no edits.

Id. ¶ 101.  In addition, regarding "Notice of Funding Opportunity (NOFO) Guidance," the document has only the following text: "[pending]."  Id. ¶ 102.

In sum, the Plaintiffs allege that the Directives --
comprised of the February 28 Guidance, the March 25 Guidance,
and other versions of these documents that articulated areas of
research that purportedly "no longer effectuate[] agency
priorities" -- fail to define critical terms, such as
"diversity, equity, and inclusion" or "DEI"; "artificial and
non-scientific categories"; "amorphous equity objectives";
"[t]ransgender issues"; "gender identity"; or "COVID-related."
Id. ¶ 103.

The Plaintiffs allege that pursuant to the Directives, each
termination notice begins by identifying the project number,
identifying which year's Grants Policy Statement applies to the
grantee's project, and stating that the letter "constitutes a
notice of termination," purportedly pursuant to that Grants
Policy Statement and 2 C.F.R. § 200.340(a)(2). Id. ¶ 106. The
notice also emphasizes that "obligations generally should be
determined by reference to the law in effect when the grants
were made." Id. Citing the pertinent year's Grants Policy
Statement, each notice states, "[a]t the time your grant was
issued, 2 C.F.R. § 200.340(a)(2) permitted termination '[b]y the
Federal awarding agency or pass-through entity, to the greatest
extent authorized by law, if an award no longer effectuates the
program goals or agency priorities.'" Id. ¶ 107.

Each notice includes one of a few slightly different scripts stating that the grant "no longer effectuates agency priorities."  Id. ¶ 108.  The language in these notices repeats the mandatory language from the appendices, described above, and is nearly identical across notices.  Id. ¶¶ 108-09.  Each notice outlines the appeals process.  Id. ¶ 110.

The Plaintiffs allege that for the vast majority, if not all, of the grants terminated since February 28, 2025, the notices: (1) offer no other justifications for termination, (2) fail to explain how or why the relevant grant fails to "effectuate agency priorities" or otherwise warrants termination, and (3) fail to cite any project-specific information or data, much less any reasons to disregard that information or data.  Id. ¶¶ 111-12.  Further, the Plaintiffs allege that the assertions in the termination notices about the lack of scientific validity, rigor, or public health benefit of the studies contradict the conclusions of NIH and the external scientists who previously reviewed these projects and chose to award those grants in the first place, including the multiple panels of experts in the grantees' fields who judged the proposals based on criteria such as the lead scientist's track record, the rigor of the study's design, and the project's likelihood of addressing a pressing biomedical-research issue.  Id. ¶ 112.  These notices also purportedly do not address NIH's

prior assessment that the projects do meet agency priorities and are aligned with the statutory mandate and goals of NIH and the pertinent IC.  Id.  Finally, the Plaintiffs claim the notices reveal that NIH failed to consider any reliance interests at stake for ongoing grants.  Id. ¶ 113.

For grants that were terminated, the NIH also issued revised NOAs with new end-of-project dates that reflected immediate or near-immediate termination.  Id. ¶ 114.  These revised NOAs included new termination language with statements that were substantively similar to the language included in Appendix 3 of the February 28 Guidance and March 25 Guidance, and made explicit reference to "2 C.F.R. §200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2" as the regulatory authority for these terminations.  Id.

According to the Plaintiffs, evidence suggests the language in the termination notices did not originate with NIH or the Department of Health and Human Services staff but was instead drafted by staff from the Department of Government Efficiency ("DOGE").  For example, metadata associated with at least one such notice shows it was authored by "JoshuaAHanley," apparently a 2021 law school graduate, who works at DOGE.  Id. ¶ 115.

### 4. Results of the Grant Terminations and Delays

The Plaintiffs allege that the terminations cut across diverse topics that NIH is statutorily required to research.

