# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; and NICOLE MAPHIS, | Case No. 1:25-cv-10787-WGY |
| *Plaintiffs*, | |
| v. | |
| NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR*., in his official capacity as Secretary of the United States Department of Health and Human Services*, | |
| *Defendants*. | |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO <u>COMPLETE THE ADMINISTRATIVE RECORD</u>

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ................................................................................................. iv-v

ARGUMENT ...................................................................................................................... 3

I.    LEGAL STANDARDS ............................................................................................ 3

      A.    Defendants Must Produce a Complete Administrative Record ............................ 3

      B.    This Court Has Discretion to Order Disclosure of Deliberative Documents.......... 4

II.   DEFENDANTS HAVE NOT PRODUCED A COMPLETE ADMINISTRATIVE
      RECORD ................................................................................................................ 5

      A.    Defendants Must Produce Documents They Used to Identify Grants
            for Termination Under the Directives ................................................................ 5

            1.    The AR Establishes that NIH Considered Additional, Yet-to-be-Produced
                  Documents to Identify Grants for Termination ............................................. 5

            2.    The Deliberative Process Privilege Does Not Protect the Termination Forms
                  or Associated Agency Guidance ................................................................. 7

            3.    Even if the Privilege Applied, the Court Should Exercise Its Discretion to ....
                  Order the Documents' Disclosure ............................................................... 8

      B.    Defendants Must Produce Emails from HHS and DOGE Concerning
            Implementation of the Directives....................................................................... 9

            1.    The AR Lacks Documents from HHS Despite Indications of HHS's
                  Involvement in the Directives' Creation and in Grant Terminations ............ 10

            2.    The AR Indicates DOGE Played a Key Role in Formulating the Directives
                  and Terminating Grants Despite a Gap in Documentation............................ 12

            3.    The Deliberative Process Privilege Does Not Apply to the HHS and
                  DOGE Documents ...................................................................................... 13

            4.    The Attorney Client Privilege Should Not Bar Production of the HHS
                  Documents. Defendants Have Waived Any Asserted Attorney Client
                  Privilege to HHS Documents...................................................................... 14

      C.    Defendants Must Produce Artificial Intelligence Tools They Used to Identify
            Grants for Termination Under the Directives. ................................................... 15

      D.    Defendants Must Produce the Metadata Associated with the Administrative
            Record ....................................................................................................... 16

III.  DEFENDANTS' CERTIFICATION OF THE AR IS INCOMPLETE ....................... 18

IV.   THE COURT SHOULD EXPEDITE BRIEFING ON THIS MOTION..................... 19

CONCLUSION.................................................................................................................. 20

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Bar MK Ranches v. Yuetter*,
   994 F.2d 735 (10th Cir. 1993) ................................................. 3

*Decision Econ., Inc. v. Blank*,
   No. 12-10673-NMG, 2012 WL 1701601 (D. Mass. May 14, 2012) ...................... 17

*Favors v. Cuomo*,
   No. 11 Civ. 5632, 2013 WL 11319831 (E.D.N.Y. Feb. 8, 2013).................. 9

*In re Grand Jury Subpoena (Mr. S.)*,
   662 F.3d 65 (1st Cir. 2011)................................................ 14

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   254 F.R.D. 35 (D. Mass. 2008)......................................... 4, 5, 10

*Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
   649 F.3d 5 (1st Cir. 2011).................................................. 14

*Moradi v. Morgan*,
   527 F. Supp. 3d 144 (D. Mass. 2021) ...................................... 3

*Providence Journal Co. v. U.S. Dep't of Army*,
   981 F.2d 552 (1st Cir. 1992)......................................... 4, 7, 18, 19

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   No. C 17-05211 WHA, 2017 WL 4642324 (N.D. Cal. Oct. 17, 2017) ............ 2

*Roe v. Mayorkas*,
   No. 22 Civ. 10808, 2024 WL 5198705 (D. Mass. Oct. 2, 2024)................... passim

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   No. 20 Civ. 396, 2022 WL 2953075 (D. Me. July 26, 2022) .................... 3

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
   60 F.3d 867 (1st Cir. 1995)................................................. 4

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
   137 F.R.D. 183 (D. Mass. 1991), *aff'd*, 968 F.2d 1438 (1st Cir. 1992)................. 2, 6

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
   968 F.2d 1438 (1st Cir. 1992)............................................ 15

iv

*Towns of Norfolk v. Walpole v. U.S. Army Corps. of Eng'rs*,
  137 F.R.D. 183 (D. Mass. 19991).................................................................... 15

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
  592 U.S. 261 (2021).................................................................. 3, 4, 17, 18

*United States v. Johnson*,
  93 F.4th 605 (2d Cir. 2024) ................................................................ 17

*Univ. of Colo. Health at Mem. Hosp. v. Burwell*,
  151 F. Supp. 3d 1(D.D.C. 2015).......................................................... 16

*Washington v. Trump*,
  2:25-cv-244-LK (W.D. Wash.).............................................................. 19

