**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

AMERICAN PUBLIC HEALTH
ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS (UAW); BRITTANY
CHARLTON; KATIE EDWARDS; PETER
LURIE; and NICOLE MAPHIS,

        *Plaintiffs*,

    v.

NATIONAL INSTITUTES OF HEALTH;
JAY BHATTACHARYA, *in his official
capacity as Director of the National Institutes
of Health*; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and ROBERT F.
KENNEDY, JR*., in his official capacity as
Secretary of the United States Department of
Health and Human Services*,

        *Defendants*.

Case No. 1:25-cv-10787-WGY

---

## APHA PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' PHASE 2 CLAIMS (ECF No. 130)

**TABLE OF CONTENT**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

   I.    Overview of Grant Application Process. .......................................................... 3

   II.   Defendants' Refusal to Review Grants and Delay of Grant-Awarding Processes. ........... 4

   III.  APHA Plaintiffs and Members' Profound Harm from Defendants' Delay. ..................... 5

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................ 6

   I.    Defendants' Brief is not a Proper Motion to Dismiss. ....................................... 6

   II.   This Court Has Jurisdiction over APHA Plaintiffs' Phase 2 Claims. ................................. 7

       A.   APHA Plaintiffs have Article III standing. ..................................................... 7

       B.   APHA Plaintiffs have prudential standing. ..................................................... 11

       C.   Plaintiffs' Section 706(1) claims are not moot. ........................................... 13

       D.   This Court can and should address Plaintiffs' 706(1) claim regardless of success on their 706(2) claims. ........................................................... 15

   III.  This Court Should Reject Defendants' 12(b)(6) Arguments. ........................................... 17

       A.   Processing applications is a discrete and mandatory duty. ........................................... 17

       B.   Processing applications is not committed to agency discretion. ................................... 18

       C.   The Court should once again reject Defendants' arguments regarding 5 U.S.C. § 706(2). ........................................................................................... 19

   CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Verlus v. Experian Info. Sols.*, 2025 WL 836588 (D. Mass. Mar. 17, 2025)................................ 6
*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*,
   4 F.4th 63 (1st Cir. 2021) ................................................................................................... 6
*Rezaii v. Kennedy*, 2025 WL 750215 (D. Mass. Feb. 24, 2025)........................................... 6
*Audette v. Carrillo*, 2017 WL 1025668 (D. Mass. Mar. 16, 2017)........................................ 7
*Reaves v. Kallis*, 2019 WL 2648766 (C.D. Ill. June 27, 2019)............................................. 7
*Ryan v. Newark Grp., Inc.*, 2025 WL 1115024 (D. Mass. Apr. 15, 2025) ............................ 7
*Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63 (1st Cir. 2014)............................................ 7
*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)............................... 8, 9
*Thakur v. Trump*, 2025 WL 1734471 (N.D. Cal. June 23, 2025) ................................ 9, 10, 11, 13
*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
   2025 WL 1716141 (U.S. June 20, 2025)......................................................................... 8, 9, 10
*Dep't of Com. v. New York*, 588 U.S. 752 (2019).............................................................. 10
*Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) ..................... 11
*Ondrusek v. United States Army Corps of Eng'rs*, 123 F.4th 720 (5th Cir. 2024)...................... 11
*Ministeri v. Reliance Standard Life Ins. Co.*, 523 F. Supp. 3d 157 (D. Mass. 2021) .................. 11
*Massachusetts v. Kennedy, No.*,
   CV 25-10814-WGY, 2025 WL 1371785 (D. Mass. May 12, 2025)..................................... 12
*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007)...................... 12
*Am. Ass'n v. United States Dep't of Just.*, 2025 No. 25-CV-2; 2025 WL 1684817 (MKV 2025) 12
*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...................................................................... 12
*Food & Drug Admin. v. R. J. Reynolds Vapor Co.*,
   1187, No. 23-, 2025 WL 1716135 (U.S. June 20, 2025) ................................................... 13
*ABC, Inc. v. Stewart*, 360 F.3d 90 (2d Cir. 2004)............................................................ 15
*Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923 (9th Cir. 2010) ........................ 16
*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ..................................................... 16
*Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095 (9th Cir. 2007) ........................................ 20
*Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001)................................. 11
*Al Otro Lado, Inc. v. Mayorkas*,
   No. 23-CV-1367-AGS-BLM, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) ......................... 17
*Env. Def. Fund v. Regan*, 2024 WL 3887383 (D.D.C. Aug. 20, 2024)...................................... 17
*Touarsi v. Mueller*, 538 F. Supp. 2d 447 (D. Mass. 2008) ................................................ 19

**Statutes**

Title 5 U.S.C. § 706(2)(A).......................................................................................... 2, 20
Title 5 U.S.C. § 706(2)(C).......................................................................................... 2, 20
Title 5 U.S.C. § 706(1)............................................................................................... 2
Title 5 U.S.C. § 706(2)............................................................................................... 19
Title 5 U.S.C. § 551(13)............................................................................................. 20

**Regulations**

Title 42 C.F.R. § 52.5 ................................................................................................ 3, 16

Title 45 C.F.R. § 75.373(a) ............................................................................................. 5

## INTRODUCTION

APHA Plaintiffs oppose Defendants' motion to dismiss their Phase 2 claims. ECF No. 130. Defendants in large part seek a second bite at the apple on arguments that this Court has already rejected. To the extent that Defendants challenges this Court's jurisdiction, the Supreme Court— just days ago in *Diamond Alternative Energy, LLC v. Environmental Protection Agency*— reiterated traditional standing principles that confirm jurisdiction here. But before dispensing with Defendants' arguments, APHA Plaintiffs provide a brief overview of what is at issue in Phase 2.