Id. ¶ 116.  These terminations purportedly compromise NIH's ability to fulfill, among other things, its statutory obligations.  Id. ¶¶ 118-24.  The Plaintiffs provide specific examples of how the termination of the research funding of the Individual Plaintiffs, Ibis, and the Associational Plaintiffs' members affects medical and scientific research.  Id. ¶¶ 125-94.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  To test the sufficiency of the pleading, a defendant can file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and, to test the subject matter jurisdiction of the Court, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1).  "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first."  Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.) (quoting Northeast Erectors Ass'n of the BTEA v. Secretary of Labor, Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995), aff'd, 672 F.3d 64 (1st Cir. 2012)).  Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court

[13]

must take all of plaintiff's allegations as true and must view
them, along with all reasonable inferences therefrom, in the
light most favorable to plaintiff." Verlus v. Experian Info.
Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D.
Mass. Mar. 17, 2025) (Casper, J.).  The complaint must include
sufficient factual allegations that, accepted as true, "state a
claim to relief that is plausible on its face." Bell Atl. Corp.
v. Twombly, 550 U.S. 544, 570 (2007).  Courts "draw every
reasonable inference" in favor of the plaintiff, Berezin v.
Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they
disregard statements that "merely offer legal conclusions
couched as fact or threadbare recitals of the elements of a
cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d
1, 12 (1st Cir. 2011) (cleaned up).  Accordingly, the Court
addresses the jurisdictional issues first, and then proceeds to
the merits arguments.

### B. The Motion to Dismiss for Lack of Subject Matter Jurisdiction

As an initial matter, this Court rules that the motion to
dismiss for lack of subject matter jurisdiction based on
challenges relating to the Tucker Act, sovereign immunity,
programmatic attack, jurisdiction over individual actions, and
agency discretion, is DENIED substantially for the same reasons
set forth in Massachusetts v. Kennedy, No. CV 25-10814-WGY, 2025

WL 1371785, at *5 (D. Mass. May 12, 2025), a related case before this Court.

That leaves standing. Just a few weeks ago, this Court wrote at length about standing in American Ass'n of Univ. Professors v. Rubio, No. CV 25-10685-WGY, --- F.Supp. 3d ----, 2025 WL 1235084, at *13-18 (D. Mass. Apr. 29, 2025), so much of this will be familiar.

"As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: '"What's it to you?"'" Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). As the Supreme Court recently explained, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute," and "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); and then quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487 (1982)). "In particular, the standing requirement means that the federal courts decide some contested legal

questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process," and that "the federal courts may never need to decide some contested legal questions." Id. at 380. Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" Id. (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the APHA and UAW lack associational standing. Defs.' Opp'n 21-22. The Public Officials do not contest that Ibis has standing, and this Court rules that it does.

In order to establish standing, the APHA and UAW must show that they each have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (cleaned up). "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter,'" and "must support each element of standing 'with the manner and degree of evidence required at

the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 57 (2024) (alterations in original) (first quoting Carney v. Adams, 592 U.S. 53, 59 (2020); and then quoting Lujan, 504 U.S. at 561). "'[P]laintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" Id. at 61 (quoting TransUnion LLC, 594 U.S. at 431). "At the pleading stage, [the Court] 'appl[ies] [to questions of standing] the same plausibility standard used to evaluate a motion under Rule 12(b)(6)"; the Plaintiffs, therefore, "'need not definitively prove [their] injury or disprove ... defenses' but need only 'plausibly plead on the face of [their] complaint' facts supporting standing." In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 307-08 (1st Cir. 2024) (first quoting Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7 (1st Cir. 2018); and then quoting Tyler v. Hennepin Cnty., 598 U.S. 631, 637 (2023)).

Associational standing allows an organization to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977);

see also In re Fin. Oversight, 110 F. 4th at 308.  The Public

Officials challenge the second and third elements.

The Public Officials argue that "nothing in Plaintiffs'

Complaint . . . or in their PI motion establish that the

interests that organizational Plaintiffs seeks to protect are

germane to their purpose" and that this is so "particularly with

respect to the UAW, a labor union aimed at improving working

conditions for its members."  Defs.' Opp'n. 22 & n. 13.  Not so.

As APHA argues, the mission of APHA is to "[b]uild public health

capacity and promote effective policy and practice."  Decl.

Georges C. Benjamin, M.D. ¶ 2, ECF No. 38-23; see also Compl. ¶

19 (describing APHA as, among other things, "act[ing] to build

capacity in the public health community and champion[ing]

optimal, equitable health and well-being for all.").  The Public

Officials' alleged actions directly interfere with the APHA's

stated mission and core purpose as supported by the allegations

in the Complaint.  This element is therefore easily met.