*Younes v. 7-Eleven*, Inc.,
  No. 13-3500 RMB/J, 2015 WL 1268313 (D.N.J. Mar. 18, 2015)........................... 17

**Other Authorities**

Hannah Natanson, *DOGE vowed to make government more 'efficient' — but it's doing the
  opposite*, WASH. POST (Jun. 2, 2025),
  https://www.washingtonpost.com/business/2025/06/02/doge-vowed-makegovernment-more-
  efficient-its-doing-opposite/.......................................................................... 17

*The People Carrying Out Musk's Plans at DOGE*, N.Y. TIMES (June 4, 2025),
  https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html ................. 12

**Rules**

Fed. R. Civ. Proc. 34.................................................................................... 18

## INTRODUCTION

At the June 3, 2025 Case Management Conference ("June 3 Conference"), the Court clearly articulated its expectation that the Administrative Record ("AR") in this case would include all documents reflecting NIH's reasoning for issuing the Directives Plaintiffs challenge and the reasons for the agency's grant terminations pursuant to those Directives:

> I want to know all about these directives. I want to know where they came from. I want to know why there were no edits. And this business, which is fulsomely set forth in your complaint, we'll hear at least all about that. I want a full record as to those directives. And then I want to see how it plays out in cutting off funding for grants approved.

Tr. (June 3, 2025) ECF No. 89 at 25:10-17.

The AR that Defendants produced does not meet these requirements. Instead, Plaintiffs have identified four core categories of missing material, including documents: (1) used to evaluate grants for termination under the Directives, including termination forms referenced in an email from an NIH Program Officer; (2) reflecting the Department of Health and Human Services' ("HHS") and Department of Government Efficiency's ("DOGE") participation in the Directives' creation and in grant terminations under the Directives; (3) concerning the use of artificial intelligence ("AI") in grant termination decisions under the Directives; and (4) metadata for the documents in the AR. Defendants must produce these documents to complete the AR. Defendants also must be ordered to certify the completion of the AR as to *all* challenged directives. Plaintiffs respectfully request the Court expedite briefing on this Motion.

## BACKGROUND

The full factual background of this case is set forth in Plaintiffs' Opening Brief on Phase 1, which Plaintiffs incorporate by reference. *See* Pl. Opening Br. at 3-15. That brief establishes

1

Plaintiffs' entitlement to relief on the AR as it currently exists. Plaintiffs separately move here to complete the record to ensure the unlawfulness of Defendants' policies and practices is fully aired, and in the interests of providing the Court with the information it has requested. *Cf.* ECF No.87 (clerk notes of June 3 Conference stating "Record to be supplemented as to the challenged directives as directed by the Court"). On June 2, 2025, Defendants produced the AR in the related case *, 250814,* and certified that it "constitute[s] the true, accurate, and complete administrative records for the grant terminations challenge in this case and . . . the true, accurate and complete administrative records for plaintiffs' 'Challenged Directives.'" No. 25 Civ. 10814, Dkt. 118-1, ¶ 2. That same day, Defendants produced the same AR to Plaintiffs and filed an amended notice and certification in this case the next day. *See* ECF Nos. 85, 86, & 86.1.[1]

Following review of the AR, Plaintiffs sent Defendants a deficiency letter identifying the four categories of missing documents outlined above and requesting their immediate production on June 5, 2025. *See* Brinckerhoff Decl., Ex. 1. Counsel for the parties met-and-conferred via Zoom and email about these deficiencies on June 5 and 6, followed by emails on June 8 and 9. *See id.,* Ex. 2. Defendants do not dispute the existence of any of these categories of documents. Instead, they refuse to identify, quantify, or produce any of them on the grounds that they are subject to the deliberative process privilege, and additionally claim that some of the material may be subject to the attorney-client privilege or may not have been involved in any challenged termination decision. Because the missing materials are properly part of the AR and should not be excluded under either privilege, Plaintiffs move to compel Defendants to complete the record.

---

[1] Defendants are also required to produce an additional Administrative Record in the instant case on the terminations of Plaintiffs' and Plaintiff members' grants on June 16, 2025. *See* June 3, 2025 Tr. at 20:14-17. This motion reflects deficiencies Plaintiffs have identified in the current AR, and Plaintiffs reserve rights to challenge additional deficiencies in that second, yet-to-be-filed AR.

2

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Defendants Must Produce a Complete Administrative Record

An administrative record must consist of "all documents and materials directly or indirectly considered by [the] agency decision-makers and includes evidence contrary to the agency's position." *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 137 F.R.D. 183, 185 (D. Mass. 1991), *aff'd*, 968 F.2d 1438 (1st Cir. 1992). An agency "'may not unilaterally determine what constitutes' the administrative record." *Roe v. Mayorkas*, No. 22 Civ. 10808, 2024 WL 5198705, at *8 (D. Mass. Oct. 2, 2024) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)). Rather, the administrative record must include "all documents that literally passed before the eyes of the final agency decision maker as well as those considered and relied upon by subordinates who provided recommendations." *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2017 WL 4642324, at *2 (N.D. Cal. Oct. 17, 2017) (brackets and quotation marks omitted).