APHA Plaintiffs brought suit to challenge unlawful Directives that required the purge of certain disfavored research topics and pipeline grants seeking to address diversity in the biomedical field, as well as the resulting termination of hundreds of grants. *See* ECF No. 1. APHA Plaintiffs also sought to address Defendants' interruption, pursuant to those Directives, of the normal review processes at NIH, including refusal to act on pending applications and unreasonable delays in the grant review process. *Id.* Shortly after, APHA Plaintiffs filed a motion for preliminary injunction. *See* ECF Nos. 37, 66, 71. On May 22, 2025, the Court consolidated that motion with a trial on the merits pursuant to Rule 65(a), *see* ECF No. 77, and construed—without objection—Defendants' opposition to that motion as a motion to dismiss. *See* ECF No. 84 at 2.

The Court denied Defendants' motion to dismiss as to APHA Plaintiffs' Administrative Procedure Act ("APA") claims, finding that Plaintiffs had plausibly stated a claim as to Counts I through III and V. *See* ECF No. 84 at 43–44. Then, on June 16, 2025, the Court presided over a trial on the merits for Phase 1 of the case—which consisted of claims regarding the unlawfulness of the Directives and the resulting terminations. The Court vacated the Directives and the grant terminations that had been placed before the Court, declaring that both categories constituted final agency actions that were arbitrary and capricious in violation of the Administrative Procedure Act. *See* ECF No. 138.

Now at Phase 2 of this case, APHA Plaintiffs seek relief for individual grant applicants—rather than individuals with terminated grants—by way of three distinct claims, all of which already survived Defendants' first motion to dismiss. ECF No. 84 at 43–44 ("For the reasons stated above, the Motion to Dismiss, ECF No. 66, is ALLOWED in part as to Counts IV, VI, and VII, which are dismissed without prejudice, and DENIED in part as to the remaining Counts."):

(1) through Count I.B, APHA Plaintiffs claim that Defendants' refusal to consider applications submitted for unpublished Notices of Funding Opportunities ("NOFOs") is arbitrary and capricious and contrary to regulations under 5 U.S.C. § 706(2)(A). ECF No. 1 ¶¶ 210–12.

(2) through Count III, APHA Plaintiffs assert that Defendants' refusal to review grant applications properly submitted to funding streams that implement various NIH statutory mandates, including mandates to diversify the bio-medical research field and prioritize and support research on minority health and health disparities, exceeds statutory authority under 5 U.S.C. § 706(2)(C). ECF No. 1 ¶ 231.

(3) through Count V, APHA Plaintiffs challenge NIH's unlawfully withheld and unreasonably delayed action on properly submitted applications for now-disfavored research topics and pipeline programs, under 5 U.S.C. § 706(1). ECF No. 1 ¶¶ 237–40.

This Court already resolved several discrete issues relevant to relief on these claims. Notably, Defendants previously argued that the refusal to act on a pending grant application is (a) not a discrete and mandatory agency action, and (b) is rooted in the agency's discretion to defer a decision. The Court rejected those arguments, holding:

> As alleged, the Public Officials have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them . . . This raises a fact issue—whether NIH is processing affected applications at all, as opposed to something else—that would be improper for this Court to decide at this stage.

*See* ECF No. 84 at 40; *see also id.* at 14–15 (ruling on agency discretion).

2

The Court's merits determination that the Directives are arbitrary and capricious also impacts the Phase 2 claims, as the Directives' prohibition on issuing awards for unpublished NOFOs or funding disfavored topics has directly led to the issues facing applicants here. However, relief for individual applicants—both APHA Plaintiffs and members[1] of Associational Plaintiffs (hereafter "APHA Plaintiffs and Members") has not yet been addressed. As part of the Phase 2 proceedings, APHA Plaintiffs are providing the Court and opposing counsel with a spreadsheet of impacted applicants,[2] and Defendants have been ordered to produce the corresponding administrative record on July 9, with dispositive motions to follow. ECF No. 89 at 18:7–9.

Now, Defendants seek to dismiss APHA Plaintiffs' Phase 2 claims. *See* ECF No. 130. For the reasons discussed below, this Court should deny that motion.

## FACTUAL BACKGROUND

### I.    Overview of Grant Application Process.

NIH lacks authority to halt review of applications based on its determination that the grant "no longer effectuates agency priorities." ECF No. 1 ¶ 56. HHS regulations provide that "all" applications "shall be evaluated" and that the agency will "(1) approve, (2) defer because of either lack of funds or a need for further evaluation, or (3) disapprove support of the proposed project in whole or in part." *Id.* ¶ 55; 42 C.F.R. § 52.5. NIH policy mandates that "applications for funding submitted to NIH" will be "evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias." ECF No. 1 ¶ 51.

---

[1] "Members" refers to all current members of the associational Plaintiffs American Public Health Association ("APHA") and United Automobile, Aerospace, and Agricultural Implement Workers ("UAW"), including Pre-Members of UAW (individuals for whom UAW is their exclusive bargaining representative in ongoing negotiations with their employer, and who intend to become dues-paying members once a collective bargaining unit is in place).

[2] Consistent with Phase 1 practice, APHA Plaintiffs respectfully reserve the right to supplement this spreasheet prior to any Phase 2 merits determination.