The UAW argument is more nuanced.  The Public Officials

suggest a distinction between the UAW's core advocacy for

improved working conditions and the circumstances here, where,

as alleged, UAW members have lost grant funding, had previously

approved grants moved into administrative limbo, or had grant

programs they were prepared to apply for abruptly change,

requiring them to leave their current postdoctoral positions or

[18]

otherwise significantly alter their career paths.  Compl. ¶¶
167-178.  The UAW briefed this issue for this Court in response
to questioning at the hearing, and argued that the UAW "**exist[s]**
to represent [its] members' interests in relation to their terms
and conditions of employment," pointing to cases where unions
have been held to have associational standing based on their
members' threatened jobs, benefits, or other conditions of
employment.  Suppl. Br. Regarding Standing Pl. UAW, ECF No. 79
2-3.

        This Court is persuaded by these arguments, and by the
reasoning of these prior decisions.  See, e.g., New York v.
McMahon, No. 25-10601, 2025 WL 1463009, at *18 (D. Mass. May 22,
2025) (Joun, J.) (ruling that labor union plaintiffs have
standing to sue on behalf of their members regarding actions
taken to shut down the Department of Education where members
"rely on federal student aid to afford their education and on
positions created through federal work study, without which
Union Plaintiffs' members would be forced to forgo higher
education, default on existing loans, or potentially opt out of
careers in public service").  Although some of the cases cited
by UAW relate to issues with which the plaintiff unions were
more directly involved, see International Union, United Auto.,
Aerospace & Agric. Implement Workers of Am. v. Brock, 477 U.S.
274, 286 (1986) ("paus[ing] only briefly" to find germaneness

requirement satisfied where UAW had lobbied for the precise
benefits at issue in the suit), this Court is reminded that the
purpose of the Hunt germaneness test is not to nitpick subtle
gradations of harm, but rather to "raise[] an assurance that the
association's litigators will themselves have a stake in the
resolution of the dispute, and thus be in a position to serve as
the defendant's natural adversary," ensuring "adversarial
vigor," United Food & Com. Workers Union Local 751 v. Brown
Grp., Inc., 517 U.S. 544, 555-56 (1996).  The UAW's submissions
regarding its purpose and the impact of the challenged actions
on its members, and its representations in court, reassure this
Court that its plaintiff members will not be prejudiced by a
lack of vigor here.  See Decl. Neal Sweeney on Behalf of UAW,
ECF No. 38-25.

The Public Officials' argument that the organizations'
individual members must participate in this lawsuit fares no
better.  The Public Officials argue that the "sheer number of
declarations submitted by the organizational Plaintiffs' members
in an attempt to show irreparable harm" demonstrates that those
"members must participate to show entitlement to injunctive
relief -- particularly if this Court follows the proper practice
of limiting any injunction to those that have shown that the
Directives will cause them irreparable harm."  Defs.' Opp'n 21.
The Plaintiffs argue in response that the referenced

declarations were submitted not to show standing but "to demonstrate the breadth of devastation that [the Public Officals'] actions are causing the medical community and public health," and the "boilerplate" nature of the Public Officials' reasoning with respect to the challenged terminations.  Pls.' Reply 7-8.  This Court agrees that the Plaintiffs here have challenged sweeping agency actions with, as alleged, virtually indistinguishable reasoning as regards the individual grants affected, and thus that the participation of individual members in this suit is not required.

For these reasons, this Court rules that both the APHA and UAW have associational standing to sue on their members' behalf.

### C. The Motion to Dismiss on the Merits

#### 1. The Administrative Procedure Act and Fifth Amendment Void for Vagueness Claims, Counts I – VI

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The codified scope of judicial review under this statutory right of judicial review acts as a guardrail against unlawful agency actions under

Section 706.[2]  The APA was enacted by Congress in 1946 "as a
check upon administrators whose zeal might otherwise have
carried them to excesses not contemplated in legislation
creating their offices," Loper Bright Enters. v. Raimondo, 603
U.S. 369, 391 (2024) (quoting United States v. Morton Salt Co.,
338 U.S. 632, 644 (1950)), and "sets forth the procedures by

---

[2] Section 706 provides in pertinent part:

    To the extent necessary to decision and when
presented, the reviewing court shall decide all
relevant questions of law, interpret constitutional
and statutory provisions, and determine the meaning or
applicability of the terms of an agency action.  The
reviewing court shall—

(1)   compel agency action unlawfully withheld or
      unreasonably delayed; and

(2)   hold unlawful and set aside agency action, findings,
      and conclusions found to be—

    (A)   arbitrary, capricious, an abuse of discretion, or
         otherwise not in accordance with law;

    (B)   contrary to constitutional right, power,
         privilege, or immunity;

    (C)   in excess of statutory jurisdiction, authority,
         or limitations, or short of statutory right;

.  .  .  .