On a motion to complete the administrative record, Plaintiffs need only present "reasonable, non-speculative grounds to believe that materials considered in the decision making process are not included in the record, and identify the pertinent omitted materials with sufficient specificity[.]" *Id.* at *7 (internal citations and quotations omitted); *accord Sierra Club v. U.S. Army Corps of Eng'rs*, No. 20 Civ. 396, 2022 WL 2953075, at *5 (D. Me. July 26, 2022) (applying same standard). This standard is satisfied where "plaintiffs [did] not merely proffer broad categories of documents they believe likely exist, but rather, after carefully parsing through the record, identif[ied] specific gaps in the record." *Roe*, 2024 WL 5198705, at *2.

3

**B.**     **This Court Has Discretion to Order Disclosure of Deliberative Documents**

During the meet-and-confer process, Defendants invoked the deliberative process

privilege for all materials Plaintiffs seek in this motion. The deliberative process privilege is a

qualified privilege that "shields from disclosure documents reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S.

261, 267 (2021) (quotation marks omitted). Documents must be both "predecisional" and

"deliberative" to qualify for the privilege. *Id.*; *accord Roe*, 2024 WL 5198705, at *3.

Defendants bear the burden to establish that the deliberative process privilege applies.

*Moradi v. Morgan*, 527 F. Supp. 3d 144, 155 (D. Mass. 2021). A document is "predecisional" if

it was "generated before the agency's final decision on the matter." *U.S. Fish & Wildlife Serv.*,

592 U.S. at 268. A "document will qualify as 'deliberative' provided it (i) formed an essential

link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather

than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely

disclose the views of the agency." *Id.* (alteration in original) (quoting *Providence Journal Co. v.*

*U.S. Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992)).

Critically, "[e]ven if a document satisfies the criteria for protection under the deliberative

process privilege, nondisclosure is not automatic." *Texaco P.R., Inc. v. Dep't of Consumer*

*Affairs*, 60 F.3d 867, 885 (1st Cir. 1995). The privilege is "a qualified one" and is "not absolute"

*Id.* (citation and quotation marks omitted). The Court has "discretion as to whether the

deliberative process privilege requires nondisclosure." *In re Pharm. Indus. Average Wholesale*

*Price Litig.*, 254 F.R.D. 35, 40 (D. Mass. 2008). In exercising that discretion, the Court "should

consider, among other things, the interests of the litigants, society's interest in the accuracy and

integrity of factfinding, and the public's interest in honest, effective government." *Texaco P.R.*, 60 F.3d at 885. Courts in this District examine five factors to assess whether Plaintiffs' and the public's interest in accurate factfinding outweighs the government's interest in nondisclosure: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Roe*, 2024 WL 5198705, at *3 (quoting *In re Pharm.*, 254 F.R.D. at 240).

## II. DEFENDANTS HAVE NOT PRODUCED A COMPLETE ADMINISTRATIVE RECORD

### A. Defendants Must Produce Documents They Used to Identify Grants for Termination Under the Directives

The current AR consists of (i) challenged Directives in this case, (ii) termination notices and revised Notices of Award NIH sent under the Directives with only boilerplate reasoning, (iii) appeals of grant terminations filed by grantees, and (iv) emails from NIH and DOGE officials attaching large lists of grants for termination, with no substantive reasoning or explanation as to why those grants were selected for termination. To complete the AR, Defendants must produce documents regarding the "guidance to the people who made the determinations" about grant terminations pursuant to the Directives. June 3, 2025 Tr. at 7:2-8, 8:16-20.

#### 1. The AR Establishes that NIH Considered Additional, Yet-to-be-Produced Documents to Identify Grants for Termination

Plaintiffs have clear evidence that the NIH considered documents to identify grants for termination pursuant to the Directives that were not produced with the AR. The AR includes an email from an NIH Program Director in which she explains that she was "asked to complete a <u>form</u> indicating whether [a] project was focused on any of the areas that have been identified as

5

low program priority, which includes gender identity, DEI, or environmental justice." AR0125 (emphasis added). This email establishes that NIH gave Program Officers forms to identify grants for termination based on whether they were a low program priority under the Directives (the "Termination Forms"). Yet the AR produced by Defendants does not include the Termination Forms, agency guidance about how to fill out the Termination Forms, or agency guidance about how to otherwise identify grants for termination under the Directives.