The Public Health Service Act, its enacting regulations, and detailed NIH protocols outline a highly competitive and rigorous process for grant decisions involving multiple layers of scientific review over many months. ECF No. 1 ¶ 5; ECF No. 41 at 10–11. Institutes and Centers ("ICs") post NOFOs to alert researchers to the availability of funds. ECF No. 1 ¶ 49. Applications are received by the Center for Scientific Review and assigned to scientific review groups ("study groups" or "study sections") to be analyzed and scored by experts in their field and then reviewed by IC-specific advisory councils of "senior scientists with broad experience and members of the public with general knowledge of, and interest in, the IC's mission." *Id.* ¶¶ 52–53. All applications must explain how the research meets NIH policy requirements related to "inclusion of genders, members of minority groups, and individuals across the lifespan in clinical research." *Id.* ¶ 50. The Director of the IC determines which projects to fund. *Id.* ¶¶ 53, 57. Successful applicants receive a Notice of Award ("NOA"). *Id.* ¶ 58.

## II.    Defendants' Refusal to Review Grants and Delay of Grant-Awarding Processes.

In February 2025, Defendants altered normal grant review processes in several ways to implement the Directives. *Id.* ¶¶ 7, 122. First, Defendants refused to review applications properly submitted for subsequently unpublished funding opportunities. *Id.* ¶¶ 7–8, 123, 162, 174. In February 2025, the "F31 Diversity track" and MOSAIC funding opportunities disappeared from NIH's website. *Id.* ¶¶ 123, n.92, 166. In the past, NIH maintained expired funding opportunities online, but the links to those NOFOs now result in a "page not found" message. *Id.* The Revised Priorities Directive[3] instructed that applications "received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority" were not to be funded. *Id.* ¶ 123. Under this direction, Plaintiff Maphis's MOSAIC application was

---

[3] Plaintiffs identified this as the "March 25 Guidance" in the Complaint, but here retain the title used in the Phase 1 merits briefing. ECF No. 103 at 21, n.16.

never acted on, *id.* ¶¶ 163–64, and UAW Member 3's MOSAIC perfect score did not result in an award, *id.* ¶ 170.[4] Similarly, UAW Member 8's F31 Diversity track grant application—to explore early risk factors of neurodevelopmental and psychiatric disease—was changed back to "pending" despite previous issuance of a Notice of Award. *Id.* ¶ 178; *see* 45 C.F.R. § 75.373(a) (requiring notification of grant termination). Other grant applications, like the application for a diversity supplement connected to the grant of APHA Members 10 and 11, are simply in limbo—delayed, perhaps indefinitely. *Id.* ¶ 151.[5]

## III.    APHA Plaintiffs and Members' Profound Harm from Defendants' Delay.

Defendants' refusal to consider, and delay in considering, properly submitted grants directly harms Applicant Plaintiffs and Members, depriving them of the irreplaceable opportunity to compete for NIH funding that would allow them to contribute to public health. *Id.* ¶ 124. Applicant Plaintiffs and Members have lost the opportunity to compete for vital funding to finish their studies, *id.* ¶¶ 168, 173–74, 178; launch or progress in their careers, *id.* ¶¶ 163–64, 168–69, 172, 176, 181, 188; hire staff, *id.* ¶ 166; set up labs, *id.* ¶¶ 166, 176, 181; receive valuable training, *id.* ¶ 164; and continue their research, *id.* ¶¶ 166, 168, 173, 194. Without these opportunities, Applicant Plaintiffs and Members will be less competitive in the job market and potentially forced to abandon career paths they have been pursuing for years. *Id.* ¶¶ 164, 169–70, 176, 181, 184.

---

[4] At the time of filing the complaint, most applicants for unpublished NOFOs had not yet received any information from NIH regarding the status of their applications. ECF No. 1 ¶¶ 123, 166, 168, 170, 174, 176, 180–81, 184, 191. After the complaint was filed, NIH publicly acknowledged the end of the unpublished opportunities and administratively withdrew pending applications. ECF No. 41 at 16–17, ECF No. 72-10 ¶¶ 2–5. Maphis, for example, was informed that MOSAIC is a "discontinued program that no longer effectuated NIH priorities," DEI studies "are often used to support unlawful discrimination on the basis of race and other protected characteristics," and her "application has been administratively withdrawn." ECF No. 72-10 ¶ 3.

[5] Although unnecessary for the purpose of surving the instant motion to dismiss, the spreadsheet APHA Plaintiffs will serve today shows that these stories are far from unique. Approximately 200 APHA Plaintiffs and Members have had NIH review of their properly submitted applications halted or delayed pursuant to the Directives.

## LEGAL STANDARD

"Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), 'the reviewing court must take all of the plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff.'" ECF No. 84 at 13–14 (quoting *Verlus v. Experian Info. Sols.*, No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025)). A claim will survive a Rule 12(b)(1) motion so long as a plaintiff pleads facts that plausibly state a claim that the court has subject-matter jurisdiction over the case. *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021). Rule 12(b)(1) is not the proper forum to adjudicate merits-based defenses and arguments. *See* ECF No. 84 at 33–34. Under Rule 12(b)(6), a plaintiff need only plead sufficient facts to allege "a plausible entitlement to relief," meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Rezaii v. Kennedy*, No. 1:24-CV-10838-JEK, 2025 WL 750215, at *3 (D. Mass. Feb. 24, 2025) (denying motion on APA unreasonable delay claim).