    In making the foregoing determinations, the court
shall review the whole record or those parts of it
cited by a party, and due account shall be taken of
the rule of prejudicial error.

5 U.S.C. § 706.

which federal agencies are accountable to the public and their
actions subject to review by the courts," Department of Homeland
Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020)
(quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)).
Broadly, the APA establishes a rebuttable "presumption of
judicial review [for] one 'suffering legal wrong because of
agency action.'"  Id. (alteration in original) (quoting Abbott
Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)).  The rebuttal of
this presumption is made "by a showing that the relevant statute
'preclude[s]' review, § 701(a)(1), or that the 'agency action is
committed to agency discretion by law,' § 701(a)(2)."[3]  Id. at
17.  The first exception is self-explanatory, and the Supreme
Court has read the second exception "quite narrowly," applying
"it to those rare 'administrative decision[s] traditionally left
to agency discretion.'"  Id. (alteration in original) (first
quoting Weyerhaeuser Co. v. United Staes Fish & Wildlife Serv.,
586 U.S. 9, 23 (2018); and then quoting Lincoln v. Vigil, 508
U.S. 182, 191 (1993)); Department of Com. v. New York, 588 U.S.

---

[3] Section 701 provides in pertinent part:

(a) This chapter applies, according to the provisions
thereof, except to the extent that--
    (1) statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by
    law.

5 U.S.C. § 701(a).

752, 772 (2019) ("[W]e have read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly, restricting it to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."'" (quoting Weyerhaeuser Co., 586 U.S. at 23)). Examples of decisions traditionally left to agency discretion include "a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." New York, 588 U.S. at 772 (citations omitted). The Court's review depends upon the type of claim made.

As to actions brought pursuant Section 706(2)(A), here Count I of the Complaint, the APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. at 771 (quoting 5 U.S.C. § 706(2)(A)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Environmental Prot. Agency, 603 U.S. 279, 292 (2024) (quoting Federal Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).

Review by the Court under the arbitrary or capricious standard of Section 706(2)(A) is narrow, because all that is "required [is for] agencies to engage in 'reasoned

decisionmaking.'"  Regents of the Univ. of Cal., 591 U.S. at 16
(quoting Michigan v. Environmental Prot. Agency, 576 U.S. 743,
750 (2015)).  To be sure, this Court may not "substitute its
judgment for that of the agency," but rather "must ensure, among
other things, that the agency has offered 'a satisfactory
explanation for its action[,] including a rational connection
between the facts found and the choice made.'"  Ohio, 603 U.S.
at 292 (alteration in original) (first quoting Federal Commc'ns
Com. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009);
and then quoting Motor Vehicle Mfrs. Ass'n of United States,
Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).
Said another way, this Court's review "simply ensures that the
agency has acted within a zone of reasonableness and, in
particular, has reasonably considered the relevant issues and
reasonably explained the decision."  Prometheus Radio Project,
592 U.S. at 423.

     This Court, as a general proposition, is "ordinarily
limited to evaluating the agency's contemporaneous explanation
in light of the existing administrative record."  New York, 588
U.S. at 780.  In the usual course, this is because "further
judicial inquiry into 'executive motivation' represents 'a
substantial intrusion' into the workings of another branch of
Government and should normally be avoided."  Id. at 781 (quoting
Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S.

252, 268 n.18 (1977)).  Indeed, this Court may neither "reject
an agency's stated reasons for acting simply because the agency
might also have had other unstated reasons" nor "set aside an
agency's policymaking decision solely because it might have been
influenced by political considerations or prompted by an
Administration's priorities."  Id.  This general rule recognizes
the reality that "[a]gency policymaking is not a 'rarified
technocratic process, unaffected by political considerations or
the presence of Presidential power.'"  Id. (quoting Sierra Club
v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)).  In fact, every
Administration enjoys the benefit of the bully pulpit, and
agency "decisions are routinely informed by unstated
considerations of politics, the legislative process, public
relations, interest group relations, foreign relations, and
national security concerns (among others)."  Id.  Such routine
decisions are not within the purview of this Court, but rather
appropriately within the exclusive realm of the Executive
Branch.  The general rule presumes rational actors that are
proceeding lawfully, as opposed to using lawful explanations as
a means to unlawful ends.