The Termination Forms and associated guidance are plainly "documents and materials directly or indirectly considered by [NIH] decision-makers" when they terminated grants pursuant to the Directives. *See Town of Norfolk*, 137 F.R.D. at 185. During the meet and confer process, Defendants indicated that the specific form referenced at AR0125 is not appropriately a part of the record because the individual who filled out the form was not the decisionmaker and explicitly states that she was not involved in the decision to terminate. But an administrative record includes "*all* documents" the agency considered, including material "contrary to the agency's position." *Id.* That the decision-maker may have disregarded the individual's recommendation does not mean the recommendation was not considered. Indeed, the Court stated at the June 3 Conference that it "expect[s] to see" the "guidance to the people who made the determinations" about grant terminations under the Directives. June 3, 2025 Tr. at 7:2-8, 8:16-20. The Court also stated that it "want[s] a full record as to those directives," which includes documents showing "how it plays out in cutting off funding for grants approved." *Id.* at 25:10-17. Accordingly, to complete the AR, Defendants must produce (1) all versions of Termination Forms provided to NIH employees or decision-makers to assess grants for termination pursuant to the Directives (which reflect agency policy); (2) all filled-out Termination Forms for the grant terminations at issue in this case  (guidance to the people who

6

made the determinations); (3) all guidance to NIH employees or decision-makers about how to fill out the Termination Forms (policy); and (4) all other guidance to NIH employees or decision-makers about how to identify grants for termination under the Directives (policy).

### 2. The Deliberative Process Privilege Does Not Protect the Termination Forms or Associated Agency Guidance

Defendants' invocation of the deliberative process privilege with respect to the Termination Forms and associated agency guidance is misplaced because—with one exception—the documents Plaintiffs seek are not deliberative.

Termination Forms that are not filled out with respect to any individual grant are not "deliberative" because they simply reflect "the policy of the agency" to apply the criteria set forth in the forms. *Providence Journal*, 981 F.2d at 557. They do not reveal "the personal opinions of the writer" or "prematurely disclose the views of the agency" with respect to any individual grant. *Id.* Indeed, in *Roe v. Mayorkas*, the Government's administrative record produced in unredacted form the questions and prompts that parole adjudicators were required to fill out on Parole Adjudication Worksheets (PAWS)—an implicit acknowledgement that the questions and prompts were not privileged. 2024 WL 5198705, at *3. The prompts and questions on the Termination Forms are likewise not deliberative. Agency guidance about how to complete the Termination Forms or otherwise identify grants for termination are not deliberative for the same reasons: such guidance reflects the "policy of the agency" and does not reveal "the personal opinions of the writer." *Providence Journal*, 981 F.2d at 557.

Finally, although explanations for individual grant terminations in filled out versions of Termination Forms may qualify as deliberative, the Court should, to the extent they do, exercise its discretion to set aside the privilege and order their production. *See infra* Section II.A.3

7

### 3. Even if the Privilege Applied, the Court Should Exercise Its Discretion to Order the Documents' Disclosure

Even if the deliberative process privilege applies to the Termination Forms and associated agency guidance the relevant factors weigh firmly in favor of disclosing them.

The first two factors—relevance and availability of other evidence—weigh powerfully in favor of disclosure. *See Roe*, 2024 WL 5198705, at *3; *In re Pharm.*, 254 F.R.D. at 240. The current AR includes no documents showing how NIH identified grants for termination under the Directives. The Termination Forms and associated agency guidance would fill this analytical gap, addressing questions the Court has raised in connection with Plaintiffs' claims, such as whether Defendants had "a working definition of Diversity, Equity, and Inclusion" or the other forbidden topics under the Directives. ECF No. 84 at 35 n.4; *see* Pl. Opening Br. at 18. This highly relevant evidence is unavailable elsewhere in the AR.

The third and fourth factors—the seriousness of the litigation and the role of the government—also weigh firmly in favor of disclosure. *See Roe*, 2024 WL 5198705, at *3; *In re Pharm.*, 254 F.R.D. at 240. As of June 4, 2025, NIH has terminated 1,737 grants under the Directives in all fifty states, with $3.4 billion in unspent value. Pl. Opening Br. at 12-13. projects seek to address vital health issues, including cancer, stroke risk, cardiac health, and Alzheimer's Disease, just to name a few. ECF No. 38-27 ¶ 13. Defendants' central role in deciding to abruptly terminate billions of dollars of research grants also favors disclosure. *See Roe*, 2024 WL 5198705, at *5 (agency's "central role . . . in the litigation" favors disclosure).

Where the first four factors favor disclosure, the fifth will not overcome them. *See, e.g.*, *id.* at *6 (collecting cases and finding that "balance of factors here outweighs non-disclosure" despite fifth factor favoring the Government); *Favors v. Cuomo*, No. 11 Civ. 5632, 2013 WL

11319831, at *11 (E.D.N.Y. Feb. 8, 2013) ("If consideration of the first four factors leads to the conclusion that they outweigh the risk addressed by the fifth—possible future timidity—then the demanded document ought to be disclosed, despite the assertion of legislative privilege.").