## ARGUMENT

I.    **Defendants' Brief is not a Proper Motion to Dismiss.**

Defendants' motion is not proper in at least two ways. First, Defendants rehash arguments the Court already rejected on their first motion to dismiss.[6] Defendants could have acknowledged that setback and sought the Court's reconsideration under either Rule 59(e) or Rule 60(b). Their

---

[6] APHA Plaintiffs reminded Defendants during the requisite meet and confer that they had already moved to dismiss. *See* ECF No. 130 at 2. Defendants nevertheless rehash the same arguments. For example, with respect to meetings, they recycle their assertion that "Defendants have resumed holding meetings and taking the procedural steps needed to review new applications and issue awards." *Compare* ECF No. 131 at 19, *with* ECF No. 66 at 38 ("Defendants resumed holding meetings and taking all procedural steps needed to issue awards even before plaintiffs sued."). Similarly, Defendants repeat their assertion that "NIH did cancel previously scheduled meetings and refrained from setting new meetings based on the January 21, 2025 Notice Pause Directive." *Compare* ECF No. 131 at 19, *with* ECF No. 66 at 38 ("NIH canceled previously scheduled meetings and did not schedule new meetings based on the January 21, 2025, temporary freeze, but resumed holding all meetings by March 18, 2025.").

failure to do so is reason enough to deny their motion. *See, e.g., Audette v. Carrillo*, No. 15-CV-13280-ADB, 2017 WL 1025668, at *5 (D. Mass. Mar. 16, 2017) ("a motion for reconsideration does not present defendants with an opportunity to rework and better articulate previously-failed arguments.")

Even if construed as a motion for reconsideration, Defendants' efforts must be denied. Motions for reconsideration under Rule 59(e) "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Reaves v. Kallis*, No. 09-CR-187, 2019 WL 2648766, at *1 (C.D. Ill. June 27, 2019), *aff'd*, No. 19-2653, 2021 WL 3642337 (7th Cir. Mar. 1, 2021). Neither limited function exists here. And "[r]elief under Rule 60(b) is extraordinary in nature and, thus, motions invoking that rule should be granted sparingly." *Ryan v. Newark Grp., Inc.*, No. 4:22-CV-40089-MRG, 2025 WL 1115024, at *1 (D. Mass. Apr. 15, 2025) (quotation omitted). Defendants nowhere show their second motion to dismiss—which repeats, almost verbatim, many arguments this Court has already rejected—is warranted by extraordinary need.

Second, because Defendants' motion relies on matters outside of the pleadings, *see* ECF No. 131 at 16, 18, 23–24, it is effectively a premature motion for summary judgment. Pursuant to Rule 12(d), the proper time to address such a motion is *after* discovery (including after the production of the administrative record here). *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 73 (1st Cir. 2014). Because APHA Plaintiffs have not yet received the Phase 2 administrative record or otherwise been afforded the opportunity for discovery, Defendants' motion is premature.

## II.    This Court Has Jurisdiction over APHA Plaintiffs' Phase 2 Claims.

### A.    APHA Plaintiffs have Article III standing.

Defendants lodge two new arguments on standing: the harms are "too attenuated," and the claims are "far too speculative." ECF No. 131 at 18. Defendants are wrong about both.

"Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). To establish Article III standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. The point of standing is to ensure that plaintiffs "possess a personal stake in the dispute," so that they "do not sue the wrong parties and [] courts do not issue advisory opinions." *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 2025 WL 1716141, at *6, 11 (U.S. June 20, 2025). Courts therefore "should not make standing law more complicated than it needs to be." *Id.* at *14 (quotation omitted). The government "generally may not target a business or industry through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Id.*

The Supreme Court's analysis in *Diamond Alternative Energy* squarely resolves this Court's jurisdiction. In that case, the EPA had approved California regulations requiring automakers to make fewer gasoline-powered vehicles. *Id.* at *7. Although those regulations imposed requirements on automakers and *not* fuel producers, the Supreme Court held that a group of fuel producers had standing to challenge those regulations. *Id.* at *14.

The Court considered two distinct categories of injury based on whether the "plaintiff is an object of the action (or forgone action) at issue." *Id.* at *7 (quotation omitted). On the first prong, the Court emphasized that, "[w]hen a plaintiff is the object of a government regulation, there should ordinarily be little question that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries." *Id.* at *8 (quotation omitted). For

example, "[i]f the government bans bookstores from selling certain publishers' books, then those publishers, not just bookstores, might be objects of the regulation" and have standing to sue. *Id.*

This is not the only type of injury that leads to standing. Instead, *Diamond Alternative Energy* turned on the second prong: "what the Court has described as the 'familiar' circumstance where government regulation of a business 'may be likely' to cause injuries to other linked businesses." *Id.* at *9 (quoting *All. for Hippocratic Med.*, 602 U.S. 367, 384). The Court emphasized that "[i]t may not be certain, but it is at least 'predictable' that invalidating the California regulations would likely result in the fuel producers ultimately selling more gasoline and other liquid fuels." *Id.* at *13. For this reason, the fuel producers had standing.

Here, "[b]oth prongs of the Supreme Court's analysis" in *Diamond Alternative Energy* confirm this Court's jurisdiction. *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *23 (N.D. Cal. June 23, 2025) (applying *Diamond Alternative Energy* to hold that researchers have standing to challenge grant terminations). As to the first prong, "Plaintiffs' research is the object of the unreasoned, arbitrary conclusion that their research no longer matches agency priorities" and thus should be withheld or delayed. *Id.*; ECF No. 1 ¶¶ 6, 18–19, 21, 162–94. The grant delays (and terminations) are "being based on a review of the researchers' project, *not* a review of the grantee universities." *Thakur*, 2025 WL 1734471, at *23 (emphasis added); *see supra*, Background Section III.