Nevertheless, the Supreme Court has "recognized a narrow
exception to the general rule against inquiring into the mental
processes of administrative decisionmakers" upon a "strong
showing of bad faith or improper behavior" -- such as a pretext

-- "where such an inquiry may be warranted" and, in appropriate circumstances, "may justify extra-record discovery." Id. (citations omitted). In particular, "unlike a typical case in which an agency may have both stated and unstated reasons for a decision," when "an explanation for agency action . . . is incongruent with what the record reveals about the agency's priorities and decisionmaking process," the Court is not required to "ignore the disconnect between the decision made and the explanation given." Id. at 784-85. While typically "review is deferential," it does not require the Court to blind itself to reality; it is "not required to exhibit a naiveté from which ordinary citizens are free." Id. at 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). The whole point of "[t]he reasoned explanation requirement of administrative law, after all, is . . . to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." Id. The explanation must be the one invoked contemporaneously at the time of the action, not created in hindsight. Regents of the Univ. of Cal., 591 U.S. at 20-23.

An APA claim that agency action is "not in accordance with law" is a subpart of Section 706(2)(A), alleged here in Count II of the Complaint. In reviewing this claim "a reviewing court must uphold an agency's decision if it is: (1) devoid of legal

errors; and (2) "supported by any rational review of the record." New York v. Trump, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025) (quoting Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024)).

An APA action brought under Section 706(2)(C), here Count III of the Complaint, challenges agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Id. The "[C]ourt[] must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." Loper Bright, 603 U.S. at 412. "[T]he [C]ourt fulfills [its] role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority. . .and ensuring the agency has engaged in '"reasoned decisionmaking"' within those boundaries." Id. at 395 (citation omitted) (first quoting Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983); and then quoting Michigan, 576 U.S. at 750). In sum, "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute." Id. at 403.

A claim brought under Section 706(2)(B), here Count IV, seeks to contest agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." National Educ. Ass'n v. United States Dept. of Educ., --- F.Supp. 3d ----, No. 25-CV-091-LM, 2025 WL 1188160, at *27 (D.N.H. Apr. 24, 2025).

Finally, claims seeking to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. Southern Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis omitted). This is a high standard inasmuch as "[t]he central question in evaluating such a claim is whether the agency's delay 'is so egregious that mandamus is warranted.'" Rezaii v. Kennedy, No. 1:24-CV-10838-JEK, 2025 WL 750215, at *4 (D. Mass. Feb. 24, 2025) (Kobick, J.) (quoting Kokajko v. Federal Energy Regul. Comm'n, 837 F.2d 524, 526 (1st Cir. 1988)).

With this outline of the law in mind, the Court proceeds to the parties' arguments.

The Public Officials first argue that the Section 706(2) claims (Counts I, II, III, IV) fail as matter of law because the

terminations complied with the terms of the agreements.  Defs.'
Opp'n 22.  The Public Officials argue that 2 C.F.R. § 200.340 is
incorporated into each Notice of Award, and that this regulation
permits the Public Officials to terminate an award "if an award
no longer effectuates the program goals or agency priorities."
Id. (citing 2 C.F.R. § 200.340(a)(4)).  The Public Officials
omit the complete sentence, which provides significant context.
Under the cited regulation, an agency can terminate an award
"pursuant to the terms and conditions of the Federal award,
including, **to the extent authorized by law,** if an award no
longer effectuates the program goals or agency priorities."  2
C.F.R. § 200.340 (emphasis added).  This is a distinction with a
difference, because "this regulation only allows agencies to
terminate . . . agreements 'to the extent authorized by law,'"
and "this regulation cannot authorize actions that contravene
statutory requirements, nor does it relieve [the Public
Officials] of [their] duty to follow the law."  Pacito v. Trump,
No. 2:25-CV-255-JNW, 2025 WL 893530, at *9 (W.D. Wash. Mar. 24,
2025) (quoting 2 C.F.R. § 200.340(a)(4)).