*Roe v. Mayorkas* demonstrates that deliberative process should similarly not prevent the disclosure of the filled-out Termination Forms. There, the court considered whether the U.S. Customs and Immigration Service ("USCIS") could redact the "explanations" parole adjudicators provided in PAWs in an APA case challenging a change in the standard for humanitarian parole ("HP") applications for Afghan nationals. 2024 WL 5198705 at *1-5. Despite finding the explanations subject to the deliberative process privilege, the *Roe* court exercised its discretion to order the Government to nevertheless produce individual parole adjudication explanations as part of the administrative record because (1) they were relevant to "whether USCIS implemented a new policy through its 2021 Guidance . . . which endorsed categorical denial of HP applications from Afghan-based beneficiaries"; (2) the Court was "unlikely to obtain such relevant information from other sources"; (3) the case raised important issues as to humanitarian parole for Afghan nationals; and (4) USCIS played a "central role" in the litigation. *Id.* at *5-6. Just so here. NIH's explanations for grant terminations in the Termination Forms will provide the reasons why the agency identified those grants as low program priorities under the Directives, which is plainly relevant to whether there was any rational or scientific basis for grant terminations pursuant the Directives.

**B.    Defendants Must Produce Emails from HHS and DOGE Concerning Implementation of the Directives.**

Throughout the AR, there are references to Defendant HHS's and DOGE's involvement in creating the Directives and selecting grants for termination pursuant to the Directives. There

9

are also emails indicating that NIH Principal Deputy Director Dr. Matthew Memoli was "asked to terminate . . . grants," with no reference in the record about who asked Dr. Memoli and the other NIH officials in that email to do so. AR002562. These references show that HHS and DOGE officials played a significant role in where the Directives "came from" and "how it plays out in cutting off funding for grants approved" under the Directives. June 3, 2025 Tr. at 25:10-17. Since these documents and communications were clearly relied upon by the NIH, and because as a named defendant, HHS's documents and communications are necessarily part of this record, this Court should order that Defendants include them in the AR.

### 1. The AR Lacks Documents from HHS Despite Indications of HHS's Involvement in the Directives' Creation and in Grant Terminations

HHS is a defendant in this case, and several documents indicate that HHS staff played a key role in the creation of the Directives and resulting terminations. For example, Rachel Riley[2]—who appears from the record to be an official at HHS—sent multiple emails the evening of February 28, 2025 to NIH officials with the subject line "Grants for immediate termination today," and included lists of grants that were terminated. AR2296-2302. That same day, Dr. Memoli stated, "Rachel is trying to work on the letters (see an example attached)[.]" *See id*. Similarly, on March 11, 2025, Ms. Riley sent an email to Dr. Memoli attaching a list of grants and noting that she "sent [Memoli] 6 in case [he] find[s] an issue with any one." AR3511.

As indicated by this email, Ms. Riley drafted termination letters for grants. However, the AR contains *no internal HHS correspondence*, nor correspondence between HHS and NIH officials memorializing or explaining Ms. Riley's role. This clear gap in the record exemplifies

---

[2] Public reporting also establishes Ms. Riley's affiliation with DOGE. *See The People Carrying Out Musk's Plans at DOGE*, N.Y. TIMES (June 4, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.

the wider issues concerning the lack of documentation surrounding the participation of HHS in the creation of the Directives and grant terminations under the Directives.

The AR also indicates that HHS was intimately involved in many aspects of the Directives' creation. A March 4, 2025 email to NIH chief grant management officers states that "the process for terminating awards based in DEI," also known as the March 4th "Priorities Directive," was provided by HHS and that HHS had sent NIH a list of *grants* to terminate. AR2135; *see also* AR3453 ("I will send the specific details from the attached document to the ICs that were impacted by yesterday's termination list provided to us by HHS/ASA."). However, the AR contains none of this correspondence between HHS and NIH.

In fact, outside of the emails sent by Rachel Riley, the AR contains *zero* emails between HHS and NIH about the Directives. But as the agency that houses NIH and a named Defendant in this case, HHS's communications, *instructions*, or commands with respect to the Directives are necessarily materials considered in creation of the Directives and grant terminations under the Directives. This is supported by the fact that NIH officials directly cite HHS as the driving force behind their instructions. *See* AR1957 ("If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated."); 2135 ("I have also added the process for terminating awards based in DEI as provided to us by HHS."). And to the extent these materials from HHS contained—or failed to contain—any reasoned analysis, consideration of reliance interests, or any other sufficient reasoning as to its creation and implementation of the Directives, they would be material evidence in this case. *See* Pl. Opening Br. at 18-21.