Even if this were not the case, and delays (or even terminations) "were implausibly construed to be directed solely at the [universities or other institutions] to the exclusion of APHA Plaintiffs and Members, APHA Plaintiffs would still have standing under the second prong for the same reasons as the fuel producers did" in *Diamond Alternative Energy*, as the evidence "show[ed] that the grant [decisions] will likely have a predictable effect on the continued funding of

[Plaintiffs'] projects" and career development. *Thakur*, 2025 WL 1734471, at *23 (quotation omitted); *see supra*, Background Section III. Indeed, "[t]he grants were" or would be "expressly made to fund Plaintiffs' [work], and Plaintiffs have [alleged] that no alternate funding is readily available." *Thakur*, 2025 WL 1734471, at *23; ECF No. 1 ¶¶ 10–11, 18, 19, 21, 162–65, 168, 170, 194.

*Diamond Alternative Energy* thus confirms APHA Plaintiffs' standing as to all phases and contradicts Defendants' standing arguments. First, the harms are not attenuated. Defendants assert that it is "the choice of [*Plaintiffs' employers*]" causing them harm, as the employers could choose to continue funding their projects. ECF No. 131 at 18. The same type of reasoning applied in *Diamond Alternative Energy*: "In that case, consumers could have decided to buy just as many gasoline-powered cars due to changes in the new vehicle market, thereby insulating fuel producers from the effects of the new regulations." *Thakur*, 2025 WL 1734471, at *23 (cleaned up) (citing *Diamond Alternative Energy*, 2025 WL 1716141, at *9–11). "Likewise, Agency Defendants' actions here are likely to cause a predictable disruption to Plaintiffs' research. That is sufficient for causation and redressability." *Id.* Indeed, "[i]t belies commonsense economic realities . . . that grantees would be able to immediately cover millions or billions of dollars in funding shortfalls." *Id.* (quotation omitted); *see also Diamond Alternative Energy,* 2025 WL 1716141, at *9 ("When third party behavior is predictable, commonsense inferences may be drawn.").

Second, the alleged harms are not speculative, vague, or undefined. *See* ECF No. 131 at 18. "Los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). And it is well established that "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that

benefit had it been accorded the lost opportunity." *Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (citation omitted). Further, APHA Plaintiffs have also alleged severe negative impacts on their career development (including delays in their academic careers) and their reputation, ECF No. 1 ¶¶ 167–69, as well as disruption or abandonment of their research, *id.* ¶¶ 166, 168. *See also supra*, Background Section III. APHA Plaintiffs have thus alleged "invasions of traditionally cognizable interests sufficient to confer standing." *Thakur*, 2025 WL 1734471, at *21 (collecting cases). Tellingly, Defendants omit these or any other allegations, instead cherry-picking portions of Members' declarations—portions that, even on their own, would satisfy the requirements of Article III standing. ECF No. 131 at 18. But again, at this juncture, APHA Plaintiffs' allegations must be taken as true, and those allegations clearly establish standing here.

### B. APHA Plaintiffs have prudential standing.

Defendants are wrong to assert that APHA Plaintiffs lack third-party—and therefore prudential—standing for any of their claims. As an initial matter, prudential standing is not jurisdictional—and the issue is therefore waivable. *See Ondrusek v. United States Army Corps of Eng'rs*, 123 F.4th 720, 735 (5th Cir. 2024).[7] Because Defendants have not previously raised this issue, they have forfeited any challenge on prudential standing. *See Ministeri v. Reliance Standard Life Ins. Co.*, 523 F. Supp. 3d 157, 174 (D. Mass. 2021)*, judgment entered*, No. 18-CV-10611-LTS, 2021 WL 3815929 (D. Mass. Aug. 18, 2021).

In any event, to support their argument on prudential standing, Defendants mischaracterize APHA Plaintiffs' challenge, asserting that they seek to "enforce rights related to a government contract." *See* ECF No. 131 at 15. Defendants in turn rely on case law regarding who can enforce

---

[7] APHA Plaintiffs note that the First Circuit has not resolved whether prudential standing is waivable. *See Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 n.3 (1st Cir. 2001).

the terms of a contract, arguing that APHA Plaintiffs must show "that they are party to [a] putative contract or an intended third-party beneficiary" to bring their suit here. *See id.* at 15–17.

But putting aside that the grants at issue are *not* contracts, *see* ECF No. 41 at 21, this Court has already held that APHA Plaintiffs did not bring this suit to enforce the terms of any contract, *see* ECF No. 84 at 14–15. Instead, APHA Plaintiffs seek "to stop [Defendants] from violating the statutory grant-making architecture created by Congress, replacing Congress' mandate with new policies that directly contradict that mandate, and exercising authority arbitrarily and capriciously, in violation of federal law[.]" *Massachusetts v. Kennedy*, No. CV 25-10814-WGY, 2025 WL 1371785, at *9 (D. Mass. May 12, 2025); *see also* ECF No. 84 at 14–15. Thus, case law regarding contract enforcement—and specifically, who can enforce the terms of a contract—has no bearing here. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 679–80 (9th Cir. 2007) ("Rather than asking us to remedy a violation of private law (*e.g.*, a breach of contract), the petitioners ask us to remedy the violation of a public law—the [APA]—by contending that [the agency] acted arbitrarily, capriciously, and contrary to law[.]"). And for that same reason, the decision from the Southern District of New York's ruling in *Am. Ass'n of Univ. Professors v. United States Dep't of Just.*—a case on which Defendants rely-in which labor unions challenged the federal government's decision to terminate grants awarded to Columbia University, ECF No. 131 at 17—is of no import, as the court there relied on the same flawed logic rooted in *contract* law to reach its conclusion on prudential standing. No. 25-CV-2429 (MKV), 2025 WL 1684817, at *11 (S.D.N.Y. June 16, 2025). That court was wrong—just like Defendants are here.