        As an initial matter, it is undisputed that this regulation
has not yet been adopted by HHS, and will not be adopted until
October 2025; accordingly, the regulation is apparently
inapplicable here.  The Public Officials counter that the
regulation has been incorporated into the terms and conditions

[30]

of the grantees' awards.  Even if the regulation applied as a
contractual term (which this Court need not decide), whether the
"award no longer effectuates the programs goals or agency
priorities" can **still** be challenged under the APA where the
Plaintiffs allege a failure to provide a reasonable explanation.
See American Ass'n of Colls. for Tchr. Educ. v. McMahon, No.
1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025)
(ruling that even if termination letters invoked a valid reason
to terminate under 2 C.F.R. § 200.340, APA claims survived
because the letters "fail[ed] to provide [the plaintiffs] any
workable, sensible, or meaningful reason or basis for the
termination of their awards").  The Court need go no further at
the motion to dismiss stage.

The Public Officials next argue that their explanations
were reasoned and reasonable under the circumstances.  Defs.'
Opp'n 26.  At the motion to dismiss stage, the Complaint has
plausibly alleged otherwise -- that the explanations are
conclusory and vague.  The first examples cite to undefined
gender identity issues untethered to the specific terminated
grants, with what looks more like a political statement than
reasoning about the grants, and without any explanation as to
why no corrective action is possible:

38-20

> This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.
>
> Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-20 50; and again,

> This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-24 37; and again, this time with so-called "DEI"

language,

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of Project Number ███████████ is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-28 146-47, and again,

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-32 34-35. The Public Officials argue that the Plaintiffs are merely disagreeing with actions of the agencies "designed to align with a democratically elected administration." Defs.' Opp'n. 25-26 & n. 15. While the Public Officials may prove this at a hearing or trial on the merits with a more fulsome record, taking all inferences in favor of the Plaintiffs, the Court cannot make this conclusion at this stage. Indeed, another session of this Court, and other courts, have recently found similar, and in some cases almost identical language in a different agency's terminations sufficient to issue a temporary restraining order. California v. United States Dep't of Educ., No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (Joun, J.) ("In the absence of any

[34]

reasoning, rationale, or justification for the termination of the grants, the Department's action is arbitrary and capricious."); see also Southern Educ. Found. v. United States Dep't of Educ., No. CV 25-1079 (PLF), 2025 WL 1453047, at *17 (D.D.C. May 21, 2025) ("The Court finds that the Department's Termination Letter provides no reasoned explanation for the grant termination.  In fact, the Termination Letter's list of possible bases 'is so broad and vague as to be limitless; devoid of import, even.'") (citing McMahon, 2025 WL 833917, at *21)).[4] The Public Officials' motion to dismiss is denied on this ground.

Next, the Public Officials argue that their grant terminations are consistent with the relevant statutes requiring them to support research into "minority-related topics," claiming that there are other "DEI"-related grants that are

---

[4] The Court observes that neither the EOs, nor any of the policy statements to follow, nor counsel for the Public Officials, has, to date, provide a working definition of Diversity, Equity and Inclusion.  The Court pressed this issue at the hearing on this motion, but no satisfactory answer was provided by the Public Officials.  This is not the first court to grapple with the absence of a definition of DEI.  See National Ass'n of Diversity Officers in Higher Educ. v. Trump, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *26 (D. Md. Feb. 21, 2025) ("[N]either [EO 14151] nor [EO 14173] gives guidance on what the new administration considers to constitute 'illegal DEI discrimination and preferences,' or '[p]romoting "diversity,"' or 'illegal DEI and DEIA policies,' or what types of 'DEI programs or principles' the new administration considers 'illegal' and is seeking to 'deter[.]'" (citations omitted)).

proceeding.[5]  Defs. Opp'n 27-28.  The Public Officials also point

to continued support of certain grants for the "training and

development of a diverse corp of health science researchers."

Opp'n Mem. 27.[6]  The Plaintiffs attack the substance of the

Public Officials' factual claims, Pls.' Reply 8-9, and at the

motion to dismiss stage, even if true the maintenance of some

so-called "DEI" programs or programs that promoted diversity in

research, does not necessarily mean agency action with respect

to other programs was neither arbitrary nor capricious.

---

[5] The Court observes that Public Officials appear to fold
"minority-related topics" into DEI. Defs.' Opp'n 27.  The
Plaintiffs also pick up on this definitional disparity.  Pls.'
Reply 8 ("Defendants fail to define 'DEI grants' or how, for
example, a grant that addresses specific challenges related to
kidney health faced by racial minorities constitutes 'DEI.'").