11

### 2. The AR Indicates DOGE Played a Key Role in Formulating the Directives and Terminating Grants Despite a Gap in Documentation

The AR also suggests that DOGE officials played a significant role in providing "guidance to the people who made the *determinations*" about grant terminations under the Directives and "how it plays out in cutting off funding for grants approved." June 3, 2025 Tr. at 7:5-8, 25:16-17. The AR contains four[3] from DOGE officials directing NIH officials to terminate grants under the Directives or otherwise demonstrating DOGE's involvement with grant terminations. *See, e.g.*, AR002295, 003122, 003631, 003752. In one of those emails, Brad Smith—a DOGE official—states to Dr. Memoli, "Per our conversation, below are a number of NOFOs that it may be worth your team reviewing to make sure they align with your directive and priorities." AR003752. But the record contains no documents reflecting how Smith or anyone at DOGE selected those NOFOs. Plaintiffs have alleged DOGE involvement in the grant terminations under the Directives, including by demonstrating that DOGE employees were involved in drafting grant termination letters. *See* ECF No. 1 at ¶ 115; ECF No. 41 at 25 (citing testimony of current and former NIH officials reflecting the same). Given the scope of the terminations at issue here, it is implausible that four emails encompass the entire universe of DOGE's involvement as to the creation of the Directives or grant terminations under them.

Not only would these missing documents have been directly considered by the NIH in its implementation of the Directives, but they would also be relevant to Plaintiff's claims against the NIH in this case. Improper external influence on agency action is a factor in whether the action is arbitrary and capricious. Pl. Opening Br. at 21. Further, whether people other than those designated by statute and regulation are involved in determining agency priorities is clearly

---

[3] Since Rachel Riley's status at HHS and DOGE is in question, including Ms. Riley's emails would increase this total to eight emails.

relevant to Plaintiffs' claims. Pl. Opening Br. at 30. Communications between DOGE and NIH would likely support both of those theories.

### 3.   The Deliberative Process Privilege Does Not Apply to the HHS and DOGE Documents

Defendants have asserted a deliberative process privilege over the HHS and DOGE documents. *See supra* Section I.B. However, these documents are not deliberative. The documents sought by Plaintiff—*i.e.* documents memorializing HHS's instructions to NIH on the directives, and HHS and DOGE staff roles in *termination* of grants and draft termination letters—would reflect "the policy of the agency," *Providence Journal*, 981 F.2d at 557, and the "reasons supporting" the Directives, *U.S. Fish & Wildlife Serv.*, 592 U.S. at 267, rather than any debates on the best way to implement the Directives.

Even if these documents were protected by the privilege, the Plaintiffs' and the Court's interest in disclosure of these documents outweighs any speculative "future timidity by government employees[.]" *Roe*, 2024 WL 5198705, at *4. Plaintiffs believe that these documents may indicate that (a) HHS was not engaging in any reasoned analysis, and (b) DOGE was exerting improper external influence regarding the *termination* of grants, both of which would provide strong support for their arbitrary and capricious arguments. This information is missing from the AR and is not available anywhere else. Finally, just as with the Termination Forms, there can be no doubt of the seriousness of this litigation and the key role of the government. *See supra* Section II.A.3. Consequently, even if these documents fall into the deliberative process privilege, this Court should hold that the qualified privilege is overcome with respect to DOGE and HHS documents.

13

### 4. The Attorney Client Privilege Should Not Bar Production of the HHS Documents. Defendants Have Waived Any Asserted Attorney Client Privilege to HHS Documents.

Defendants raised the assertion of attorney-client privilege with respect to unidentified communications between HHS and NIH surrounding the development, creation and implementation of the challenged Directives for the first time on June 9, 2025. To begin, this assertion cannot have any bearing on communications between HHS and NIH that did not involve counsel, which must be included in the AR for the reasons articulated above. *Cf. Mississippi Pub. Employees' Ret. Sys. V. Bos. Sci. Corp.*, 649 F.3d 5, 30 (1st Cir. 2011) ("Attorney-client privilege protects communications made in confidence by a client and client's employees to an *attorney*, acting as an *attorney*, for the purpose of obtaining *legal advice*.") (emphasis added).

As to the allegation that the privilege applies to unidentified communications between HHS and NIH that included counsel, "the attorney-client privilege does not allow the withholding of documents simply because they are the product of an attorney-client relationship... It must also be demonstrated that the information is confidential." *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 71-72 (1st Cir. 2011) (internal quotation marks omitted). Here, neither Plaintiffs nor the Court can assess the applicability of the privilege because the Defendants have not provided any explanation or description, either via privilege log—which the Defendants refused to produce during the meet-and-confer process—or otherwise. The First Circuit "has yet to address under what circumstances an agency may be compelled to produce a privilege log." *Roe*, 2024 WL 5198705 at *10. Although *Roe* did not require the Government to produce a privilege log within the context of deliberative process privilege, *id.* at *9-10, it acknowledged that "courts have observed a growing consensus . . . that agencies must submit a

14

[privilege] log if they withhold privileged materials from the administrative record." *Id.* at*10 (internal quotation marks omitted) (alterations in original). Under the circumstances of this case, Plaintiffs request that the Court order Defendants to produce a privilege log, or in the alternative, conduct an *in camera* review of the disputed documents. *Cf. Towns of Norfolk v. Walpole v. U.S. Army Corps. of Eng'rs*, 137 F.R.D. 183, 190 (D. Mass. 19991), *aff'd sub nom Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438 (1ˢᵗ Cir. 1992) (conducting in camera review of documents to determine whether they were required to be included in the administrative record).