More broadly, third-party standing jurisprudence has no application here. Third-party standing comes into play only when plaintiffs do not assert their own legal rights and interests. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). But here, APHA Plaintiffs and Members "assert

their own rights" and "are exactly the individuals whom . . . the APA aim[s] to protect," as "their research is the target of the unreasoned arbitrary" decisionmaking around "funding." *Thakur*, 2025 WL 1734471, at *22. That is, APHA Plaintiffs "assert claims based on their own legally protected interest in not being subject to . . . unexplained arbitrary agency action." *Id.* The "third party standing doctrine is [therefore] inapplicable." *Id.* (holding that researchers on grant applications assert their own interests in challenging grant terminations).

Indeed, "[it] is hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded as either dangerously or insufficiently important." *Thakur*, 2025 WL 1734471, at *24 (applying the reasoning from *Diamond Alternative Energy* to reject a similar argument on third-party standing that Defendants raise here); *see also supra*, Argument Section II.A; *cf. Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, No. 23-1187, 2025 WL 1716135, at *4 (U.S. June 20, 2025) ("A plaintiff may sue under the APA unless her interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." (quotation omitted)). The Court should therefore reject Defendants' arguments on prudential standing.

### C.  Plaintiffs' Section 706(1) claims are not moot.

Defendants re-raise their unsuccessful argument that APHA Plaintiffs' applicant claims are moot because Defendants have allegedly "resumed holding meetings and taking the procedural steps needed to review new applications and issue awards." ECF No. 131 at 19; *see* ECF No. 66 at 38 (raising same argument). But Defendants' reference to the *overall* number of peer review meetings that have been scheduled or held between March 24 and June 30 fails to address the essence of Plaintiffs' 706(1) claims, which is whether *APHA Plaintiffs' and Members'* applications concerning disfavored topics or submitted in response to previously withdrawn NOFOs are being reviewed and determinations on their applications being made. *See* ECF No. 1 ¶¶ 237–40; *see also*

13

ECF No. 84 at 39 ("Plaintiffs allege that NIH has not only withheld decisions on pending applications, but also removed submitted applications from study sections and withheld Notices of Award from previously approved submissions."). Indeed, APHA Plaintiffs lay out significant allegations concerning pending grant applications not being reviewed in response to the Directives. *See* ECF No. 1 ¶¶162–94. These allegations alone merit denial of the motion to dismiss.

At most, Defendants seek to rely on a factual question of whether NIH is processing the applications at issue—which this Court has already stressed would be improper to decide at the motion to dismiss stage. ECF No. 84 at 40. The same is true with Defendants' attempt to rebut allegations by citing to the federal register to show that *some* study sections and advisory council meetings have occurred or are scheduled to occur. *See* ECF No. 131 at 12. Moreover, Defendants' meeting schedule says nothing about *which* applications are being reviewed in those meetings, and whether applications previously submitted pertaining to disfavored research topics or for diversity-oriented pipeline programs are once again being reviewed.[8]

Likewise, Defendants have provided no indication that they have begun reviewing and funding applications submitted previously through withdrawn NOFOs.[9] For example, Plaintiff Maphis applied for a MOSAIC program grant in November 2024. ECF No. 1 ¶ 163. Her proposed research would, if funded, study the link between alcohol-use disorder and Alzheimer's disease. *Id.* On March 4, 2025, Maphis was notified that her application had been pulled from its study group and would not be reviewed. *Id.* ¶ 164. Since the complaint was filed, Defendants have

---

[8] Defendants cite to a declaration by Jon Lorsch. ECF No. 131 at 19 (citing ECF No. 66-1). Even if the Court were to consider information beyond the Complaint, that declaration lacks any information about *which* applications have been reviewed, and whether the numbers cited include those for withdrawn NOFOs. *See* ECF No. 72-4 ¶¶ 6–7.

[9] Defendants state that without a stay of the Court's judgment as to Phase 1, they "will restore NOFOs related to terminated programs listed on Plaintiffs' spreadsheet," ECF No. 131 at 24 n.13, and therefore concede that the NOFOs for Pipeline Programs were withdrawn *solely because* of the Directives. However, even reinstating NOFOs does not fully answer the question of whether review will occur for any applications that were submitted and remain administratively withdrawn, nor for applicants who were already reviewed, received high scores, and should have been funded.

administratively withdrawn Maphis's application on the basis that the application "responded to a discontinued program that no longer effectuated NIH priorities," ECF No. 72-10 ¶ 3, and her application *remains* administratively withdrawn as of this filing. Her application therefore has not been considered in the newly scheduled meetings cited by Defendants, and is not moot because it is *not* "impossible for the court to grant any effectual relief whatever to a prevailing party." *ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir. 2004)(quotation omitted).

This example highlights the fatal flaw in Defendants' attempt to sidestep the motion-to-dismiss standard: they attempt to resolve a factual dispute before the parties have had a chance to air out the facts. Once Defendants produce the Phase 2 administrative record, Defendants can test Plaintiffs' factual proof for their claims. But Defendants cannot do so at this juncture. *See* ECF No. 84 at 40. Instead, viewing the well-pleaded facts in the light most favorable to APHA Plaintiffs, their applications remain administratively withdrawn and delayed, and their claims remain live.

### D.  This Court can and should address Plaintiffs' 706(1) claim regardless of success on their 706(2) claims.

Defendants further contend that Plaintiffs' Section 706(1) claims should be dismissed as veiled 706(2) claims. This fails for multiple reasons.