[6] Amici Curiae describe the importance of fostering a
diverse corp of health professionals, describing the
disadvantages of a homogenous research community, and explaining
advantages such as illuminating blind spots and fostering
innovation that a diverse research community brings.  See Br.
Amici Curae Biological and Biomedical Research Societies 6-8,
ECF No. 81.  As Amici posits:

> Science is about solving complex problems, and
> progress in scientific endeavors demands creativity,
> curiosity, and drive. Maintaining a rich and vibrant
> collaboration in science, and bringing different
> perspectives and skillsets to the forefront of
> discovery, is paramount to maintaining America's
> competitive edge in our evolving world.  As Congress—
> and NIH itself—have long understood, "[d]iversity
> enhances excellence and innovation." It does not
> stifle them.

Id.

The Public Officials also argue that they have complied
with the NIH's statutory requirement to develop a six year
strategic plan under 42 U.S.C. § 282(m)(1).  The point of the
six-year plan, is "to provide direction to the biomedical
research investments made by the National Institutes of Health,
to facilitate collaboration across the institutes and centers,
to leverage scientific opportunity, and to advance biomedicine."
Id.  The Public Officials are correct that, on the one-hand it
is not a "six-year straight jacket," but at the same time the
Plaintiffs persuasively argue that under a separate subsection
of that statute the as the Plaintiffs' argue that the NIH is
required to "ensure that the resources of the National
Institutes of Health are sufficiently allocated for research
projects identified in strategic plans."  42 U.S.C. § 282(b)(6).
While it is apparently undisputed that the NIH complied with
preparation of a six year plan, whether the Public Officials
have thwarted the operations of the statute is at least
plausibly pleaded.  The Court is persuaded, in part, by Amici's
description of the complex, statutorily imposed stability in NIH
funding  of priorities.  See Br. Amici Curiae of the Association
of American Medical Colleges et al. 14, ECF 76.  At the motion
to dismiss stage, the Court credits the allegations of the
Complaint, and the motion to dismiss is denied as to this
ground.

The Public Officials then challenge the Plaintiffs' Due Process, void-for vagueness claim, Counts IV and VI, arguing that the void-for-vagueness doctrine applies only to statutes or regulations forbidding or requiring primary conduct, that the Plaintiff's facial challenge fails as matter of law, that the Plaintiffs have alleged no protected liberty or property interest, and that vagueness standards are relaxed in the government funding context. Defs.' Opp'n 29-31. This Court agrees with the Public Officials' first argument. The Plaintiffs point to cases applying the void-for-vagueness doctrine to facially similar but factually distinguishable cases, all of which involve threatened penalties for violating vague standards. See National Educ. Ass'n v. United States Dep't of Educ., No. 25-cv-091, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (evaluating letter threatening Title VI enforcement based on vague, DEI-based standard); National Ass'n for Advancement of Colored People v. United States Dep't of Educ., No. 25-cv-1120, 2025 WL 1196212, at *6 (evaluating certification requirement "threaten[ing] serious consequences for schools' failure to comply with vaguely-defined prohibitions on DEI initiatives"). That is not what the Plaintiffs have alleged here. Accordingly, for the reasons stated above, the motion to dismiss is ALLOWED as to Count VI, and as to Count IV, which incorporates the same void-for-vagueness argument.

The Public Officials also argue that the Plaintiffs' claim of unlawfully withheld or unreasonably delayed agency action fails as matter of law, because the Plaintiffs have not identified any discrete and mandatory agency action the agency has failed to take, the agency has discretion to defer deciding on grant applications and to hold meetings at its own pace, and any delays that might have occurred have ceased, because, after a brief pause, the agency has resumed meetings and processing applications at a rapid pace.  Defs.' Opp'n 31-34.

As stated above, "a claim under §706(1) can proceed only where a plaintiff asserts that an agency failed to take **discrete** agency action that it is **required to take**," and "broad programmatic attack[s]" will not be entertained.  Norton v. Southern Utah Wilderness All., 542 U.S. 55, 64 (2004).  There is some force to the Public Officials' argument that, as the Supreme Court has put it, "pervasive oversight" over the "manner and pace" of agency action "is not contemplated by the APA," id. at 67, but they do not deal with the entirety of what the Plaintiffs have alleged.  Specifically, the Plaintiffs allege that NIH has not only withheld decisions on pending applications, but also removed submitted applications from study sections and withheld Notices of Award from previously approved submissions.  See Pls.' Mem. 10-11.