## C. Defendants Must Produce Artificial Intelligence Tools They Used to Identify Grants for Termination Under the Directives.

At the June 3rd Conference, the Court made clear that "if there's an algorithm" the agency used to identify grants for termination under the Directives, "I expect to see it. . . . I want to see what it is. The record [is] to be supplemented in that respect." June 3, 2025 Tr. at 7:5-8. And public reporting from the Washington Post states that an NIH employee told the Post, "every grant must now be fed through an AI tool to screen for references to concepts deemed unpalatable by the Trump administration, such as 'DEI, transgender, China, or vaccine hesitancy'"—which are the same categories of research the Directives identify for termination.[4]

It thus appears the NIH used artificial intelligence ("AI") tools to identify grants as low program priorities for termination pursuant to the Directives, which is the kind of analytical tool the Court stated it expected to be part of the AR. Yet the AR does not contain any information or documents about the AI tools the agency relied on. To complete the AR, Defendants must produce the AI tools they used to identify grants for termination under the Directives and any

---

[4] Hannah Natanson, *DOGE vowed to make government more 'efficient' — but it's doing the opposite*, WASH. POST (Jun. 2, 2025), https://www.washingtonpost.com/business/2025/06/02/doge-vowed-makegovernment-more-efficient-its-doing-opposite/ (emphasis added).

15

agency guidance or communications about how to use those tools. *See Univ. of Colo. Health at Mem. Hosp. v. Burwell*, 151 F. Supp. 3d 1, 20 (D.D.C. 2015) (ordering HHS to "supplement[] the administrative record" in APA case "with the formula or algorithm HHS has used" to arrive at the decision at issue because the algorithm is "essential to delineate the path HHS taken to arrive at" the relevant decision).

Defendants cannot hide their AI tools behind the deliberative process privilege. AI tools are not "deliberative" because they do not reflect the "personal opinions of the writer"—they are not human beings with "personal opinions" at all. *Providence Journal*, 981 F.2d at 557. AI tools also do not implicate the privilege's purpose to "encourage candor" and "blunt[] the chilling effect that accompanies the prospect of disclosure," because they are by definition indifferent to the prospect that their existence or methodologies might be disclosed. *See U.S. Fish & Wildlife Serv.*, 592 U.S. at 267. Any agency guidance or communications about how to use AI tools to identify grants for termination under the Directives likewise reflect "the policy of the agency" and are not deliberative in nature. *Providence Journal*, 981 F.2d at 559.

### D.    Defendants Must Produce the Metadata Associated with the Administrative Record

"Metadata is, by definition, data about other data: it may reveal who created, edited, or deleted digital data; identify when other data was accessed; and provide *necessary* contextual information to understand digital files." *United States v. Johnson*, 93 F.4th 605, 614 (2d Cir. 2024) (cleaned up) (emphasis added). Some forms of pertinent metadata include the creator of a document and the date the document was created. During the meet-and-confer process, Defendants alleged that metadata was not properly a part of the administrative record. Federal courts have not frequently had the opportunity to analyze the role of metadata in administrative

records, and there is no applicable case law in this Circuit affirmatively speaking to its inclusion or exclusion from the administrative record. However, metadata has long been acknowledged as a core part of the exchange of documents and information in litigation. *See* Fed. R. Civ. Proc. 34 (outlining the procedure for producing electronically stored information like metadata in the course of discovery); *see also Decision Econ., Inc. v. Blank*, No. 12-10673-NMG, 2012 WL 1701601, at *1 (D. Mass. May 14, 2012) (granting preliminary injunction preventing defendant from deleting metadata); *Younes v. 7-Eleven*, Inc., No. 13-3500 RMB/J, 2015 WL 1268313, *7 (D.N.J. Mar. 18, 2015) (granting motion to compel production of metadata). As a result, metadata is an essential part of the documents themselves and should be produced as a part of a complete administrative record.

Particularly in this case, the original metadata behind the documents is a substantive part of the AR because it would allow the parties and the Court to understand when and by whom documents were created. This information will allow the court to better discern whether the NIH exceeded its statutory authority or acted arbitrarily and capriciously by allowing improper external influence into its decision-making process. Pl. Opening Br. at 21. The Court already expressed an interest in the use of metadata to demonstrate DOGE's participation in grant terminations pursuant to the Directives. S*ee* ECF No. 84 at 12. Plaintiffs believe that metadata from the other documents in the AR will provide more clarity on this issue.

In the meet and confer, Defendants also asserted that the metadata of the documents in the Administrative Record falls under the deliberative process privilege. Because metadata is simply data reflecting facts about the composition of a document, it cannot be deliberative. Data reflecting who authored a document and when the document was authored does not reveal any

17

"opinions, recommendations and deliberations" that were considered during the creation of the documents. *U.S. Fish & Wildlife Serv.*, 592 U.S. at 267.