First, and foremost, APHA Plaintiffs' Sections 706(2) and 706(1) applicant claims are legally distinct, addressing different actions by Defendants. The Section 706(2) applicant claims are based on final decisions by NIH to not review applications for grants for unpublished NOFOs. Pursuant to the Directives, NIH has removed certain funding opportunities and implemented a policy of not processing applications previously submitted for those opportunities, which APHA Plaintiffs challenge as final actions reviewable under 706(2). By contrast, the Section 706(1) applicant claims are based on NIH's failure to timely process and make determinations on

applications that have already been submitted. *See* ECF No. 1 ¶¶ 237–40. Relevant to those claims, APHA Plaintiffs have alleged that NIH has pulled applications from assigned study groups and held the applications in a state of suspended animation, with applicants unable to obtain information about their status. *Id.* ¶¶ 162–66. In other words, the 706(2) claims involve final decisions by NIH to not review and withdraw applications; the 706(1) claims involve NIH's egregious delay of application review.

In addition, Defendants claim that Plaintiffs are attempting to evade Section 706(2)'s final agency action requirement by disguising those claims as Section 706(1) claims. ECF No. 131 at 20. Not so. An "'agency action'" is "'unlawfully withheld'" (and thus appropriate for Section 706(1) review) when it is both "'discrete'" and "'legally required.'" *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)). As this Court has already determined, Defendants' failure to process applications, and thus issue new grants, is a sufficiently discrete "agency action." *See* ECF No. 84 at 39–40. And the processing of applications—following the rigorous, scientific peer-review process outlined in both statutes and regulations—is "legally required." *See* ECF No. 1 ¶¶ 55–57, 240; *see also* ECF No. 84 at 40 (citing 42 C.F.R. § 52.5).

Finally, Defendants assert that "Plaintiffs' § 706(1) claims" should be dismissed because they "are simply another assault on the Challenged Directives." ECF No. 131 at 21. True, APHA Plaintiffs do assert that Defendants' illegal withholding of review and delay flows from the Directives and must be vacated (just like the terminations) as illegal implementation of a now void and vacated agency action. But APHA Plaintiffs *also* challenge Defendants' refusal to consider applications based on the independent legal duty of Defendants to process applications. *See* ECF No. 1 ¶ 240; *see also* 42 C.F.R. § 52.5.

16

Although Defendants assert that Section 706(1) claims and Section 706(2) claims cannot be based on the "same legal theory," there is no legal bar to Plaintiffs challenging in the same suit both the Directives and the resulting refusal to process applications.[10] Because APHA Plaintiffs have sufficiently pled that NIH's failure to consider applications is an "agency action" that has been "unlawfully withheld" and/or "unreasonably delayed" under Defendants' own regulations, APHA Plaintiffs have met their burden and can maintain a Section 706(1) claim independent of any challenge to the Directives.

### III.    This Court Should Reject Defendants' 12(b)(6) Arguments.

#### A.    Processing applications is a discrete and mandatory duty.

Defendants argue that the Court cannot compel NIH to decide applications because doing so is not a discrete and mandatory duty. The Court has already addressed these arguments, holding that "NIH has not only withheld decisions on pending applications, but also removed submitted applications from study sections and withheld Notices of Award from previously approved submissions." ECF No 84 at 39. Accordingly, as alleged by APHA Plaintiffs, Defendants "have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them[,]" citing the requirement under 42 C.F.R. 52.5 that all applications be evaluated. The Court concluded that "[t]his raises a fact issue -- whether NIH is processing affected applications at all, as opposed to something else[.]" ECF No. 84 at 40. This ruling follows from Plaintiffs' well-pleaded complaint, which spells out Defendants' obligations in the application

---

[10] *See, e.g., Al Otro Lado, Inc. v. Mayorkas*, No. 23-CV-1367-AGS-BLM, 2024 WL 4370577, at *9–12 (S.D. Cal. Sept. 30, 2024) (in the context of CBP policy ordering certain asylum seekers to be "turned back," plaintiffs stated a claim challenging both the policy under 706(2) and each individual "turnback" under 706(1)); *Env. Def. Fund v. Regan*, No. CV 20-762, 2024 WL 3887383, at *9 (D.D.C. Aug. 20, 2024) *v't.* (where plaintiffs alleged both 706(1) and 706(2) claims and, as in the instant case, identified discrete regulatory basis for 706(1) claims, both categories were allowed to proceed).

process and their failures to follow that process here. *See* ECF No. 1 ¶¶ 49–60 (alleging detailed grant application process with citations to authorities obligating NIH to consider applications), 122–24, 162–94 (alleging detailed failures to adhere to that process for Plaintiff Maphis and a sample of fifteen individual Members from APHA and UAW).

In tension with their claim that they had no mandatory duty to decide applications, Defendants also assert that NIH *did* comply with its requirement to decide applications:

> HHS regulations expressly authorize the agency to "defer" making a final decision "because of either lack of funds or a need for further evaluation." 42 C.F.R. § 52.5(b). That is exactly what NIH briefly did here (before resuming issuing notices of award): NIH deferred decisions on grant applications due to a need to evaluate whether such applications were consistent with revised agency priorities following a change in administration. Making a final decision cannot be mandatory when the regulations permit deferring that decision.

ECF No. 131 at 23. But this argument fails to test the adequacy of APHA Plaintiffs' allegations, instead introducing (unsupported) assertions that NIH deferred applications in accordance with applicable law. *See supra*, Argument Section II.C. Indeed, Defendants ignore many of the application-related allegations—including that Defendants have removed certain applications from study groups and withheld NOAs from previously approved submissions—and also ignore the Court's core holding on these points: that, at most, a question of fact exists as to whether NIH is processing affected applications at all.[11] ECF No. 84 at 40.