[39]

As alleged, the Public Officials have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them.   42 C.F.R. § 52.5 (providing that properly filed applications "**shall** be evaluated" and subject to one of these three dispositions).   This raises a fact issue -- whether NIH is processing affected applications at all, as opposed to something else -- that would be improper for this Court to decide at this stage.   Accordingly, the Public Officials' motion to dismiss is DENIED as to Count V.

## 2. Separation of Powers, Count VII

Repose of power in three separate branches of government -- the separation of powers -- is a check and balance system "designed to preserve the liberty of all the people." <u>Collins</u> v. <u>Yellen</u>, 594 U.S. 220, 245 (2021).   The doctrine finds its roots right here in the Commonwealth of Massachusetts' Constitution, as recounted by Justice Scalia:

> It is the proud boast of our democracy that we have "a government of laws and not of men."   Many Americans are familiar with that phrase; not many know its derivation. It comes from Part the First, Article XXX, of the Massachusetts Constitution of 1780, which reads in full as follows:
>
>> "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The

[40]

> executive shall never exercise the
> legislative and judicial powers, or either
> of them: The judicial shall never exercise
> the legislative and executive powers, or
> either of them: to the end it may be a
> government of laws and not of men."
>
> The Framers of the Federal Constitution similarly
> viewed the principle of separation of powers as the
> absolutely central guarantee of a just Government . .
> . . Without a secure structure of separated powers,
> our Bill of Rights would be worthless, as are the
> bills of rights of many nations of the world that have
> adopted, or even improved upon, the mere words of
> ours.

Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J.,

dissenting). "So whenever a separation-of-powers violation

occurs, any aggrieved party with standing may file a

constitutional challenge." Collins, 594 U.S. at 245. "If the

constitutional structure of our Government that protects

individual liberty is compromised, individuals who suffer

otherwise justiciable injury may object." Bond v. United

States, 564 U.S. 211, 223 (2011). The Public Officials argue

that there is no separation-of-powers issue here because

Congress provides the Executive with broad discretion over grant

termination. Defs.' Opp'n 34-36. The Plaintiffs argue that the

NIH's general discretionary authority is limited by the agency's

statutory mandate, which requires research into certain topics

the agency now labels "DEI." Pls.' Reply 15. The Plaintiffs'

argument in their reply is limited largely to reference to their

APA argument, id., which addresses the many ways they believe

[41]

the Public Officials have "flouted congressional mandates," id. at 8.

The Plaintiffs' reference to their APA claims on this count is indicative of why this Court declines to analyze exhaustively the potential separation-of-powers issues here.  As another court has observed in a similar context, "plaintiffs' concerns are better addressed by []other count[s] of their complaint," that is, their APA claims, and "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."  Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 40 (D.D.C. 2018) (quoting Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (Brandeis, J., concurring)).  "[T]his is a classic APA claim," and, because "judging the constitutionality of action taken by a coequal branch of government is 'the gravest and most delicate duty that this Court is called on to perform,'" this Court "must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim." Id. (quoting Northwest Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 204 (2009)).  This Court declines to do so here.

The essence of the Plaintiffs' claims, broadly, is that the Public Officials have acted contrary to their statutory mandate

and in conflict with statutory and regulatory requirements, not that they have seized some general power never before permitted to the Executive Branch. This is the stuff of APA litigation, which appears to provide an avenue for complete relief in this matter. See id. at 40 ("As plaintiffs allege in their substantive APA claim the same infirmities that underlie their separation of powers claim, the Court will be able to consider the allegations fully in that context.").

The First Circuit has suggested, in a very different context, that a separation of powers claim might be viable were an agency "by its actions to repeal an act of Congress or displace a long standing power of the United States." United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 14 (1st Cir. 2005), but that is not what the Plaintiffs have alleged here. Instead, they have alleged several ways in which the agency's actions may be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

For these reasons, the motion to dismiss is ALLOWED as to Count VII.

## III. CONCLUSION

For the reasons stated above, the Motion to Dismiss, ECF No. 66, is ALLOWED in part as to Counts IV, VI, and VII, which

are dismissed without prejudice, and DENIED in part as to the

remaining Counts.

**SO ORDERED.**

<i>William G. Young</i>

WILLIAM G. YOUNG

JUDGE

of the

UNITED STATES[7]

---

[7] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.