## III.    DEFENDANTS' CERTIFICATION OF THE AR IS INCOMPLETE

Finally, Defendants' certification of the administrative record does not address all Directives challenged by Plaintiffs. *See* ECF Nos. 86 and 86-1. Defendants indicate that they "compiled the complete administrative record for" the 7 Directives specifically named in the States' order.  ECF No. 86-1 ¶¶ 2-3, 7; *see also* ECF 76-1 at 3-4 (listing those 7 Directives). This omits the Directives issued on February 21, 2025 (AR3821), May 7, 2025 (AR3548), or May 15, 2025 (AR3517).

During the meet-and-confer process, Defendants alleged that these Directives were not challenged Directives that were properly raised in Plaintiffs' complaint, but Plaintiffs' challenge is in no way confined to those seven Directives.  Indeed, Plaintiffs' complaint challenges *all* of the Directives that repeat the same conclusory and boilerplate justifications relied on by Defendants:

> The Directives—comprised of the February 28 Guidance, the March 25 Guidance, *and other versions of these documents* that articulated areas of research that purportedly "no longer effectuate[] agency priorities"—fail to define critical terms, such as "diversity, equity and inclusion" or "DEI"; "artificial and non-scientific categories"; "amorphous equity objectives"; "[t]ransgender issues"; "gender identity"; or "COVID-related."

ECF No. 1 ¶ 103 (emphasis added); *see also id.* ¶¶ 6-8. Further, Plaintiffs challenged the implementation of the Directives, including through the adoption of scripts in termination letters, and through the grant terminations and failure to consider applications that began in February 2025 and continued thereafter.  *See, e.g.*, ECF No. 1 ¶¶ 105-124.  And the limited record produced shows that Defendants rely on and parrot this conclusory and boilerplate language

18

across all of the Directives, including the ones list Defendants brazenly argue are not at issue here.  *See* AR2930; AR2141; AR 3567.

Defendants' assertion is all the more absurd given that they have explicitly represented in open court that the early waves of terminations were done pursuant to the February 21 Directive.  John Lorsch—a declarant relied on by Defendants in this proceeding, ECF No. 66-1—has testified in a separate proceeding that, "[i]n late February, in accordance with the [February 21, 2025 Directive], NIH began terminating certain grants through termination letters that explained why the grant no longer met the agency's funding priorities." *See Washington v. Trump*, 2:25-cv-244-LK (W.D. Wash.), Dkt. 279-1 at 6.  And Defendants' own public list of grant terminations reflects that grants were terminated following the May 7 and May 15 Directives—pursuant to those very same agency justifications.  *See* https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf (listing grant terminations on 5/8, 5/9. 5/12, 5/13, 5/14, 5/15, 5/16, 5/19, and onward); *see also Louisiana v. Biden,* No. 2:21-CV-00778, 2021 WL 5370101, at *3-*6 (W.D. La. Nov. 17, 2021) (holding AR incomplete with respect to agency actions that took place after the filing of the complaint because the actions were taken in reliance on the executive order challenged by the complaint).

## IV.    THE COURT SHOULD EXPEDITE BRIEFING ON THIS MOTION

The parties agree that it would be most efficient to fully brief this motion prior the June 16, 2025 hearing so that this Court could hear argument on these issues at that time. The parties agree that Defendants shall file any opposition to this motion by 6pm on Friday, June 13, 2025, and Defendants assent to Plaintiffs request for the opportunity to file a reply of no more than 15 pages by 8am on Monday, June 16, 2026.

19

**CONCLUSION**

For the reasons stated above, the Court should order Defendants to complete the AR by producing (1) the Termination Forms and associated guidance they relied on identify grants for termination under the Directives; (2) documents reflecting HHS and DOGE input into the creation of the Directives and grant terminations under the directives; (3) AI tools and accompanying guidance used to identify grants as low program priority under the Directives; and (4) metadata from all documents in the AR; and (5) should also order certification of the complete record.  If the Court is inclined to rule in Defendants' favor with regards to the issues of privilege, we would ask the Court to order Defendants to produce a privilege log of the asserted privileges and for the Court to conduct an *in camera* review of the documents.

*[signatures on following page]*

Dated: June 9, 2025

Shalini Goel Agarwal
shalini.agarwal@protectdemocracy.org
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

Kenneth Parreno
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Lisa S. Mankofsky*
Oscar Heanue*
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Respectfully submitted,

Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union**
**Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod*
Alexis Agathocleous*
Rachel Meeropol*
Alejandro Ortiz*
**American Civil Liberties Union**
**Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

*/s/ Matthew D. Brinckerhoff*
Matthew D. Brinckerhoff
**Emery Celli Brinckerhoff Abady**
**Ward & Maazel LLP**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com

21

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2025 a true and correct copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

June 9, 2025                                          */s/ Matthew D. Brinckerhoff*
                                                     Matthew D. Brinckerhoff