### B. Processing applications is not committed to agency discretion.

Defendants next argue that all Phase 2 claims should be dismissed because the consideration of applications is committed to agency discretion. Defendants made the same argument before, ECF No. 66 at 24–25, and this Court rejected it, *see* ECF No. 84 at 14, 43–44.

---

[11] While unnecessary at the motion to dismiss stage, at the moment there is only undisputed evidence that NIH is *not* considering affected applications. *See* ECF No. 72–10 ¶¶ 2, 5 (Maphis attesting that, according to NIH's website, her MOSAIC application was "withdrawn" without notice); ECF No. 38-40 ¶¶ 10–11 (UAW Member 11 attesting that NIH notified him that he had received a fundable score on his F-31 diversity application but he received no NOA).

Undeterred by that prior ruling, Defendants assert that in the context of applications, APHA Plaintiffs must show NIH has a non-discretionary duty to adjudicate grant applications within a certain time frame. ECF No. 131 at 25–26. But there is a fundamental problem with Defendants' argument. Unlike in the immigration cases on which Defendants rely,[12] APHA Plaintiffs have alleged that NIH does have a regular schedule by which it considers applications, with three cycles per year. *See* ECF No. 1 ¶ 51 (describing "highly standardized peer review process"); ECF No. 38-26 ¶ 34. Defendants have unlawfully withheld or unreasonably delayed consideration of applications in light of that highly standardized process. *See* ECF No. 1 ¶ 167 (alleging that UAW Member 1 received a high score on their proposal but later learned their project would likely not be funded); ECF No. 1 ¶ 170 (alleging that UAW Member 3 received a perfect score on their proposal but that NIH will no longer communicate with them); ECF No. 1 ¶ 178 (alleging that UAW Member 8 had a highly scored proposal but was notified that the program to which they applied had been cancelled).[13]

### C. The Court should once again reject Defendants' arguments regarding 5 U.S.C. § 706(2).

Finally, Defendants argue that "[a]ny unreasonable delay claim under 5 U.S.C. § 706(2) should be dismissed." ECF No. 131 at 24–26. Here too, Defendants regurgitate arguments the Court has previously rejected and should summarily reject again.

As described above, APHA Plaintiffs have two applicant-related claims lodged in Counts I and III, which allege violations of 5 U.S.C. §706(2). *See* ECF No. 1 ¶¶ 210–12 (alleging under

---

[12] As Judge O'Toole expressed in concluding that the "pace" at which certain immigration-related applications is not subject to judicial review: "it is hard to ignore unmistakable congressional efforts increasingly to insulate executive decision-making in the area of immigration from judicial review." *Touarsi v. Mueller*, 538 F. Supp. 2d 447, 451 (D. Mass. 2008), a point that is not true for NIH applications.

[13] The available evidence also cuts in this direction. *See* ECF No. 72-10 ¶¶ 2–3 (Maphis attesting that her application was administratively withdrawn).

Count I that Defendants' refusal to consider applications for previously published NOFOs constitutes final agency action under the APA and that its refusal to consider properly submitted applications is arbitrary and capricious and contrary to regulations in violation of 5 U.S.C. §706(2)(A); *id.* ¶¶ 226, 230–231 (alleging under Count III that Defendants' refusal to review submitted grant applications runs afoul of statutory mandates in violation of 5 U.S.C. §706(2)(C)). The Court preserved Counts I and III in full despite Defendants' previous motion to dismiss those claims. *See* ECF No. 84 at 2, 43–44. That alone resolves this issue.

In any event, Defendants' arguments are without merit. First, for the reasons expressed above and in this Court's prior ruling, APHA Plaintiffs—including Maphis, APHA, and UAW—have standing to challenge agency inaction related to grants. *See supra*, Argument Sections II.A–B; *see also* ECF No. 84 at 16–21 (explaining standing of APHA and UAW). Second, APHA Plaintiffs challenge final agency action cognizable under the APA. The APA expressly defines "agency action" to include the "failure to act." 5 U.S.C. § 551(13). That's what happened here: Defendants "fail[ed] to act" by refusing to consider properly submitted applications of APHA Plaintiffs in accordance with NIH's policies and regulations, constituting reviewable "final agency action." *See id.* The cases Defendants cite do not disturb this basic tenet. Their lead case, *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095 (9th Cir. 2007), is inapplicable. The agency there did not yet have an opportunity to review the relevant grant application. *See id*. But here, APHA Plaintiffs allege that Defendants have refused review of those applications they concluded no longer effectuate agency priorities. *See* ECF No. 1 ¶¶ 210–12, 226, 230–31.

## CONCLUSION

For the foregoing reasons, APHA Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.

Dated: June 30, 2025

Respectfully submitted,

Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union**
**Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod
Alexis Agathocleous
Rachel Meeropol
Alejandro Ortiz
**American Civil Liberties Union**
**Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

Lisa S. Mankofsky
Oscar Heanue
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Shalini Goel Agarwal
shalini.agarwal@protectdemocracy.org
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

*/s/ Kenneth Parreno*
Kenneth Parreno
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Matthew D. Brinckerhoff
Ilann M. Maazel
Max Selver
Sydney Zazzaro
**Emery Celli Brinckerhoff Abady Ward &**
**Maazel LLP**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com
imaazel@ecbawm.com
mselver@ecbawm.com
szazzaro@ecbawm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 30, 2025 a true and correct copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

June 30, 2025                                    *<u>/s/ Kenneth Parreno</u>*
                                                 Kenneth Parreno